# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Gissing North America LLC,<br>a Delaware limited liability<br>company, | Case No. 22-46160 |
| | Hon. |
| Debtor. | |

## DECLARATION OF STEVEN R. WYBO IN SUPPORT OF CHAPTER 11 PETITION, FIRST-DAY MOTIONS, AND OTHER RELIEF

I, Steven R. Wybo, declare:

1.      I am the Chief Restructuring Officer ("CRO") of Gissing North America, a Delaware limited liability company ("GNA") headquartered in Bingham Farms, Michigan, along with its affiliated debtors and debtors in possession, all of which are Delaware limited liability companies: Gissing Sidney LLC ("Sidney), Gissing Technologies, LLC ("Technologies"), Gissing Technologies Mexico LLC ("Technologies-Mexico"), Gissing Auburn LLC ("Auburn"), Gissing Sumter LLC ("Sumter"), Gissing Fremont LLC ("Fremont"), and Gissing Greenville LLC ("Greenville," collectively with GNA, Sidney, Technologies, Technologies-Mexico, Auburn, Sumter and Fremont, "Debtors").

2. I am a Senior Managing Director at Riveron Management Services, LLC ("Riveron") in metropolitan Detroit, where I lead Riveron's automotive practice. I have over 20 years of experience providing turnaround, reorganization, M&A, and financial advisory services to distressed and underperforming companies. I assist clients with insolvency and bankruptcy matters, turnaround and crisis management, profit enhancement, mergers and acquisitions, business valuation, raising debt/equity capital, and liquidations both in and out of court. I have served as an interim chief financial officer, chief restructuring officer, interim chief operating officer, treasurer, and court-appointed receiver for numerous middle market clients. I also have experience in public accounting at PwC, where I was a senior associate. I earned an M.B.A. from the University of Michigan and a B.S. in Accounting from Michigan State University. I am a Certified Turnaround Professional, which means I have passed rigorous qualifications of education, experience, and testing in the fields of accounting, finance, and management pertaining to corporate restructurings, bankruptcy, workouts, and insolvencies.

3. I was retained as CRO of the Debtors on May 24, 2022. Riveron was also retained at that time to provide restructuring and financial advisory services.

4.     I have worked closely with the Debtors in analyzing their strategic alternatives and, as a result, I have become familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the Debtors' financial distress.

5.     The Debtors entered into an Accommodation Agreement and related agreements with four major customers and their senior secured lenders to obtain critical funding and other support to ensure Debtors' continued operations.  As described in more detail below, the Accommodation Agreement requires the Debtors to file for chapter 11 bankruptcy by August 8, 2022 to pursue an expedited sale.

6.     On the date of this Declaration ("Petition Date"), I understand that each of the Debtors will have filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") in the Eastern District of Michigan, and that the Debtors will have filed or will file motions and applications seeking urgently needed relief (collectively, "First-Day Motions").

7.     The Eastern District of Michigan was chosen by Debtors as the venue for these cases in consultation with Debtors' major stakeholders, and was selected due to the Court's extensive experience with automotive

supplier bankruptcies and its proximity to Debtors' headquarters, Debtors' stakeholders and their counsel.

8.     Except as otherwise indicated, all facts in this Declaration are based upon the following: (a) my personal knowledge, (b) my discussions with the management team and Debtors' advisors, (c) my review of documents and information about the Debtors' operations, financial affairs, restructuring initiatives, (d) information provided to me by members of the Debtors' management team and professionals retained by the Debtors, including Riveron, and/or (e) my opinion based on experience. If called upon to testify, I would testify competently to the facts in this Declaration.   I am authorized to submit this Declaration on behalf of the Debtors.

### A.     Overview of Debtors' Business

9.     Debtors are innovative and technology-driven suppliers of acoustic systems and weight reduction solutions for the automotive industry.  Debtors provide customers products that minimize noise, vibration, and harshness throughout a vehicle and reduce vehicle weight by using proprietary technology to deliver superior products.  Debtors have a network of manufacturing operations and technical centers throughout North America.

10.     Debtors' 2021 revenue was approximately $110 million and projected revenue for 2022 is approximately $136 million.  These revenue figures include revenue amounts from non-filing subsidiaries of Debtors.

11.     Debtors' acoustic solutions include the following business segments: overhead systems, interior systems, cargo management systems, exterior systems, and hard trim.

12.     Debtors' overhead systems business produces headliners, which are lightweight and improve the acoustics of the vehicle while eliminating odors and minimizing volatile organic compounds.

13.     Debtors' interior systems business produces high-quality, customizable products, including thermoformed and non-woven interior carpets, door armrests, and roof pillars, all of which provide acoustic solutions and reduce the weight of the vehicle.

14.     Debtors' cargo management systems business manufactures products that provide safe storage and increased load capacity while enabling superior acoustics throughout the vehicle.  Examples of these products include side trim, trunk trim, storage mats, load floors, and tool storage.

15.     Debtors' exterior systems products are designed to minimize sound disbursement from the vehicle, with ice and impact resistance

capabilities. Products in this business segment include wheel and fender liners, and splash shields.

16. Debtors' hard trim business line features lightweight, durable products used throughout the interior and exterior of the vehicle that have customizable modeling capabilities. Many of these products are made using a proprietary material, GSSF™, which patent is pending and is held by GNA's immediate parent, non-debtor Gissing Automotive Systems, LLC, a Michigan limited liability company ("GAS"), and licensed to Debtors. GSSF™ is a flexible, adjustable, and cost-effective alternative to injection molded trim widely used in vehicle interiors.

17. Like many automotive suppliers, Debtors use the "just-in-time" supply method, meaning that Debtors do not maintain a significant inventory bank of raw materials and components under their control, but instead rely on frequent shipments from their suppliers.

Debtors' Customers

18. Debtors' customers are primarily in the automotive market. Debtors work closely with some of the world's leading OEMs, including Tesla, General Motors, Toyota, BMW, Ford, and Stellantis.

19. Four major customers, Tesla, General Motors, Toyota, and BMW (collectively, "Accommodating Customers") have agreed to provide

financial and other accommodations to Debtors in connection with their purchase of component parts.  These accommodations are memorialized in the Accommodation Agreement with an effective date of July 18, 2022 (as amended by the Joinder (defined below), "Accommodation Agreement"), the original parties to which were Debtors, General Motors, Toyota, BMW, and The Huntington National Bank, as administrative agent for itself and Comerica Bank (collectively, "Lenders").  Debtors, GM, and Toyota are also the original parties to a related Access and Security Agreement with an effective date of July 18, 2022 (as amended by the Joinder (defined below), "Access Agreement"). Tesla and the other parties to the Accommodation Agreement and Access Agreement executed Tesla's Joinder to Accommodation and Access Agreement effective as of July 29, 2022 ("Joinder").

20.     The Accommodating Customers have agreed to fund Debtors' projected liquidity shortfall of over $14 million between now and the expected closing of a sale of Debtors' assets by October 31, 2022, via a combination of subordinated participations, surcharges, expedited payment terms, and limitations on their setoff rights.  The credit enhancements the Accommodating Customers have agreed to provide are the foundation for the Debtors' requested DIP Facility, and the Court's approval of the

Accommodation Agreement and Access Agreement is a condition precedent to the Debtors' ability to obtain post-petition financing to continue operations and bridge to an expected going concern sale.

<u>Manufacturing and Other Facilities</u>

21.    Debtors own or lease over 1.24 million square feet of space. Debtors have manufacturing locations in Sidney, Ohio; Auburn, Maine; Sumter, South Carolina; and Leon, Mexico.  Debtors own the facilities in Auburn and Sumter, lease the facility in Sidney, and lease and operate the facility in Leon, Mexico ("<u>Maquiladora Facility</u>") through their wholly owned subsidiaries, Gissing Guanajuato S. de R.L. de C.V and Gissing Mexico S. de R.L. de C.V. ("<u>Maquiladora Subsidiaries</u>") pursuant to the Mexican government's Maquiladora Program, with Gissing Sidney LLC as the United States partner.

22.    Debtors have engineering centers in Wixom, Michigan and Newark, California.  The facility in Wixom is leased by GNA, while the facility in Newark is leased by Gissing Fremont LLC.

23.    Debtors' nerve center and headquarters is in Bingham Farms, Michigan.

24.    Greenville also leased space in Fountain Inn, South Carolina in anticipation of an award of new business from an OEM.  That award did not

happen, and Greenville has subleased part of the space to a large Tier 1 supplier, covering approximately 50% of the monthly lease cost.

<u>Debtors' Workforce</u>

25.     Debtors employ approximately 332 employees throughout the United States, approximately 41 of whom are full time and employed directly by GNA.  The employees are not unionized.  Debtors also typically utilize numerous temporary workers.

**B.      Debtors' Corporate Structure**

26.     As illustrated in the corporate organization chart below, GNA owns, directly or indirectly, each of the other Debtors and the non-debtor Maquiladora Subsidiaries.

**Organizational Chart**



27.   GNA's members are non-debtor GAS (92%), William J. Vaughn (4%), and Steven B. Philips (4%).

28.   GNA directly owns 100% of the membership interests of Debtors Sidney and Technologies.

29.   Technologies owns 100% of the membership interests of Debtors Sumter, Auburn, Fremont, Greenville, and Technologies-Mexico.

30.   As for the non-debtor Maquiladora Subsidiaries, Technologies-Mexico owns 99.97% of the interests in Gissing Guanajuato S. de R.L. de C.V., with Technologies owning the remaining .03%, while Gissing Mexico

S. de R.L. de C.V.'s interests are owned by GNA (99.97%) and Technologies-Mexico (.03%).

**C.    Debtors' Financing**

31.    Debtors' day-to-day financing is provided through credit facilities from the Lenders.

32.    The Debtors and non-debtors, Conform Automotive, LLC, a Michigan limited liability company, and DTI Molded Products, Inc., a Michigan corporation, are borrowers under a Fifth Amended and Restated Credit Agreement dated June 18, 2019 (as amended, "<u>Credit Agreement</u>").

33.    The Credit Agreement is secured by a first priority lien on substantially all of the Debtors' assets as more particularly described in the Credit Agreement and the related loan documents (collectively, "<u>Loan Documents</u>"). Under the Credit Agreement, the Debtors had access to revolving credit and term loan facilities evidenced by the following notes ("<u>Notes</u>"): (a) Eighth Amended and Restated Revolving Note, (b) Second Amended and Restated Equipment Term Loan Note, (c) Second Amended and Restated Real Estate Term Loan Note, (d) Second Amended and Restated CapEx Note, and (e) Amended and Restated Second Amendment CapEx Note, in each case, dated October 29, 2021.

34.     The following table summarizes the Debtors' estimated

outstanding obligations under the Notes as of the Petition Date:

| 35. | Maturity | Interest | Outstanding Principal |
|---|---|---|---|
| Revolving Commitment | November 10, 2022 | Prime plus 3%, plus the Default Rate of 2% | $ 13,661,253.21* |
| Equipment Term Loan | November 10, 2022 | Prime plus 3%, plus the Default Rate of 2% | $4,350,000.00 |
| Real Estate Term Loan | November 10, 2022 | Prime plus 3%, plus the Default Rate of 2% | $5,916,666.55 |
| CapEx Term Loan | November 10, 2022 | Prime plus 3%, plus the Default Rate of 2% | $439,562.04 |
| Second Amendment CapEx Term Loan | November 10, 2022 | Prime plus 3%, plus the Default Rate of 2% | $686,834.88 |
| Total | | | $25,054,316.68 |

\* A portion of the outstanding amounts has been funded by certain
Accommodating Customers through Subordinated Last-Out
Participations

36.     The Debtors defaulted under the Loan Documents, which led

to a Forbearance Agreement dated November 30, 2021 (as amended,

"Forbearance Agreement"). Pursuant to the Forbearance Agreement, the

Lenders agreed to forbear from exercising certain rights and remedies

under the Loan Documents for a limited period of time, subject to certain

terms and conditions.

37.     GNA is also indebted to GAS, William H. Vaughn ("Vaughn"),

and Steven B. Phillips ("Phillips" collectively with GAS and Vaughn, "Permitted Holders") under a Third Amended and Restated Subordinated Promissory Note dated June 18, 2019, in the original principal amount of $7,300,000 ("Seller Note"). The Seller Note matures on January 1, 2025, and is guaranteed by, and secured by a lien on the assets of, Sidney (f/k/a FFT Sidney, LLC), Sumter (f/k/a FFT Sumter, LLC), Auburn (f/k/a FFT Auburn, LLC), and Technologies (f/k/a Formed Fiber Technologies, LLC). The obligations under the Seller Note accrue interest at 5.5% per annum, payable in kind on a quarterly basis. All of the liens and rights to payment are subordinated to the Lenders pursuant to an Amended and Restated Subordination Agreement dated June 18, 2019 by and between Lenders, Debtors (other than Fremont and Greenville), and the Permitted Holders ("Permitted Holders Subordination Agreement"). As of the Petition Date, there is $5,037,059 owing under the Seller Note.

38.    Also on June 18, 2019, the Permitted Holders and Lenders entered into a Keepwell Agreement (as amended, "Keepwell Agreement"), pursuant to which the Permitted Holders agreed to make investments in Debtors (other than Fremont and Greenville) in the form of extending loans or making capital contributions to cure Debtors' financial covenant defaults under the Loan Documents. Any loans

extended by the Permitted Holders pursuant to the Keepwell Agreement are subordinated to the Lenders in accordance with the Permitted Holders Subordination Agreement.  Under the Keepwell Agreement, GAS advanced loans to GNA evidenced by the following (a) a First Amended and Restated Promissory Note dated June 18, 2019, in the original principal amount of $1,000,000 ("GAS Note One"); (b) a Demand Promissory Note dated October 18, 2019, in the original principal amount of $2,000,000 ("GAS Note Two"); (c) a Demand Promissory Note dated April 1, 2020, in the original principal amount of $2,000,000 ("GAS Note Three"); (d) a Demand Promissory Note dated April 5, 2021, in the original principal amount of $1,000,000 ("GAS Note Four"); and (e) a Subordinated Promissory Note dated May 28, 2021, in the original principal amount of $6,825,000 ("GAS Note Five," and collectively with GAS Note One, GAS Note Two, GAS Note Three, and GAS Note Four, "GAS Notes").  As of the Petition Date, there is $12,956,491 owing under the GAS Notes.

39.    In addition, one of the Accommodating Customers, Tesla, provided financing pursuant to the following ("Tesla Notes"): (a) Note Payable executed by GNA dated April 25, 2022, in the original principal amount of $2,850,000; (b) Credit Note and Set Off Agreement by and

between GNA and Tesla dated April 22, 2022, in the original principal amount of $9,000,000, and (iii) Tesla Purchase Order No. 4700350669 dated December 3, 2021, in the original principal amount of $3,118,371.18, which was reduced by the amount shown in Line #240 of that order because the order was cancelled.  The Tesla Notes are secured by a second priority lien on substantially all of the Debtors' assets up to $5.7 million, and are subordinated to the Lenders pursuant to a Subordination Agreement dated July 29, 2022.

      **D.**    **Debtors' Unsecured Trade Debt.**

40.    There are approximately 600 unsecured creditors owed approximately $27,491,213.40 as of the Petition Date, and there are more than 6,000 parties listed on Debtors' mailing matrices.

      **E.**    **Events Leading to These Chapter 11 Cases**

41.    A combination of macroeconomic volatility and lower than expected operating efficiencies have resulted in significant and unsustainable financial losses for the Debtors, disrupting their growth strategy.

42.    From a macroeconomic perspective, the COVID-19 pandemic caused production to halt for approximately three months, resulting in losses, some of which were covered by a now-forgiven Payroll Protection

Program loan. Significant price increases for all input costs – material, labor, transportation and burden – have presented unprecedented challenges to Debtors and auto suppliers across North America. Debtors' core raw material, resin, has increased in price by approximately 49% since 2019. Two of GNA's top resin suppliers' average price per pound has increased approximately 57% since 2019.

43.     Not only have labor costs increased significantly, but there is a profound shortage of capable workers. This shortage forced Debtors, from November 2021 through April 2022, to use temporary employees from North Carolina in its Sidney, Ohio facility, incurring their lodging and meal costs in addition to paying them above-market wages.

44.     Inflationary and geopolitical headwinds continue to drive increases in fuel and freight costs.

45.     Debtors have experienced a number of unique setbacks in addition to the generally inhospitable manufacturing environment. The GM strike began in September 2019 and lasted six weeks. At the time, GM was Debtors' largest customer, and the shutdown had a significant negative effect on borrowing capacity and profitability.

46.     Debtors also experienced two major cyber-attacks on their computer network in late 2021, and a water main break at the Auburn facility in March 2022.

47.     Debtors have attempted to grow their manufacturing capabilities since 2020, including multiple program launches.  Scrap issues and labor inefficiencies have been driving margin erosion since 2021.  Over the past several months, Debtors have attempted to recruit an experienced Chief Operating Officer and have been unsuccessful in finding a candidate as of the Petition Date.

48.     Greenville leased space in Fountain Inn, South Carolina in anticipation of an award of new business from an OEM.  That award did not happen. Greenville incurred approximately $500,000 of sunk costs but has subleased part of the space to a large Tier 1 supplier covering approximately 50% of the monthly lease cost.

49.     Debtors' ultimate parent is a Chinese entity, Wuxi Gissing Auto Parts Co., Ltd. ("Wuxi").

50.     From 2019 through 2021, Wuxi funded over $36 million to support existing operations, viewing Debtors as a strategic growth asset to increase North American market share.

51.　Total Wuxi contributions exceed $45 million in various forms of equity and debt, in addition to funding approximately 100 expats from China to support Debtors' launches.

52.　Debtors unsuccessfully attempted to refinance their senior secured debt owing to the Lenders in the first quarter of 2022.

53.　I was retained as CRO of the Debtors in May 2022 as a condition of the Lenders' extension of the Forbearance Agreement.

54.　Debtors retained Wolfson Bolton PLLC on July 25, 2022 to begin preparing these chapter 11 cases.

55.　Debtors' Chief Executive Officer and President, Claudio Calado, resigned effective August 2, 2022.

**F.　The Accommodation Agreement and Proposed Sale Process**

56.　Following my retention as CRO, Debtors explored their options for preserving and maximizing value for all stakeholders.

57.　Toward that end, Debtors retained investment banking firm Livingstone Partners LLC on July 3, 2022 to advise them with respect to a potential sale of the Debtors.

58.　During this period, the Debtors continued to experience severe liquidity constraints and were unable to manage them with only the support and cooperation of the Lenders.

59. In addition to the Lenders' forbearance and support, the Accommodating Customers provided support to the Debtors through the Accommodation Agreement and related documents, including in the form of limitations on their setoff rights, accelerating their payments, agreeing to purchase their inventory in certain circumstances, limitations on resourcing, and funding the Debtors' liquidity shortfall via a combination of subordinated participations in Lender's loans and surcharges.

60. Debtors determined, in consultation with Livingstone Partners, Lenders, and the Accommodating Customers, that the best alternative for preserving and maximizing value for all stakeholders is an expedited process for the sale of their businesses as a going concern.

61. Debtors have agreed to a sale process with the following milestones:

i. The Debtors shall file for bankruptcy under chapter 11 of the Bankruptcy Code on or before August 8, 2022;

ii. The Debtors shall file with the Bankruptcy Court, on or before August 19, 2022 at 5:00 p.m. (Eastern Time), a motion, in form and substance reasonably satisfactory to Collateral Agent, the Required Lenders, and Accommodating Customers, requesting entry by the Bankruptcy Court of an order approving auction, bid and sale procedures for the sale of the Debtors' assets to one or more "Qualified Buyers" (as defined in the Accommodation Agreement);

iii. The Debtors shall obtain from the Bankruptcy Court, on or before September 12, 2022, an order approving the bidding

procedures, and providing that all bids are due by October 7, 2022;

iv. The Debtors shall conduct, on or before October 11, 2022, at or before 5:00 p.m. (Eastern Time), an auction for the sale of their assets to one or more Qualified Buyers and at the conclusion of the auction selected one or more Qualified Buyers ("Accepted Bidder(s)"), acceptable to the Collateral Agent and the Required Lenders;

v. A hearing to approve the proposed sale (the "Sale Hearing") to the Accepted Bidders pursuant to Section 363 of the Bankruptcy shall be conducted by the Bankruptcy Court on or before October 17, 2022 at 5:00 p.m. (Eastern Time), or as soon as reasonably practicable thereafter based upon the Bankruptcy Court's availability;

vi. The Debtors shall obtain, within two (2) business days of the Sale Hearing, an order from the Bankruptcy Court approving the proposed sale to the Accepted Bidder(s); and

vii. The closing of the sale(s) to the Accepted Bidder(s) shall occur on or before October 31, 2022.

**G. Debtors' Need for Postpetition Financing and Use of Cash Collateral**

62. To complete the expedited sale process, Debtors determined that it is necessary to file these chapter 11 cases and obtain postpetition financing to maintain liquidity sufficient to continue operating the Debtors' businesses during the period prior to the asset sales, which are to be completed by October 31, 2022.

63. After searching for postpetition financing from traditional lending sources, including Lenders, Debtors determined that it would not be

possible to obtain financing necessary to successfully complete these chapter 11 cases without the Accommodating Customers' substantial participation through the Accommodation Agreement.

64.     Therefore, Debtors sought postpetition financing with three components: support of the Accommodating Customers, postpetition financing, and use of cash collateral.

65.     After significant negotiations with the Lenders and the Accommodating Customers, Debtors were able to reach agreement on the terms of this multi-source postpetition financing arrangement that addresses Debtors' liquidity needs during the sale process.  Importantly, none of the components of Debtors' proposed postpetition financing is individually sufficient to satisfy Debtors' postpetition financing needs.  As a result, the approval of each component described in the proposed financing order is a condition precedent to the effectiveness of the others, and all components are necessary to the success of Debtors' chapter 11 cases.

66.     Simply put, Debtors have no other financing option to bridge to a sale process and avoid a winddown other than the multi-party financing arrangement presented to the Court for approval.

67.     Debtors do not have sufficient unencumbered cash to enable them to operate and require additional liquidity to finance their current

operations in the form of the § 364 financing requested in their DIP Financing Motion.

68.     Debtors are unable to obtain unsecured credit sufficient to maintain operations under Bankruptcy Code section 364(a) or (b), that is, by granting a lender administrative expense priority.

69.     Debtors are unable to obtain credit sufficient to maintain operations under Bankruptcy Code section 364(c), that is, by granting a lender a priority administrative expense claim, by granting a lender a lien on property of their estates that is not otherwise subject to a lien, or by granting a lender a junior lien on property of the Debtors' estates that is subject to a lien.

70.     The proposed financing from the DIP Lenders reflected in the DIP Credit Agreement and the Interim Order (a) is appropriate, (b) should meet the Debtors' business and financing needs for these chapter 11 cases, (c) is necessary to finance the restructuring process and allow the Debtors to pursue their restructuring goals and preserve value in these chapter 11 cases; and (d) is the most cost effective and beneficial financing – if not the only such financing – available to the Debtors.

71.     It is essential for the Debtors to immediately obtain the financing contemplated by the DIP Credit Facility to preserve and protect

the value of their estates. Based on the Debtors' financial forecasts, I believe the funding contemplated by the DIP Facility will provide the Debtors with sufficient liquidity to continue operating and to pursue their restructuring goals.

## I. Debtors' First-Day Motions

72. To enable Debtors to minimize the adverse effects of these Chapter 11 case, Debtors are filing several First-Day Motions

73. The First-Day Motions seek relief aimed at retaining employees, promoting an efficient and effective bankruptcy, maintaining Debtors' going-concern value, and maximizing the value of Debtors' assets.

74. I believe that the relief sought in the First-Day Motions is critical to achieving these goals.

75. The factual information contained in the First-Day Motions is true to the best of my knowledge, information, and belief and as indicated in paragraph eight to this Declaration. Any capitalized terms not expressly defined in this Declaration have the meanings given to them in the relevant First-Day Motions.

76. Nothing in this Declaration is intended to be or should be construed as an admission of the validity of debts, obligations, defaults, claims, security interests, liens, or any other rights or interests that may be

asserted against Debtors.

**EMERGENCY FIRST-DAY MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105(a), 361, 362, 363, AND 364 AND FEDERAL BANKRUPTCY RULES 2002, 4001, 6004, 9006, AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN SECURED POSTPETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) AUTHORIZING AND APPROVING ACCOMMODATION AND ACCESS AGREEMENTS; (IV) MODIFYING THE AUTOMATIC STAY; (V) SETTING FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

77.    Through this Motion, Debtors seek entry of the Interim Order, and ultimately a final order:

A. authorizing and approving, pursuant to section 364(c) and (d) of the Bankruptcy Code, the Debtors to obtain debtor-in-possession financing from the DIP Lenders pursuant to the terms and conditions of (a) the Interim Order and any Final Order, (b) the Debtor in Possession Credit Agreement dated August 8, 2022, by and among the Debtors, and the lenders referenced therein (the "DIP Loan Agreement"), the Loan Documents and all ancillary documents, instruments, agreements, including the Accommodation Agreement and Access Agreement, and writings referred to in the Interim Order, the DIP Loan Agreement or any final order and/or required to be executed by the Debtors in connection therewith

(collectively, the "<u>DIP Financing Documents</u>"), and (c) the budget attached to the Motion as Exhibit 6a (the "<u>Budget</u>") (collectively, the "<u>DIP Credit Facility</u>");

B. in connection with the DIP Loan Agreement, pursuant to Bankruptcy Code section 363(b), authorizing and approving the Accommodation Agreement and the Access Agreement, deeming them reaffirmed, ratified, and remade by Debtors postpetition, requiring Debtors to perform their obligations thereunder, and providing that the obligations of the Debtors thereunder constitute valid, postpetition obligations;

C. authorizing and approving, pursuant to sections 361 and 363(c) of the Bankruptcy Code, the Debtors' use of Cash Collateral of the Prepetition Lenders in accordance with the provisions of the Interim Order;

D. granting the Prepetition Lenders adequate protection, including, without limitation, (a) adequate protection against the diminution in the value or amount of the Prepetition Collateral, including certain payments, (b) Replacement Liens, and (c) administrative expense claims under sections 503 and 507(b) of the Bankruptcy Code, such Replacement Liens and

sections 503 and 507(b) administrative expense claims to be subject to the Carve-Out, and the liens, security interests and superpriority treatment granted to the DIP Lenders, as more particularly set forth in the Interim Order;

E. Authorizing the Debtors, subject to the Carve-Out, and only effective upon entry of the Final Order granting such relief, to prohibit surcharging of Collateral pursuant to section 506(c) of the Bankruptcy Code;

F. Vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement the provisions of the DIP Financing Documents and the Interim Order; and

G. Granting any further and related relief as the Court deems just and equitable.

78.     Without immediate approval of this financing for the Debtors to avoid immediate and irreparable harm before a final order can be entered, Debtors will be forced to winddown their operations.

79.     The financing is expected to provide Debtors a bridge to a sale to a buyer(s) to be determined.

80.     To complete the expedited sale process, Debtors determined

that it was necessary to file these chapter 11 cases and obtain postpetition

financing to maintain liquidity sufficient to continue operating the Debtors'

businesses during the period prior to the asset sales, which are to be

completed by October 31, 2022.

81.     After searching for postpetition financing from traditional lending

sources, including Debtors' existing lenders, Debtors determined that it

would not be possible to obtain financing necessary to successfully

complete these chapter 11 cases without credit enhancements from

Debtors' major customers.

82.     Therefore, Debtors sought postpetition financing with three

components: support of their major customers under an accommodation

agreement, postpetition financing, and use of cash collateral.  After

significant negotiations with the Debtors' prepetition secured lenders and

the Debtors' major customers, Debtors reached agreement on the terms of

this multi-source postpetition financing arrangement that addresses

Debtors' liquidity needs during the sale process.

83.     Importantly, none of the components of Debtors' proposed

postpetition financing is individually sufficient to satisfy Debtors' postpetition

financing needs.  As a result, the approval of each component described in

the proposed financing order is a condition precedent to the effectiveness

of the others, and all components are necessary to the success of Debtors' chapter 11 cases.

84.　The proposed financing from the DIP Lenders reflected in the DIP Credit Agreement and the Interim Order (a) is appropriate, (b) should meet the Debtors' business and financing needs for these chapter 11 cases, (c) is necessary to finance the restructuring process and allow the Debtors to pursue their restructuring goals and preserve value in these chapter 11 cases; and (d) is the most cost effective and beneficial financing – if not the only such financing – available to the Debtors.

**FIRST-DAY MOTION FOR ENTRY OF AN ORDER DIRECTING JOINT ADMINISTRATION OF DEBTORS' CHAPTER 11 CASES**

85.　Debtors seek entry of an order directing (a) the joint administration of Debtors' Chapter 11 cases under Fed. R. Bankr. P. 1015(b) and E.D. Mich. LBR 1015-1 for procedural purposes only, and (b) parties in interest to use the caption contained in the proposed order.

86.　Joint administration of these Chapter 11 cases will (a) ease the administrative burden on the Court and the parties, (b) protect creditors of different estates, and (c) simplify the United States Trustee's supervision of the administrative aspects of the Debtors' Chapter 11 cases.

87.     Debtors are eight affiliated entities.  Debtors anticipate that numerous notices, applications, motions, pleadings, hearings, and orders in these cases will affect all Debtors.  With eight affiliated Debtors, each with its own case docket, not jointly administering these cases would result in numerous duplicative filings and service of the filings.  This duplication would result in significant additional cost and delay and would unnecessarily overburden the Court.

88.     Joint administration would permit the Court to use a single general docket for the Debtors' cases and combine notices to creditors and other parties in interest.  Joint administration would also protect parties in interest by ensuring that parties in each case will be apprised of the matters before the Court in all the cases.

**DEBTORS' FIRST-DAY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE CONTINUED USE OF DEBTORS' PRE-PETITION CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, COMMERCIAL CARDS, AND BUSINESS FORMS**

89.     To avoid disruption to the normal operations of Debtors' businesses, Debtors seek entry of an order permitting Debtors to continue to use their pre-petition Cash Management System, Bank Accounts, Commercial Cards, and Business Forms in the ordinary course of Debtors' businesses.

90.     Debtors maintain a cash management and disbursement

system in the ordinary course of their businesses (collectively, "Cash Management System").

91.　　Debtors monitor their cash position on a daily basis through use of the Cash Management System.

92.　　Disbursements under the Cash Management System are controlled primarily by Debtors' financial personnel through Debtors' deposit and operating bank accounts at The Huntington National Bank ("Bank Accounts") as described on Exhibit 6a to the Motion.

93.　　Debtors utilize a centralized cash management system to manage cash disbursements and collections among the Debtors. On a daily basis, Debtors borrow against their credit facility and the funds are placed into GNA's operating account ending in 051. This is Debtors' main operating account, which is also used to transmit wires to third parties and to fund Debtors' payroll. Accounts receivable collections are deposited into GNA's deposit account ending in 048 and swept daily by Debtors' lender. GNA utilizes its cash disbursement account ending in 595 to issue paper checks to vendors and other creditors. Finally, GNA's cash disbursement account ending in 634 is used for ancillary payroll purposes (e.g., garnishments).

94.　　Through the Cash Management System, Debtors are able to

monitor the collection and disbursement of funds and maintain control over the administration of the Bank Accounts required to effect the collection, disbursement, and movement of cash related to Debtors' operations.

95.     In addition, the Cash Management System facilitates Debtors' ability to produce accurate financial reporting.

96.     Debtors then use funds in the Bank Accounts to pay Debtors' direct expenses, including payments to vendors, employees, and landlords.

97.     Debtors are parties to a commercial credit agreement with The Huntington National Bank.  Pursuant to the commercial credit card agreement, Debtors have access to a purchasing line of credit up to $190,000.  As more fully set forth on Exhibit 6b to the Motion, certain Debtors' management employees have credit cards issued under Debtors' commercial credit agreement (collectively, "Commercial Cards").

98.     Debtors utilize the Commercial Cards for administrative convenience in connection with small-value and internet purchases including, but not limited to, office supplies, airline tickets, and various maintenance supplies and other items.

99.     Debtors desire to continue the use of Commercial Cards post-petition in the ordinary course of Debtors' businesses as modified by this Motion.

100.   Debtors also request permission to continue to use their existing business forms and stationery, such as checks and purchase orders (collectively, "<u>Business Forms</u>") without alteration.

101.   Parties doing business with Debtors undoubtedly will be aware of Debtors' status as a Chapter 11 debtor-in-possession.

102.   Debtors do not print their business forms or stationery.

103.   Thus, substantial time and expense would be required if Debtors were required to print new business forms and stationery to indicate "debtor-in-possession."

104.   Changing business forms at this critical, early stage of these Chapter 11 cases would be expensive and burdensome to the Debtors' estates and present an unnecessary distraction.

105.   Considering the nature of Debtors' operations, it is often necessary for Debtors to conduct transactions by debit, wire, ACH payment, or other similar methods.

106.   In addition, a number of Debtors' receipts are received by wire transfer.

107.   To deny Debtors the opportunity to conduct business by debit, wire, ACH payment, or other similar methods would interfere with and unnecessarily disrupt Debtors' business operations, as well as create

additional costs to Debtors.

**DEBTOR'S FIRST-DAY MOTION FOR ENTRY OF AN ORDER (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE TO DEBTORS; AND (II) ESTABLISHING PROCEDURES TO DETERMINE REQUESTS FOR ADEQUATE ASSURANCE OF PAYMENT**

108.   Debtors seek entry of an order (i) determining that Debtors have provided each of their Utilities with "adequate assurance of payment" in compliance with § 366 of the Bankruptcy Code ("Adequate Assurance"); (ii) approving certain procedures ("Assurance Procedures") that provide for an initial offer of Adequate Assurance to the Utilities and a procedure for the Utilities to request additional or different Adequate Assurance; and (iii) prohibiting the Utilities from altering, refusing, or discontinuing utility services to Debtors.

109.   A list of substantially all of Debtors' utility providers (each a "Utility," and collectively, "Utilities") and the approximate monthly amount that Debtors pay each Utility is attached as Exhibit 6 to the Motion.

110.   The utility services provided by the Utilities to Debtors include electrical power, natural gas, water, telephone, and data services, including cellular phone service, rubbish removal and recycling, and similar utility products and services (collectively, "Utility Services").

111.   Debtors cannot operate without Utility Services provided by the

Utilities, and any disruption could cause significant damage to Debtors' on-going business operations and estates.

112. Debtors intend to pay when due all undisputed post-petition charges for Utility Services.

113. Debtors expect that their available cash will be more than sufficient to pay for Debtors' post-petition Utility Services.

114. Nevertheless, in accordance with § 366(c)(1)(A) of the Bankruptcy Code, Debtors propose to, as necessary in accordance with the procedures detailed here, deposit for the benefit of the Utilities a sum equal to $112,044.76, or approximately 25% of Debtors' estimated cost of monthly utility consumption calculated as a historical average over the immediately preceding seven months, into a newly-created, segregated, interest-bearing account ("Adequate Assurance Deposit Account") within 30 days after the Petition Date.

115. The Adequate Assurance Deposit Account will be increased in the event that there are any added Utilities, in an amount equal to the value of two weeks of services to Debtors (calculated as a historical average over the immediately preceding seven months) from such Added Utilities.

116. Debtors require the relief requested in this Utilities Motion to ensure that the Utilities will provide Debtors with post-petition Utility

Services without interruption.

117.  Debtors' operations depend upon water, gas, electricity,

telephone and data services, and various other utility services.

118.  Even a short-term interruption in Utility Services could cause

significant damage to Debtors' business operations.

**DEBTORS' FIRST-DAY MOTION FOR AN ORDER AUTHORIZING PAYMENT OF PRE-PETITION WAGES, COMPENSATION, AND EMPLOYEE BENEFITS**

119.  To continue their business operations for the benefit of all

creditors, and to minimize the personal hardship to Debtors' Employees

during this critical time, Debtors seek entry of an order authorizing, but not

directing, Debtors to:

      a.    pay and honor all pre-petition (i) Payroll, including Third-Party Deductions, Unpaid Wages and Salaries, and Payroll Processing Fees; and (ii) Employee Benefits, including Unpaid Savings Contributions, Unpaid Health Contributions, PTO, Unpaid Premiums, Attendance Bonus, and Unpaid Expense Reimbursements (collectively, the "Unpaid Amounts");

      b.    continue to maintain and provide all Employee Benefits in the ordinary course of Debtors' businesses;

      c.    pay all Unpaid Amounts required to be paid to the extent any amounts accrued pre-petition and/or accrued post-petition but relate to the period before the Petition Date; and

      d.     modify, cancel, discontinue, and/or replace, without the need for further notice or Court approval, any policies, plans, offerings, or programs relating to any Payroll or Employee Benefits as Debtors deem appropriate, and to pay any amounts necessary to effect a modification, cancellation, discontinuance, or replacement in the ordinary course of business without the need for further Court approval.

120.   In the ordinary course of Debtors' business operations, GNA directly employs approximately 332 full-time employees who work in different capacities for Debtors, including production, sales, accounting, management, and skilled labor.

121.   Of Debtors' employees, approximately 41 employees are salaried Employees ("Salaried Employees") and the remaining 291 are hourly Employees ("Hourly Employees," together with Salaried Employees, "Employees").

122.   Debtors use temporary staffing agencies to provide temporary workers daily.  At any given time, Debtor may be using the services of approximately 90 temporary workers.

123.   Temporary workers are paid directly by their respective staffing agencies, and Debtor is not responsible for withholdings with respect to temporary workers.

124.   Given the Employees' knowledge and understanding of Debtors' operations and customer relations, an effective restructuring of

Debtors would not be possible without the continued services of the Employees.

125.   If pre-petition wage, compensation, benefit, and reimbursement amounts are not received by Employees in the ordinary course, they will suffer extreme personal hardship and, in many cases, will be unable to pay their basic living expenses.

126.   Moreover, Debtors' failure to timely pay wages and compensation would destroy Employee morale and likely result in work stoppages and sudden and unmanageable Employee turnover in this historically tight labor market, causing immediate, pervasive, and irreparable damage to Debtors' on-going business operations and Debtors' ability to reorganize.

127.   Even a temporary work stoppage could cause Debtors immediate and irreparable harm given Debtors' business model, which relies on the sale of automotive component parts made by Debtors' Employees to Debtors' customers.

128.   In the ordinary course of their businesses, Debtors pay their Employees for, among other things, Employees' wages, salaries, and other compensation (collectively, "Payroll").

129.   Debtors pay wages and other compensation to their Salaried

Employees on a semi-monthly basis, which averages approximately $198,000 per pay period.

130.   Debtors pay wages and other compensation to their Hourly Employees on a weekly basis, which averages approximately $270,000 per pay period.

131.   Debtors' pay their Salaried Employees on the 15th and the last day of the month.

132.   Debtors' pay period for Hourly Employees is Monday through Sunday.

133.   For purposes of administration and distribution of Payroll, Debtors use Paylocity ("Payroll Provider").

134.   Debtors remit gross payroll amounts, which include the employee portion of all federal and state withholding taxes, the employer's share of federal, state, and local taxes to the Payroll Provider to fund Payroll.

135.   In addition, as a courtesy to Employees, Debtors permit Employees to take deductions from their gross payroll amounts for items such as, but not limited to, amounts owed on account of Employee's vehicle, home, or pet insurance and such amounts are then paid directly by Debtors to the third-party recipient on behalf of the Employee ("Third-Party

Deductions").

136. Third-Party Deductions average approximately $17,000 per month.

137. As of the Petition Date, Debtors owe approximately $334,000 to their Employees on account of accrued, but unpaid wages, salaries, and other compensation (collectively, "Unpaid Wages and Salaries"). This amount is inclusive of necessary tax withholding/deductions and Third-Party Deductions.

138. No individual is owed more than $15,150, the adjusted dollar amount for pre-petition wages entitled to priority under 11 U.S.C. § 507(a)(4).

139. Debtors also seek authority, but not direction, to pay any processing fees that may be owed to the Payroll Provider ("Payroll Processing Fees") in the ordinary course of Debtors' businesses. As of the Petition Date, Debtors are current with respect Payroll Processing Fees. Payment of Payroll Processing Fees is necessary in order for the Payroll Provider to process Unpaid Wages and Salaries on behalf of the Debtors.

140. In the ordinary course of their business operations, Debtors provide Employees benefits, including: (a) 401(k) savings plan; (b) health insurance (including dental) and the ability to participate in a health savings

plan; (c) paid personal time off; (d) short term disability insurance and life insurance; (e) an attendance bonus (applicable to certain Employees); and (f) other miscellaneous benefits such as employee expense reimbursement (collectively, "Employee Benefits").

141. Debtors offer a 401(k) and/or Roth tax-deferred savings plan match to eligible Employees equal to 100% of the first 2% of an Employee's payroll income up to a maximum amount of $4,000 annually.

142. Debtors' remit approximately $7,200 per pay period on account of Debtors' employer match.

143. Debtors' retirement plan is administered and held by Empower.

144. As of the Petition Date, Debtors owe accrued but unpaid employee savings contributions in the approximate amount of $7,200 (collectively, "Unpaid Savings Contributions").

145. Debtors' offer health and vision insurance through Blue Cross Blue Shield of Michigan to Employees, and Debtors cover 70%-80% of the premium cost of the health insurance coverage depending on the health care plan selected by the Employee. The premium cost not covered by Debtors is deducted from an Employee's payroll amount and paid to the health insurer.

146. Debtors remit approximately $50,000 per pay period to cover

the premium cost of Employee's health insurance coverage.

147.  Debtors also offer dental care coverage through Delta Dental of Michigan.  The dental plan is a self-funded plan and Debtors' remit approximately $10,000 per month to cover claims and coverage premiums.

148.  Out-of-pocket health insurance expenses are the responsibility of Employees, and Employees may voluntarily contribute to a health savings account plan that is administered by Navia Benefits.

149.  As of the Petition Date, Debtors owe accrued but unpaid health premiums in the approximate amount of $271,000 (collectively, "Unpaid Health Contributions").  Of the $271,000, approximately $19,000 is the Employee portion of Unpaid Health Contributions that is paid to the health insurer.

150.  In the ordinary course of Debtors' businesses, Debtors provide Employees with an amount of paid personal time off ("PTO") that varies depending on the Employee's tenure.

151.  The maximum amount of PTO that any Employee may accrue is up to 192 hours in a calendar year.  PTO may be rolled over from year to year, up to a maximum of 40 hours. Should an Employee's PTO exceed the Employee's available amount of PTO, any deficiency in PTO is deducted from an Employee's final paycheck upon termination of the

employment relationship.

152.  Debtors seek authority to honor, in their discretion, their PTO program in the ordinary course of business by allowing Employees to use accrued pre-petition PTO post-petition.  Debtors also seek authority, in Debtors' discretion and to the extent required by applicable non-bankruptcy law, to pay accrued pre-petition PTO amounts that are owed to Employees only if the Employee is terminated post-petition.

153.  Debtors offer Employees the opportunity to acquire short-term disability and/or life insurance coverage.

154.  Debtors pay all premium and administrative fees associated with the short-term disability and life insurance coverages provided to eligible Employees.

155.  Debtors remit approximately $5,100 per month for group life insurance premiums.

156.  Debtors remit approximately $11,500 per month for short-term disability premiums.

157.  As of the Petition Date, Debtors owe approximately $9,000 in short-term disability and life insurance unpaid premiums (collectively, "Unpaid Premiums").

158.  In certain states, Debtors provide an attendance bonus where

Employees receive a 5% bonus added to their wages if the Employees maintain a perfect work attendance for a work period and/or a 2% bonus added to Employees' wages if the Employee maintains a perfect attendance for a work quarter.

159. Given the on-going labor shortages and the nature of Debtors' business operations that require just in time production of automotive component parts, the attendance bonus facilitates Debtors' business operations by encouraging Employees to report to work.

160. As of the Petition Date, Debtors owe approximately $75,000 in unpaid Employee attendance bonuses (collectively, "Attendance Bonus").

161. In the ordinary course of business, some of Debtors' Employees incur expenses on behalf of Debtors for items such as business travel, business meals, car rentals, and limited tuition reimbursement.

162. Expense reimbursements average approximately $15,000 per month.

163. The expenses directly incurred by Employees for business purposes are submitted as an expense report with associated documentation to their direct manager for review and approval. The expense report is then sent to Debtors' HR Manager for final review, approval, and entry into Debtors' payroll system.

164.  As of the Petition Date, Debtors owe approximately $22,000 in unpaid and approved expense reimbursements (collectively, "<u>Unpaid Expense Reimbursements</u>").

165.  The Employees are vital to the continued operation of Debtors' businesses and to their successful sale and reorganization.

166.  Authorization to pay the Unpaid Amounts is necessary to prevent many of the Employees from suffering personal hardship and to maintain Debtors' businesses as a going concerns.

**DEBTOR'S FIRST-DAY MOTION FOR ENTRY OF AN ORDER GRANTING ADMINISTRATIVE EXPENSE STATUS TO UNDISPUTED OBLIGATIONS TO VENDORS ARISING FROM POST-PETITION DELIVERY OF GOODS AND SERVICES ORDERED PRE-PETITION AND AUTHORIZING DEBTORS TO PAY SUCH OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS**

167.  Debtors seek entry of an order authorizing, but not directing, Debtors to (i) grant administrative priority status to all undisputed obligations owing to Vendors arising from the post-petition delivery of goods and services that were ordered before the Petition Date; and (ii) pay obligations relating to post-petition Vendor performance in the ordinary course of business.

168.  In the normal course of Debtors' business operations, Debtors rely on various vendors, service providers, and suppliers (collectively,

"Vendors") to provide Debtors with parts, goods, and/or services necessary for Debtors' operations.

169.  For example, Debtors routinely issue purchase orders for raw materials, parts, and supplies necessary to complete production of automotive component parts.

170.  As of the Petition Date, Debtors have orders outstanding with various Vendors for goods and services Debtors ordered before their bankruptcy filing.

171.  Because of the commencement of Debtors' Chapter 11 cases, Vendors – especially those located outside of the United States and who may not be familiar with Chapter 11 and the protections afforded post-petition creditors under the Bankruptcy Code – may be concerned that the obligations arising from goods shipped or services ordered pre-petition but delivered post-petition will not be paid.

172.  Without the benefit of an order establishing that Debtors are authorized to pay for post-petition deliveries of goods and services under pre-petition agreements, Vendors may refuse to ship such goods, recall shipments in transit, or refuse to perform services unless Debtors issue substitute purchase orders post-petition.

173.  Any delays in delivery or performance could severely impact Debtors' just-in-time business operations and Debtors' ability to promptly meet the needs of Debtors' customers.

**DEBTORS' FIRST-DAY MOTION FOR ADDITIONAL TIME TO FILE SCHEDULES AND STATEMENTS OF FINANCIAL AFFAIRS**

174.  Debtors seek entry of an order extending the date by which they must file their Schedules and Statements by an additional 21 days, which would give them a total of 35 days after the Petition Date to complete them, making the Schedules and Statements due by September 12, 2022. Debtors seek this relief without prejudice to their right to seek a further extension if necessary.

175.  Due to the complexity of their businesses and the critical restructuring issues that have consumed the attention of the Debtors' key personnel and professionals, Debtors believe that they cannot complete their Schedules and Statements within the time limitation of Fed. R. Bankr. P. 1007(c).

176.  Debtors' personnel have faced and continue to face severe demands with respect to their time in initiating these eight Chapter 11 cases.  Additionally, Debtors' President and Chief Executive Officer resigned within the past week.

177. Debtors' personnel have been focused on other preparations for this case including negotiating a complex accommodation agreement with Debtors' major customers, conducting a sale process, amending their loan facilities, negotiating a DIP financing facility, and seeking other critical first-day relief while managing Debtors' liquidity, operational activities, and otherwise preparing these Chapter 11 cases.

178. Accordingly, Debtors require additional time to satisfactorily complete the Schedules and Statements.

179. Debtors have already commenced the extensive process of gathering the necessary information to prepare and finalize the Schedules and Statements but believe that the time provided by Bankruptcy Rule 1007(c) will not be sufficient to permit Debtors to complete them.

**DEBTORS' FIRST-DAY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO PAY PRE-PETITION TAXES, FEES, AND OTHER SIMILAR CHARGES AND RELATED OBLIGATIONS**

180. Debtors seek entry of an order authorizing, but not directing, Debtors to pay, in their sole discretion, Pre-Petition Taxes and associated fees, licenses, and other similar charges, and assessments or related obligations to the respective authorities in the ordinary course of the Debtors' businesses.

181. In connection with the normal operation of their businesses,

Debtors are obligated to pay taxing authorities various taxes (collectively,

"<u>Pre-Petition Taxes</u>") such as sales and use tax and commercial activity

taxes.

182. Debtors estimate that the outstanding Pre-Petition Taxes

include, but are not limited to, the following:

      i. Goods and services tax (GST) payable to Canada Revenue Agency. These taxes are paid monthly and Debtors are still reconciling this amount but presently believe that they are current on this tax.

     ii. Commercial activity tax (CAT) payable to the Ohio Department of Taxation. These taxes are paid quarterly and Debtors believe that the approximate amount owing is $26,567.00 as of the Petition Date.

   iii. Sales and use tax payable to Maine Revenue Services. These taxes are paid annually and Debtors are still reconciling this amount but presently believe that they are current on this tax.

   iv. Sales and use tax payable to the South Carolina Department of Revenue. These taxes are paid monthly and Debtors believe that the approximate amount owing is $753.74 as of the Petition Date.

183. Debtors have attempted to identify all Pre-Petition Taxes that

may be owing – other than real property taxes which Debtors do not

currently intend to pay – but the above list may be incomplete. Debtors

seek authority through this Motion to pay all Pre-Petition Taxes arising

before the Petition Date.

184. Debtors seek this relief to avoid potential audits, suspension of

Debtors' business operations, and personal liability of directors and/or responsible officers of entities responsible for collecting and paying taxes to the extent that such liability may exist and taxes are not remitted.

**DEBTORS' FIRST-DAY MOTION FOR ENTRY OF ORDER ESTABLISHING A SPECIAL SERVICE LIST AND AUTHORIZING USE OF A SINGLE CONSOLIDATED CREDITOR MATRIX**

185.   Debtors seek entry of an order establishing a special service list under Fed. R. Bankr. P. 2002 and E.D. Mich. LBR 2002-1, and authorizing Debtors' claims and noticing agent to utilize a single consolidated mailing matrix.

186.   There are approximately 600 unsecured creditors in Debtors' eight Chapter 11 cases and more than 6,000 parties on Debtors' mailing matrices.

187.   The establishment of the Special Service List is in the best interests of Debtors' estates because notice to all creditors would impose a substantial administrative and economic burden on Debtors.

188.   Further, utilization of a consolidated mailing matrix is in the best interest of Debtors' estates and creditors because it will permit Debtors, or Debtors' claims agent, to utilize one mailing matrix in circumstances where notice must be sent to all of Debtors' creditors.  This will allow Debtors to streamline efficiencies and reduce costs to Debtors' estates.

I declare, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 8, 2022

_____
Steven R. Wybo
Chief Restructuring Officer, Debtors

Executed in Troy, MI

{00117954.DOCX 6 }