EXECUTION COPY

# TESLA'S JOINDER TO
# ACCOMMODATION AGREEMENT AND ACCESS AGREEMENT

Tesla, Inc., for itself and on behalf of its subsidiaries and affiliates ("Tesla"), Gissing North America LLC, f/k/a Conform Gissing International, LLC, a Delaware limited liability company ("GNA"), Gissing Technologies LLC, f/k/a Formed Fiber Technologies, LLC, a Delaware limited liability company ("GT"), Gissing Sidney LLC, f/k/a FFT Sidney, LLC, a Delaware limited liability company ("Sidney"), Gissing Sumter LLC, f/k/a FFT Sumter, LLC, a Delaware limited liability company ("Sumter"), Gissing Auburn LLC, f/k/a FFT Auburn, LLC, a Delaware limited liability company ("Auburn"), Gissing Technologies – Mexico LLC, f/k/a Formed Fiber Technologies – Mexico, LLC, a Delaware limited liability company ("Gissing Mexico"), DTI Molded Products, Inc., a Michigan corporation ("DTI"), Conform Automotive, LLC, a Michigan limited liability company ("Conform"), Gissing Fremont LLC, a Delaware limited liability company ("Fremont"), and Gissing Greenville LLC, a Delaware limited liability company ("Greenville," and collectively with GNA, GT, Sidney, Sumter, Auburn, Gissing Mexico, DTI, Conform, and Fremont, "Supplier"), and The Huntington National Bank, a national banking association, in its capacity as agent (in that capacity, "Agent Bank"), for itself and the other financial institutions party to the Loan Documents[1] from time to time as lenders (collectively, together with the Agent Bank, the "Lending Group") (Agent Bank, Tesla and Supplier are collectively called the "Parties") enter into this Joinder to Accommodation Agreement and Access Agreement ("Joinder") as of July 29, 2022.

## RECITALS

A.    As of July 18, 2022, Supplier, certain of Supplier's customers and Agent Bank entered into the Accommodation Agreement (the "Accommodation Agreement"). A copy of the Accommodation Agreement is attached as Exhibit 1.

B.    As of July 18, 2022, Supplier and certain of Supplier's customers entered into an Access and Security Agreement (the "Access Agreement" and, together with the Accommodation Agreement, the "Agreements"), which was acknowledged and consented to by Agent Bank. A copy of the Access Agreement is attached as Exhibit 2.

C.    Supplier and Agent Bank have requested that Tesla join the Accommodation Agreement, so that Tesla will be included as a "Customer" as defined in the Accommodation Agreement. Tesla has requested to join the Access Agreement, so that Tesla will be included as a "Customer" as defined in the Access Agreement.

D.    Tesla has agreed to all the terms of the Agreements, except as expressly modified

---

[1] Capitalized Terms not defined herein have the meanings set forth in the Accommodation Agreement attached as Exhibit 1.

by this Joinder, such that Tesla (i) is, subject to Tesla's performance of the obligations of the "Customers" pursuant to the Agreements, entitled to all of the benefits received by the other "Customers" under the Agreements and (ii) will be bound by all the obligations of the Customers under the Agreements.

E.      Subject to the terms of this Joinder and the Agreements, Tesla has agreed to become a "Customer" under the Agreements and provide certain financial and other accommodations to Supplier and the Lending Group to support a sale process, Supplier has agreed to provide certain supply protection, acknowledgements and assurances to Tesla (similar to other Customers), and Agent Bank and the Lending Group have agreed to provide certain acknowledgements and assurances to Customers and to provide certain financial and other accommodations to Supplier to support a sale process.

F.      By signing the acknowledgment below, each of Supplier's other customers who previously executed one or both of the Agreements consents to the terms of this Joinder and agrees to be bound by the Agreement(s) that it previously executed, as modified by this Joinder.

Based on the foregoing recitals and other consideration, the accuracy, receipt, and adequacy of which are acknowledged, the Parties agree as follows:

## TERMS AND CONDITIONS

1.      Effective as of July 18, 2022, Tesla hereby joins the Agreements as a "Customer" and agrees to be bound by all the terms and conditions set forth therein, except as expressly modified in this Joinder.

2.      Supplier, Agent Bank and each of the Customers agree and consent to Tesla joining the Agreements pursuant to terms set forth herein.

3.      The following sentence is added to the end of the first paragraph of section 2 of the Accommodation Agreement (immediately prior to subsection (a) of section 2):

As to its accounts payable owing to Supplier for Component Parts or otherwise, whether generated before the Term and outstanding as of the Effective Date or generated on or after the Effective Date through the end of the date that is five (5) business days after the expiration of the Term, Tesla will not setoff, recoup or deduct any amount that Tesla has paid Supplier's vendors directly for raw materials necessary to continue production, or any amounts loaned to Supplier, including under various Credit Notes (both written and unwritten) and related documents, including notably, the following written documentation: (i) a signed writing entitled "Credit Note and Setoff Agreement" and dated April 22, 2022 in the amount of $9,000,000.00; (ii) a signed writing entitled "Note Payable" and dated April 25, 2022 in the amount of $2,850,000.00; and (iii) Tesla Purchase Order No. 4700350669 dated December 3, 2021 in the amount of $3,118,371.18 which was reduced by the amount shown in Line # 240 because the order was cancelled (collectively, "Credit Notes") or for amounts loaned to Supplier under the Subordinated Loan described in section 26 of the

Agreement (as modified below); provided, however, that nothing in this paragraph shall limit or restrict Tesla's ability to take Permitted Setoffs that arise on or after the Effective Date, in accordance with this Agreement.

4. Section 4 of the Accommodation Agreement is amended to add the language in **bold**:

Accelerated Payment. After taking into account Allowed Setoffs **and Permitted Setoffs**, each Customer shall pay accounts payable for Component Parts existing on the Effective Date and those arising on or after the Effective Date of this Agreement and through the end of the Term on terms of "net ten (10) days." All of each Customer's payments to any Supplier shall be made to Agent Bank to the applicable account(s) specified on Exhibit C (collectively, the "Designated Account").

5. The following sentence that appears in section 8(a) of the Accommodation Agreement is amended to delete the language shown as ~~stricken~~ and to add the language in **bold** as set forth below:

"Notwithstanding anything in this Agreement to the contrary, if, within ~~ten (10)~~ **eleven (11)** days of the Effective Date, any customer constituting greater than ten percent (10%) of sales at Supplier's Mexico facility does not enter into agreements providing Supplier with substantially the same economic benefits as those arising under this Agreement, with such Accommodation being effective as of the Effective Date, then any Customer may, at any time, resource all production of Component Parts from Supplier's Mexico facility (and any such resourcing shall be deemed a Permitted Resourcing)."

6. Section 9(b) of the Accommodation Agreement is amended and restated as follows:

(b) "Material Customers" means those customers among GM, Toyota, Tesla and BMW who have material production (i.e., greater than five percent (5%) in the aggregate per Transaction) at the locations covered by each respective Transaction. A schedule of the customers and Material Customers by Transaction is attached as Exhibit E.

7. Section 26 of the Accommodation Agreement is amended and restated as follows:

Purchase of Subordinated, Last-Out, Non-Voting Participation Interests/ Surcharge and Grant of Security Interest to Tesla. Simultaneously with entering into this Agreement, GM and Agent Bank and Lenders shall execute the Second Amended and Restated Subordinated, Last-Out, Participation Agreement ("GM Participation Agreement"). GM shall provide funding, consistent with the Budget, through the purchase of subordinated, last-out, non-voting participation interests in the Over Formula Advance (as defined in the GM Participation Agreement) in accordance with the GM Participation Agreement. In lieu of executing the GM Participation Agreement, Toyota and BMW agree to provide funding to Supplier by payment to Supplier of a surcharge in an amount up to the amount specified in the Budget (the "Surcharge"). Each time

that Supplier submits a funding request to GM under the GM Participation Agreement, Supplier shall simultaneously submit to Toyota and BMW a request for funding (a "Toyota and BMW Funding Request"). The amount of each Toyota and BMW Funding Request shall be equal to Toyota's and BMW's respective share of the total funding requested as identified by Supplier and consistent with the Budget. Toyota and BMW shall pay to Supplier by wire transfer in immediately available funds the amount of each Toyota and BMW Funding Request on the next business day after receipt of the Toyota and BMW Funding Request if received by 12:00 p.m. Columbus, Ohio time, and otherwise on the second business day.

Tesla shall be granted a security interest in all assets of Supplier (except Conform and DTI) ("Tesla Lien"), which security interest shall (a) secure an existing debt of $5.7 million owed to Tesla by Supplier (the "Subordinated Loan") and (b) be junior in priority to the security interest granted to the Agent Bank and Lenders. Concurrently with the grant of the security interest, Tesla shall deliver to Agent Bank a subordination agreement in form and substance satisfactory to Agent Bank. In addition, simultaneously with entering into its Joinder to the Agreement, Tesla and Agent Bank and Lenders shall execute a Subordinated, Last-Out, Participation Agreement ("Tesla Participation Agreement" and together with the GM Participation Agreement, the "Participation Agreements"). After the Effective Date, Tesla shall provide funding, consistent with the Budget, through the purchase of subordinated, last-out, non-voting participation interests in the Over Formula Advance (as defined in the Tesla Participation Agreement) in accordance with the Tesla Participation Agreement.

The participations granted to GM and Tesla under the Participation Agreements will be *pari passu*. If the rights and benefits of Lenders under the Loan Documents are assigned or deemed assigned to GM or Tesla in accordance with their respective Participation Agreements, such rights and benefits will be assigned or deemed assigned to both GM and Tesla on a *pari passu* basis. If the rights and benefits of Agent under the Loan Documents are assigned or deemed assigned to GM or Tesla in accordance with their respective Participation Agreements, such rights and benefits will be assigned to a designee selected by both GM and Tesla, provided that if such parties have not agreed upon and identified a designee to Agent within ten (10) days after written request from Agent, then Agent may designate GM or Tesla as the designee as selected by Agent in its sole discretion; the designee shall be deemed to be a successor to the Agent under the Loan Documents.

Tesla and GM shall enter into an intercreditor agreement to memorialize their agreement as to priority of their respective recoveries under the Participation Agreements and the Subordinated Loan, which shall be on *pari passu* basis.

8. The reference to "August 1, 2022" in section 9(a)(ii) of the Accommodation Agreement is amended to refer to "August 8, 2022."

9. The parentheticals in section 9 of the Accommodation Agreement that state "(excluding Conform Automotive, LLC)" shall be deemed amended to state "(excluding Conform Automotive, LLC and DTI Molded Products, Inc.)." For clarity, accounts and inventory of DTI

shall not constitute Eligible Accounts or Eligible Inventory for purposes of the Borrowing Base (as those terms are defined in the Loan Documents).

10. Tesla shall not be permitted to object to any sale(s) of Supplier's assets or business on the basis that its Subordinated Loan has not or will not be paid in full or in part.

11. It shall not be an Event of Default under section 32 of the Accommodation Agreement should the Tesla Lien be avoided, set aside, expunged, or otherwise impaired by any court or tribunal, including, without limitation any bankruptcy court. Notwithstanding the foregoing, it shall be an Event of Default under section 32 of the Accommodation Agreement (which Event of Default may be asserted by Tesla only) if any of the other Parties to the Accommodation Agreement in any way challenge the enforceability of the Tesla Lien.

12. Tesla's Customer Addendum, incorporated into the Accommodation Agreement in accordance with section 6 of the Accommodation Agreement, is incorporated into this Joinder and attached as Exhibit 3.

13. Section 31 of the Accommodation Agreement and section 23 of the Access Agreement are amended to add the following parties to receive notice under the respective Agreements:

|  |  |
|---|---|
| If to Tesla: | Legal Department |
|  | Tesla, Inc. |
|  | 3500 Deer Creek Road |
|  | Palo Alto, CA, 94304 |
|  | E-mail: elough@tesla.com |
|  |  |
| With a copy to: | DLA Piper LLP (US) |
|  | 2000 Avenue of the Stars |
|  | Suite 400 North Tower |
|  | Los Angeles, California |
|  | 90067-4735 |
|  | Email: Eric.Goldberg@us.dlapiper.com |

14. Exhibit A to the Accommodation Agreement is amended and restated as set forth on the revised Exhibit A attached to this Joinder as Exhibit 4.

15. Exhibit E to the Accommodation Agreement is amended and restated as set forth on the revised Exhibit E attached to this Joinder as Exhibit 5.

16. Exhibit F to the Accommodation Agreement (the Budget) for each Customer will be updated to reflect the Tesla participation pursuant to the Tesla Participation Agreement.

17. For the avoidance of doubt, Section 29 of the Accommodation Agreement applies to this Joinder.

4888-8393-8859_4

18. Unless otherwise modified herein, the remaining terms of the Agreements remain in full force and effect and apply to Tesla, Agent Bank, Supplier and the other Customers who are parties to such Agreements, as applicable.

Supplier, Tesla and Agent Bank have executed this Joinder as of the date first written above.

[Signature pages follow.]

4888-8393-8859_4

**SUPPLIER:**

**GISSING NORTH AMERICA LLC,**
 a Delaware limited liability company

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**GISSING TECHNOLOGIES LLC,**
 a Delaware limited liability company

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**GISSING SIDNEY LLC,**
 a Delaware limited liability company

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**GISSING SUMTER LLC,**
 a Delaware limited liability company

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**GISSING AUBURN LLC,**
 a Delaware limited liability company

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**GISSING TECHNOLOGIES MEXICO LLC,**
a Delaware limited liability company

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**CONFORM AUTOMOTIVE, LLC,**
a Michigan limited liability company

By: _____

Name: _____

Title: _____

**DTI MOLDED PRODUCTS, INC.,**
a Michigan corporation

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**GISSING FREMONT LLC,**
a Delaware limited liability company

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**GISSING GREENVILLE LLC,**
a Delaware limited liability company

By: _____

Name: CLAUDIO CALADO

Title: CEO & President

**GISSING TECHNOLOGIES MEXICO LLC,**
a Delaware limited liability company

By:_____
Name: _____
Title: _____

**CONFORM AUTOMOTIVE, LLC,**
a Michigan limited liability company

By:_____
Name: _STEVEN PHILLIPS_____
Title: _CEO_____

**DTI MOLDED PRODUCTS, INC.,**
a Michigan corporation

By:_____
Name: _____
Title: _____

**GISSING FREMONT LLC,**
a Delaware limited liability company

By:_____
Name: _____
Title: _____

**GISSING GREENVILLE LLC,**
a Delaware limited liability company

By:_____
Name: _____
Title: _____

**TESLA:**

**TESLA, INC.,**
A Delaware corporation

By: Roshan Thomas (Jul 31, 2022 16:24 PDT)
Name: Roshan Thomas
Title: VP Supply Chain

**AGENT BANK:**

**THE HUNTINGTON NATIONAL BANK,**
**as Agent Bank (for itself and the Lending**
**Group)**
By: _____
Name: _Nelson Rauscher_
Title: _Vice President_

**ACKNOWLEDGED AND CONSENTED TO:**

**GENERAL MOTORS LLC,**
a Delaware limited-liability company

By: _____
Name: _____ M. J. FISCHER _____
Title: _____ DIRECTOR, SUPPLY RISK MGT _____

**TOYOTA MOTOR ENGINEERING &
MANUFACTURING NORTH AMERICA,
INC.,**
a Kentucky corporation

By: _____
Name: _____
Title: _____

**BMW SLP S.A. de C.V.**
a San Luis Potosí, Mexico corporation

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**ACKNOWLEDGED AND CONSENTED TO:**

**GENERAL MOTORS LLC,**
a Delaware limited liability company

By:_____
Name:_____
Title:_____

**TOYOTA MOTOR ENGINEERING &**
**MANUFACTURING NORTH AMERICA,**
**INC.,**
a Kentucky corporation

By:_____
Name:___Robert Young_____
Title:___Group Vice President___

**BMW SLP S.A. de C.V.**
a San Luis Potosí, Mexico corporation

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

[Signature page to Joinder]

## ACKNOWLEDGED AND CONSENTED TO:

**GENERAL MOTORS LLC,**
  a Delaware limited liability company

By: _____
Name: _____
Title: _____


**TOYOTA MOTOR ENGINEERING &
MANUFACTURING NORTH AMERICA,
INC.,**
  a Kentucky corporation

By: _____
Name: _____
Title: _____


**BMW SLP S.A. de C.V.**
  a San Luis Potosí, Mexico corporation

By: _____
Name: _Christian Ceno H._____
Title: _Head of Accounting._____

By: _____
Name: _Gerardo Iñigo_____
Title: _Legal Counsel_____

EXHIBIT 1

Accommodation Agreement

4888-8393-8859_4

## ACCOMMODATION AGREEMENT

General Motors LLC, for itself and on behalf of its subsidiaries and affiliates ("GM"), Toyota Motor Engineering & Manufacturing North America, Inc., for itself and on behalf of its subsidiaries and affiliates ("Toyota"), BMW SLP S.A. de C.V., for itself and on behalf of its subsidiaries and affiliates ("BMW" and collectively with GM and Toyota "Customers" and each a "Customer"), Gissing North America LLC, f/k/a Conform Gissing International, LLC, a Delaware limited liability company ("GNA"), Gissing Technologies LLC, f/k/a Formed Fiber Technologies, LLC, a Delaware limited liability company ("GT"), Gissing Sidney LLC, f/k/a FFT Sidney, LLC, a Delaware limited liability company ("Sidney"), Gissing Sumter LLC, f/k/a FFT Sumter, LLC, a Delaware limited liability company ("Sumter"), Gissing Auburn LLC, f/k/a FFT Auburn, LLC, a Delaware limited liability company ("Auburn"), Gissing Technologies – Mexico LLC, f/k/a Formed Fiber Technologies – Mexico, LLC, a Delaware limited liability company ("Gissing Mexico"), DTI Molded Products, Inc., a Michigan corporation ("DTI"), Conform Automotive, LLC, a Michigan limited liability company ("Conform"), Gissing Fremont LLC, a Delaware limited liability company ("Fremont"), and Gissing Greenville LLC, a Delaware limited liability company ("Greenville," and collectively with GNA, GT, Sidney, Sumter, Auburn, Gissing Mexico, DTI, Conform, and Fremont, "Supplier"), and The Huntington National Bank, a national banking association, in its capacity as agent (in that capacity, "Agent Bank"), for itself and the other financial institutions party to the Loan Documents (as defined below) from time to time as lenders (collectively, together with the Agent Bank, the "Lending Group") (Agent Bank, Customers and Supplier are collectively called the "Parties") enter into this Accommodation Agreement ("Agreement") as of July 18, 2022 ("Effective Date").

## RECITALS

A.   Supplier is obligated to manufacture certain component parts, service parts, assemblies and/or other products (other than Tooling (defined below)) for Customers (collectively, "Component Parts") under various purchase agreements, supply contracts, general terms and conditions, release requests or purchase orders issued by Customers to Supplier and accepted by Supplier (together with any replacement, substitute and new purchase orders, "Purchase Orders").

B.   Supplier, certain affiliates of Supplier, and Agent Bank and the Lending Group are parties to various loan and security agreements (collectively, together with any future agreements and amendments which may be entered into between Agent Bank or the Lending Group and Supplier, the "Loan Documents"). The Loan Documents include the Forbearance Agreement (as defined below). The indebtedness outstanding under the Loan Documents is secured by a lien on substantially all of Supplier's real and personal property assets.

C.   Supplier acknowledges that any material lapse in production and/or delay in shipment of the Component Parts or any material breach of any Purchase Order may cause irreparable harm to Customers.

D.   Supplier has informed Customers that the loans available under the Loan Documents, together with the working capital generated by Supplier's business, are

insufficient sources of cash to meet the production schedule for the Component Parts.

E.  Subject to the terms of this Agreement, Customers have agreed to provide certain financial and other accommodations to Supplier and the Lending Group to support a sale process, Supplier has agreed to provide certain supply protection, acknowledgements and assurances to Customers, and Agent Bank and the Lending Group have agreed to provide certain acknowledgements and assurances to Customers and to provide certain financial and other accommodations to Supplier to support a sale process.

Based on the foregoing recitals and other consideration, the accuracy, receipt, and adequacy of which are acknowledged, the Parties agree as follows:

## TERMS AND CONDITIONS

1  Term.  "Term" means the date beginning on the Effective Date and ending on the earlier to occur of: (a) the occurrence of an Event of Default (as defined below) (solely as to a Customer exercising its right to terminate due to the occurrence of an Event of Default), but only with respect to a Customer or Customers that has or have given three business days' prior written notice (unless production for such Customer has been interrupted, in which case the Term may be terminated immediately upon written notice to the Supplier, Agent Bank, and the other Customers stating that the Term is terminated) of the Event of Default to Supplier, Agent Bank and all other Customers together with a statement that it or they are resourcing; (b) the closing of a Transaction (as defined below), but only with respect to the Supplier location(s) that are covered by each Transaction; or (c) 11:59 pm EDT on October 31, 2022 (the "Termination Date").  For the avoidance of doubt, after the occurrence of an Event of Default, the Term shall continue in effect for all Customers electing not to give written notice of the Event of Default and election to resource. In addition, (i) if a Transaction closes that does not include all of Supplier's locations, the Term shall continue in effect with respect to all remaining Supplier locations, and (ii) if an Event of Default occurs under Section 32(h) with respect to less than all of Supplier's locations or less than all Material Customers (defined below), the Term shall continue in effect with respect to all remaining Supplier locations, or all remaining Material Customers, respectively.

## Customer Accommodations

2  Limitation on Setoffs.  Customers are entitled, under the terms of the Purchase Orders and otherwise under applicable law, to exercise rights of setoff, recoupment, deduction or defense.  Notwithstanding such rights, as to all accounts payable owing by Customers to Supplier for Component Parts or otherwise (including accounts payable owing to Supplier's Mexican affiliates and accounts related to Tooling), whether generated before the Term and outstanding as of the Effective Date or generated on or after the Effective Date through the end of the date that is five (5) business days after the expiration of the Term, for the sole and exclusive benefit of Lending Group, each Customer agrees not to exercise its rights

of setoff, recoupment, or other deduction of any kind, including, without limitation, with respect to any prior, existing or future defaults under any Purchase Orders, or any defenses, rights or claims (including, without limitation, claims for any incidental, special or consequential damages) (all of the preceding, each a "Setoff" and collectively "Setoffs"), except for "Allowed Setoffs," "Material Setoffs," "Tooling Setoffs", "Ordinary Course Setoffs" (each defined below), and Setoffs for short shipments, misshipments, improper invoices, mispricing, and duplicate payments or billing errors (collectively, "Billing Errors"). Allowed Setoffs, Material Setoffs, Tooling Setoffs, Ordinary Course Setoffs, and Setoffs for Billing Errors are collectively called "Permitted Setoffs". In the case of Material Setoffs and Tooling Setoffs, Customer must give Agent Bank and Supplier written notice of the amount of the Material Setoff and Tooling Setoff (each, a "Setoff Notice") and (1) such Material Setoffs may only be asserted against accounts payable arising from shipments made by Supplier more than three business days after Agent Bank's and Supplier's receipt of such Setoff Notice and (2) such Tooling Setoffs may only be taken against tooling payables. Certain Customers have previously provided and will continue to provide certain materials, components or services to Supplier in the ordinary course under existing and future supply agreements and have taken and may continue to take Setoffs with respect to amounts owed to Customer under such supply agreements in the ordinary course ("Ordinary Course Setoffs"). Any such Customer shall provide written notice to Supplier and Agent Bank with respect to Ordinary Course Setoffs that it takes. As of June 27, 2022, each Customer represents and warrants (A) that the amount of each Customer's accounts payable owing by it to Supplier for Component Parts, Tooling, or otherwise (including accounts payable owing to Supplier's Mexican affiliates) are not less than the amounts listed on Exhibit A (collectively, the "Specified Accounts") and (B) that the Specified Accounts are not subject to any Setoffs (other than Permitted Setoffs, but not Billing Errors). As of June 27, 2022, each Supplier represents and warrants that the amount it owes to Tooling vendors and Tooling repairmen is as listed on Exhibit B. Supplier's Chief Restructuring Officer (the "CRO") shall certify to Agent Bank on each day the amount of Tooling Setoffs and Ordinary Course Setoffs. Without limitation, the Tooling Setoffs and the Ordinary Course Setoffs will be reserved from the borrowing base under the Loan Documents. In addition, as to any of their respective accounts payable owing to Supplier for Component Parts or otherwise, whether generated before the Term and outstanding as of the Effective Date or generated on or after the Effective Date through the end of the date that is five (5) business days after the expiration of the Term, (i) Toyota will not setoff, recoup or deduct the Toyota Contribution, the Additional Toyota Contribution (each as defined in that certain letter agreement among Toyota, Agent Bank and Supplier dated June 30, 2022) or its Surcharge (defined below), and (ii) BMW will not setoff, recoup, or deduct its Surcharge (defined below). Further, (x) this Agreement replaces the Letter Agreement Regarding Setoff Limitations dated July 7, 2022 executed by BMW, Agent Bank and certain Supplier entities, but does not terminate or amend the assignment documents executed in connection therewith, (y) this Agreement supersedes and fully replaces the Letter Agreement regarding Credit Enhancements to The Huntington National Bank related to Gissing North America LLC (f/k/a Conform Gissing International, LLC), and Certain of its Affiliates dated June 30, 2022 executed by GM and Agent Bank, and (z) the Letter

44484769.8

Agreement Regarding Setoff Limitations dated June 30, 2022 executed by Toyota, Agent Bank and Supplier shall not be replaced or superseded by this Agreement but, in the event of a conflict, this Agreement shall control.

(a)     "Allowed Setoffs" means Setoffs for (1) any and all defective or nonconforming Component Parts, quality problems, recall costs, warranty costs, unordered or unreleased parts returned to Supplier, premium freight charges (not caused by Customer) necessary to avoid production interruption, but excluding any incidental, special or consequential damages arising from or relating to such items and (2) Customer's reasonable professional fees and costs incurred relating to Supplier ("Professional Fees"); provided, however, in no event may Allowed Setoffs exceed five percent (5%) of the face amount of a bona fide invoice or group of invoices (the "Allowed Setoff Cap"). Customers may deduct the amount of the Allowed Setoffs that exceeds the Allowed Setoff Cap against any subsequent invoices or group of invoices, subject to the Allowed Setoff Cap. Upon request by Supplier or Agent Bank, each Customer shall provide reasonably detailed written substantiation of any Permitted Setoffs asserted by such Customer. For clarity, Billing Errors, Tooling Setoffs, Material Setoffs, and Ordinary Course Setoffs are not subject to the Allowed Setoff Cap.

(b)     "Material Setoffs" means Setoffs first arising after the Effective Date for (1) materials or components delivered to Supplier or services performed for Supplier, purchased by a Customer from persons other than Supplier or supplied by a Customer to Supplier for use in connection with the production of Component Parts by Supplier for that Customer (other than Ordinary Course Setoffs), or (2) direct payment(s) to material or service vendors by or on behalf of a Customer for the purchase of materials or components or services used by Supplier in connection with the production of Component Parts by Supplier for that Customer.

(c)     "Tooling Setoffs" means Setoffs for any payment to a tooling vendor or tooling repairman for all or part of the purchase price or repair price of Tooling (defined below) that is used by Supplier in connection with the manufacture, assembly or transportation for a Customer's Component Parts (existing and future) for which the Customer reasonably determines such payment is necessary to secure the release of, or prevent assertion of, any valid and perfected lien against Tooling or is required to obtain possession of Tooling from the Tooling vendor or tooling repairman.

3     Reservation of Certain Rights. Subject to the terms of this Agreement, each Customer expressly reserves and does not waive any rights, claims and interests it may have against Supplier, including, without limitation, Setoffs asserted with respect to accounts arising more than five (5) business days after the Termination Date (excluding accounts arising in connection with each Customer's inventory-purchase obligations under this Agreement and the Access Agreement (as defined below) and all accounts and other amounts arising in connection with Customer's payment obligations for Purchased Assets) and Setoffs asserted for defensive

purposes against any claims of any nature that may be asserted against such Customer by Supplier (excluding claims for breaches of this Agreement) or any third party (excluding the Lending Group).

4        <u>Accelerated Payment</u>.  After taking into account Allowed Setoffs, each Customer shall pay accounts payable for Component Parts existing on the Effective Date and those arising on or after the Effective Date of this Agreement and through the end of the Term on terms of "net ten (10) days."  All of each Customer's payments to any Supplier shall be made to Agent Bank to the applicable account(s) specified on <u>Exhibit C</u> (collectively, the "<u>Designated Account</u>").

5        <u>Inventory Purchase</u>.  For the sole and exclusive benefit of Agent Bank and Lending Group (and Customers as it relates to inventory located at or procured by Supplier for use at Supplier's Mexico facility), Customers agree that upon the occurrence of a Trigger Event (as defined below) following completion of a physical inventory by Supplier, which Supplier agrees to complete as soon as possible after a Trigger Event and which may be observed by Customers and the Lending Group, that Customers shall purchase from Supplier, Agent Bank, any receiver for Supplier, any bankruptcy trustee, or any other party lawfully acting for the benefit of the Agent Bank or Supplier as applicable, all of the following that are useable (as defined below) and merchantable (as defined below) as of the date of the Trigger Event: all of Supplier's raw materials (including purchased components) and finished-goods inventory of Component Parts manufactured for the applicable Customer; provided that (1) in the event of a resourcing, such inventory is related exclusively to the resourced Component Parts, (2) in the event a Customer has exercised access, are located at the facility where the Customer has exercised access (collectively, "<u>Inventory</u>"), and (3) Supplier makes such Inventory available for pick up by such Customer free and clear of all liens and security interests within seventeen (17) days (or, in the event that the inventory is sold via UCC Article 9 secured party sale or via a bankruptcy sale, then within twenty-five (25) days) of the Trigger Event and, during that time, permits such Customer to conduct an inspection of such Inventory to determine whether it is usable, merchantable, and complies with all applicable specifications therefor, including, but not limited to, quality and performance.  Customer agrees to pay the Inventory Purchase Price (as defined below) for any Inventory purchased under this Section to Agent Bank for account of Supplier by wire transfer to the Designated Account without Setoff (including Permitted Setoffs).  In addition, any useable and merchantable Inventory shipped to a Customer under the normal release schedule (or as otherwise requested by a Customer) after a Trigger Event and before the physical inventory is completed is treated as Inventory purchased by such Customer under this Section (including that Customer must pay for such Inventory without Setoff (including Permitted Setoffs) by wire transfer to the Designated Account).

(a)        "<u>Trigger Event</u>" means, subject to Subsection 5(i) below, the earliest of: (i) a resourcing by a Customer permitted under the terms of this Agreement of some or all of its Component Part production from Supplier (provided that a resourcing by a Customer of less than all of its Component Parts shall trigger a purchase obligation only as to Inventory related to the resourced

Component Parts and shall trigger the Option only as to Dedicated Equipment related to the resourced Component Parts); (ii) an Event of Default occurs under this Agreement or the Loan Documents and, in connection with such Event of Default, Customer invokes its right of access under the Access Agreement (provided that a right of access exercised as to less than all of Supplier's facilities shall constitute a Trigger Event only as to the Inventory and Dedicated Equipment located at the facility at which the right of access is exercised); (iii) the date on which the Forbearance Period under the Forbearance Agreement terminates and Agent Bank advises Customers and Supplier in writing that it is declining an advance request by Supplier on two or more consecutive days and that it is exercising its rights under this Section; or (iv) the date on which the Term terminates or expires as to any Customer or any plant (but the Term shall only be deemed terminated with respect to such Customer or such plant). For clarity, if Supplier closes on a Transaction for a particular plant and such Transaction includes a sale of the Inventory at such plant, Customers shall not be required to purchase such Inventory that has been purchased by the purchaser of that plant. Notwithstanding anything contained in this Agreement to the contrary, each Customer shall be required to purchase Inventory under this Agreement (as opposed to the Purchase Orders) only upon the occurrence of a Trigger Event, provided that the seller thereof can make the Inventory available for pick up and purchase by Customer or its designee free and clear of all liens and security interests (other than liens (1) that are discharged by operation of law upon purchase or (2) with respect to which the Agent Bank has provided an indemnity to the Customer on terms acceptable to Agent Bank in its discretion) within twenty-five (25) calendar days after the Trigger Event; provided, however, the determination of whether the Inventory is usable and merchantable shall be made as of the date the Inventory is made available to Customer ("Determination Date").

(b)     The price for Inventory to be purchased under this Agreement (the "Inventory Purchase Price") is:

(i)     for raw materials (including purchased components) - 100% of Supplier's actual and documented cost of the raw materials and components; and

(ii)     for finished Component Parts – one hundred percent (100%) of the Purchase Order price as existed on the Effective Date (and as may be amended with Agent Bank's prior written consent).

All prices under this Section are available Ex Works (EXW) Supplier's dock and are payable on terms of "net immediate."

(c)     To the fullest extent permitted under applicable law, any warranties related to Inventory that are received by Supplier from its suppliers shall be deemed to pass to the applicable Customer upon such Customer's purchase of such Inventory.

(d)    "merchantable" means merchantable as that term is defined in Uniform Commercial Code ("U.C.C.") § 2-314 (as enacted in Michigan and Ohio) and in conformance with applicable Purchase Order specifications reasonably applied and/or as previously accepted.

(e)    "usable" means Inventory relating to the Component Parts that is not obsolete on the Determination Date, is available for pick up by Customer in accordance with Section 5(a), and is capable of being used by Customer (or Customer's alternative supplier(s) of the Component Parts) in connection with manufacturing the Component Parts for which Customer has Unsatisfied Releases.

(f)    "Unsatisfied Releases" means the quantity of Component Parts provided in the releases, fabrication, raw material or similar authorizations issued by Customer and in effect as of the Trigger Event, minus the quantities of Component Parts shipped by Supplier after receipt of such releases and authorizations.

(g)    Commercially Reasonable Sale.  Supplier does not object to any purchase by Customer of any Inventory at any time under the terms of this Agreement.  Supplier acknowledges that the sale and the Inventory Purchase Price paid by Customer shall constitute a commercially reasonable sale in all respects (including method, time, place and terms) at a commercially reasonable price.

(h)    Obligation to Purchase Foreign Inventory.  To avoid doubt, Customers shall be obligated under this Section to purchase Inventory located in Mexico when a Trigger Event occurs. If sale(s) by Supplier of Inventory located in Mexico to GM or BMW in connection with a resourcing in Mexico occurs, the proceeds from such sales in an aggregate amount not to exceed $500,000 shall be applied by Agent Bank to the Revolving Loan and not subject to a Reserve (as defined in the Loan Documents).

(i)    Conversion of Raw Materials to Finished-Goods Inventory.  After a Trigger Event occurs, if requested by a Customer, Supplier shall use commercially reasonable efforts to convert all raw materials dedicated to each Customer into finished-goods inventory of Component Parts within ten (10) days following such Trigger Event, and such finished goods shall be subject to purchase under this Section 5. In no event shall work-in-process constitute Inventory subject to the purchase requirements hereunder.

6    Additional Customer Accommodations.  Each Customer shall provide Supplier with the additional accommodations, if any, set forth in the Customer-specific addendum to this Agreement attached as Exhibit D (each, a "Customer Addendum").  There shall be a separate Customer Addendum for each Customer. Agent Bank and Supplier agree to maintain the confidentiality of each separate Customer Addendum on the terms provided in this Agreement, and agree that the Customer Addendum for each particular Customer shall not (unless otherwise allowed by this Agreement) be shared with the other Customers or any other third

44484769.8

parties.

7      Commercial Claims. Each Customer shall work in good faith to resolve the open
       commercial claims identified in the Customer Addendum attached hereto as
       Exhibit D within thirty (30) days of the Effective Date. Payments with respect to
       such commercial claims are called "Commercial Claims Payments;" provided,
       however, Commercial Claims Payments shall reduce such Customer's funding
       contributions under Section 26 of this Agreement on a dollar-for-dollar basis.
       Customer and Supplier shall give Agent Bank five (5) business days' prior written
       notice of the amount and date of each Commercial Claims Payment before any
       Commercial Claims Payment is made.

8      Limitation on Resourcing. Notwithstanding anything in the Purchase Orders to
       the contrary, during the Term, except as otherwise provided in a Winddown Plan
       (as defined below) or in the case of a Permitted Resourcing (as defined below),
       during the Term, subject to Subsection 8(b) below, Customers shall not resource
       production of any Component Parts to an alternative supplier. Notwithstanding
       the foregoing, each Customer may take any action that such Customer deems
       necessary or useful, in its sole discretion, to prepare for a resourcing ("Resource
       Preparation"), which includes, without limitation: (i) discussing, negotiating, and
       executing agreements with an alternative supplier(s) relating to Component Parts
       currently produced by Supplier; (ii) purchasing sample or prototype Component
       Parts from an alternative supplier(s); and (iii) Permitted Resourcing (as defined
       below). This limitation on resourcing does not prohibit Customers from reducing
       or ceasing orders under Purchase Orders temporarily or permanently because of:
       (x) the COVID-19 pandemic or other supply chain disruptions; (y) ordinary course
       normal business fluctuations, including, without limitation, reductions in
       consumer demand; and (z) ordinary course product, engineering, or program and
       model changes, cancellations or modifications. Without limiting Customers'
       obligations under the following Section, this limitation on resourcing is not a
       commitment by any Customer to retain any of its business with Supplier after the
       Termination Date.

       (a)    "Permitted Resourcing" means, as to any particular Component Part, the
              resourcing of production of such Component Part(s) that Customer,
              Supplier and Agent Bank agree in writing may be resourced from Supplier
              to a third party (including, without limitation, pursuant to any written
              agreement executed by such parties prior to the Effective Date). For clarity,
              upon the occurrence of an Event of Default, Customers may terminate the
              Term of this Agreement and resource production of Component Parts,
              subject to all other applicable obligations of Customers pursuant to this
              Agreement. Notwithstanding anything in this Agreement to the contrary, if,
              within ten (10) days of the Effective Date, any customer constituting greater
              than ten percent (10%) of sales at Supplier's Mexico facility does not enter
              into agreements providing Supplier with substantially the same economic
              benefits as those arising under this Agreement, with such Accommodation
              being effective as of the Effective Date, then any Customer may, at any
              time, resource all production of Component Parts from Supplier's Mexico
              facility (and any such resourcing shall be deemed a Permitted Resourcing).

-8-

(b)    <u>Component Parts Excluded From Resourcing Limitation</u>.  The Component Parts that Supplier and each Customer have, prior to the Effective Date, agreed will be resourced are identified on each Customer's Customer Addendum and such Component Parts are not subject to the resourcing limitation prescribed by this Section 8.

## Supplier's Obligations

9    Sale Process.

(a)    Supplier shall immediately and diligently commence a sale process for a going-concern asset or majority equity sale of its business to a Qualified Buyer (as defined below) on terms and conditions satisfactory to each Material Customer and Agent Bank (the "Sale Process").  Each sale transaction is defined as a "Transaction."  Each Customer shall use commercially reasonable efforts to cooperate with Supplier and Agent Bank to support the Sale Process, provided that Customers shall not be required to extend any price increases or other accommodations to any purchaser and further provided that Purchase Orders may not be assigned to any purchaser of the assets or business of Supplier (other than Qualified Buyers) without the prior written consent of the applicable Customer (with such consent subject to the terms of the Purchase Orders).  Supplier has retained Livingstone Partners, LLC (the "Investment Banker"), an investment banker acceptable to Agent Bank.  Supplier will cause Investment Banker to provide Customers and Agent Bank with regular, written weekly updates regarding the progress of the Sale Process and shall otherwise keep the Customers and Agent Bank reasonably informed on all material developments in respect to the Sale Process.  Supplier further agrees to continue the retention of financial and operational advisors mutually acceptable to Supplier, Agent Bank, and the Customers through Supplier's satisfaction of the Sale Milestones (defined below), and Agent Bank and Customers acknowledge that Riveron Management Services, LLC is acceptable.  Supplier shall not grant any prospective purchaser "exclusivity" without Agent Bank's prior written consent.  Supplier agrees to conduct the Sale Process in accordance with the following sale milestones (each, a "Sale Milestone", or collectively, the "Sale Milestones"):

(i)    **Out-of-Court Process**:

- Within thirty-five (35) days of the Effective Date of the Accommodation Agreement, Supplier (excluding Conform Automotive, LLC) shall deliver to each of the Material Customers (as defined below) and Agent Bank one or more nonbinding expressions of interest on terms and conditions reasonably satisfactory to the Customers and Agent Bank.

- Within sixty-five (65) days of the Effective Date, Supplier (excluding Conform Automotive, LLC) shall have selected a Qualified Buyer to enter into one or more Transactions for the

-9-

sale of its locations (the "<u>Transaction(s)</u>") on terms reasonably acceptable to Agent Bank and each of the Material Customers (defined below) at those locations;

- By no later than October 15, 2022, provided that not all Qualified Buyers have withdrawn from the Sale Process, Supplier (excluding Conform Automotive, LLC) must have entered into purchase agreements on terms and conditions satisfactory to each of the Material Customers and Agent Bank for the Sale Process to close by October 31, 2022; and

- By no later than October 31, 2022, Supplier (excluding Conform Automotive, LLC) shall have closed each Transaction with a Qualified Buyer on terms reasonably acceptable to Agent Bank and each of the Material Customers at those locations.

(ii) **<u>In-Court Process</u>:** If, after consultation with Agent Bank and Material Customers, Supplier decides to complete the Sale Process through a court-supervised process –

- By August 1, 2022, Supplier (excluding Conform Automotive, LLC) shall have filed a bankruptcy petition under Chapter 11 of the U.S. Bankruptcy Code, or some other court process (the "<u>Court</u>");

- By September 12, 2022, Supplier (excluding Conform Automotive, LLC) shall have obtained an Order from the Court approving bidding procedures providing that all Qualified Bids are due by October 7, 2022, and setting a sale hearing by October 17, 2022; and

- By October 31, 2022, Supplier (excluding Conform Automotive, LLC) shall have closed each Transaction with a Qualified Buyer on terms reasonably acceptable to Agent Bank and each of the Material Customers at those locations.

(b) "<u>Material Customers</u>" means those customers among GM, Toyota, and BMW who have material production (i.e., greater than five percent (5%) in the aggregate per Transaction) at the locations covered by each respective Transaction. A schedule of the customers and Material Customers by Transaction is attached as <u>Exhibit E</u>.

(c) For purposes of this Agreement, a "<u>Qualified Buyer</u>" means a buyer which: (a) possesses the financial capabilities, business plan, and management structure to effect the acquisition and subsequent operation of, or otherwise effect a majority investment in, Supplier's business and operations without interrupting the supply of Component Parts to, and the manufacture or acquisition of Tooling and capital equipment for, Customers; (b) has

44484769.8

sufficient working capital, financial stability, and economic resources to meet Customers' production needs for Component Parts in the future; (c) agrees to assume (to extent there is an asset sale) the Purchase Orders without modification; (d) is otherwise acceptable to each Material Customer, in its reasonable discretion; and (e) has made a purchase commitment sufficient to repay all obligations under the Loan Documents in full or otherwise satisfy the obligations under the Loan Documents in Agent Bank and Lending Group's reasonable discretion. Nothing in this Agreement or otherwise requires any Customer to agree to the assumption and assignment of any of its Purchase Orders by a Qualified Buyer.

(d)     Within the timeline defined by the Sale Milestones, Supplier will support the Sale Process and Transaction by: (1) maintaining and making available to Qualified Buyers and their consultants, a data room with financial and legal information about Supplier's assets and operations; (2) hosting tours of Supplier's operations and hosting management meetings for Qualified Buyers and their consultants; and (3) using its best efforts to enter into definitive purchase and sale agreements, on commercially reasonable terms and conditions, for the sale to one or more Qualified Buyers.

10      Budget.  During the Term:

(a)     Supplier will pay only ordinary and necessary expenses of its operations in accordance with a budget that covers the period through October 31, 2022 that is attached as Exhibit F (the "Budget"), provided that Customers and Supplier may, at their option, amend the Budget without the consent of Agent Bank and the Lending Group to the extent that any such amendment does not necessitate the provision of accommodations by Agent Bank and the Lending Group in addition to those provided by Agent Bank and the Lending Group in this Agreement. Customers will provide funding to Supplier, including in accordance with Section 26, only in accordance with the Budget;

(b)     Supplier will provide Customers and Agent Bank actual Budget data on a weekly basis;

(c)     Supplier will make no distributions, dividends or other payments (including, but not limited to, management fees, performance bonuses, management incentive payments, interest, principal, or other related fees) to any of its owners, members, shareholders or other related parties of Supplier, except current base salary to Supplier's management to the extent included in the Budget; and

(d)     The Budget shall assume that Supplier will obtain loans under the Loan Documents up to the maximum amount available under the Loan Documents.

11      Winddown Plan. If the Sale Process is terminated or fails with respect to any of Supplier's locations, Supplier, Agent Bank and the respective Customers who have production in such location agree to negotiate in good faith a separate

winddown plan (each a "<u>Winddown Plan</u>") for such location.

12    <u>Tooling Acknowledgment</u>.  Supplier acknowledges and agrees that exclusive of Supplier Owned Tooling and Unpaid Tooling (each defined below), all Tooling that has been, is now or may be utilized to manufacture, assemble or transport Component Parts by Supplier for a Customer, whether under direct agreements between Supplier and a Customer or agreements between Supplier and third parties ("<u>Customer Tooling</u>"), is subject to the terms of this Agreement and is (i) owned ("<u>owned</u>" means paid for by the applicable Customer or otherwise, or delivered by such Customer to Supplier) by the applicable Customer (or affiliates of such Customer, or another supplier to such Customer); and (ii) is being held by Supplier and, to the extent that Supplier has transferred the Customer Tooling to third parties, by such third parties, as bailees-at will.  This Section is referred to as the "<u>Tooling Acknowledgment</u>."

(a)    "<u>Tooling</u>" means collectively all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, documentation including engineering specifications and test reports, together with all appurtenances, accessions, attachments, parts, substitutions, replacements and accessories, and all returnable dunnage (racks, containers, bins, etc.) used or useable by Supplier in connection with its manufacture, assembly and/or transport of the Component Parts for a Customer.

(b)    "<u>Unpaid Tooling</u>" means Tooling manufactured for a Customer for which such Customer has not made full payment under the applicable purchase order agreement with Supplier.

(c)    "<u>Supplier Owned Tooling</u>" means Tooling which Supplier asserts is not owned by a Customer and which is not subject to a purchase order issued by a Customer.

(d)    Within thirty (30) days from the Effective Date, Supplier will provide each Customer and Agent Bank with a list (a "<u>Tooling Schedule</u>") of Supplier Owned Tooling and Unpaid Tooling relating to such Customer's Component Parts (which shall not be binding on Customers or Agent Bank). Any Tooling that has been or is utilized to manufacture Component Parts for a Customer that is not on the Tooling Schedule for such Customer will be deemed Customer Tooling for that Customer and the failure to timely deliver a Tooling Schedule to a Customer is an acknowledgment by Supplier that the Tooling that has been or is utilized to manufacture Component Parts for a Customer is Customer Tooling for that Customer.

(e)    Each Customer and Agent Bank reserves the right to notify the other Parties of a dispute regarding Supplier's list of Supplier Owned Tooling and Unpaid Tooling for up to thirty (30) days following Customer's and Agent Bank's receipt of such list (a "<u>Disputed Tooling Notice</u>"). Any Tooling identified in a Disputed Tooling Notice is defined as "<u>Disputed Tooling</u>." To the extent a Customer or Agent Bank does not timely assert a dispute in a Disputed Tooling Notice with respect to an item on such list, such Customer

-12-

or Agent Bank (as applicable) shall be deemed to agree with Supplier's designation of such item. If a dispute regarding the listing of any Tooling as Supplier Owned Tooling or Unpaid Tooling cannot be resolved by Supplier, Agent Bank and the applicable Customer within thirty (30) days of the date the dispute arises, the matter shall be jointly submitted to a third party to be selected by Agent Bank, Supplier and such Customer for expedited resolution, with costs to be shared equally by Supplier and such Customer. Notwithstanding anything contained herein to the contrary, in the event of a dispute, provided that such Customer places the Disputed Tooling Payment (as defined below) in escrow with an independent third party agreed to by such Customer and Agent Bank without Setoff (other than Setoffs permitted by this Agreement), the applicable Customer shall be entitled to immediate possession of such items of Disputed Tooling. The "Disputed Tooling Payment" shall be an amount equal to: (i) in the case of Unpaid Tooling, the difference between the Purchase Order price of the Disputed Tooling and the amount that the Supplier acknowledges that the applicable Customer has paid therefor; and (ii) in the case of Supplier Owned Tooling, the difference between the net book value, but not less than twenty percent (20%) of the original purchase price of the Disputed Tooling and the amount that the Supplier acknowledges that the applicable Customer has paid therefor.

(f)     Upon payment of the applicable purchase order price for any item of Unpaid Tooling to the Designated Account (a portion of which purchase order price may be satisfied by Tooling Setoffs taken in accordance with this Agreement) such Unpaid Tooling will deemed to be Customer Tooling. Other than as provided in this Agreement, nothing in this Agreement modifies Customers' obligations to Supplier on account of Unpaid Tooling.

(g)     Neither Supplier nor, to Supplier's knowledge, any other person or entity other than Customer (or its affiliates) shall have any right, title or interest in Tooling determined to be Customer Tooling other than Supplier's rights, subject to Customer's discretion, to utilize the Customer Tooling in the manufacture, assembly or transportation of the Component Parts. Subject to the limitations on resourcing set forth in this Agreement, without further notice or court hearings, each Customer and its affiliates have the right to take immediate possession of its respective Customer Tooling at any time without payment of any kind to Supplier should Customer elect to exercise such right, so long as removal of such Customer Tooling from Supplier's equipment may be accomplished without damage to Supplier's equipment and real estate, and Supplier hereby agrees to cooperate with each Customer in its taking possession of its respective Customer Tooling. Without further notice or court hearings, which rights, if any, are hereby waived, subject to the immediately preceding sentence, such Customer shall have the right to enter immediately the premises of Supplier and take possession of any and all of its respective Customer Tooling, and Supplier agrees to provide such Customer or its nominee(s) with such access; provided, however, such Customer shall not unreasonably interfere with Supplier's ongoing manufacturing operations when removing its respective Customer Tooling

-13-

and such Customer shall promptly repair any damage to Supplier's assets (including real estate) caused by such removal. Any failure to provide to a Customer its Customer Tooling or any Disputed Tooling (subject to payment into escrow that may be required as described above) in accordance with this Section will result in irreparable harm to such Customer for which money damages would be an inadequate remedy. In the event of such failure, such Customer shall be entitled to equitable relief (including injunctive relief) to require Supplier to release such Customer Tooling to the Customer without any requirement to prove irreparable injury or post bond as a condition to such relief.

(h)     Supplier grants to each Customer permission to record on Supplier's behalf any notice financing statements (or take such other similar actions in jurisdictions outside the United States) with respect to such Customer Tooling, which such Customer determines are reasonably necessary to reflect its interest in the Customer Tooling. Supplier also authorizes each Customer to affix any plate, stamp or other evidence of such Customer's ownership upon each item of Customer Tooling. The acknowledgements, rights and obligations contained in this subsection are (i) in addition to the rights of Supplier and a Customer under the Purchase Orders or any other agreement between Supplier and a Customer currently in effect, and (ii) will continue in effect after the expiration or termination of this Agreement.

13     Option.  As an expansion of and in no way a limitation of the rights of each Customer under its Purchase Orders, Supplier grants to each Customer an irrevocable and exclusive option to purchase free and clear of all liens, claims, encumbrances, and security interests  (the option granted under this Agreement is called the "Option"), to be exercised either (i) with respect to Supplier Owned Tooling and Dedicated Equipment that relate to production that is subject to a Permitted Resourcing, only within thirty-five (35) days after a Permitted Resourcing, or (ii) within thirty-five (35) days after the Term ends, to purchase any Supplier Owned Tooling and any machinery or equipment (along with any related accessions, attachments, parts, accessories, substitutions, replacements, documents, software and appurtenances, as applicable) that is (a) owned by Supplier, (b) used and useable solely for the manufacture, assembly or transport of Component Parts for that Customer, and (c) identified on Exhibit G, which shall be provided by Supplier no later than fifteen (15) days after the Effective Date (collectively, "Dedicated Equipment"), (i) for Dedicated Equipment, at the gross orderly liquidation value for such Dedicated Equipment listed on Gordon Brothers appraisal dated November 15, 2021 and for Dedicated Equipment that is not contained in such appraisal, Supplier's net book value, but not less than twenty percent (20%) of the original purchase price of such Dedicated Equipment, and (ii) for Supplier Owned Tooling, at a price agreed to by Supplier, Agent Bank, and such Customer or if Supplier, Agent Bank, and such Customer cannot agree on the price for Supplier Owned Tooling, at the greater of the unamortized value or 50% of the cost of the Supplier Owned Tooling (collectively, the "Dedicated Equipment Purchase Price"). Once approved in writing by Customers and Agent Bank, for itself and on behalf of the Lending Group, (which shall occur within ten (10) days of receipt) Exhibit G shall be deemed included as part of this Agreement. The

44484769.8

Option shall also extend to Supplier Owned Tooling and Dedicated Equipment that is used in the production, assembly or transportation of Component Parts for one Customer and also for other Customers or customers, provided the affected Customers or customers consent. A Customer may exercise the Option by (1) providing written notice to Supplier, Agent Bank and the other Customers pursuant to the terms of this Agreement and (2) paying the Dedicated Equipment Purchase Price to the Specified Account without Setoff (including Permitted Setoffs) within ten (10) days of exercising each Option. Notwithstanding any other term or condition of this Agreement, the Option terminates with respect to all assets sold to a Qualified Buyer (whether directly in an asset sale or indirectly through an equity-interest sale). Upon exercise of the Option and payment of the Dedicated Equipment Purchase Price, Purchaser shall have the right to take immediate possession of the Dedicated Equipment without further payment of any kind and to own, operate, use and enjoy, sell, assign, transfer and/or convey the same, and Supplier hereby agrees to cooperate with Purchaser in its taking possession and control of the Dedicated Equipment. Upon such Customer's purchase of an item of Dedicated Equipment that constitutes Supplier Owned Tooling, such item shall constitute Customer Tooling under this Agreement.

(a)     Supplier warrants all U.S. Dedicated Equipment and Supplier Owned Tooling that each Customer purchases using the Option (collectively, the "Purchased Assets") to be free and clear of all liens, claims, encumbrances, and security interests. Each Customer and Supplier agree that any sale under this Section is commercially reasonable in all respects, including method, pricing, time, place, and terms.

(b)     If a Customer exercises the Option, Supplier shall grant such Customer and its assignee(s) or designee(s) (for no additional consideration) a royalty-free, irrevocable, and fully transferrable world-wide license or sublicense (as applicable and to the extent Supplier has a right to convey such license and/or sublicense, and provided that such Customer pays any applicable third-party royalty or licensing fees) to use: (i) all Intellectual Property (as defined below) that is helpful or necessary to use the Purchased Assets for the purpose of producing Component Parts, and any documents or software related to such Intellectual Property; and (ii) Supplier's processes and methods used in the production of Component Parts (the "Dedicated Equipment License"). This Section does not limit any of Customers' rights under the Purchase Orders.

(c)     On a Customer's exercise of the Option and such Customer's payment of the Dedicated Equipment Purchase Price for the Purchased Assets to the Designated Account without Setoff (including Permitted Setoffs), such Customer shall have the right to use the Dedicated Equipment License and to take possession of the Purchased Assets and any embodiments of the Dedicated Equipment License at any time, without notice, court order, commencement of court proceedings, or payment of any kind to Supplier. At such Customer's request, Supplier shall cooperate fully with such Customer in such Customer's taking possession of the Purchased Assets, including, without limitation: (i) providing such Customer or its designee(s)

with access to Supplier's manufacturing operations to inspect current production processes; (ii) providing such Customer or its designee(s) with access to Supplier's facilities to inspect, prepare to transport, and remove Purchased Assets, including access to Supplier's books and records relating to Purchased Assets; (iii) assisting such Customer or its designee(s), at such Customer's reasonable cost, in preparing, loading, and removing the Purchased Assets from Supplier's facilities, including allowing such Customer to utilize Supplier's employees, machinery, and equipment as reasonably necessary to remove the Purchased Assets; and (iv) executing documents that such Customer reasonably requests to memorialize and implement this Section. For clarity, the Option and the Dedicated Equipment License are continuing rights and obligations that survive the expiration or termination of the Term of this Agreement.

14    Intellectual Property License. In accordance with the general terms and conditions between Supplier and each Customer, Supplier grants each Customer (i) a world-wide, perpetual, non-exclusive, irrevocable, fully paid, royalty-free license to the Intellectual Property owned by Supplier and used in connection with the manufacture or assembly of the Component Parts for currently awarded programs and those programs in current production (including service parts production), including all of Supplier's processes, methods, documents, and software related to such Intellectual Property or used in the production of Component Parts; and (ii) a sublicense to the Intellectual Property licensed to Supplier and necessary for the manufacture or assembly of the Component Parts (subject to the terms of any applicable existing licenses and to any licensor's consent to assignment of such license, if applicable, and provided that the applicable Customer pays any applicable third-party royalty or licensing fees), to make, have made, use, have used, modify, improve, reproduce, prepare derivative works of, distribute, display, offer to sell, sell, import and do all other things and exercise all other rights in the licensed or sublicensed Intellectual Property that is helpful or necessary to manufacture, assemble or transport the Component Parts for such Customer (the "License"). The License shall extend to Component Parts supplied or to be supplied under the Purchase Orders (including service obligations for past-model and used Customer vehicles). The License shall also apply to any (i) new model year changes with respect to the Component Parts, (ii) mid-cycle enhancements with respect to the Component Parts or (iii) refreshes with respect to the Component Parts incorporating the Intellectual Property. Moreover, nothing in this License may be construed as an admission by any Customer of the validity of a Supplier's claimed rights to Intellectual Property, including an admission that a license is required by any Customer to make, have made, sell, offer for sale and/or import the Component Parts. Nothing in this License is intended to limit any rights granted to any Customer under the Purchase Orders, including rights concerning licensing and other Intellectual Property, but is intended to expand those rights. Each Customer shall, and shall cause its sublicensees to, treat and preserve the Intellectual Property in accordance with the same practices employed by such Customer to safeguard its own intellectual property against unauthorized use and disclosure. The License shall be granted and irrevocable as of the Effective Date but will only be exercisable by a Customer upon a Trigger Event. This Section survives the expiration or termination of the Term of this Agreement.

44484769.8

(a)     The term "<u>Intellectual Property</u>" means (a) all currently existing registered and applied-for intellectual property owned by Supplier (including, without limitation, all patents, patent applications, trademark registrations, trademark applications, copyright registrations, and copyright applications), used in or related to the manufacture, assembly or transport of the Component Parts (b) all agreements for intellectual property licensed to Supplier used in or related to the manufacture, assembly or transport of the Component Parts, and (c) any other intellectual property used in or to produce Component Parts (whether or not the intellectual property is identified, including, without limitation, unregistered copyrights, inventions, discoveries, trade secrets and designs, and regardless of whether those items are registerable or patentable in the future, and all related documents and software), which Supplier directly or indirectly sells to a Customer.

15     <u>Continued Production</u>.  Supplier shall continue to produce Component Parts for Customers, in accordance with the Purchase Orders and related releases, as modified by this Agreement. Supplier will immediately notify the applicable Customer(s) in writing upon of the occurrence of any act or condition that puts at risk Supplier's timely shipment of Component Parts.

16     <u>Bank Build</u>.  Supplier shall manufacture, ship and invoice an inventory bank of Component Parts to the extent requested by each Customer in such Customer's reasonable discretion (the "<u>Inventory Bank</u>"), subject to reasonable capacity constraints, and subject to such Customer's assumption of responsibility for all documented incremental costs that Supplier reasonably incurs in connection with building and shipping the Inventory Bank, including, without limitation, premium labor, freight, packaging and handling costs (e.g., disposable dunnage, wrapping, coating, etc.) ("<u>Incremental Costs</u>").  Supplier shall prepare an Inventory Bank budget (the "<u>Inventory Budget</u>") and will provide the Inventory Budget (and any back-up documents and information requested by the applicable Customer) to each Customer.  Supplier shall ship Inventory Bank parts to a location designated by each Customer in writing as they are produced and according to the terms of the applicable Purchase Orders.   The applicable Customer must approve all Incremental Costs in advance and in writing.  Each Customer's obligation to compensate Supplier for its Incremental Costs shall be limited to the amounts set forth in the Inventory Budget as and to the extent approved by the Customer. All amounts owed by each Customer in connection with the Inventory Bank shall be paid by the Customer on the same terms as are set forth in <u>Section 4</u> above. Incremental Costs shall be paid without Setoff (including Permitted Setoffs). The purchase price for the inventory shall be paid without Setoff (excluding Permitted Setoffs). In connection with any Inventory Bank builds, Supplier will allocate its excess capacity among Customers in a manner consistent with Supplier's historical production volumes.

17     <u>Information</u>.  Supplier agrees to supply to each Customer and copy Agent Bank, by the thirtieth (30th) day of each month, financial information, including operating statements and balance sheets for the preceding month, and updated projections. In addition, Supplier shall provide to each Customer all financial information

-17-

including, without limitation, forecasts, projections, and reports regarding accounts receivable, inventory, accounts payable and contracts prepared by Supplier or its financial consultants whenever they are provided to Agent Bank and/or other customers (or their respective agents). Supplier shall provide to each Customer and its agents access to Supplier's books, records and other information pertinent to this Agreement and other agreements between such Customer and Supplier (excluding proprietary information of other Customers or customers) together with access to plant floor scheduling information and any MRP system utilized by the Supplier, during normal business hours or, if outside normal business hours, on twenty-four (24) hours' notice.

18      Access Agreement. Concurrently with execution of this Agreement, (a) Supplier and (b) GM and Toyota shall execute an Access Agreement in the form attached as Exhibit H (the "Access Agreement"). Supplier shall use it best efforts to obtain the consent of any landlords of real property in which Component Parts are produced or assembled within five (5) days of execution of the Access Agreement by Supplier. Upon the sale of a plant to a Qualified Buyer the right of access automatically terminates with respect to that plant.

19      Access To Operations. Supplier shall allow each Customer, its employees and agents (including consultants) access to Supplier's facilities in order to inspect the Tooling and equipment relating to the production of Component Parts and to monitor Supplier's compliance with this Agreement and the Purchase Orders at mutually convenient times upon request and Supplier further agrees to allow such individuals to video tape production procedures and operations for contingency planning purposes.

20      Resourcing Cooperation. In the event a Customer chooses to resource production of its Component Parts following the Termination Date or as part of a resourcing otherwise permitted under this Agreement, Supplier shall fully cooperate with such Customer, including without limitation, by providing such Customer and its agents, representatives, designees, consultants, officers, employees, and successor suppliers with:

(a)     access to Supplier's manufacturing operations to inspect current production processes, including access to Supplier's daily manpower reports applicable to the production of such Customer's Component Parts;

(b)     access to Supplier's facilities to inspect, prepare to transport, and remove applicable Customer Tooling, including access to Supplier's books and records relating to such Customer Tooling; and

(c)     assistance in preparing, loading, and removing applicable Customer Tooling from Supplier's facilities, including allowing such Customer to utilize Supplier's employees, machinery, and equipment as reasonably necessary to remove such Customer Tooling.

21      Enforceable in Mexico. Supplier agrees that as soon as reasonably practical after the Effective Date, it shall provide all necessary documentation, including without limitation, powers of attorney from its Mexican affiliates authorizing the

-18-

representative of Supplier to execute this Agreement, the Access Agreement and any other agreements required or contemplated under this Agreement and to otherwise act on behalf of the Mexican affiliates as may be required to make this Agreement, the Access Agreement and the related documents effective and enforceable in Mexico. In addition, all Parties agree that they will execute such additional documents as may be reasonably requested by Customers to make this Agreement, the Access Agreement and the related documents effective and enforceable in Mexico.

## Agent Bank and Lending Group Accommodations

22    Forbearance. Agent Bank agrees on behalf of itself and Lending Group to forbear from exercising its rights against Supplier or the collateral as and to the extent set forth in the Forbearance Agreement dated November 30, 2021, among Agent Bank, Lending Group and Supplier, as amended by the First Amendment to Forbearance Agreement dated December 31, 2021, the Second Amendment to Forbearance Agreement dated January 26, 2022, the Third Amendment to Forbearance Agreement dated February 28, 2022, the Fourth Amendment to Forbearance Agreement dated March 31, 2022, the Fifth Amendment to Forbearance Agreement dated April 29, 2022, the Sixth Amendment to Forbearance Agreement dated May 31, 2022, the Seventh Amendment to Forbearance Agreement dated June 9, 2022, the Eighth Amendment to Forbearance Agreement dated June 30, 2022, and the Ninth Amendment to Forbearance Agreement dated July 11, 2022. Simultaneous with the execution of this Agreement, Agent Bank on behalf of itself and Lending Group and Supplier shall enter into a Tenth Amendment to Forbearance Agreement (to be executed concurrently with this Agreement in the form attached as Exhibit I (the Forbearance Agreement dated November 30, 2021, as amended by the First through Tenth Amendments thereto, the "Forbearance Agreement"), pursuant to which Agent Bank agrees on behalf of itself and Lending Group will agree, provided no Forbearance Default (as such term shall be defined in the Forbearance Agreement) occurs, to forbear from exercising its rights and remedies against Supplier through the conclusion of the Term. In the event Agent Bank decides to (i) cease to forbear or (ii) exercise its rights against Supplier or its assets, Agent Bank shall give contemporaneous written notice of any such action to Supplier and Customers.

23    Advance Rates; Reserves. In consideration of the Customer Accommodations, during the Term, absent the occurrence of a Forbearance Default under the Forbearance Agreement, Agent Bank on behalf of itself and Lending Group will continue to advance on Customer accounts receivable and inventory at the advance rates set forth in the Loan Documents and will not reduce such advance rates or impose any additional Reserves (as defined in the Loan Documents) or caps that would reduce Supplier's borrowing availability as it relates to the Customers' accounts receivable and inventory under the Loan Documents, other than Permitted Reserves (as such term is defined in the Forbearance Agreement). This provision shall not prohibit Agent Bank on behalf of itself and Lending Group from not advancing on accounts receivable and inventory that is not Customer accounts receivable and inventory or reducing advance rates or imposing any

reserves and caps on such other customer's accounts receivable and inventory.

24    <u>Consent</u>.  Agent Bank expressly consents to the Tooling Acknowledgment, Option and the License granted by Supplier to Customers under this Agreement and the corresponding purchase price and terms of each of the foregoing as set forth in this Agreement, in each case free and clear of all liens, claims, encumbrances, and security interests.  In addition, concurrently with execution of this Agreement, Agent Bank shall execute the acknowledgment to the Access Agreement.

25    <u>Release of Liens in Connection with Refinancing/Sale Transactions</u>.  Agent Bank will consent to the sale to a Qualified Buyer with respect to each Transaction that closes in accordance with the terms of a letter of intent that has been consented to in writing by Agent Bank per the letter of intent Sale Milestone provisions set forth above (or that closes with another Qualified Buyer at net economic cash-benefit to the Lending Group not less than that set forth in such letter of intent and on terms and conditions otherwise satisfactory to the Lending Group) and release its liens on the assets sold in each such Transaction when all proceeds of each such Transaction (net of ordinary and customary closing costs consented to by Agent Bank in its reasonable discretion) have been delivered to Agent Bank for application to Supplier's obligations to one or more of the Lending Group that are secured by such assets.

26    <u>Purchase of Subordinated, Last-Out, Non-Voting Participation Interest/ Surcharge</u>. Simultaneously with entering into this Agreement, GM and Agent Bank and Lenders shall execute the Second Amended and Restated Subordinated, Last-Out, Participation Agreement ("Participation Agreement").   GM shall provide funding, consistent with the Budget, through the purchase of subordinated, last-out, non-voting participation interests in the Third SOFA Amount (as defined in the Participation Agreement) in accordance with the Participation Agreement. In lieu of executing the Participation Agreement, Toyota and BMW agree to provide funding to Supplier by payment to Supplier of a surcharge in an amount up to the amount specified in the Budget (the "Surcharge").   Each time that Supplier submits a funding request to GM under the Participation Agreement, Supplier shall simultaneously submit to Toyota and BMW a request for funding (a "Toyota and BMW Funding Request").  The amount of each Toyota and BMW Funding Request shall be equal to Toyota's and BMW's respective share of the total funding requested as identified by Supplier and consistent with the Budget. Toyota and BMW shall pay to Supplier by wire transfer in immediately available funds the amount of each Toyota and BMW Funding Request on the next business day after receipt of the Toyota and BMW Funding Request if received by 12:00 p.m. Columbus, Ohio time, and otherwise on the second business day.

## Other Provisions

27    <u>Bankruptcy</u>.  Supplier agrees that in the event Supplier files a voluntary petition for bankruptcy or if an involuntary bankruptcy petition is filed against Supplier, Supplier shall exercise its best efforts, in good faith, promptly at the outset of the proceedings, to obtain the bankruptcy court's entry of a final order, binding on any subsequently appointed Chapter 11 or Chapter 7 trustee, approving this Agreement

-20-

and the Access Agreement (an "<u>Approval Order</u>").  Should the bankruptcy court enter an Approval Order as an "interim" order, Supplier shall also seek to have the bankruptcy court enter a "final" version of the Approval Order, in the case of each such interim and final Approval Order, in connection with the bankruptcy court's approval of "interim" and "final" debtor-in-possession financing provided to Supplier by Agent Bank on behalf of itself and Lending Group.  In the event that the bankruptcy court does not enter such an Approval Order on an interim and final basis within ten (10) and twenty-five (25) days, respectively, after entry of the interim and final debtor-in-possession financing or cash collateral orders, then the Term of this Agreement will be deemed terminated.

28      <u>Accommodations from Other Customers</u>.  Supplier shall use commercially reasonable efforts in good faith to cause any of its other customers who represent more than two (2%) percent of sales to enter into agreements providing Supplier with substantially the same economic benefits as those arising under this Agreement. Supplier also agrees that it shall not enter into any agreements with any of its other customers on terms more favorable to the other customers than the terms contained in this Agreement, without the prior written consent of Customers, which consent shall not be unreasonably withheld.  Supplier will not utilize any funding provided by the Customers to fund production for other customers which have not provided accommodations substantially equivalent to those being provided under this Agreement.

29      <u>Confidentiality</u>.  The Parties each agree to keep and maintain the existence and terms of this Agreement strictly confidential, and the Parties shall not disclose the existence or terms thereof to any person or entity who is not a Party without the prior written consent of the other Parties, except to the extent that such agreements or terms (a) are already known by, become available to, or are in the possession of the third party recipient at the time of disclosure, provided the source of such information was not known by such recipient to be bound by a legal or contractual obligation of confidentiality, (b) are or become publicly available (other than through a breach of this Section), (c) are in good faith determined by the disclosing Party to be necessary or appropriate to disclose in connection with a legal, regulatory, or administrative case or proceeding (including, without limitation, such an action to enforce the terms and provisions of this Agreement), (d) are in good faith determined by the disclosing Party required to be disclosed by law, court order, subpoena, or other judicial, governmental or regulatory process or request, or (e) are in good faith determined by the disclosing Party required to be disclosed in order to comply with requests of bank regulators, examiners, auditors and other similar oversight and compliance entities.

30      <u>Reservation of Rights</u>.  Unless expressly waived or modified in this Agreement or the Loan Documents, each party reserves and does not waive any claims, rights, and remedies that it may have under the Purchase Orders, the Loan Documents, any other agreements between or among one or more of the Parties, or applicable law, and each Party expressly reserves all such claims, rights and remedies they have under this Agreement, the Purchase Orders, the Loan Documents, any other agreements between or among any one or more of the Parties and applicable law.

31 <u>Notices</u>.  Any notice or other instrument to be given hereunder must be in writing and, except as otherwise provided in this Agreement, shall be deemed to be duly given (i) if mailed, 3 days following the date of mailing, (ii) if sent by facsimile or hand delivery, at the time of service on the day on which it was so delivered or (iii) if sent by electronic mail to the addresses below, at the time of sending the electronic mail. Until changed by notice in the manner described above, the addresses of the Parties for the purpose of notice shall be:

| | |
|---|---|
| If to Supplier: | Gissing North America LLC<br>125 Allied Road<br>Auburn, Maine 04211<br>Attention: Steven Wybo<br>Email: steven.wybo@riveron.com |
| With a copy to: | Kerr, Russell and Weber, PLC<br>500 Woodward Ave., Suite 2500<br>Detroit, MI 48226<br>Attention:  Jason W. Bank<br>Email: jbank@kerr-russell.com |
| If to GM: | General Motors LLC<br>Cole Engineering Center<br>29755 Louis Chevrolet Road<br>Warren, MI  48090-9020<br>M/C 480-210-8S<br>Attention: Mark W. Fischer<br>Email: mark.w.fischer@gm.com |
| With a copy to: | General Motors LLC<br>Aaron Silver, GPSC Legal Counsel<br>300 Renaissance Center, MC482-C23-A68<br>Detroit, MI 48265<br>E-Mail: aaron.silver@gm.com |
| | and |
| | Honigman LLP<br>660 Woodward Avenue<br>2290 First National Building<br>Detroit, MI 48226-3506<br>E-Mail: tsable@honigman.com |
| If to Toyota: | Toyota Motor Engineering & Manufacturing North America, Inc.<br>8777 Platt Road<br>Saline, MI  48176<br>Attn: Wes Triplett<br>Email: wes.triplett@toyota.com |

-22-

|                    | Toyota Motor North America, Inc.<br>6565 Headquarters Drive<br>Plano, TX 75024<br>Attn: Meadow Clendenin<br>Email: meadow.clendenin@toyota.com |
|--------------------|---|
| With a copy to:    | Frost Brown Todd LLC<br>The Pinnacle at Symphony Place<br>150 3rd Avenue South, Suite 1900<br>Nashville, Tennessee 37201<br>Attn: Patricia Burgess<br>E-mail: pburgess@fbtlaw.com |
| If to BMW:         | BMW SLP, S.A. de C.V.<br>Boulevard BMW 655<br>Parque Industrial Desarrollo Logistik<br>C.P. 79526 Villa de Reyes<br>San Luis Potosí, México<br>Attn: David Blue, CFO<br>Email: david.blue@bmw.com |
| With a copy to:    | BMW SLP, S.A. de C.V.<br>Gerardo Iñigo, Legal Counsel<br>Boulevard BMW 655<br>Parque Industrial Desarrollo Logistik<br>C.P. 79526 Villa de Reyes<br>San Luis Potosí, México<br>Email: Gerardo.inigo@bmw.com.mx<br><br>and<br><br>Jaffe Raitt Heuer & Weiss, P.C.<br>27777 Franklin Road – Suite 2500<br>Southfield, MI 48034<br>Attn: Richard Kruger<br>Email: rkruger@jaffelaw.com |
| If to Agent Bank:  | The Huntington National Bank<br>200 Public Square, CM64<br>Cleveland, Ohio 44114<br>Attention: Gissing North America Account Manager<br>Email: ABLoperations@huntington.com |
| With a copy to:    | McDonald Hopkins LLC<br>600 Superior Avenue, East<br>Suite 2100 |

-23-

44484769.8

Cleveland, Ohio 44114
Attention: Scott N. Opincar, Esq.
Email: sopincar@mcdonaldhopkins.com

32    Events of Default.  The occurrence of any of the following shall constitute an "Event of Default" under this Agreement unless a waiver or deferral is agreed to in writing by the Customers:

(a)    Supplier repudiates or materially breaches its obligations, or refuses to materially perform, its obligations with respect to any Customer or Customers under this Agreement  (in which case the Event of Default applies only to such Customer or Customers);

(b)    Supplier repudiates or materially breaches its obligations, or refuses to materially perform its obligations under the Purchase Orders (as modified by this Agreement), the consequence of which is a substantial likelihood that a Customer's production will be materially interrupted (in which case, if such repudiation or breach results in a substantial likelihood that only that Customer's production will be materially interrupted, the Event of Default applies only to that Customer);

(c)    Supplier experiences a material adverse change, the consequence of which is a substantial likelihood that any Customer's production will be materially interrupted (in which case, if such material adverse change results in a substantial likelihood that only that Customer's production will be materially interrupted, the Event of Default applies only to that Customer) (for the avoidance of doubt, Supplier's failure to obtain contractual or business accommodations from Tesla, Inc. will not constitute such a material adverse change);

(d)    An Event of Default by Supplier occurs as to one or more Customers and such Customer(s) exercises its right to terminate this Agreement and provides notice of its intent to resource as to one or more Component Parts programs;

(e)    The date on which the Forbearance Period under the Forbearance Agreement terminates and Agent Bank or Lending Group (i) declines an advance request by Supplier on two or more consecutive days, or (ii) commences a repossession or foreclosure action against a material portion of the operating assets of Supplier, the consequence of which is a substantial likelihood that a Customer's production will be materially interrupted (in which case the Event of Default applies only to that Customer);

(f)    Any secured or lien creditor (including, but not limited to, Agent Bank on behalf of itself and Lending Group) commences a repossession or foreclosure action against a material portion of the operating assets of Supplier, the consequence of which is a substantial likelihood that a Customer's production will be materially interrupted (in which case the Event of Default applies only to that Customer);

-24-

(g)     There is a Forbearance Default under the Loan Documents other than a "Default" or "Disclosed Default" (each as defined in the Forbearance Agreement) after the Effective Date and Agent Bank or Lending Group ceases to provide financing to Supplier consistent with the Forbearance Agreement;

(h)     Supplier fails to commence or terminates the Sale Process, including terminating the engagement of its Investment Banker (without replacement acceptable to Agent Bank and the Material Customers), or fails to meet any Sale Milestone in connection with the Sale Process, without the written consent of the Agent Bank and the Material Customers; Supplier requests any additional accommodations from Customers (exclusive of those set forth in this Agreement);

(i)     There is a twenty (20%) percent or greater unfavorable cumulative net cash flow variance in Supplier's performance when compared to the Budget during the three (3)-week period beginning on the Effective Date, or a ten (10%) percent or greater unfavorable cumulative net cash flow variance in Supplier's performance when compared to the Budget at any time following the three (3)-week period beginning on the Effective Date; and/or

(j)     Supplier breaches the Winddown Plan, if any.

Upon the occurrence of an Event of Default, in addition to any rights the applicable Customer may have under the Purchase Orders, this Agreement or otherwise applicable law, upon written notice of the Event of Default to all other Parties, the affected Customer shall have the right, at its option, to immediately terminate the Term of this Agreement.

33     Injunctive Relief.  In the event Supplier fails to perform any of its respective obligations as set forth in this Agreement or Supplier takes or threatens any action that would constitute an Event of Default, the affected Party may file for preliminary injunctive relief for a court to order specific performance of the non-performing Party's obligations, and the affected Party shall be entitled to injunctive relief or other equitable relief and/or a decree for specific performance without the posting of any bond or other security, in addition to any remedies it may have for damages or otherwise.  Such non-performing Party shall not object to such request for preliminary relief on the grounds that there is no irreparable harm or that the affected Party has an adequate remedy at law.

34     Authorization.  The individuals executing this Agreement warrant that they have the power and authority to execute this Agreement on behalf of the Party they represent and that their signatures bind their respective Parties to the terms of this Agreement.

35     Section Headings.  The Section headings used in this Agreement are for convenience only and do not constitute part of the Agreement for purposes of construction or interpretation.

36     Purchase Orders Continue.  Except as expressly provided for in this Agreement,

the terms, covenants and conditions of each Customer's Purchase Orders remain in full force and effect and are incorporated by reference. During the Term, in the event of any inconsistency between the terms of this Agreement and the terms of any Customer's Purchase Orders, the terms of this Agreement will control.

37    <u>No Waiver; Cumulative Remedies; Severability</u>.  The Parties shall not, by any act, delay, indulgence, omission or otherwise, be deemed to have waived any right or remedy under this Agreement or any breach of the terms and conditions of this Agreement.  A waiver by any party of any right or remedy under this Agreement on any one occasion shall not be construed as a bar to any right or remedy which the party would otherwise have had on any future occasion.  No failure to exercise nor delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude either its future exercise by a party or the exercise of any other right, power or privilege.  The rights and remedies under this Agreement are cumulative, may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by any other agreement or applicable law.  If any provision of this Agreement is held invalid or unenforceable, the remainder of the Agreement shall remain in effect.

38    <u>Assignment; Successors and Assigns</u>.  Supplier may not assign or transfer, directly or indirectly, any right or obligation under this Agreement without prior written consent of Customers and Agent Bank.  This Agreement and all obligations in it shall be binding upon and inure to the benefit of the successors and permitted assigns of each Party. Any purported assignment in violation of this section will be null and void.

39    <u>Governing Law</u>.  This Agreement shall be governed by, and be construed and interpreted in accordance with, the laws of the State of Michigan, without regard to conflicts of laws principles.  Jurisdiction and venue shall be proper in federal district court in Wayne County and in any state court in Oakland County, except that in the event of a bankruptcy, the bankruptcy court shall have exclusive jurisdiction over all related matters.

40    <u>Entire Understanding; Amendment</u>.  This Agreement, the Purchase Orders, and the Loan Documents constitute the entire understanding of the Parties with respect to its subject matter, and none of their terms or provisions may be waived, altered, modified or amended except in a written agreement signed by all Parties.  This Agreement is intended to supplement, not supplant, the Purchase Orders and the Loan Documents.  However, in the event and to the extent of a conflict between the Purchase Orders and this Agreement, this Agreement will control.  In addition, as between Customers and the Lending Group solely, in the event and to the extent of a conflict between the Loan Documents and this Agreement, this Agreement will control.

41    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and on separate counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to

-26-

produce or account for more than one counterpart. The Parties agree that their respective signatures may be delivered by facsimile or email and that facsimile or pdf signatures shall be treated as originals for all purposes.

42    Third Parties.  There are no third-party beneficiaries of this Agreement.

43    No Waiver.  No delay or failure of Agent Bank, Supplier or Customers to exercise any right, power or privilege hereunder will affect such right, power or privilege, nor will any single or partial exercise thereof preclude any further exercise thereof, nor the exercise of any other right, power or privilege.

44    Representations.  EACH PARTY HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE BEFORE SIGNING THIS AGREEMENT AND IS DOING SO WITHOUT DURESS, INTIMIDATION, OR COERCION. NO PARTY IS RELYING ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS THAT ARE NOT IN THIS AGREEMENT.  ANY AMBIGUOUS LANGUAGE IN THIS AGREEMENT SHOULD NOT BE CONSTRUED AGAINST ANY PARTICULAR PARTY BECAUSE THAT PARTY DRAFTED THE LANGUAGE.

45    Waiver of Jury Trial.  THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED.  THE PARTIES EACH KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT, THE PURCHASE ORDERS, AND THE LOAN DOCUMENTS.  NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS THE RELINQUISHMENT IS IN WRITING AND SIGNED BY THE PARTY TO WHICH THE RELINQUISHMENT IS CHARGED.

[Remainder of page intentionally left blank.]

44484769.8

Supplier, Customers, and the Agent Bank have executed this Accommodation Agreement as of the date first written above.

**SUPPLIER:**

**GISSING NORTH AMERICA LLC,**
  a Delaware limited liability company

By: _____
Name: CLAUDIO CALADO
Title: CEO & President

**GISSING TECHNOLOGIES LLC,**
  a Delaware limited liability company

By: _____
Name: CLAUDIO CALADO
Title: CEO & President

**GISSING SIDNEY LLC,**
  a Delaware limited liability company

By: _____
Name: CLAUDIO CALADO
Title: CEO & President

**GISSING SUMTER LLC,**
  a Delaware limited liability company

By: _____
Name: CLAUDIO CALADO
Title: CEO & President

**GISSING AUBURN LLC,**
  a Delaware limited liability company

By: _____
Name: CLAUDIO CALADO
Title: CEO & President

44484769.6

**GISSING TECHNOLOGIES MEXICO LLC,**
a Delaware limited liability company

By: _Cl Caldo._

Name: _CLAUDIO CALADO_

Title: _CEO & President_

**CONFORM AUTOMOTIVE, LLC,**
a Michigan limited liability company

By: _____

Name: _____

Title: _____

**DTI MOLDED PRODUCTS, INC.,**
a Michigan corporation

By: _Cl Caldo._

Name: _CLAUDIO CALADO_

Title: _CEO & President_

**GISSING FREMONT LLC,**
a Delaware limited liability company

By: _Cl Caldo._

Name: _CLAUDIO CALADO_

Title: _CEO President_

**GISSING GREENVILLE LLC,**
a Delaware limited liability company

By: _Cl Caldo._

Name: _CLAUDIO CALADO_

Title: _CEO President_

{10517031:2}

4892-3877-7895_2
44484769.6

**GISSING TECHNOLOGIES MEXICO LLC,**
 a Delaware limited liability company

By:_____
Name: _____
Title: _____

**CONFORM AUTOMOTIVE, LLC,**
 a Michigan limited liability company

By:_____
Name: *STEVEN PHILLIPS*
Title: *CEO*

**DTI MOLDED PRODUCTS, INC.,**
 a Michigan corporation

By:_____
Name: _____
Title: _____

**GISSING FREMONT LLC,**
 a Delaware limited liability company

By:_____
Name: _____
Title: _____

**GISSING GREENVILLE LLC,**
 a Delaware limited liability company

By:_____
Name: _____
Title: _____

{10517031:2 }

4892-3877-7895_2
44484769.8

**CUSTOMER:**

**GENERAL MOTORS LLC,**
a Delaware limited liability company

By: _____
Name: _____ M. W. Fischer
Title: _____ Director, SFRM

{10517031:2 }

4892-3877-7895_2
44484769.6

**CUSTOMER:**

**TOYOTA MOTOR ENGINEERING &
MANUFACTURING NORTH AMERICA,
INC.,**
 a Kentucky corporation

By: _____
Name: __Robert Young_____
Title: _Group Vice President, Purchasing Supplier Development

{10517031:2 }

4892-3877-7895_2
44484769.6

**CUSTOMER:**

**BMW SLP, S.A de C.V.**
a Mexican corporation

By: _____

Name: David W. Blue

Title: Vice President & CFO

By: _____

Name: Ana Carolina Roman

Title: Legal Counsel

**AGENT BANK:**

**THE HUNTINGTON NATIONAL BANK,**
**as Agent Bank (for itself and the Lending**
**Group)**

By: _____

Name: _BARRY S. O'NEALL_

Title: _Senior Vice President_

{10517031:2 }

4892-3877-7895_2
44484769.6

**EXHIBITS**

**Exhibit A – Specified Accounts/Permitted Setoffs**
**Exhibit B – Amounts Owed by Supplier to Tooling Vendors and Tooling Repairmen**
**Exhibit C – Designated Accounts**
**Exhibit D – Customer Addendum**
**Exhibit E – Customers and Material Customers by Transaction**
**Exhibit F – Budget**
**Exhibit G – Dedicated Equipment**
**Exhibit H – Access Agreement**
**Exhibit I – Tenth Amendment to Forbearance Agreement**

0110257.0750031   4862-5505-4629v12

{10517031:2 }

**EXHIBIT A**
**Specified Accounts/Permitted Setoffs**

| Gissing North America<br>Accommodation Agreement - Exhibit A<br>Specified Accounts / Permitted Setoffs | | |
|---|---|---|
| *As of: June 27, 2022* | | |
| GM AR[1] | $ | 4,577,403.85 |
| Toyota AR [1] | | 731,763.11 |
| BMW AR[1] | | 93,500.00 |
| **Total Open AR[2]** | **$** | **5,402,666.96** |

(1)Values shown reflects the minimum accounts payable owing by each customer to Supplier for open accounts payable position in customer's ledger. Subject to Supplier providing all documentation required for payment under the applicable Purchase Orders, Supplier and Customers will work in good faith to reconcile the outstanding accounts payable within thirty (30) days of the Effective Date. Notwithstanding the foregoing, any unreconciled accounts existing after the 10th business day following the Effective Date will be a Permitted Reserve.

(2) All amounts are subject to Setoff in accordance with Section 2 of the Agreement.

# EXHIBIT B
## Amounts Owed by Supplier to Tooling Vendors and Tooling Repairmen

**Gissing North America**
**Accommodation Agreement - Exhibit B**
**Outstanding Tooling Payables**

| Vendor | | Outstanding Balance | % of Total Tooling AP |
|---|---|---|---|
| *As of: June 27, 2022* | | | |
| **Tooling Vendor Summary** | | | |
| TOOLING TECHNOLOGY LLC | $ | 637,118.00 | *32.7%* |
| ADVANCED ENG.SOL.****TOOLING**** | | 555,510.00 | *28.5%* |
| PRO DESIGN & MANUFACTURING LLC | | 336,695.00 | *17.3%* |
| ODC TOOLING & MOLDS | | 216,175.60 | *11.1%* |
| COVERT MG. | | 81,885.00 | *4.2%* |
| CENTURY TOOL & GAGE, LLC | | 73,500.00 | *3.8%* |
| PLASTIC AGE***TOOLING*** | | 13,635.00 | *0.7%* |
| GUANAJUATO TOOLING SA DE CV | | 13,154.40 | *0.7%* |
| VISTECH TOOLING*********TOOLING | | 12,061.20 | *0.6%* |
| ZHONGSHAN HORD RAPIDTOOLS CO., LTD | | 6,000.00 | *0.3%* |
| BEN ALPREN MACHINE TOOL & SUPPLY CO | | 1,431.85 | *0.1%* |
| AC ELECTRIC CORP | | 1,395.00 | *0.1%* |
| QUALITY MACHINE TOOL, INC. | | 1,222.00 | *0.1%* |
| **Total Tooling Payable** | **$** | **1,949,783.05** | ***100.0%*** |

**EXHIBIT C**
**Designated Accounts**

**Gissing North America**
**Accommodation Agreement - Exhibit C**
**Designated Accounts**

**Domestic Account**
Huntington National Bank
ABA Routing #:041000153
Account #: 01668429048

**Mexico Account**
BBVA – Bancomer - Mexico
Account #: 0115862213
SWIFT Code #: BCMRMXMMPYM

{10517031:2 }

**EXHIBIT D**
**Customer Addendum**

[EACH CUSTOMER TO ADD ITS RESPECTIVE CUSTOMER ADDENDUM]

{10517031:2 }

# EXHIBIT E
## Customers and Material Customers by Transaction

| Gissing North America<br>Accommodation Agreement - Exhibit E<br>Material Customers by Location | | | | | |
|---|---|---|---|---|---|
| **Customer** | **CFA Mexico** | **Sidney** | **Auburn** | **Sumter** | **Canada** |
| **Total GM** | X | X | X | X | |
| **Total Toyota** | | X | X | X | |
| **Total BMW** | X | | | | |

{10517031:2 }

**EXHIBIT F**
**Budget**




[EACH CUSTOMER TO ADD ITS RESPECTIVE BUDGET]

**EXHIBIT G**
**Dedicated Equipment**

[TO BE EXECUTED NOT LATER THAN 15 DAYS AFTER THE EFFECTIVE DATE]

{10517031:2 }

4892-3877-7895_2
44484769.8

**EXHIBIT H**
**Access Agreement**

## ACCESS AND SECURITY AGREEMENT

General Motors LLC, for itself and on behalf of its subsidiaries and affiliates ("GM"), Toyota Motor Engineering & Manufacturing North America, Inc., for itself and on behalf of its subsidiaries and affiliates ("Toyota" and together with GM, "Customers" and each a "Customer"), Gissing North America LLC, f/k/a Conform Gissing International, LLC, a Delaware limited liability company ("GNA"), Gissing Technologies LLC, f/k/a Formed Fiber Technologies, LLC, a Delaware limited liability company ("GT"), Gissing Sidney LLC, f/k/a FFT Sidney, LLC, a Delaware limited liability company ("Sidney"), Gissing Sumter LLC, f/k/a FFT Sumter, LLC, a Delaware limited liability company ("Sumter"), Gissing Auburn LLC, f/k/a FFT Auburn, LLC, a Delaware limited liability company ("Auburn"), Gissing Technologies – Mexico LLC, f/k/a Formed Fiber Technologies – Mexico, LLC, a Delaware limited liability company ("Gissing Mexico"), DTI Molded Products, Inc., a Michigan corporation ("DTI"), Conform Automotive, LLC, a Michigan limited liability company ("Conform"), Gissing Fremont LLC, a Delaware limited liability company ("Fremont"), and Gissing Greenville LLC, a Delaware limited liability company ("Greenville," and collectively with GNA, GT, Sidney, Sumter, Auburn, Gissing Mexico, DTI, Conform, and Fremont, "Supplier"), enter into this Access and Security Agreement ("Agreement") on July 18, 2022.

## RECITALS:

A.      Supplier is obligated to manufacture certain component parts, service parts, assemblies and/or other products (other than Tooling (defined below)) for Customers (collectively, "Component Parts") under various purchase agreements, supply contracts, general terms and conditions, release requests or purchase orders issued by Customers to Supplier and accepted by Supplier (together with any replacement, substitute and new purchase orders, "Purchase Orders").

B.      Supplier, certain of Supplier's affiliates, and The Huntington National Bank, a national banking association, in its capacity as agent (in that capacity, "Agent Bank"), for itself and the other financial institutions party to the Loan Documents (as defined below) from time to time as lenders (collectively, together with the Agent Bank, the "Lending Group") are parties to various loan and security agreements (collectively, together with any future agreements and amendments which may be entered into between Agent Bank or the Lending Group and Supplier, the "Loan Documents"). The indebtedness outstanding under the Loan Documents is secured by a lien on substantially all of Supplier's real and personal property.

C.      Supplier acknowledges that any material lapse in production and/or delay in shipment of the Component Parts or any material breach of any Purchase Order may cause irreparable harm to Customers.

D.      Supplier has informed Customers that the loans available under the Loan Documents, together with the working capital generated by Supplier's business, are insufficient sources of cash to meet the production schedule for the Component Parts.

E. Supplier has requested that Customers provide certain accommodations to Supplier to allow Supplier to continue in operation.

F. Subject to the terms of a certain Accommodation Agreement (the "<u>Accommodation Agreement</u>") executed concurrently with this Agreement, Customers have agreed to provide certain accommodations to Supplier. As an inducement to Customers entering into the Accommodation Agreement, Supplier has agreed to grant Customers a Right of Access (as defined below) to Supplier's Facilities (as defined below).

G. In consideration for Customers agreeing to provide the above-referenced accommodations, Customers have requested that Supplier provide them with certain assurances and acknowledgments to induce Customers to defer from immediately exercising their rights under the Purchase Orders to resource production of the Component Parts.

H. Customers are entering into this Agreement to afford them the right to use certain of Supplier's assets as provided below if a Default (as defined below) occurs.

**BASED ON THE FOREGOING RECITALS** which are incorporated as representations and warranties of the parties, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Customers and Supplier agree as follows:

## TERMS AND CONDITIONS

1   <u>Defined Terms</u>.

(a)       In addition to those terms defined elsewhere in this Agreement, the following terms have the indicated meanings, unless the context otherwise requires:

(b)       "<u>Accounts</u>" means any "account" or "chattel paper," as defined in Section 9-102 of the Code (defined below), owned now or hereafter by Supplier, and shall also mean and include: (i) all accounts receivable, contract rights, book debts, notes, drafts, instruments, documents, acceptances, payments under leases and other forms of obligations, now owned or hereafter received or acquired by or belonging or owing to Supplier (including under any trade name, styles, or division thereof) whether arising out of goods sold or leased or services rendered by Supplier or from any other transaction, whether or not the same involves the sale of goods or services by Supplier (including, without limitation, any such payment obligation or right to payment which might be characterized as an account, contract right, general intangible, or chattel paper under the Uniform Commercial Code in effect in any jurisdiction); (ii) all monies due to or to become due to Supplier under all contracts for the sale or lease of goods or the performance of services by Supplier (whether or not yet earned by performance on the part of Supplier) now in existence or hereafter arising; and (iii) deposit accounts, insurance refunds, tax refunds, tax refund claims and related cash and cash equivalents, now owned or hereafter received or acquired by or belonging or owing to Supplier.

(c)       "<u>Chattel Paper</u>" means all "chattel paper" as defined in Section 9-102 of the Code.

(d)       "<u>Code</u>" means the Uniform Commercial Code as in effect in the State of

Michigan and Ohio as of the date of this Agreement.

        (e)        "<u>Collateral Access Agreement</u>" means the Collateral Access Agreement entered into as of July 29, 2021 by Unifin Financiera, S.A.B. DE C.V. and the Agent Bank relating to the Mexican Facility.

        (f)        "<u>Contract Rights</u>" means all rights of Supplier (excluding all rights to payment and the items described in the definition of Accounts) under each "Contract" (defined below).

        (g)        "<u>Contracts</u>" or individually, "<u>Contract</u>", shall mean, any licensing agreements and any and all other contracts, supply agreements, or other agreements in or under which Supplier may now or hereafter have any right, title, or interest and which pertain to the lease, sale, or other disposition by Supplier of "Equipment" (defined below), "Inventory" (defined below), fixtures, real property, or the right to use or acquire personal property, in each case, used in the manufacture, production, assembly or transportation of Component Parts, as any of the same may from time to time be amended, supplemented, or otherwise modified.

        (h)        "<u>Default</u>" shall mean any of the following events:

        (a)        An Event of Default occurs under the Accommodation Agreement. For clarity, an Event of Default under the Accommodation Agreement only with respect to particular Customer(s) or Facility(ies) constitutes a Default under this Agreement only with respect to such particular Customer(s) or Facility(ies); or

        (b)        The Term (as defined in the Accommodation Agreement) terminates (whether by expiration or otherwise). For clarity, if the Term (as defined in the Accommodation Agreement) terminates only with respect to particular Customer(s) or Facility(ies), it shall constitute a Default under this Agreement only with respect to such particular Customer(s) or Facility(ies).

        (i)        "<u>Documents</u>" means all "documents" as defined in Section 9-102 of the Code.

        (j)        "<u>Equipment</u>" means any "equipment," as that term is defined in Section 9-102 of the Code, now or hereafter owned by Supplier, which is used in the manufacture, production, assembly or transportation of Component Parts, and shall also mean and include all machinery, equipment, vehicles, furnishings, and fixtures (as such term is defined in Section 9-102 of the Code) now owned or hereafter acquired by Supplier used in the manufacture, production, assembly or transportation of Component Parts, including, without limitation, all items of machinery and equipment of any kind, nature and description, whether affixed to real property or not, as well as all additions to, substitutions for, replacements of or accessions to any of the foregoing items and all attachments, components, parts (including spare parts), and accessories whether installed thereon or affixed thereto.

        (k)        "<u>Facilities</u>" means the real property identified on the attached <u>Exhibit A</u>, and any other real property wherever located leased or owned by Supplier that is utilized in any way in the production of any Component Part. "<u>Facility</u>" means any one of them individually.

(l) "General Intangibles" means all "general intangibles," as such term is defined in Section 9-102 of the Code, now or hereafter owned by Supplier, used in the manufacture, production, assembly or transportation of Component Parts, including, without limitation, customer lists, rights in intellectual property, goodwill, trade names, service marks, trade secrets, patents, trademarks, copyrights, applications therefor, permits, licenses, now owned or hereafter acquired by Supplier, but excluding items described in the definition of Accounts.

(m) "Instruments" means all "instruments" as defined in Section 9-102 of the Code.

(n) "Intellectual Property" means all now existing or hereafter acquired patents, trademarks, copyrights, inventions, licenses, discoveries, processes, know-how, techniques, trade secrets, designs, specifications and the like (regardless of whether such items are now patented or registered, or registerable, or patentable in the future), and all technical, engineering, or other information and knowledge, production data and drawings, used in the manufacture, production, assembly or transportation of Component Parts, including without limitation, all items, rights and property defined as "intellectual property" under 11 U.S.C. Section 101, as amended from time to time.

(o) "Inventory" means any "inventory," as that term is defined in Section 9-102 of the Code, wherever located, now owned or hereafter acquired by Supplier or in which Supplier now has or hereafter may acquire any right, title or interest including, without limitation, all goods and other personal property now or hereafter owned by Supplier which are leased or held for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in Supplier's business, or in the processing, packaging or shipping of the same, and all finished goods.

(p) "Mexican Facility" means the Mexican facility located at Circuito de Las Colinas #321, Manzana 4, Lote 30, Parque Industrial Colinas de León, León Guanajuato CP 37430, Mexico.

(q) "Obligations" means all obligations owed by Supplier to Customers under this Agreement (including the obligation to provide each Customer or its designee(s) the "Right of Access" (as defined below)).

(r) "Operating Assets" means all assets in which Supplier has an interest which a Customer exercising its Right of Access reasonably determines are necessary or helpful for the timely and efficient production of the Component Parts, wherever located, including Equipment, Software, Contract Rights and General Intangibles (other than deposit accounts, insurance refunds, tax refund claims, cash and cash equivalents), but specifically excluding any Accounts, Inventory, Documents, Instruments, Chattel Paper and Proceeds (defined below) of such excluded items and the Proceeds of General Intangibles.

(s) "Proceeds" has the meaning provided it under the Code and, in any event, shall include, but not be limited to: (i) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to Supplier from time to time with respect to any of the Collateral (defined in below); (ii) any and all payments (in any form whatsoever) made or due and payable to Supplier

from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau, or agency (or any Person acting under color of governmental authority); and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

(t) "<u>Requirement of Law</u>" means the charter and by-laws or other organizational or governing documents of any entity, and any material law, treaty, rule or regulation or determination of arbitration of a court or other governmental authority, in each case applicable to or binding upon any applicable person or entity or its property or to which such entity or person or any of its property is subject.

(u) "<u>Software</u>" means all of the following that which are used in the manufacture, production, assembly or transportation of the Component Parts (i) computer programs and supporting information provided in connection with a transaction relating to the program, and (ii) computer programs embedded in goods and any supporting information provided in connection with a transaction relating to the program whether or not the program is associated with the goods in such a manner that it customarily is considered part of the goods, and whether or not, by becoming the owner of the goods, a person acquires a right to use the program in connection with the goods, and whether or not the program is embedded in goods that consist solely of the medium in which the program is embedded.

2     <u>Grant of Liens and Security Interests</u>. As collateral security for the Obligations, Supplier hereby grants to each Customer a continuing security interest in and lien upon the Operating Assets and Facility(ies), whether now owned or hereafter acquired by Supplier, or in which Supplier now has or at any time in the future may acquire any right, title or interest (the "<u>Collateral</u>"). Further, Supplier hereby grants to each Customer a power of attorney to execute on its behalf and file any financing statements and/or mortgages deemed necessary by such Customer to perfect its security interest and liens granted hereby. The security interests granted to Customers under this Agreement to secure the Obligations shall be junior to the liens and security interests granted to Agent Bank (and any other security interest perfected before the date of this Agreement), but in all cases, Agent Bank's exercise of its rights and remedies with respect to its liens and security interests against the Operating Assets are subject to the terms of this Agreement. Customers acknowledge that a right of access has been granted to Unifin Financiera, S.A.B. DE C.V., owner and lessor of certain assets at the Mexican Facility, under the Collateral Access Agreement with respect to the Mexican Facility only. Supplier shall not grant any other party a similar right of access except on terms acceptable to Customers and Agent Bank.

Agent Bank may take any necessary action to protect its rights in the Collateral, conditioned upon such action not impairing Customers' Right of Access (as defined below), including, but not limited to, preparing for a sale and selling, transferring, or liquidating any asset not included as Operating Assets or Facilities, or to list the Operating Assets and/or Facilities for sale.

The lien priorities provided in this Agreement shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement or refinancing of any loan documents, nor by any action or inaction which any of the Parties hereto may take or fail to take in respect of the Collateral.

Subject to applicable law and Section 4 of this Agreement, this Agreement shall continue in full force and effect after the filing of any petition by or against Supplier under the United States Bankruptcy Code (the "Bankruptcy Code") or similar proceeding and all converted, succeeding or similar cases in respect thereof. All references herein to Supplier shall be deemed to apply, if applicable, to Supplier as debtors-in-possession and to a trustee for Supplier.

3  Right of Access.

(a)  General. Supplier hereby grants each Customer or its designee(s) the right, but not the obligation, to use and occupy the Operating Assets, and one or more of the Facility(ies), to manufacture Component Parts ("Right of Access") for a period of up to nine (9) months for each Facility (the "Occupancy Period") upon the occurrence of a Default. A Customer may invoke the Right of Access at any one or more of the Facilities by delivering written notice to each of Supplier, the other Customers, and Agent Bank indicating its intention to exercise the Right of Access and identifying the applicable Facility(ies). A Customer may exercise its Right of Access at different Facilities separately and the Occupancy Period at each Facility will commence on the date that the Right of Access is exercised at each such Facility. Customers shall have no right to sell, transfer, or dispose of any of the Operating Assets or the Facility(ies) as part of the Right of Access. Any exercising Customer's Right of Access throughout the Occupancy Period is conditioned upon such exercising Customer's compliance with Section 3(b) during the Occupancy Period. All Customers that exercise the Right of Access at a Facility shall cooperate with each other in good faith to coordinate all production after the Right of Access is exercised and shall use their best efforts not to interfere in any manner with the production of another exercising Customer. Resources and costs at a Facility or associated with Operating Assets that are common for Customers who exercise the Right of Access at a Facility shall be divided among such Customers according to their respective percentages of sales at each Facility at which the Right of Access has been exercised at the time immediately preceding the Default.

(b)  Customer's Obligations. If a Customer invokes the Right of Access with respect to a particular Facility(ies) or Operating Assets, the exercising Customer or Customers or their designees, if any, shall:

(i)  indemnify, defend, and hold harmless Supplier, Lending Group, and each of their respective employees, officers, directors and agents, from any physical damage to property (ordinary wear and tear excepted), including, without limitation, the Operating Assets and Facility(ies), any injury suffered by third parties and any claims or causes of action brought against Supplier or Lending Group directly and proximately caused by (i) such Customer's exercise of the Right of Access, or (ii) the use of the Operating Assets and Facility(ies) during the Occupancy Period by the exercising Customer, its designee or their respective employees, agents or representatives including any and all reasonable, costs and expenses (including reasonable attorneys' fees) constituting a direct and proximate part of the claim to which such indemnification obligation relates. The obligation to

indemnify under this subparagraph will not be subject to any right of Setoff (as defined in the Accommodation Agreement that the Customer may have against Supplier;

(ii) use such reasonable care in the custody and preservation of the Operating Assets and Facility(ies) as a prudent owner would use in connection with the custody and preservation of its own assets;

(iii) insure (naming Agent Bank as the lender loss payee and additional insured and naming Customers as additional insureds) and maintain the Operating Assets and the Facilities in the same condition as existed on the date the Customer exercised the Right of Access, ordinary wear and tear excepted;

(iv) in lieu of the Purchase Order price, pay (a) the actual costs and expenses incurred in connection with the manufacturing of the Component Parts during the Occupancy Period, including, without limitation, utilities and other overhead expenses, prorated property taxes and assessments attributable to such Operating Assets and Facility(ies), and any payments due on account of any of the Operating Assets which are leased from third parties (including Agent Bank and its affiliates) and leased Facility(ies), and (b) in addition to the amounts set forth in (a) above, a Monthly Access Fees to Agent Bank without Setoff in the amount specified on Exhibit A;

(v) subject to Customer's or its designee's right to use and occupy such Operating Assets and Facility(ies) during the Occupancy Period in accordance with this Agreement and without interference, afford Supplier's representatives (and representatives of Agent Bank, secured creditors, owners or mortgagees of the Operating Assets and/or the Facility(ies)) reasonable access to inspect the Operating Assets and the Facility(ies), to market and sell the Operating Assets and the Facility(ies), to prepare for a liquidation of the Operating Assets and the Facility(ies) at the end of the Occupancy Period, and to sell any asset other than the Operating Assets and Facility(ies) prior to expiration of the Occupancy Period;

(vi) Subject to (a) non-exercising Customer or other customer of Supplier (i) agreeing to make payment to the exercising Customer(s) or its designee(s) on account of their allocable share of overhead and related expenses and all direct expenses related to such non-exercising Customer's or other customer's production and (ii) entering into a separate agreement, acceptable to the exercising Customer(s) in its

sole discretion and to Agent Bank in its sole discretion, under which such non-exercising Customer or other customer agrees to release and indemnify the exercising Customer(s) and the Lending Group from any and all liability, including with respect to any product liability and warranty claims and such non-exercising Customer having entered into an accommodation agreement with Agent Bank and Supplier that is acceptable to Agent Bank, and (b) Supplier making the necessary tangible personal property available for use during the Occupancy Period, the exercising Customer agrees, for itself and its designee(s), to produce parts for such non-exercising Customer or other customer during the Occupancy Period (the "Producing Customer");

(vii)     purchase and pay for Inventory and, if it exercises the Option, Purchased Assets (as those terms are defined in the Accommodation Agreement) for the prices and on the terms set forth in the Accommodation Agreement (the obligations under this subsection shall also apply to all other Customers at each Facility as to which the Right of Access has been exercised by any Customer); and

(viii)    pay all Accounts and other amounts owed to Supplier to the Specified Account without Setoff (other than Setoffs specifically allowed under the Accommodation Agreement) within ten (10) days after the beginning of the Occupancy Period (the obligations under this subsection shall also apply to all other Customers at each Facility as to which the Right of Access has been exercised by any Customer); and

(ix)     at the end of the Occupancy Period, leave the Operating Assets and Facilities broom clean and in safe and secure states, properly removing all hazardous wastes used or generated during the Occupancy Period, and in the same condition that the Operating Assets and Facilities were in prior to the exercise of the Right of Access, ordinary wear and tear excepted.

The exercising Customer(s)' obligations under this Section (3)(b) shall not be subject to Setoff of any kind (except as specified in subparagraph (viii) above).

(c)     Supplier Obligations. If one or more Customers exercise the Right of Access, Supplier shall comply with the following as to each Customer exercising its Right of Access, as applicable:

(i)     At such Customer's election in its sole discretion, Supplier

shall use its best efforts to continue to employ those of its employees which Customer determines are necessary to maintain production of the Component Parts (the "Employees") and in turn lease the Employees to Customer or its designee(s) (except for the Mexican Facility, where no leasing of Employees shall take place) and Customer or its designee(s) shall reimburse Supplier for all costs and expenses relating to Supplier's employment of the Employees incurred during the Occupancy Period (including overtime). Without limiting the generality of the foregoing, such Customer or its designee(s) shall reimburse Supplier all amounts incurred by Supplier to meet its regular payroll obligations, including salaries, wages, payroll taxes, workers' compensation, unemployment insurance, disability insurance, welfare, pension and other payments and contributions required to be made by Supplier with respect to the Employees, which are incurred during the Occupancy Period, but in no event will Customer be liable for (A) any costs for unfunded actuarial liability, past service unfunded actuarial liability, or solvency or deficiency liability relating to any pension plan, severance plan or other obligations relating to benefits accrued or service provided prior to the time Customer exercised its Right of Access or after the termination of the Occupancy Period, (B) any unpaid minimum contribution obligations to the pension plan(s), regardless of when they are due, relating to benefits accrued prior to or relating to the period prior to the time Customer exercised its Right of Access or after termination of the Occupancy Period, (C) unpaid premium payments to the PBGC with respect to any pension plan which accrued prior to or relating to the period prior to to the time Customer exercised its Right of Access or after the termination of the Occupancy Period, or (D) any excise tax, interest, make whole payments, or agency hearing or litigation costs on account of any prohibited transactions or other fiduciary breaches occurring prior to or relating to the period prior to the time the Customer exercised the Right of Access or after the termination of the Occupancy Period, alleged or confirmed with respect to Supplier's employee benefit plans. Notwithstanding the foregoing, under no circumstances will such Customer be responsible for reimbursing Supplier for costs and expenses relating to Supplier's employment of the Employees to the extent the Employees are performing services (x) unrelated to the production of the Component Parts or (y) unrelated to performance of Supplier's obligations under this Agreement;

(ii)     During the Occupancy Period, Supplier will have sole responsibility for maintaining and administering all employee benefit plans, and will assume and carry out all fiduciary obligations with respect to such plans. Such Customer's sole responsibility with respect to Supplier's employee benefit plans during the Occupancy Period will be to pay the Supplier all amounts needed to pay premiums or otherwise fund the plans in accordance with the plan documents and applicable law, and for its pro rata share of the reasonable costs of administering the plans in the ordinary course during the Occupancy Period (but specifically excluding any items listed in Section 3(c)(i)(A)-(D) above). Other than the obligation to pay Supplier the funds necessary to maintain and administer the employee benefit plans during the Occupancy Period, pursuant to this section and section 3(c)(i) above, such Customer has no other responsibilities or obligations with respect to the employee benefit plans, and does not have any role in overseeing, maintaining or administering them during the Occupancy Period;

(iii)    During the Occupancy Period, Supplier shall not increase compensation or benefits of the Employees without the consent of such Customer except as may be required by applicable law or preexisting contract;

(iv)     Supplier shall indemnify, defend and hold such Customer and the Lending Group, and their respective designee(s), employees and agents harmless from any and all costs, expenses (including reasonable attorneys' fees), losses, damages, liabilities or injury arising from claims or liabilities arising or accruing prior to the date of such Customer's exercise of the Right of Access or after termination of the Occupancy Period, regardless of when such claims are asserted; and

(v)      During the Occupancy Period, Supplier agrees that such Customer and its designee(s), agents and representatives shall have access to Supplier's books and records for the purposes of confirming and calculating the amounts due, if any, from such Customer under this Agreement.

(d)     <u>Right to Terminate</u>. Each Customer shall have the absolute right to terminate its respective Right of Access with respect to particular Operating Assets and Facility(ies) upon ten (10) days prior written notice to Supplier, Agent Bank and all other Customers. If the terminating Customer is a Producing Customer, each Customer who had not previously exercised its Right of Access at such Facility(ies) may exercise its Right of

Access or another Producing Customer may be designated for such Facility(ies) under the terms of Section 3(b)(vi), each within ten (10) days after receipt of the notice, provided, however, in each instance (1) the Occupancy Period shall be deemed to have commenced at such time as the first Producing Customer exercised its Right of Access in such Facility(ies) and (2) if no other Customer exercises its Right of Access before the Producing Customer(s) Right of Access terminates, then each Customer's Right of Access with respect to such Operating Assets and Facility(ies) shall be permanently terminated. Upon expiration of the notice period, the Occupancy Period for such Facility(ies) will terminate as to such terminating Customer and the Customer shall fulfill its obligations under this Agreement with respect to the Operating Assets and Facility(ies).

(e)     SPECIFIC PERFORMANCE.  **IN CONNECTION WITH ANY ACTION OR PROCEEDING TO ENFORCE THE RIGHT OF ACCESS, SUPPLIER ACKNOWLEDGES THAT CUSTOMERS WILL NOT HAVE AN ADEQUATE REMEDY AT LAW, THAT THE OPERATING ASSETS AND FACILITY(IES) ARE UNIQUE AND THAT EACH CUSTOMER SHALL BE ENTITLED TO SPECIFIC PERFORMANCE OF SUPPLIER'S OBLIGATIONS TO AFFORD EACH CUSTOMER THE RIGHT OF ACCESS UNDER THIS AGREEMENT. SUPPLIER FURTHER AGREES THAT EACH CUSTOMER MAY SEEK EXPEDITED RELIEF FROM A COURT OF PROPER JURISDICTION AND THAT TWENTY – FOUR (24) HOURS NOTICE OF SUCH REQUESTED EXPEDITED RELIEF SHALL BE ADEQUATE NOTICE THEREOF**.

(f)     Appointment of Receiver.  In addition to any rights and remedies each Customer may have as secured creditor under the terms of this or any other agreement between such Customer and Supplier, each Customer shall have the right to the appointment of a receiver to effectuate the Right of Access. In connection with any hearing on the appointment of a receiver, Supplier agrees that at least twenty-four (24) hours actual notice of any request for a hearing on such appointment shall be adequate notice. This Section 3(f) is not intended to limit or diminish any rights granted to each Customer in the Purchase Orders or the Accommodation Agreement, which rights continue in full force and effect.

(g)     IRREPARABLE HARM; LIMITATION OF NOTICE.  **SUPPLIER ACKNOWLEDGES THAT CUSTOMERS WILL SUFFER IRREPARABLE HARM IF ANY CUSTOMER EXERCISES THE RIGHT OF ACCESS AND SUPPLIER FAILS TO COOPERATE WITH SUCH CUSTOMER IN ALLOWING SUCH CUSTOMER TO EXERCISE THE RIGHT OF ACCESS UNDER THIS AGREEMENT. ACCORDINGLY, PROVIDED THAT SUPPLIER AND AGENT BANK RECEIVE AT LEAST TWENTY-FOUR (24) HOURS WRITTEN NOTICE OF ANY REQUEST FOR HEARINGS IN CONNECTION WITH PROCEEDINGS INSTITUTED BY A CUSTOMER, SUPPLIER WAIVES, TO THE FULLEST EXTENT POSSIBLE UNDER APPLICABLE LAW, THE RIGHT TO NOTICE IN EXCESS OF TWENTY-FOUR (24) HOURS IN CONNECTION WITH ANY JUDICIAL PROCEEDINGS INSTITUTED BY A CUSTOMER TO ENFORCE THE RIGHT OF ACCESS.**

4       Court Approval. In the event of any bankruptcy or insolvency proceeding involving Supplier, Supplier will exercise its commercial best efforts, in good faith, to obtain entry of a final order of a court of competent jurisdiction, confirming each Customers' rights under this Agreement and authorizing Supplier to enter into same, which order shall be sought promptly upon the commencement of such bankruptcy proceeding, but in no event later than the time periods set forth in Section 27 of the Accommodation Agreement.

5       License. This Section 5 is not intended to modify, and to the extent the Intellectual Property rights granted to a Customer under this Section 5 are not equal to or greater than the Intellectual Property rights granted to such Customer under the Purchase Orders, this Section 5 does not modify, any rights granted to Customers in the Purchase Order. For clarity, this Section 5 is intended to expand those rights. If necessary, subject to subsection (a) below, Supplier grants each Customer a non-exclusive worldwide, irrevocable, fully paid right and license to use any Intellectual Property to develop and manufacture the Component Parts for such Customer's use and/or use by third parties (the "License"). Such Customer's right to use the License shall include the right to sublicense third parties for the manufacture of the Component Parts.

        (a)     Right to Use License. Although the License is being granted to Customers as of the date set forth above, each Customer agrees that neither it nor its sublicensees will utilize the License unless such Customer invokes the Right of Access (and then it will only use the License during the Occupancy Period).

        (b)     No Royalty. For all purposes, Supplier has been fully paid for the License and other rights granted to Customers under this Agreement and no royalties, fees, payments, charges or other consideration shall be due from Customers on account of the License or this Agreement or any Customer's (or any sublicensee's) use of the License or other rights granted under this Agreement.

        (c)     Protection of Ownership. Each Customer shall treat and preserve the Intellectual Property in accordance with the same practices employed by such Customer to safeguard its own intellectual property against unauthorized use and disclosure and will only use such information, data and trade secrets during the Occupancy Period in connection with producing Component Parts. The foregoing obligations of each Customer shall not be applicable to information which is now or becomes hereafter available to the public through no action, conduct, admission or fault of such Customer. The provisions of this paragraph shall survive termination of this Agreement.

6       Rights of Customers; Limitations on Customers' Obligations. Unless a Customer exercises its Right of Access, in which case such Customer shall have the obligations outlined in this Agreement, such Customer shall not have any obligation or liability by reason of or arising out of this Agreement nor shall such Customer be required or obligated in any manner to perform or fulfill any of the obligations of Supplier.

7       Remedies. Subject to the terms of Section 2 above, upon a Default and the expiration of any applicable cure periods, each Customer shall have all rights and remedies provided in this Agreement, in any other agreements with Supplier, and all rights and remedies available to a secured creditor under applicable law; provided that Customers' rights as secured

creditors shall be limited to enforcing their Right of Access under this Agreement. Under no circumstances shall Customers have the right to assert or otherwise be allowed a secured monetary claim, based upon the liens and security interests granted pursuant to this Agreement, in any prospective bankruptcy proceeding in which Supplier is the debtor, or otherwise. Further, in connection with each Customer's rights and remedies under this Agreement:

        (a)      Supplier waives any right it may have to require such Customer to foreclose its security interests and liens and/or reduce the Obligations to a monetary sum;

        (b)      If a Customer exercises its Right of Access, such Customer shall be treated as a secured party in possession and such Customer's use and occupancy of the Operating Assets will not be deemed to be acceptance of such assets in satisfaction of the Obligations; and

        (c)      All of such Customer's rights and remedies under this Agreement are cumulative and not exclusive of any rights and remedies under any other agreement or under applicable law or at equity.

8      <u>Injunctive Relief</u>. Each Customer represents and Supplier acknowledges that Customers will incur significant damages if Supplier fails to timely satisfy its obligations to Customers and Customers' assembly or other plant operations will be negatively impacted, and because Customers do not have an adequate remedy at law and would be irreparably harmed by such events, Supplier agrees that Customers shall be entitled to injunctive relief (both prohibitive and mandatory) upon a Default and/or in connection with any violations by Supplier of any terms or conditions of this Agreement. Customers agree to provide Agent Bank notice of any proceeding seeking injunctive relief simultaneously with providing such notice to Supplier.

9      <u>Representations and Warranties</u>. Supplier represents and warrants to each Customer that:

        (a)      <u>Title; No Other Security Interests</u>. Except for the security interest granted under this Agreement to Customers and the liens and security interests granted to Agent Bank and the liens and security interests granted any other secured party of record, Supplier owns the Collateral free and clear of any and all security interests.

        (b)      <u>Addresses</u>. Supplier's chief executive office is set forth in <u>Exhibit B</u> and shall not be changed without prior written notice to Customers, but the Operating Assets, wherever located, are covered by this Agreement. Supplier must immediately advise Customers in writing of any change in any of its names, trade names, addresses, or forms of organization.

        (c)      <u>Trade Names</u>. Any and all trade names under which Supplier transacts any part of its business, and all former names of Supplier, are those which have been previously disclosed to Customers in writing.

        (d)      <u>Accuracy of Information</u>. All information, certificates, or statements given to Customers under this Agreement are true and complete in all material respects, when given.

(e) <u>Description of Facility(ies)</u>. The legal description of the Facility(ies) attached as <u>Exhibit B</u> is a complete and accurate description of the Facility(ies) and includes all property on which all buildings and other facilities of Supplier necessary for or useful in the production of Component Parts are located.

(f) <u>Authority</u>. It has full power and authority to enter into this Agreement and perform all of its obligations hereunder.

10    <u>Covenants</u>. Supplier covenants and agrees with Customers that from and after the date of this Agreement until the Obligations are satisfied in full:

(a) <u>Further Documentation</u>. At any time and from time to time, upon the written request of a Customer, and at Supplier's sole expense, Supplier will promptly and duly execute and deliver any and all such further instruments and documents and take such further action as such Customer may reasonably request for the purpose of obtaining the full benefits of this Agreement and of the rights and powers herein granted. Further, Supplier hereby grants each Customer a power of attorney to execute on its behalf and file necessary or appropriate financing or continuation statements under the Code to perfect the security interests granted hereby.

(b) <u>Sales or Dispositions of Assets; Certain Uses Prohibited</u>. Except as otherwise set forth in the Accommodation Agreement, without the prior written consent of Customers (which consent will not be unreasonably withheld), Supplier will not sell, encumber or otherwise dispose of any Operating Assets except in the ordinary course of business and will not sell, encumber or otherwise dispose of the Facility(ies). Further, Supplier will not use any of the Operating Assets or the Facility(ies) in any way which would materially adversely affect Customers' Right of Access or Customers' other rights and remedies under this Agreement. Supplier acknowledges and agrees that it will be reasonable for a Customer to withhold consent if the proposed sale or encumbrance impairs, or may impair, Customer's rights under this Agreement or the Purchase Orders.

(c) <u>Limitations on Modifications of Agreements, etc</u>. Supplier will not, other than in the ordinary course of business: (i) amend, modify, terminate, or waive any provision of any Contract which might materially adversely affect Customers' Right of Access; or (ii) fail to exercise promptly and diligently each and every right which it may have under each Contract in any manner which could materially adversely affect Customers' Right of Access or a Customers' other rights or remedies under this Agreement or any other agreement between  such Customer and Supplier.

(d) <u>Maintenance of Insurance</u>. Supplier must, at its expense,  keep and maintain insurance on the Collateral, including the Operating Assets and the Facility(ies), against all risk of loss or damage from fire, theft, malicious mischief, explosion, sprinklers, and all other hazards or risks of physical damage included within the meaning of the term "extended coverage" in amounts as are ordinarily insured against by other similar businesses and shall furnish Customers evidence of said insurance, name Agent Bank as lender loss payee and additional insured, and name Customers as additional insureds.

(e) <u>Right of Inspection; Cooperation</u>. In addition to any rights Customers may have under the Purchase Orders or any other agreement with Supplier (including the Accommodation Agreement), each Customer and its representatives shall, upon reasonable request and at reasonable times, have the right to enter into and upon any premises where any of the Collateral, including the Operating Assets or the Facility(ies), is located for the purpose of inspecting the same, observing their use or otherwise protecting Customer's interests therein. Each Customer will take reasonable steps to maintain the confidentiality of information obtained by Customer, except as required by law.

(f) <u>Notice of Default</u>. Supplier will provide immediate notice to Customers, by way of electronic delivery and overnight express mail service, of its or its attorneys' or agents' receipt of any notice of default under Supplier's agreements with Agent Bank, or any other secured creditors including but not limited to taxing authorities. Supplier hereby grants to Customers the option, but not the obligation, to exercise whatever rights to cure defaults that Supplier has under such agreements or by law.

11 <u>Secured Party and Lessor Acknowledgments</u>.

(a) Supplier will provide to Customers within thirty (30) days following the date of this Agreement, acknowledgments of any and all lessor(s) of the Facility(ies) and Operating Assets (to the extent leased) to Customers' rights hereunder, in a form substantially similar to <u>Exhibit D</u> attached hereto.

(b) Supplier shall obtain Agent Bank's acknowledgment to the rights and interests granted to Customers under this Agreement by providing Customers a copy of the form attached as <u>Exhibit C</u> executed by a duly authorized representative of Agent Bank.

(c) If, as of the Effective Date, Supplier has granted security interests in any of the Operating Assets or Facility(ies) to any party other than Customers, Supplier must deliver to Customers an acknowledgment from such secured creditors, mortgagees, and/or lessees in a form substantially similar to <u>Exhibit D</u> attached hereto within fifteen (15) business days of the Effective Date. Supplier shall not be required to obtain an acknowledgement from Unifin Financiera, S.A.B. DE C.V. If subsequent to the execution of this Agreement, Supplier intends to grant additional or further security interests, liens, mortgages or leaseholds in any of the Operating Assets or the Facility(ies) to any party other than Customers, fifteen (15) business days prior to granting such liens, security interests, mortgages or leaseholds, Supplier must deliver to Customers an acknowledgment from such secured creditors, mortgagees, and/or lessees in the form attached as <u>Exhibit C</u>.

12 <u>Effect on Purchase Contracts</u>. The purpose of this Agreement is to preserve the rights and interests of Supplier and Customers under the Purchase Orders and, by entering into this Agreement, neither Customers nor Supplier are waiving or limiting any rights it may have under the Purchase Orders. This Agreement shall be deemed to be incorporated by reference into, and shall constitute an amendment to all existing and future Purchase Orders regardless of whether any specific reference to this Agreement is made in any such Purchase Orders. To the extent that any

term or provision in this Agreement is inconsistent with any term or condition of any such Purchase Order, the terms and conditions of this Agreement shall control.

13      Term. The rights granted to each Customer under this Agreement with respect to any one or more Facility(ies) shall continue until the date that is ten (10) days after the termination (whether by expiration or otherwise) of the Term (as defined in the Accommodation Agreement) with respect to such Facility, unless such Customer has exercised its Right of Access at such Facility(ies) prior to expiration of that time period. For any Facility as to which a Customer has exercised its Right of Access, the rights granted to such Customer under this Agreement with respect to such Facility and the Operating Assets related to such Facility shall continue until the earlier of (a) the expiration of the Occupancy Period at such Facility, or (b) when such Customer's requirements under the Purchase Orders with respect to production at such Facility are satisfied or all of the Component Parts produced at such Facility are resourced, or (c) upon the sale of the Operating Assets at such Facility to a Qualified Buyer (as defined in the Accommodation Agreement).

14      Confidential Information and Data. Without limiting Customers' rights under this Agreement, to the extent the Operating Assets include or a Customer or its designee(s) otherwise comes into possession of or becomes aware of, Supplier's trade secrets or proprietary information during such Customer's exercise of the Right of Access, such Customer and its designee(s) shall: (a) keep the information, data and trade secrets confidential; and (b) only use the information, data and trade secrets during the Occupancy Period in connection with producing the Component Parts. The provisions of this paragraph shall survive termination of this Agreement.

15      Severability. Should any provision of this Agreement be held invalid, prohibited or unenforceable in any one jurisdiction it shall, as to that jurisdiction only, be ineffective to the extent of such holding without invalidating the remaining provisions of this Agreement, and any such holding does not invalidate or render unenforceable that provision in any other jurisdiction wherein it would be valid and enforceable.

16      Authorization. The parties executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the entity that they represent and that their signatures bind said entities to the terms of this Agreement. This representation and warranty expressly survives the termination of this Agreement.

17      Section/Paragraph Headings. The section/paragraph headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation of this Agreement. All references to paragraphs, sections, Schedules and Exhibits are to paragraphs, sections, Schedules and Exhibits in or to this Agreement unless otherwise specified.

18      Interpretation.  Unless the context requires otherwise, for purposes of this agreement:

        (a)      the singular includes the plural, and vice versa, including with respect to references to the Parties to this Agreement;

        (b)      all pronouns and their variations refer to the masculine, feminine, or

neuter, as the identity of the person or persons may require;

(c) all definitions and references to an agreement, instrument, or document means that agreement, instrument, or document together with all exhibits and schedules to that agreement, instrument, or document, and any and all amendments, restatements, supplements, replacements, or modifications to that agreement, instrument, or document, as the same may be in effect at the time of such definition or reference;

(d) "include," "includes," and "including" are to be treated as if followed by "without limitation" whether or not they are followed by these words or words with a similar meaning;

(e) text that is shown in bold or IN ALL CAPITAL LETTERS is deemed conspicuous;

(f) all accounting terms not otherwise specifically defined herein shall be construed in accordance with GAAP.

19     No Waiver; Cumulative Remedies. Customers and Supplier shall not by any act, delay, indulgence, omission or otherwise be deemed to have waived any right or remedy under this Agreement or of any breach of the terms and conditions of this Agreement. A waiver by a Customer or Supplier of any right or remedy under this Agreement on any one occasion shall not be construed as a bar to any right or remedy which such Customer or Supplier would otherwise have had on a subsequent occasion. No failure to exercise nor any delay in exercising on the part of a Customer or Supplier any right, power, or privilege under this Agreement, shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies under this Agreement are cumulative, may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by any other agreements or applicable law or at equity.

20     Waivers and Amendments; Successors and Assigns. No term or provision of this Agreement may be waived, altered, modified, or amended except by a written instrument, duly executed by Supplier and Customers (and consented to by Agent Bank in its reasonable discretion). This Agreement and all of Supplier's obligations are binding upon the successors and assigns of Supplier, and together with the rights and remedies of Customers under this Agreement, inure to the benefit of each Customer and each member of the Lending Group and their respective successors and assigns. Supplier may not assign or transfer any right or obligation under this Agreement without the prior written consent of Customers and Agent Bank. Any purported assignment in violation of this section will be null and void.

21     No Contra Proferentem.  The parties are competent and experienced in business, and have negotiated and reviewed this Agreement with their counsel.  Any ambiguous language in this Agreement should therefore not be construed against any party as the drafter of that language.

22     Governing Law and Forum. This Agreement shall be governed by, and be construed and interpreted in accordance with, the laws of the State of Michigan, without regard to conflicts

of laws principles. Jurisdiction and venue shall be proper in the United States District Court for the Eastern District of Michigan or the Oakland County Circuit Court in the State of Michigan.

23    Notices. All notices, requests and other communications that are required or may be given under this Agreement must be in writing and shall be deemed to have been given on the date of delivery, if delivered by hand, electronic delivery or courier, or three (3) days after mailing, if mailed by certified or registered mail, postage prepaid, return receipt requested, addressed as set forth below (which addresses may be changed, from time to time, by notice given in the manner provided in this Section). For clarity, where notice is required to be given or received by a Supplier Mexican subsidiary, GNA will be designated to give or receive such notice, as the case may be, and a notice to a Mexican subsidiary will be deemed to have been given or received when the notice is given or received by GNA on behalf of the Mexican subsidiary. GNA will obtain from each Mexican subsidiary a power of attorney designating GNA to give and receive notice under this Agreement on its behalf):

| | |
|---|---|
| If to Supplier: | Gissing North America LLC<br>125 Allied Road<br>Auburn, Maine 04211<br>Attention: Steven Wybo<br>Email: steven.wybo@riveron.com |
| With a copy to: | Kerr, Russell and Weber, PLC<br>500 Woodward Ave., Suite 2500<br>Detroit, MI 48226<br>Attention:  Jason W. Bank<br>Email: jbank@kerr-russell.com |
| If to GM: | General Motors LLC<br>Cole Engineering Center<br>29755 Louis Chevrolet Road<br>Warren, MI  48090-9020<br>M/C 480-210-8S<br>Attention: Mark W. Fischer<br>Email: mark.w.fischer@gm.com |
| | General Motors LLC<br>Aaron Silver, GPSC Legal Counsel<br>300 Renaissance Center, MC482-C23-A68<br>Detroit, MI 48265<br>E-Mail: aaron.silver@gm.com |
| | and |
| With a copy to: | Honigman LLP<br>660 Woodward Avenue<br>2290 First National Building<br>Detroit, Michigan 48226 |

Attention: E. Todd Sable
Email: tsable@honigman.com

If to Toyota:     Toyota Motor Engineering & Manufacturing
                  North America, Inc.
                  8777 Platt Road
                  Saline, MI  48176
                  Attn: Wes Triplett
                  Email: wes.triplett@toyota.com

                  Toyota Motor North America, Inc.
                  6565 Headquarters Drive
                  Plano, TX  75024
                  Attn:  Meadow Clendenin
                  Email:  meadow.clendenin@toyota.com

                  and

With a copy to:   Frost Brown Todd LLC
                  The Pinnacle at Symphony Place
                  150 3rd Avenue South, Suite 1900
                  Nashville, Tennessee 37201
                  Attn: Patricia Burgess
                  E-mail: pburgess@fbtlaw.com

 

 

24 <u>No Other Intended Third Party Beneficiary</u>. The parties hereto acknowledge and agree that the rights and interests of the parties under this Agreement are intended to benefit solely the parties to this Agreement, Agent Bank, and the other members of the Lending Group. The Lending Group is an intended third-party beneficiary of this Agreement and the Agent Bank is entitled to enforce this Agreement.

25 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

26 <u>Entire Agreement; Conflicts</u>. This Agreement together with the Accommodation Agreement, the Purchase Orders, and any other agreements and schedules executed in connection with this Agreement or the Accommodation Agreement constitutes the entire understanding of the parties in connection with the subject matter hereof. The terms and conditions of the Purchase Orders shall be unaffected by this Agreement except to the extent that an inconsistency or conflict exists between the express terms of the Purchase Orders and this Agreement in which event the terms of this Agreement shall govern and control. To the extent any term or condition of this Agreement is inconsistent or in conflict with the terms of any other agreements between the parties,

the terms of this Agreement shall govern and control.

27     CONSULTATION WITH COUNSEL.

**THE PARTIES HERETO ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH AGREEMENT WITHOUT DURESS OR COERCION AND WITHOUT RELIANCE ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN THIS AGREEMENT**.

28     WAIVER OF JURY TRIAL.

**THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR ANY OTHER AGREEMENTS BETWEEN THE PARTIES. NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED**.

[Remainder of page intentionally left blank.]

Supplier and Customers have executed this Access Agreement as of the date first written above.

<u>**SUPPLIER:**</u>

**GISSING NORTH AMERICA LLC,**
    a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING TECHNOLOGIES LLC,**
    a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING SIDNEY LLC,**
    a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING SUMTER LLC,**
    a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING AUBURN LLC,**
    a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING TECHNOLOGIES MEXICO LLC,**
a Delaware limited liability company

By: *C. Caldo.*
Name: CLAUDIO CALADO
Title: CEO & President

**CONFORM AUTOMOTIVE, LLC,**
a Michigan limited liability company

By: _____
Name: _____
Title: _____

**DTI MOLDED PRODUCTS, INC.,**
a Michigan corporation

By: *C. Caldo.*
Name: CLAUDIO CALADO
Title: CEO & President

**GISSING FREMONT LLC,**
a Delaware limited liability company

By: *C. Caldo.*
Name: CLAUDIO CALADO
Title: CEO President

**GISSING GREENVILLE LLC,**
a Delaware limited liability company

By: *C. Caldo.*
Name: CLAUDIO CALADO
Title: CEO President

44484599.1

**GISSING TECHNOLOGIES MEXICO LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**CONFORM AUTOMOTIVE, LLC,**
a Michigan limited liability company

By: _____

Name: STEVEN PHILLIPS

Title: CEO

**DTI MOLDED PRODUCTS, INC.,**
a Michigan corporation

By: _____

Name: _____

Title: _____

**GISSING FREMONT LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**GISSING GREENVILLE LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

44484769.8

**CUSTOMERS:**

**GENERAL MOTORS LLC,**
  a Delaware limited liability company

By: _____

Name: _____ M.W. FISCHER _____

Title: _____ DIRECTOR, SFRM _____

**TOYOTA MOTOR ENGINEERING &**
**MANUFACTURING NORTH AMERICA, INC.,**
  a Kentucky corporation

By: _____

Name: _____

Title: _____

44484599.1

**CUSTOMERS**:

**GENERAL MOTORS LLC,**
  a Delaware limited liability company

By:_____

Name: _____

Title: _____

**TOYOTA MOTOR ENGINEERING &**
**MANUFACTURING NORTH AMERICA,**
**INC.,**
  a Kentucky corporation

By:_____

Name: Robert Young

Title: Group Vice President, Purchasing Supplier Development

# EXHIBIT A
## FACILITIES

| Facility | Monthly Access Fee [1] | Occupancy Period [2] |
|---|---|---|
| 125 Allied Road, Auburn, Maine 04210 | $247,688 | Up to 9 Months |
| 320 Neeley Street, Sumter, South Carolina 29150 | $102,604 | Up to 9 Months |
| 1630 Ferguson Court, Sidney, Ohio 45365 | $57,375 | Up to 9 Months |
| 181 Peacock Hill RD, New Gloucester, Maine, 04260 | N/A | Up to 9 Months |
| 32500 Telegraph Road, Suite 207, Bingham Farms, Michigan 48025 | $8,222 | Up to 9 Months |
| 28031 Grand Oaks Ct., Wixom, Michigan 48393 | $6,343 | Up to 9 Months |
| 6815 Mowry Avenue, Newark, California 94560 | N/A | Up to 9 Months |
| 189 Milacron Drive, Fountain Inn, South Carolina 29644 | N/A | Up to 9 Months |
| Circuito de Las Colinas #321, Manzana 4, Lote 30, Parque Industrial Colinas de León, León Guanajuato, CP 37430, Mexico [3] | $276,000 | Up to 9 Months |
| **Total Monthly Access Fee** | **$698,232** | |

(a)

_**Notes**_

1) _Access Fee calculated using building and equipment appraisals divided by 48 or fixed asset register (excluding Mexico), Access Fee shown as monthly rate._

2) _Total Occupancy period will be up to 9 months._

3) _Mexico's Access Fee calculated using trailing three month averages for depreciation from historical financial and subject to change. Access Fee will be calculated based on the Monthly Access Fee less the historical run rate of depreciation for assets. The Lending Group does not have a first position lien right._

**EXHIBIT B**
**<u>CHIEF EXECUTIVE OFFICE</u>**

Gissing North America LLC
125 Allied Road
Auburn, Maine 04211

**EXHIBIT C**
**ACKNOWLEDGMENT AND CONSENT**

While not a party to the Access and Security Agreement (the "Access Agreement") made among General Motors LLC, for itself and on behalf of its subsidiaries and affiliates ("GM"), Toyota Motor Engineering & Manufacturing North America, Inc., for itself and on behalf of its subsidiaries and affiliates ("Toyota" and together with GM, "Customers" and each a "Customer"), Gissing North America LLC, f/k/a Conform Gissing International, LLC, a Delaware limited liability company ("GNA"), Gissing Technologies LLC, f/k/a Formed Fiber Technologies, LLC, a Delaware limited liability company ("GT"), Gissing Sidney LLC, f/k/a FFT Sidney, LLC, a Delaware limited liability company ("Sidney"), Gissing Sumter LLC, f/k/a FFT Sumter, LLC, a Delaware limited liability company ("Sumter"), Gissing Auburn LLC, f/k/a FFT Auburn, LLC, a Delaware limited liability company ("Auburn"), Gissing Technologies – Mexico LLC, f/k/a Formed Fiber Technologies – Mexico, LLC, a Delaware limited liability company ("Gissing Mexico"), DTI Molded Products, Inc., a Michigan corporation ("DTI"), Conform Automotive, LLC, a Michigan limited liability company ("Conform"), Gissing Fremont LLC, a Delaware limited liability company ("Fremont"), and Gissing Greenville LLC, a Delaware limited liability company ("Greenville," and collectively with GNA, GT, Sidney, Sumter, Auburn, Gissing Mexico, DTI, Conform, and Fremont, "Supplier"), dated July 8, The Huntington National Bank, a national banking association, in its capacity as agent (in that capacity, "Agent Bank"), for itself and the other financial institutions party to the Loan Documents from time to time as lenders (collectively, the "Lending Group") is party to various loan and/or security agreements with Supplier and certain of Supplier's affiliates (Supplier and such affiliates, collectively, the "Loan Parties") and has a security interest in all or substantially all of the Loan Parties' assets. In such capacity, Agent Bank acknowledges, consents to, and agrees that the exercise of its rights and remedies with respect to its liens and security interests in the Operating Assets (as defined in the Access Agreement) and Facilities (as defined in the Access Agreement) are subject to all applicable terms of the Access Agreement. The fact that Agent Bank is executing this Acknowledgment and Consent shall not in any way make it a guarantor or surety for Supplier's performance under the Access Agreement. Further, except as provided in the Access Agreement and the Accommodation Agreement, Agent Bank reserves all of its rights against Supplier and the other Loan Parties under its other agreements with Supplier and the other Loan Parties or applicable law.

Dated: _____, 2022

THE HUNTINGTON NATIONAL BANK,
as Agent Bank (for itself and the Lending Group)

By: _Barry S. ONeill_
Name: _Barry S. ONeill_
Title: _Senior Vice President_

44484769.6

**EXHIBIT D**
**LESSOR'S ACKNOWLEDGMENT AND CONSENT**

While not a party to the Access and Security Agreement (the "Access Agreement") made among General Motors LLC, for itself and on behalf of its subsidiaries and affiliates ("GM"), Toyota Motor Engineering & Manufacturing North America, Inc., for itself and on behalf of its subsidiaries and affiliates ("Toyota" and together with GM, "Customers" and each a "Customer"), Gissing North America LLC, f/k/a Conform Gissing International, LLC, a Delaware limited liability company ("GNA"), Gissing Technologies LLC, f/k/a Formed Fiber Technologies, LLC, a Delaware limited liability company ("GT"), Gissing Sidney LLC, f/k/a FFT Sidney, LLC, a Delaware limited liability company ("Sidney"), Gissing Sumter LLC, f/k/a FFT Sumter, LLC, a Delaware limited liability company ("Sumter"), Gissing Auburn LLC, f/k/a FFT Auburn, LLC, a Delaware limited liability company ("Auburn"), Gissing Technologies – Mexico LLC, f/k/a Formed Fiber Technologies – Mexico, LLC, a Delaware limited liability company ("Gissing Mexico"), DTI Molded Products, Inc., a Michigan corporation ("DTI"), Conform Automotive, LLC, a Michigan limited liability company ("Conform"), Gissing Fremont LLC, a Delaware limited liability company ("Fremont"), and Gissing Greenville LLC, a Delaware limited liability company ("Greenville," and collectively with GNA, GT, Sidney, Sumter, Auburn, Gissing Mexico, DTI, Conform, and Fremont, "Supplier"), dated July 8, the undersigned leases certain Facility(ies) commonly known as _____ (the "Facility"), and/or personal property to Supplier and, in such capacity, the undersigned acknowledges, consents to, and agrees with, and agrees to be bound by, the terms and conditions of the foregoing Access Agreement, including Customer's right to use the Operating Assets and the Facility during any Occupancy Period.


_____
Name of Lessor


Dated: _____, 2022

**EXHIBIT I**
**Tenth Amendment to Forbearance Agreement**

<u>**TENTH AMENDMENT TO FORBEARANCE AGREEMENT**</u>

THIS TENTH AMENDMENT TO FORBEARANCE AGREEMENT (this "<u>**Tenth Amendment**</u>") is effective as of July 18, 2022, by and among **GISSING NORTH AMERICA LLC (F/K/A CONFORM GISSING INTERNATIONAL, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES LLC (F/K/A FORMED FIBER TECHNOLOGIES, LLC)**, a Delaware limited liability company, **GISSING SIDNEY LLC (F/K/A FFT SIDNEY, LLC)**, a Delaware limited liability company, **GISSING SUMTER LLC (F/K/A FFT SUMTER, LLC)**, a Delaware limited liability company, **GISSING AUBURN LLC (F/K/A FFT AUBURN, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES MEXICO LLC (F/K/A FORMED FIBER TECHNOLOGIES – MEXICO, LLC)**, a Delaware limited liability company, **DTI MOLDED PRODUCTS, INC.**, a Michigan corporation, **CONFORM AUTOMOTIVE, LLC**, a Michigan limited liability company, **GISSING FREMONT LLC**, a Delaware limited liability company, and **GISSING GREENVILLE LLC**, a Delaware limited liability company (collectively, "<u>**Borrowers**</u>"), **THE HUNTINGTON NATIONAL BANK**, a national banking association, as administrative agent ("<u>**Agent**</u>"), and the lenders party to the Forbearance Agreement, as hereinafter defined (the "<u>**Lenders**</u>").

<u>R E C I T A L S</u>:

WHEREAS, Borrowers, Agent and the Lenders entered into that certain Forbearance Agreement dated as of November 30, 2021 (as the same may be amended, restated, modified or supplemented from time to time, the "<u>**Forbearance Agreement**</u>"). Capitalized terms used but not defined herein shall have the meanings ascribed to those terms in the Forbearance Agreement;

WHEREAS, Borrowers have requested that Agent and the Lenders continue to forbear from exercising their rights and remedies under the Loan Documents arising on account of (a) the Existing Defaults (as such term is defined in the Second Amendment to Forbearance Agreement dated January 26, 2022 by and among Borrowers, Agent and the Lenders (the "<u>**Second Amendment**</u>")), (b) an Event of Default under Section 6(a) of the Second Amendment occurred when Borrowers failed to provide Agent with at least two (2) proposal letters signed by prospective lenders that would provide for the repayment in full of the Obligations by January 28, 2022, (c) an Event of Default under Section 6(b) of the Second Amendment occurred when Borrowers failed to provide evidence to Agent that the Mexico Subsidiary issued an intercompany note owing to the Borrower Representative for an amount not less than the SOFA Amount by January 28, 2022, (d) an Event of Default under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(f) of the Credit Agreement by failing to accept a proposal letter that would provide for the repayment in full of the Obligations by January 31, 2022, (e) an Event of Default under Section 10.3 of the Credit Agreement when Borrowers violated Section 9.6 of the Credit Agreement by failing to deliver the monthly financial statements for the months ending December 31, 2021, January 31, 2022, February 28, 2022, March 31, 2022, and May 31, 2022 in each case, within thirty (30) days after the end of such month, (f) an Event of Default under Section 10.1 of the Credit Agreement when Borrowers failed to timely pay the excess of the Revolving Exposure over the Maximum Borrowing Amount, as required by Section 2.4, (g) an Event of Default under Section 3(e) of the Forbearance Agreement when Borrowers failed to deliver a report from the Consultant (as defined in the Forbearance Agreement) by February 15, 2022, (h) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(g) of the Credit Agreement by failing to deliver by February 18, 2022 a signed commitment letter that would provide for the repayment in full of the Obligations, (i) an Event of Default occurred under Section 10.3 of the Credit Agreement when Borrowers violated Section 9.2 of the Credit Agreement by failing to deliver a completed and current interim Borrowing Base Certificate commencing on October 6, 2021 and on each Wednesday thereafter through February 23, 2022, (j) an Event

of Default occurred under Section 10.3 of the Credit Agreement when Borrowers violated Section 9.2 of the Credit Agreement by failing to deliver the monthly Borrowing Base Certificate for the months ending October 31, 2021, November 30, 2021, December 31, 2021, January 31, 2022, February 28, 2022 and March 31, 2022, in each case, within fifteen (15) days after the end of such month, (k) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(a) of the Credit Agreement by failing to deliver by March 4, 2022 the delinquent financial statements for the fiscal year ending December 31, 2021, (l) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(b) of the Credit Agreement by failing to deliver by March 9, 2022 executed proposal letters that would provide for the repayment in full of the Obligations, (m) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(e) of the Credit Agreement by failing to deliver by March 21, 2022 an executed Intellectual Property Security Agreement in favor the Agent and the Lenders, (n) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(f) of the Credit Agreement by failing to deliver by March 24, 2022 a signed commitment letter that would provide for the repayment in full of the Obligations, (o) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(g) of the Credit Agreement by failing to repay the Obligations in full by March 31, 2022, (p) an Event of Default under Section 3(e) of the Forbearance Agreement when Borrowers failed to deliver a summary from the Consultant (as defined in the Forbearance Agreement) by March 11, 2022, (q) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(a) of the Credit Agreement by failing to enter into an Intellectual Property Security Agreement in favor of the Agent and the Lenders by April 6, 2022, (r) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(b) of the Credit Agreement by failing to provide the Agent and the Lenders with (i) executed proposal letters from FGI and Great Rock, and (ii) evidence and details of an agreement with Tesla to provide additional funds to the Borrowers, in each case, that would collectively provide for the repayment in full of the Obligations, by April 8, 2022, (s) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(c) of the Credit Agreement by failing to cause the Consultant to provide the Agent and the Lenders with an updated sources and uses calculation that indicates all required conditions to close by April 28, 2022 are met and would provide for the repayment in full of the Obligations, by April 11, 2022, (t) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(d) of the Credit Agreement by failing to provide the Agent and the Lenders with executed credit approvals from FGI and Great Rock that would collectively provide for the repayment in full of the Obligations by April 19, 2022, (u) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(e) of the Credit Agreement by failing to repay the Obligations in full by April 28, 2022, (v) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(b) of the Credit Agreement by failing to decide who to engage as the chief restructuring officer by May 15, 2022, (w) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(c) of the Credit Agreement by (i) failing to provide the Agent and the Lenders, on or before May 20, 2022, with executed credit approvals from FGI and Great Rock that would collectively provide for the repayment in full of the Obligations, and (ii) failing to engage a chief restructuring officer by May 21, 2022, (x) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(d) of the Credit Agreement by failing to cause the CRO to contact the original equipment manufacturers and begin discussions regarding the negotiation of accommodation agreements acceptable to the Agent and the Lenders by May 27, 2022, (y) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 7.8 of the Credit Agreement by incurring $2,850,000 of Indebtedness owing to Tesla, Inc. on or around April 25, 2022, (z) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(b) of the Credit Agreement by failing to agree on the material terms of the Access Agreement(s) and Accommodation Agreement(s) with the Customers by June 24, 2022, (aa) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(c) of the Credit Agreement by failing to deliver to Agent all documents requested by the Agent and/or the Agent's legal counsel deemed necessary or appropriate in the Agent's sole discretion for the Agent and the Lenders to (i) perfect a security interest in the assets of the Mexico Subsidiary and Gissing Mexico Subsidiary, and

(ii) perfect their security interest in all assets of the Borrowers located in Mexico, in each case, by June 24, 2022, (bb) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(a) of the Credit Agreement by failing to provide to the Agent and the Lenders fully-executed Access Agreement(s) and Accommodation Agreement(s) with the Customers by July 8, 2022, (cc) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(b) of the Credit Agreement by failing to deliver to Agent all documents requested by the Agent and/or the Agent's legal counsel deemed necessary or appropriate in the Agent's sole discretion for the Agent and the Lenders to perfect their security interest in all assets of the Borrowers located in Mexico by July 8, 2022, (dd) an Event of Default occurred under Section 10.5 of the Credit Agreement when Borrowers violated Section 6.10(a) of the Credit Agreement by failing to provide to the Agent and the Lenders fully-executed Access Agreement(s) and Accommodation Agreement(s) with the Customers by July 15, 2022, and (ee) an Event of Default occurred under Section 10.1 of the Credit Agreement when the Borrowers failed to repay the Obligations in full on or prior to the Facility Termination Date (in effect prior to the execution of this Tenth Amendment) (collectively, the "**Defaults**").

WHEREAS, Agent and the Lenders have agreed to continue to forbear from exercising their rights and remedies until the Termination Date subject to the terms and conditions set forth in the Forbearance Agreement; and

WHEREAS, the parties hereto agree to enter into this Tenth Amendment to modify the Forbearance Agreement in accordance with the terms and provisions more specifically set forth herein.

## **AGREEMENTS:**

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

1. <u>Amendment to Section 1</u>. Section 1 of the Forbearance Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

    1. **Forbearance.** In consideration of the representations, covenants and agreements contained herein, Agent and the Lenders shall continue to forbear from exercising their rights and remedies under the Loan Documents on account of the Defaults (which are not waived but expressly preserved) until the earlier of: (a) 5:00 p.m. on November 10, 2022; or (b) the date of the occurrence of any Forbearance Default (as defined below). The date on which the earlier of the events listed in clauses (a) and (b) occurs shall be the "**Termination Date**," and the period of time from the effectiveness of this Agreement to the Termination Date shall be the "**Forbearance Period**."

2. <u>Amendment to Section 3(a)</u>. Section 3(a) of the Forbearance Agreement is hereby amended by adding the following definitions thereto:

    "<u>Access and Security Agreement</u>" means that certain Access and Security Agreement by and among the Borrowers, GM and Toyota dated as of the Forbearance Tenth Amendment Effective Date and acknowledged by the Agent.

    "<u>Accommodation Agreement</u>" means that certain Accommodation Agreement dated as of the Forbearance Tenth Amendment Effective Date by and among the Borrowers, the Agent, BMW SLP S.A. de C.V., GM, Toyota and any other Person who may become a party thereto after the Forbearance Tenth Amendment

Effective Date via a joinder agreement or other documentation acceptable to the Agent.

"Forbearance Tenth Amendment" means that certain Tenth Amendment to Forbearance Agreement by and among the Borrowers, the Agent and the Lenders dated as of the Forbearance Tenth Amendment Effective Date.

"Forbearance Tenth Amendment Effective Date" means July 18, 2022.

"Permitted Reserves" shall have the meaning set forth in Section 3(j) of the Forbearance Agreement.

"Third SOFA Amount" means an amount equal to (a) the lesser of (i) the amount funded in cash by Subordinated Participant pursuant to the Third SOFA Schedule, and (ii) $12,704,000, *minus* (b) any amounts paid to Subordinated Participant by the Agent pursuant to the terms of the Participation Agreement.

"Third SOFA Schedule" means the Schedule attached to the Forbearance Tenth Amendment as Exhibit A, which may be amended from time to time pursuant to the terms and conditions of the Accommodation Agreement.

3.  Amendment to Section 3(b). Section 3(b) of the Forbearance Agreement is hereby amended by deleting the definitions of "Borrowing Base", "Facility Termination Date" and "Participation Agreement" in their entirety and replacing them with the following:

"Borrowing Base" shall mean, at any time, the sum of (a) up to 90% of each Borrower's Eligible Accounts that are owed by Tesla, GM and Toyota as long as they are an Investment Grade Account Debtor, *plus* (b) up to 85% of all of Borrower's other Eligible Accounts owing from Account Debtors located in the United States at such time (including Tesla, GM and Toyota if they are not an Investment Grade Account Debtor), *plus* (c) the lesser of (i) up to 85% of each Borrower's Eligible Accounts owing from Account Debtors located in Canada at such time and (ii) $3,500,000, *plus* (d) the lesser of (i) up to 85% of each Borrower's Eligible Tooling Accounts at such time or (ii) $4,500,000, *plus* (e) the lesser of (i) up to 85% of each Borrower's Eligible Foreign Accounts at such time and (ii) $2,000,000, *plus* (f) the lesser of (i) up to 55% of each Borrower's Eligible Inventory, valued at the lower of cost or market value, determined on a first in first out basis, at such time, and (ii) $8,000,000, *plus* (g) the SOFA Amount, *plus* (h) the Second SOFA Amount, *plus* (i) the Third SOFA Amount, *minus* (j) the Innova Lease Reserve, *minus* (k) the Fifth Amendment Reserve, *minus* (l) any other Reserves in effect on the Forbearance Tenth Amendment Effective Date, *minus* (m) the Permitted Reserves. Borrower shall deliver to Agent (x) evidence acceptable to Agent that Tesla is an Investment Grade Account Debtor prior to the initial inclusion of Tesla's Eligible Accounts in subsection (a) of "Borrowing Base," and (ii) simultaneously with the delivery of each quarterly Compliance Certificate required to be delivered pursuant to Section 9.6, evidence acceptable to Agent that each of Tesla, GM and Toyota is an Investment Grade Account Debtor, which shall be a condition to the continued inclusion of the Tesla, GM and Toyota Eligible Accounts in subsection (a) of "Borrowing Base." The Agent may, in its Permitted Discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base (other than the SOFA Amount, Second SOFA Amount and Third SOFA Amount), each upon one (1) Business Day notice to the Borrower Representative.

"Facility Termination Date" shall mean the earlier of (a) November 10, 2022 and (b) the date on which this Agreement and the obligations of parties hereto are terminated.

"Participation Agreement" means that certain Second Amended and Restated Subordinated, Last-Out Participation Agreement dated as of the Forbearance Tenth Amendment Effective Date by and among the Agent, the Lenders, and GM and consented to by the Borrowers.

4.   Amendment to Section 3(c).  Section 3(c) of the Forbearance Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

(c)      Section 6.10 (Milestones) of the Credit Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

6.10   **Milestones**. Meet the following conditions within the time frame indicated (or such extended time as may be agreed to by the Agent in its sole discretion), each of such documents and/or actions to be in form and substance acceptable to the Agent in its sole discretion:

(a)      If the Sale Process (as defined in the Accommodation Agreement) occurs out-of-court:

(i)      Within thirty-five (35) days of the Forbearance Tenth Amendment Effective Date, the Borrowers (other than Conform Automotive, LLC) shall deliver to each of the Material Customers (as defined in the Accommodation Agreement) and Agent one or more nonbinding expressions of interest on terms and conditions reasonably satisfactory to the Material Customers and Agent.

(ii)      Within sixty-five (65) days of the Forbearance Tenth Amendment Effective Date, the Borrowers (other than Conform Automotive, LLC) shall have selected a Qualified Buyer (as defined in the Accommodation Agreement) to enter into one or more Transactions for the sale of its locations (the "Transactions") on terms reasonably acceptable to Agent and each of the Material Customers at those locations.

(iii)      By no later than October 15, 2022, provided that not all Qualified Buyers have withdrawn from the Sale Process, the Borrowers (other than Conform Automotive, LLC) must have entered into purchase agreements on terms and conditions satisfactory to each of the Material Customers and Agent for the Sale Process to close by October 31, 2022.

(iv)      By no later than October 31, 2022, the Borrowers (other than Conform Automotive, LLC) shall have closed each Transaction with a Qualified Buyer on terms reasonably acceptable to Agent and each of the Material Customers at those locations.

(b)     If, after consultation with Agent and Material Customers, the Borrowers (other than Conform Automotive, LLC) decide to complete the Sale Process through a court-supervised process:

(i)     By August 1, 2022, the Borrowers (other than Conform Automotive, LLC) shall have filed a bankruptcy petition under Chapter 11 of the U.S. Bankruptcy Code, or some other court process (the "Court").

(ii)    By September 12, 2022, the Borrowers (other than Conform Automotive, LLC) shall have obtained an Order from the Court approving bidding procedures providing that all Qualified Bids are due by October 7, 2022, and setting a sale hearing by October 17, 2022.

(iii)   By October 31, 2022, the Borrowers (other than Conform Automotive, LLC) shall have closed each Transaction with a Qualified Buyer on terms reasonably acceptable to Agent and each of the Material Customers at those locations.

5.    Amendment to Section 3(h).  Section 3(h) of the Forbearance Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

(j)     Article 10 (Events of Default) of the Credit Agreement is hereby amended by adding the following new Section 10.17 thereto:

10.17   **Access and Accommodation Agreements; Investment Banker**.

(a)     Any Loan Party shall default in the observance of any material covenant, term or condition contained in (i) the Access and Security Agreement, or (ii) the Accommodation Agreement.

(b)     The termination of the term of the Accommodation Agreement prior to the payment in full of the Obligations.

(c)     BMW SLP S.A. de C.V., GM or Toyota resources production of Component Parts (as defined in the Accommodation Agreement) other than as permitted under the Accommodation Agreement.

(d)     There is a twenty (20%) percent or greater unfavorable cumulative net cash flow variance in Supplier's (as defined in the Accommodation Agreement) performance when compared to the Budget (as defined in the Accommodation Agreement) during the three (3)-week period beginning on the Forbearance Tenth Amendment Effective Date, or a ten (10%) percent or greater unfavorable cumulative net cash flow variance in Supplier's (as defined in the Accommodation Agreement) performance when compared to the Budget (as defined in the Accommodation Agreement) at any time following the three (3)-week period beginning on

the Forbearance Tenth Amendment Effective Date.

(e)     The termination of that certain Engagement Agreement dated as of July 3, 2022 by and between the Borrower Representative and Livingstone Partners LLC prior to the earlier to occur of (i) the payment in full of the Obligations, or (ii) the written consent of the Lenders to such termination.

6.     Amendment to Section 3(i).  Section 3(i) of the Forbearance Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

(i)     Article 10 (Events of Default) of the Credit Agreement is hereby amended by adding the following new Section 10.18 thereto:

10.18     **Offset by Customers**.  The occurrence of any offset by the Customers against Borrower's Eligible Accounts payable from the Customers other than as permitted under the Accommodation Agreement.

7.     Amendment to Section 3(j).  Section 3(j) of the Forbearance Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

(j)     Agent reserves the right, in its sole discretion, to increase the Reserves upon the occurrence of any Setoffs for Billing Errors, Tooling Setoffs, Material Setoffs, Ordinary Course Setoffs and/or Allowed Setoffs (each as defined in the Accommodation Agreement). In addition, notwithstanding anything to the contrary in the Loan Documents, Agent reserves the right, in its sole discretion, to determine the application of the proceeds of all unusual or extraordinary items (including, by way of example, tax refunds, insurance proceeds, or sale proceeds, other than collection of accounts for inventory sold in the ordinary course of business) to the various Obligations, including without limitation to hold the proceeds as cash collateral (in which case there will not be a Reserve), or, if applied to the Revolving Loan, to create a Reserve against the Borrowing Base in the amount of the proceeds. All of the Reserves set forth in the preceding two sentences shall be referred to as "Permitted Reserves". For the avoidance of doubt, a Permitted Reserve for any unreconciled accounts payable will be established after ten (10) Business Days from the Forbearance Tenth Amendment Effective Date. Notwithstanding the foregoing, (i) if the sale or sales by Borrower of Inventory located in Mexico to GM and/or BMW SLP S.A. de C.V. in connection with a resourcing from Mexico occurs, the proceeds from such sale or sales in an aggregate amount not to exceed $500,000 shall be applied to the Revolving Loan and not subject to a Reserve, (ii) if an ineligible Account is collected or if there is a refund from a vendor (as a result of an overpayment or otherwise), those collections will be applied to the Revolving Loan (without a reserve) and not to the Term Loan, and (iii) this provision shall not prohibit Agent on behalf of itself and the Lenders from not advancing on Accounts and Inventory that is not a Customer Account and Inventory or reducing advance rates or imposing any Reserves and caps on such other Accounts and Inventory.

8.     Amendment to Section 3(l).  Section 3(l) of the Forbearance Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

(l)     Section 3.1 (Interest) of the Credit Agreement is hereby amended by deleting subsection (a) in its entirety and replacing it with the following:

(a)     Interest on the Loans shall be payable, with respect to Domestic Rate Loans, in arrears on the first (1st) day of each calendar month.  Interest charges shall be computed on the actual principal amount of Loans outstanding during the calendar month.  Notwithstanding anything contained herein or anything else in this Agreement to the contrary, (i) the SOFA Amount, the Second SOFA Amount and the Third SOFA Amount of the outstanding Revolving Loan shall: (A) always be the first portion of the Revolving Loan advanced by the Lenders; (B) always be the last portion of the Revolving Loan repaid by the Borrowers except as set forth in the Participation Agreement; (C) be used by Borrowers solely in accordance with the SOFA Schedule, the Second SOFA Schedule and the Third SOFA Schedule, as applicable; and (ii) interest on the SOFA Amount, the Second SOFA Amount and the Third SOFA Amount shall be payable as set forth above but shall not be paid to Subordinated Participant until all other Obligations are paid in full.

9.   Amendment to Section 3(m).  Section 3(m) of the Forbearance Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

(m)     Section 11.6 (Allocation of Payments After Event of Default) of the Credit Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

11.6     **Allocation of Payments After Event of Default.**

Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent or any Lender on account of the Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of the Agent in connection with enforcing the rights of the Lenders and the Issuer under this Agreement and the Loan Documents and any protective advances made by the Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

SECOND, to payment of any fees owed to the Agent;

THIRD, to the payment of all accrued fees and interest due in respect of each Protective Advance and Overadvance;

FOURTH, to the payment of the outstanding principal amount of each Protective Advance and Overadvance;

FIFTH, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of each of the Lenders (other than Subordinated Participant) and the Issuer in connection with enforcing its rights under this Agreement and the Loan Documents or otherwise with respect to the Obligations owing to such Lender (other than Subordinated Participant) or

the Issuer arising under this Agreement and the other Loan Documents;

SIXTH, to the payment of all of the Obligations consisting of accrued fees and interest arising under or pursuant to this Agreement or the Loan Documents other than such amounts payable in connection with the SOFA Amount, the Second SOFA Amount and the Third SOFA Amount;

SEVENTH, to the payment of the outstanding principal amount of the Obligations constituting Advances (including the payment or cash collateralization of the outstanding amount of Letters of Credit) other than such amounts payable in connection with the SOFA Amount, the Second SOFA Amount and the Third SOFA Amount;

EIGHTH, to the payment of all Obligations owing to the Agent or any Lender (other than Subordinated Participant) in connection with treasury management services and Hedging Contracts;

NINTH, to all other Obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "EIGHTH" above other than such amounts payable in connection with the SOFA Amount, the Second SOFA Amount and the Third SOFA Amount;

TENTH, to all Obligations owing to Subordinated Participant; and

ELEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (b) each of the Lenders and the Issuer shall receive (so long as it is not a Defaulting Lender) an amount equal to its Commitment Percentage of amounts available to be applied pursuant to clauses "FIFTH", "SIXTH," "SEVENTH," and "NINTH," above; and (c) to the extent that any amounts available for distribution pursuant to clause "SEVENTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by the Agent in a cash collateral account and applied (i) first, to reimburse the Issuer from time to time for any drawings under such Letters of Credit and (ii) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "EIGHTH" and "NINTH" above in the manner provided in this Section 11.6. Notwithstanding the foregoing, amounts received from any Loan Party that is not a Qualified ECP Guarantor shall not be applied to any Excluded Swap Obligations of such Loan Party.

10. <u>Amendment to Section 3</u>. Section 3 of the Forbearance Agreement is hereby amended by adding the following new subsection (n) thereto:

(n)     The Borrowers shall use funds set forth in the Budget (as defined in the Accommodation Agreement) pursuant to the terms of the Accommodation Agreement for the line item disbursements detailed in the Budget (as defined in the Accommodation Agreement).

11. <u>Commitment Schedule</u>. The Commitment Schedule is hereby amended by deleting it in its entirety and replacing it with the updated Commitment Schedule attached to this Tenth Amendment.

12. <u>Conditions Precedent</u>.  In addition to all of the other conditions and agreements set forth herein, the effectiveness of this Tenth Amendment and Agent and the Lenders' continued forbearance shall be conditioned upon, and shall not become effective until, satisfaction of the following conditions precedent:

    a.   Borrowers shall have duly executed and delivered this Tenth Amendment to Agent, in form and substance acceptable to Agent and the Lenders, and this Tenth Amendment shall have been executed by Agent and the Lenders;

    b.   Execution and delivery of (i) the Access and Security Agreement, and (ii) the Accommodation Agreement, in each case, in form and substance acceptable to Agent and the Lenders, by all parties thereto;

    c.   Execution and delivery of the Participation Agreement by all parties thereto;

    d.   Borrowers shall have paid any and all costs, fees and expenses of Agent and the Lenders (including the Upfront Fee (as defined below) and attorneys' fees) in connection with this Tenth Amendment; and

    e.   Borrowers shall have executed and delivered to Agent such other and further documentation as Agent may deem necessary or appropriate in its sole discretion to accomplish the terms set forth herein, each in form and substance acceptable to Agent.

13. <u>Agreements Regarding Debt</u>.  Borrowers hereby agree that:

    a.   the Defaults constitute Events of Default under the Credit Agreement, thereby entitling Agent and the Lenders to accelerate and demand the immediate payment of all of the indebtedness owing by Borrowers to Agent and the Lenders under the Loan Documents;

    b.   by virtue of the Credit Agreement and certain other agreements, documents and instruments, including certain UCC-1 financing statements, Agent and the Lenders have a perfected, first priority security interest in and/or lien on the Collateral as collateral security for any and all obligations of Borrowers to Agent and the Lenders, including, but not limited to, the Indebtedness owing by Borrowers to Agent and the Lenders under the Loan Documents;

    c.   as of the Forbearance Tenth Amendment Effective Date, the indebtedness owing by Borrowers to Agent and the Lenders under the Loan Documents equals $25,865,981.91 plus accrued interest, fees, certain costs and expenses, including but not limited to attorneys' fees; and

    d.   Agent and the Lenders have no existing commitments, obligations or agreements to advance credit or loans or to make financial or other accommodations to Borrowers except as specifically set forth in this Tenth Amendment and the Forbearance Agreement.

14. <u>Representations and Warranties</u>.  As a material inducement to Agent and the Lenders to enter into this Tenth Amendment, Borrowers hereby represent and warrant, as of the date hereof, that

    a.   The Recitals are true and correct.

    b.   Except for the Defaults, Borrowers have complied with all of their obligations under the Loan Documents.  There is no Default or Event of Default which has occurred and is continuing under any of the Loan Documents, other than the Defaults.

c. The representations and warranties set forth in the Loan Documents remain true and correct in all material respects as of the date of this Tenth Amendment, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date).

d. The execution, delivery, and performance of this Tenth Amendment, and any other document required herein, including, without limitation, the Accommodation Agreement and the Access Agreement, is within the corporate powers of Borrowers, has been duly authorized by all necessary corporate action and does not and will not: (i) require any consent or approval of the board of directors, shareholders or members of Borrowers, other than consents and approvals certified copies of which have been delivered to Agent and the Lenders; (ii) violate any provision of the articles of incorporation or organization of Borrowers, or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrowers; (iii) require the consent or approval of, or filing or registration with, any governmental body, agency or authority; (iv) cause any breach of, or constitute a default under, any material contract, indenture or other agreement or instrument under which any Borrower is a party or by which it or its properties may be bound or affected; or (v) result in the imposition of any lien, charge or encumbrance upon any property of Borrowers, other than any immaterial lien, charge or encumbrance.

e. This Tenth Amendment constitutes, and any of the documents required herein will constitute upon execution and delivery, a legal, valid, and binding obligation of Borrowers enforceable in accordance with its terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally.

f. Borrowers will continue to take all action that may be necessary or desirable or requested by Agent and the Lenders to maintain the validity, perfection, priority, and enforceability of the security interests in, and liens upon, all of Borrowers' property that has or shall be granted to Agent and the Lenders as set forth in the Loan Documents.

g. All information provided by Borrowers to Agent and the Lenders, previously or in connection with this Tenth Amendment, including, without limitation, all information related to Eligible Unbilled Accounts, whether communicated orally or in writing, taken as a whole, is true and correct in all material respects.

h. Borrowers shall comply with all requirements, payment obligations, and milestones set forth in the Accommodation Agreement and/or Access Agreement.

i. Borrowers shall immediately notify Agent in writing in the event that any Customer is delivering to the Borrowers for finishing any inventory owned by a Customer.

15. Effect of Agreement; Terms.   Except as modified pursuant hereto, no other changes or modifications to the Forbearance Agreement are intended or implied and in all other respects the Loan Documents hereby are ratified, restated and confirmed by all parties hereto as of the effective date hereof. To the extent of conflict between the terms of this Tenth Amendment and the Forbearance Agreement, the terms of this Tenth Amendment shall govern and control.   The Loan Documents, the Forbearance Agreement and this Tenth Amendment shall be read and construed as one agreement.   The term "including" means "including without limitation," even if not followed by such words or the equivalent.   Wherever used herein, the singular includes the plural and vice versa, and the use of one gender also denotes the others,

unless the context suggests otherwise.

16. <u>Waiver of Claims</u>. **BORROWERS RESTATE, ACKNOWLEDGE AND AGREE THAT: (A) THE AMOUNTS OUTSTANDING UNDER THE LOAN DOCUMENTS ARE WITHOUT CLAIM, OFFSET, COUNTERCLAIM, DEFENSE OR AFFIRMATIVE DEFENSE OF ANY KIND AND THE OBLIGATIONS REMAIN THE CONTINUING AND INDIVIDUAL OBLIGATIONS OF BORROWERS UNTIL ALL AMOUNTS DUE THEREUNDER, INCLUDING REASONABLE ATTORNEYS' FEES AND COSTS INCURRED BY AGENT AND THE LENDERS IN CONNECTION WITH THIS TENTH AMENDMENT OR ENFORCEMENT OF THE LOAN DOCUMENTS, ARE PAID IN FULL TO AGENT AND THE LENDERS; (B) THE LIENS AND SECURITY INTERESTS GRANTED TO AGENT AND THE LENDERS BY BORROWERS ARE AND REMAIN VALID SECURITY INTERESTS IN THE ASSETS OF THOSE PARTIES; AND (C) AS OF THE DATE HEREOF, BORROWERS HEREBY RELEASE, DISCHARGE, AND AGREE TO HOLD HARMLESS AGENT, THE LENDERS AND THEIR REPRESENTATIVES, AGENTS, EMPLOYEES, ATTORNEYS, DIRECTORS, OFFICERS, PARENTS, AFFILIATES, ASSIGNS, INSURERS, SUBSIDIARIES, AND THEIR SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "<u>RELEASED PARTIES</u>") FROM ANY AND ALL CLAIMS, DEFENSES, AFFIRMATIVE DEFENSES, SETOFFS, COUNTERCLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, AGREEMENTS, PROVISIONS, LIABILITIES AND DEMANDS IN LAW OR IN EQUITY, WHETHER KNOWN OR UNKNOWN (COLLECTIVELY, THE "<u>CLAIMS</u>") WHICH BORROWERS EVER HAD, NOW HAVE, OR MAY HEREAFTER HAVE AGAINST OR RELATED TO THE RELEASED PARTIES THROUGH THE DATE OF THIS TENTH AMENDMENT, INCLUDING, BUT NOT LIMITED TO, CLAIMS RELATING TO OR ARISING OUT OF THE LOAN DOCUMENTS, THE TRANSACTIONS DESCRIBED THEREIN, THE OBLIGATIONS, AGENT'S ADMINISTRATION OF THE LOAN DOCUMENTS, OR AGENT AND LENDERS' RELATIONSHIP OF BORROWERS WITH AGENT AND THE LENDERS.**

17. <u>Choice of Law</u>. This Tenth Amendment has been negotiated and delivered in the State of Ohio and shall be deemed to have been made in the State of Ohio. The validity of this Tenth Amendment, its construction, interpretation, and enforcement as well as the rights of the parties hereunder (including, without limitation, with respect to the collateral) shall be determined under, governed by, and construed in accordance with the internal laws of the State of Ohio (without regard to its conflict of law principles).

18. <u>Provisions Severable</u>. Each provision of this Tenth Amendment shall be severable from every other provision of this Tenth Amendment for the purpose of determining the legal enforceability of any specific provision.

19. <u>Entire Agreement</u>. This Tenth Amendment and the other documents referred to herein contain the entire agreement among Agent, the Lenders, and Borrowers, or any of them, with respect to the subject matter hereof and supersedes all previous communications and negotiations. No representation, undertaking, promise, or condition concerning the subject matter hereof shall be binding upon Agent or the Lenders unless clearly expressed in this Tenth Amendment or in the other documents referred to herein. Any discussions and correspondence about the terms of a possible extension, modification, and/or restructuring of the Loan Documents shall be deemed to be in the nature of settlement negotiations. Accordingly, any such discussions and correspondence will not be admissible in any legal or administrative proceedings and shall not be actionable under any theory of law or utilized for any purpose without the consent of all parties. No agreement which is reached herein shall give rise to any claim or cause of action except for breach of the express provisions of a legally binding written agreement.

20. <u>Construction</u>. Nothing contained in this Tenth Amendment or any other document referred to herein, nor any action taken pursuant hereto or thereto, shall be construed as (a) permitting or obligating Agent and the Lenders to act as financial or business advisor or consultant to Borrowers; (b) permitting or

obligating Agent and the Lenders to control or to conduct the operations of Borrowers; (c) creating any fiduciary obligation on the part of Agent and the Lenders to Borrowers; or (d) causing Borrowers to be treated as a Lender.

21.  Fees and Expenses.  Borrowers shall reimburse Agent and the Lenders for all costs and expenses incurred in connection with the Loan Documents, this Tenth Amendment, the Access Agreement and the Accommodation Agreement, or the exercise of Agent and the Lenders' rights hereunder or thereunder. Without limiting the generality of the foregoing, Borrowers shall pay all of Agent and the Lenders' legal fees and expenses, all of the costs and expenses of equipment, real estate or other appraisals, all costs of any financial advisors, and any and all costs of enforcement of Agent and the Lenders' rights hereunder. Additionally, Borrowers shall have paid to Agent on behalf of the Lenders, to be shared pro-rata with the other Lenders, an upfront fee in an amount equal to Fifty Thousand Dollars ($50,000) (the "**Upfront Fee**"), which shall be earned in full and payable on the date hereof. For the avoidance of doubt, the $150,000 exit fee set forth in Section 6.10(g) of the Credit Agreement (the "**Exit Fee**") is earned in full due to the Borrowers failing to repay the Obligations in full by March 31, 2022, and the Exit Fee shall be payable on the date in which the Obligations are paid in full.

22.  Counterpart; Electronic Signature.  This Tenth Amendment may be executed in counterparts and all such counterparts shall constitute one agreement binding on all the parties, notwithstanding that the parties are not signatories to the same counterpart.  Any electronic signature delivered by a party by facsimile or email transmission shall be deemed to be an original signature hereto.

23.  Jurisdiction.  BORROWERS HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITUATED IN THE STATE OF OHIO OR ANY STATE OR FEDERAL COURT SITUATED IN THE STATE OF MICHIGAN, AND WAIVE ANY OBJECTION BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS, WITH REGARD TO ANY ACTIONS, CLAIMS, DISPUTES OR PROCEEDINGS RELATING TO THIS TENTH AMENDMENT, ANY OF THE LOAN DOCUMENTS, OR ANY DOCUMENT DELIVERED HEREUNDER OR IN CONNECTION HEREWITH, OR ANY TRANSACTION ARISING FROM OR CONNECTED TO ANY OF THE FOREGOING.  EACH BORROWER WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT, AND CONSENTS TO ALL SUCH SERVICE OF PROCESS MADE BY MAIL OR BY MESSENGER DIRECTED TO IT AT THE ADDRESS SPECIFIED IN THE LOAN DOCUMENTS.  NOTHING HEREIN SHALL AFFECT AGENT AND THE LENDERS' RIGHT TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW, OR LIMIT AGENT AND THE LENDERS' RIGHT TO BRING PROCEEDINGS AGAINST BORROWERS OR ANY OF THEIR PROPERTY OR ASSETS IN THE COMPETENT COURTS OF ANY OTHER JURISDICTION OR JURISDICTIONS.

24.  No Jury Trial.  THE PARTIES HERETO HEREBY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THIS TENTH AMENDMENT, ANY OF THE LOAN DOCUMENTS, ANY DOCUMENT DELIVERED HEREUNDER OR IN CONNECTION HEREWITH, OR ANY TRANSACTION ARISING FROM OR CONNECTED TO ANY OF THE FOREGOING.  THE PARTIES REPRESENT THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY GIVEN.

25.  Binding Effect.  This Tenth Amendment shall be binding on Borrowers and their respective successors and assigns, and shall inure solely to the benefit of Agent, the Lenders, their successors, assigns, and affiliates.  No third-party or other person or entity shall have any rights or benefits under this Tenth Amendment.

26.  Power of Attorney.  Agent is irrevocably appointed by each Borrower as its attorney-in-fact to execute any financing statement or any other document on its behalf in connection with perfecting any security interest on any collateral granted to Agent and the Lenders under the Loan Documents.

Additionally, if permitted by applicable law, Borrowers authorize Agent to file one or more financing statements or any other documents related to the security interests granted to Agent and the Lenders under the Loan Documents, and further authorize Agent, instead of Borrowers, to sign such financing statements or other documents.

27. Affirmation. Borrowers affirm, ratify and acknowledge that the Loan Documents, as amended by this Tenth Amendment, remain in full force and effect and binding against Borrowers in accordance with their respective terms. Borrowers reaffirm that their respective obligations under the Loan Documents, as amended by this Tenth Amendment, remain in full force and effect.

[SIGNATURE PAGES FOLLOW]

Borrowers, Agent and the Lenders have executed this Tenth Amendment as of the date first written above.

**BORROWERS:**

**GISSING NORTH AMERICA LLC,**
  a Delaware limited liability company

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**GISSING TECHNOLOGIES LLC,**
  a Delaware limited liability company

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**GISSING SIDNEY LLC,**
  a Delaware limited liability company

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**GISSING SUMTER LLC,**
  a Delaware limited liability company

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**GISSING AUBURN LLC,**
  a Delaware limited liability company

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**GISSING TECHNOLOGIES MEXICO LLC,**
  a Delaware limited liability company

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**CONFORM AUTOMOTIVE, LLC,**
  a Michigan limited liability company

By: _____
Name: Steven B. Phillips
Title: Chief Executive Officer

**DTI MOLDED PRODUCTS, INC.,**
  a Michigan corporation

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**GISSING FREMONT LLC,**
  a Delaware limited liability company

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**GISSING GREENVILLE LLC,**
  a Delaware limited liability company

By: _____
Name: Claudio Calado
Title: President and Chief Executive Officer

**AGENT:**

**THE HUNTINGTON NATIONAL BANK,**
  a national banking association

By: _____
Name: _____
Title: _____


**LENDER:**

**COMERICA BANK,**
  a Texas banking association

By: _____
Name: _____
Title: _____

**SCHEDULE 1**

Commitments of the Lenders

(see attached)

**EXHIBIT A**

Third SOFA Schedule

EXHIBIT 2

Access and Security Agreement

**EXHIBIT H**
Access Agreement

**ACCESS AND SECURITY AGREEMENT**

General Motors LLC, for itself and on behalf of its subsidiaries and affiliates ("GM"), Toyota Motor Engineering & Manufacturing North America, Inc., for itself and on behalf of its subsidiaries and affiliates ("Toyota" and together with GM, "Customers" and each a "Customer"), Gissing North America LLC, f/k/a Conform Gissing International, LLC, a Delaware limited liability company ("GNA"), Gissing Technologies LLC, f/k/a Formed Fiber Technologies, LLC, a Delaware limited liability company ("GT"), Gissing Sidney LLC, f/k/a FFT Sidney, LLC, a Delaware limited liability company ("Sidney"), Gissing Sumter LLC, f/k/a FFT Sumter, LLC, a Delaware limited liability company ("Sumter"), Gissing Auburn LLC, f/k/a FFT Auburn, LLC, a Delaware limited liability company ("Auburn"), Gissing Technologies – Mexico LLC, f/k/a Formed Fiber Technologies – Mexico, LLC, a Delaware limited liability company ("Gissing Mexico"), DTI Molded Products, Inc., a Michigan corporation ("DTI"), Conform Automotive, LLC, a Michigan limited liability company ("Conform"), Gissing Fremont LLC, a Delaware limited liability company ("Fremont"), and Gissing Greenville LLC, a Delaware limited liability company ("Greenville," and collectively with GNA, GT, Sidney, Sumter, Auburn, Gissing Mexico, DTI, Conform, and Fremont, "Supplier"), enter into this Access and Security Agreement ("Agreement") on July 18, 2022.

**RECITALS:**

A.      Supplier is obligated to manufacture certain component parts, service parts, assemblies and/or other products (other than Tooling (defined below)) for Customers (collectively, "Component Parts") under various purchase agreements, supply contracts, general terms and conditions, release requests or purchase orders issued by Customers to Supplier and accepted by Supplier (together with any replacement, substitute and new purchase orders, "Purchase Orders").

B.      Supplier, certain of Supplier's affiliates, and The Huntington National Bank, a national banking association, in its capacity as agent (in that capacity, "Agent Bank"), for itself and the other financial institutions party to the Loan Documents (as defined below) from time to time as lenders (collectively, together with the Agent Bank, the "Lending Group") are parties to various loan and security agreements (collectively, together with any future agreements and amendments which may be entered into between Agent Bank or the Lending Group and Supplier, the "Loan Documents"). The indebtedness outstanding under the Loan Documents is secured by a lien on substantially all of Supplier's real and personal property.

C.      Supplier acknowledges that any material lapse in production and/or delay in shipment of the Component Parts or any material breach of any Purchase Order may cause irreparable harm to Customers.

D.      Supplier has informed Customers that the loans available under the Loan Documents, together with the working capital generated by Supplier's business, are insufficient sources of cash to meet the production schedule for the Component Parts.

E.       Supplier has requested that Customers provide certain accommodations to Supplier to allow Supplier to continue in operation.

F.       Subject to the terms of a certain Accommodation Agreement (the "<u>Accommodation Agreement</u>") executed concurrently with this Agreement, Customers have agreed to provide certain accommodations to Supplier. As an inducement to Customers entering into the Accommodation Agreement, Supplier has agreed to grant Customers a Right of Access (as defined below) to Supplier's Facilities (as defined below).

G.       In consideration for Customers agreeing to provide the above-referenced accommodations, Customers have requested that Supplier provide them with certain assurances and acknowledgments to induce Customers to defer from immediately exercising their rights under the Purchase Orders to resource production of the Component Parts.

H.       Customers are entering into this Agreement to afford them the right to use certain of Supplier's assets as provided below if a Default (as defined below) occurs.

**BASED ON THE FOREGOING RECITALS** which are incorporated as representations and warranties of the parties, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Customers and Supplier agree as follows:

## TERMS AND CONDITIONS

1       <u>Defined Terms</u>.

(a)       In addition to those terms defined elsewhere in this Agreement, the following terms have the indicated meanings, unless the context otherwise requires:

(b)       "<u>Accounts</u>" means any "account" or "chattel paper," as defined in Section 9-102 of the Code (defined below), owned now or hereafter by Supplier, and shall also mean and include: (i) all accounts receivable, contract rights, book debts, notes, drafts, instruments, documents, acceptances, payments under leases and other forms of obligations, now owned or hereafter received or acquired by or belonging or owing to Supplier (including under any trade name, styles, or division thereof) whether arising out of goods sold or leased or services rendered by Supplier or from any other transaction, whether or not the same involves the sale of goods or services by Supplier (including, without limitation, any such payment obligation or right to payment which might be characterized as an account, contract right, general intangible, or chattel paper under the Uniform Commercial Code in effect in any jurisdiction); (ii) all monies due to or to become due to Supplier under all contracts for the sale or lease of goods or the performance of services by Supplier (whether or not yet earned by performance on the part of Supplier) now in existence or hereafter arising; and (iii) deposit accounts, insurance refunds, tax refunds, tax refund claims and related cash and cash equivalents, now owned or hereafter received or acquired by or belonging or owing to Supplier.

(c)       "<u>Chattel Paper</u>" means all "chattel paper" as defined in Section 9-102 of the Code.

(d)       "<u>Code</u>" means the Uniform Commercial Code as in effect in the State of

Michigan and Ohio as of the date of this Agreement.

(e)  "Collateral Access Agreement" means the Collateral Access Agreement entered into as of July 29, 2021 by Unifin Financiera, S.A.B. DE C.V. and the Agent Bank relating to the Mexican Facility.

(f)  "Contract Rights" means all rights of Supplier (excluding all rights to payment and the items described in the definition of Accounts) under each "Contract" (defined below).

(g)  "Contracts" or individually, "Contract", shall mean, any licensing agreements and any and all other contracts, supply agreements, or other agreements in or under which Supplier may now or hereafter have any right, title, or interest and which pertain to the lease, sale, or other disposition by Supplier of "Equipment" (defined below), "Inventory" (defined below), fixtures, real property, or the right to use or acquire personal property, in each case, used in the manufacture, production, assembly or transportation of Component Parts, as any of the same may from time to time be amended, supplemented, or otherwise modified.

(h)  "Default" shall mean any of the following events:

(a)  An Event of Default occurs under the Accommodation Agreement. For clarity, an Event of Default under the Accommodation Agreement only with respect to particular Customer(s) or Facility(ies) constitutes a Default under this Agreement only with respect to such particular Customer(s) or Facility(ies); or

(b)  The Term (as defined in the Accommodation Agreement) terminates (whether by expiration or otherwise). For clarity, if the Term (as defined in the Accommodation Agreement) terminates only with respect to particular Customer(s) or Facility(ies), it shall constitute a Default under this Agreement only with respect to such particular Customer(s) or Facility(ies).

(i)  "Documents" means all "documents" as defined in Section 9-102 of the Code.

(j)  "Equipment" means any "equipment," as that term is defined in Section 9-102 of the Code, now or hereafter owned by Supplier, which is used in the manufacture, production, assembly or transportation of Component Parts, and shall also mean and include all machinery, equipment, vehicles, furnishings, and fixtures (as such term is defined in Section 9-102 of the Code) now owned or hereafter acquired by Supplier used in the manufacture, production, assembly or transportation of Component Parts, including, without limitation, all items of machinery and equipment of any kind, nature and description, whether affixed to real property or not, as well as all additions to, substitutions for, replacements of or accessions to any of the foregoing items and all attachments, components, parts (including spare parts), and accessories whether installed thereon or affixed thereto.

(k)  "Facilities" means the real property identified on the attached Exhibit A, and any other real property wherever located leased or owned by Supplier that is utilized in any way in the production of any Component Part. "Facility" means any one of them individually.

(l) "General Intangibles" means all "general intangibles," as such term is defined in Section 9-102 of the Code, now or hereafter owned by Supplier, used in the manufacture, production, assembly or transportation of Component Parts, including, without limitation, customer lists, rights in intellectual property, goodwill, trade names, service marks, trade secrets, patents, trademarks, copyrights, applications therefor, permits, licenses, now owned or hereafter acquired by Supplier, but excluding items described in the definition of Accounts.

(m) "Instruments" means all "instruments" as defined in Section 9-102 of the Code.

(n) "Intellectual Property" means all now existing or hereafter acquired patents, trademarks, copyrights, inventions, licenses, discoveries, processes, know-how, techniques, trade secrets, designs, specifications and the like (regardless of whether such items are now patented or registered, or registerable, or patentable in the future), and all technical, engineering, or other information and knowledge, production data and drawings, used in the manufacture, production, assembly or transportation of Component Parts, including without limitation, all items, rights and property defined as "intellectual property" under 11 U.S.C. Section 101, as amended from time to time.

(o) "Inventory" means any "inventory," as that term is defined in Section 9-102 of the Code, wherever located, now owned or hereafter acquired by Supplier or in which Supplier now has or hereafter may acquire any right, title or interest including, without limitation, all goods and other personal property now or hereafter owned by Supplier which are leased or held for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in Supplier's business, or in the processing, packaging or shipping of the same, and all finished goods.

(p) "Mexican Facility" means the Mexican facility located at Circuito de Las Colinas #321, Manzana 4, Lote 30, Parque Industrial Colinas de León, León Guanajuato CP 37430, Mexico.

(q) "Obligations" means all obligations owed by Supplier to Customers under this Agreement (including the obligation to provide each Customer or its designee(s) the "Right of Access" (as defined below)).

(r) "Operating Assets" means all assets in which Supplier has an interest which a Customer exercising its Right of Access reasonably determines are necessary or helpful for the timely and efficient production of the Component Parts, wherever located, including Equipment, Software, Contract Rights and General Intangibles (other than deposit accounts, insurance refunds, tax refund claims, cash and cash equivalents), but specifically excluding any Accounts, Inventory, Documents, Instruments, Chattel Paper and Proceeds (defined below) of such excluded items and the Proceeds of General Intangibles.

(s) "Proceeds" has the meaning provided it under the Code and, in any event, shall include, but not be limited to: (i) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to Supplier from time to time with respect to any of the Collateral (defined in below); (ii) any and all payments (in any form whatsoever) made or due and payable to Supplier

from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau, or agency (or any Person acting under color of governmental authority); and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

(t)     "Requirement of Law" means the charter and by-laws or other organizational or governing documents of any entity, and any material law, treaty, rule or regulation or determination of arbitration of a court or other governmental authority, in each case applicable to or binding upon any applicable person or entity or its property or to which such entity or person or any of its property is subject.

(u)     "Software" means all of the following that which are used in the manufacture, production, assembly or transportation of the Component Parts (i) computer programs and supporting information provided in connection with a transaction relating to the program, and (ii) computer programs embedded in goods and any supporting information provided in connection with a transaction relating to the program whether or not the program is associated with the goods in such a manner that it customarily is considered part of the goods, and whether or not, by becoming the owner of the goods, a person acquires a right to use the program in connection with the goods, and whether or not the program is embedded in goods that consist solely of the medium in which the program is embedded.

2     Grant of Liens and Security Interests. As collateral security for the Obligations, Supplier hereby grants to each Customer a continuing security interest in and lien upon the Operating Assets and Facility(ies), whether now owned or hereafter acquired by Supplier, or in which Supplier now has or at any time in the future may acquire any right, title or interest (the "Collateral"). Further, Supplier hereby grants to each Customer a power of attorney to execute on its behalf and file any financing statements and/or mortgages deemed necessary by such Customer to perfect its security interest and liens granted hereby. The security interests granted to Customers under this Agreement to secure the Obligations shall be junior to the liens and security interests granted to Agent Bank (and any other security interest perfected before the date of this Agreement), but in all cases, Agent Bank's exercise of its rights and remedies with respect to its liens and security interests against the Operating Assets are subject to the terms of this Agreement. Customers acknowledge that a right of access has been granted to Unifin Financiera, S.A.B. DE C.V., owner and lessor of certain assets at the Mexican Facility, under the Collateral Access Agreement with respect to the Mexican Facility only. Supplier shall not grant any other party a similar right of access except on terms acceptable to Customers and Agent Bank.

Agent Bank may take any necessary action to protect its rights in the Collateral, conditioned upon such action not impairing Customers' Right of Access (as defined below), including, but not limited to, preparing for a sale and selling, transferring, or liquidating any asset not included as Operating Assets or Facilities, or to list the Operating Assets and/or Facilities for sale.

The lien priorities provided in this Agreement shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement or refinancing of any loan documents, nor by any action or inaction which any of the Parties hereto may take or fail to take in respect of the Collateral.

Subject to applicable law and Section 4 of this Agreement, this Agreement shall continue in full force and effect after the filing of any petition by or against Supplier under the United States Bankruptcy Code (the "Bankruptcy Code") or similar proceeding and all converted, succeeding or similar cases in respect thereof. All references herein to Supplier shall be deemed to apply, if applicable, to Supplier as debtors-in-possession and to a trustee for Supplier.

3 Right of Access.

(a) General. Supplier hereby grants each Customer or its designee(s) the right, but not the obligation, to use and occupy the Operating Assets, and one or more of the Facility(ies), to manufacture Component Parts ("Right of Access") for a period of up to nine (9) months for each Facility (the "Occupancy Period") upon the occurrence of a Default. A Customer may invoke the Right of Access at any one or more of the Facilities by delivering written notice to each of Supplier, the other Customers, and Agent Bank indicating its intention to exercise the Right of Access and identifying the applicable Facility(ies). A Customer may exercise its Right of Access at different Facilities separately and the Occupancy Period at each Facility will commence on the date that the Right of Access is exercised at each such Facility. Customers shall have no right to sell, transfer, or dispose of any of the Operating Assets or the Facility(ies) as part of the Right of Access. Any exercising Customer's Right of Access throughout the Occupancy Period is conditioned upon such exercising Customer's compliance with Section 3(b) during the Occupancy Period. All Customers that exercise the Right of Access at a Facility shall cooperate with each other in good faith to coordinate all production after the Right of Access is exercised and shall use their best efforts not to interfere in any manner with the production of another exercising Customer. Resources and costs at a Facility or associated with Operating Assets that are common for Customers who exercise the Right of Access at a Facility shall be divided among such Customers according to their respective percentages of sales at each Facility at which the Right of Access has been exercised at the time immediately preceding the Default.

(b) Customer's Obligations. If a Customer invokes the Right of Access with respect to a particular Facility(ies) or Operating Assets, the exercising Customer or Customers or their designees, if any, shall:

(i) indemnify, defend, and hold harmless Supplier, Lending Group, and each of their respective employees, officers, directors and agents, from any physical damage to property (ordinary wear and tear excepted), including, without limitation, the Operating Assets and Facility(ies), any injury suffered by third parties and any claims or causes of action brought against Supplier or Lending Group directly and proximately caused by (i) such Customer's exercise of the Right of Access, or (ii) the use of the Operating Assets and Facility(ies) during the Occupancy Period by the exercising Customer, its designee or their respective employees, agents or representatives including any and all reasonable, costs and expenses (including reasonable attorneys' fees) constituting a direct and proximate part of the claim to which such indemnification obligation relates. The obligation to

{10517031:2 }

4892-3877-7895_2
44484769.8
22-46160-lsg Doc 15-3 Filed 08/08/22 Entered 08/08/22 19:50:30 Page 112 of 140

indemnify under this subparagraph will not be subject to any right of Setoff (as defined in the Accommodation Agreement that the Customer may have against Supplier;

(ii)    use such reasonable care in the custody and preservation of the Operating Assets and Facility(ies) as a prudent owner would use in connection with the custody and preservation of its own assets;

(iii)    insure (naming Agent Bank as the lender loss payee and additional insured and naming Customers as additional insureds) and maintain the Operating Assets and the Facilities in the same condition as existed on the date the Customer exercised the Right of Access, ordinary wear and tear excepted;

(iv)    in lieu of the Purchase Order price, pay (a) the actual costs and expenses incurred in connection with the manufacturing of the Component Parts during the Occupancy Period, including, without limitation, utilities and other overhead expenses, prorated property taxes and assessments attributable to such Operating Assets and Facility(ies), and any payments due on account of any of the Operating Assets which are leased from third parties (including Agent Bank and its affiliates) and leased Facility(ies), and (b) in addition to the amounts set forth in (a) above, a Monthly Access Fees to Agent Bank without Setoff in the amount specified on Exhibit A;

(v)    subject to Customer's or its designee's right to use and occupy such Operating Assets and Facility(ies) during the Occupancy Period in accordance with this Agreement and without interference, afford Supplier's representatives (and representatives of Agent Bank, secured creditors, owners or mortgagees of the Operating Assets and/or the Facility(ies)) reasonable access to inspect the Operating Assets and the Facility(ies), to market and sell the Operating Assets and the Facility(ies), to prepare for a liquidation of the Operating Assets and the Facility(ies) at the end of the Occupancy Period, and to sell any asset other than the Operating Assets and Facility(ies) prior to expiration of the Occupancy Period;

(vi)    Subject to (a) non-exercising Customer or other customer of Supplier (i) agreeing to make payment to the exercising Customer(s) or its designee(s) on account of their allocable share of overhead and related expenses and all direct expenses related to such non-exercising Customer's or other customer's production and (ii) entering into a separate agreement, acceptable to the exercising Customer(s) in its

sole discretion and to Agent Bank in its sole discretion, under which such non-exercising Customer or other customer agrees to release and indemnify the exercising Customer(s) and the Lending Group from any and all liability, including with respect to any product liability and warranty claims and such non-exercising Customer having entered into an accommodation agreement with Agent Bank and Supplier that is acceptable to Agent Bank, and (b) Supplier making the necessary tangible personal property available for use during the Occupancy Period, the exercising Customer agrees, for itself and its designee(s), to produce parts for such non-exercising Customer or other customer during the Occupancy Period (the "Producing Customer");

(vii)     purchase and pay for Inventory and, if it exercises the Option, Purchased Assets (as those terms are defined in the Accommodation Agreement) for the prices and on the terms set forth in the Accommodation Agreement (the obligations under this subsection shall also apply to all other Customers at each Facility as to which the Right of Access has been exercised by any Customer); and

(viii)    pay all Accounts and other amounts owed to Supplier to the Specified Account without Setoff (other than Setoffs specifically allowed under the Accommodation Agreement) within ten (10) days after the beginning of the Occupancy Period (the obligations under this subsection shall also apply to all other Customers at each Facility as to which the Right of Access has been exercised by any Customer); and

(ix)      at the end of the Occupancy Period, leave the Operating Assets and Facilities broom clean and in safe and secure states, properly removing all hazardous wastes used or generated during the Occupancy Period, and in the same condition that the Operating Assets and Facilities were in prior to the exercise of the Right of Access, ordinary wear and tear excepted.

The exercising Customer(s)' obligations under this <u>Section (3)(b)</u> shall not be subject to Setoff of any kind (except as specified in subparagraph (viii) above).

(c)       <u>Supplier Obligations</u>. If one or more Customers exercise the Right of Access, Supplier shall comply with the following as to each Customer exercising its Right of Access, as applicable:

(i)       At such Customer's election in its sole discretion, Supplier

shall use its best efforts to continue to employ those of its employees which Customer determines are necessary to maintain production of the Component Parts (the "Employees") and in turn lease the Employees to Customer or its designee(s) (except for the Mexican Facility, where no leasing of Employees shall take place) and Customer or its designee(s) shall reimburse Supplier for all costs and expenses relating to Supplier's employment of the Employees incurred during the Occupancy Period (including overtime). Without limiting the generality of the foregoing, such Customer or its designee(s) shall reimburse Supplier all amounts incurred by Supplier to meet its regular payroll obligations, including salaries, wages, payroll taxes, workers' compensation, unemployment insurance, disability insurance, welfare, pension and other payments and contributions required to be made by Supplier with respect to the Employees, which are incurred during the Occupancy Period, but in no event will Customer be liable for (A) any costs for unfunded actuarial liability, past service unfunded actuarial liability, or solvency or deficiency liability relating to any pension plan, severance plan or other obligations relating to benefits accrued or service provided prior to the time Customer exercised its Right of Access or after the termination of the Occupancy Period, (B) any unpaid minimum contribution obligations to the pension plan(s), regardless of when they are due, relating to benefits accrued prior to or relating to the period prior to the time Customer exercised its Right of Access or after termination of the Occupancy Period, (C) unpaid premium payments to the PBGC with respect to any pension plan which accrued prior to or relating to the period prior to to the time Customer exercised its Right of Access or after the termination of the Occupancy Period, or (D) any excise tax, interest, make whole payments, or agency hearing or litigation costs on account of any prohibited transactions or other fiduciary breaches occurring prior to or relating to the period prior to the time the Customer exercised the Right of Access or after the termination of the Occupancy Period, alleged or confirmed with respect to Supplier's employee benefit plans. Notwithstanding the foregoing, under no circumstances will such Customer be responsible for reimbursing Supplier for costs and expenses relating to Supplier's employment of the Employees to the extent the Employees are performing services (x) unrelated to the production of the Component Parts or (y) unrelated to performance of Supplier's obligations under this Agreement;

(ii)     During the Occupancy Period, Supplier will have sole responsibility for maintaining and administering all employee benefit plans, and will assume and carry out all fiduciary obligations with respect to such plans. Such Customer's sole responsibility with respect to Supplier's employee benefit plans during the Occupancy Period will be to pay the Supplier all amounts needed to pay premiums or otherwise fund the plans in accordance with the plan documents and applicable law, and for its pro rata share of the reasonable costs of administering the plans in the ordinary course during the Occupancy Period (but specifically excluding any items listed in Section 3(c)(i)(A)-(D) above). Other than the obligation to pay Supplier the funds necessary to maintain and administer the employee benefit plans during the Occupancy Period, pursuant to this section and section 3(c)(i) above, such Customer has no other responsibilities or obligations with respect to the employee benefit plans, and does not have any role in overseeing, maintaining or administering them during the Occupancy Period;

(iii)    During the Occupancy Period, Supplier shall not increase compensation or benefits of the Employees without the consent of such Customer except as may be required by applicable law or preexisting contract;

(iv)    Supplier shall indemnify, defend and hold such Customer and the Lending Group, and their respective designee(s), employees and agents harmless from any and all costs, expenses (including reasonable attorneys' fees), losses, damages, liabilities or injury arising from claims or liabilities arising or accruing prior to the date of such Customer's exercise of the Right of Access or after termination of the Occupancy Period, regardless of when such claims are asserted; and

(v)     During the Occupancy Period, Supplier agrees that such Customer and its designee(s), agents and representatives shall have access to Supplier's books and records for the purposes of confirming and calculating the amounts due, if any, from such Customer under this Agreement.

(d)     <u>Right to Terminate</u>. Each Customer shall have the absolute right to terminate its respective Right of Access with respect to particular Operating Assets and Facility(ies) upon ten (10) days prior written notice to Supplier, Agent Bank and all other Customers. If the terminating Customer is a Producing Customer, each Customer who had not previously exercised its Right of Access at such Facility(ies) may exercise its Right of

Access or another Producing Customer may be designated for such Facility(ies) under the terms of Section 3(b)(vi), each within ten (10) days after receipt of the notice, provided, however, in each instance (1) the Occupancy Period shall be deemed to have commenced at such time as the first Producing Customer exercised its Right of Access in such Facility(ies) and (2) if no other Customer exercises its Right of Access before the Producing Customer(s) Right of Access terminates, then each Customer's Right of Access with respect to such Operating Assets and Facility(ies) shall be permanently terminated. Upon expiration of the notice period, the Occupancy Period for such Facility(ies) will terminate as to such terminating Customer and the Customer shall fulfill its obligations under this Agreement with respect to the Operating Assets and Facility(ies).

(e)  SPECIFIC PERFORMANCE.  **IN CONNECTION WITH ANY ACTION OR PROCEEDING TO ENFORCE THE RIGHT OF ACCESS, SUPPLIER ACKNOWLEDGES THAT CUSTOMERS WILL NOT HAVE AN ADEQUATE REMEDY AT LAW, THAT THE OPERATING ASSETS AND FACILITY(IES) ARE UNIQUE AND THAT EACH CUSTOMER SHALL BE ENTITLED TO SPECIFIC PERFORMANCE OF SUPPLIER'S OBLIGATIONS TO AFFORD EACH CUSTOMER THE RIGHT OF ACCESS UNDER THIS AGREEMENT. SUPPLIER FURTHER AGREES THAT EACH CUSTOMER MAY SEEK EXPEDITED RELIEF FROM A COURT OF PROPER JURISDICTION AND THAT TWENTY – FOUR (24) HOURS NOTICE OF SUCH REQUESTED EXPEDITED RELIEF SHALL BE ADEQUATE NOTICE THEREOF**.

(f)  Appointment of Receiver.  In addition to any rights and remedies each Customer may have as secured creditor under the terms of this or any other agreement between such Customer and Supplier, each Customer shall have the right to the appointment of a receiver to effectuate the Right of Access. In connection with any hearing on the appointment of a receiver, Supplier agrees that at least twenty-four (24) hours actual notice of any request for a hearing on such appointment shall be adequate notice. This Section 3(f) is not intended to limit or diminish any rights granted to each Customer in the Purchase Orders or the Accommodation Agreement, which rights continue in full force and effect.

(g)  IRREPARABLE HARM; LIMITATION OF NOTICE.  **SUPPLIER ACKNOWLEDGES THAT CUSTOMERS WILL SUFFER IRREPARABLE HARM IF ANY CUSTOMER EXERCISES THE RIGHT OF ACCESS AND SUPPLIER FAILS TO COOPERATE WITH SUCH CUSTOMER IN ALLOWING SUCH CUSTOMER TO EXERCISE THE RIGHT OF ACCESS UNDER THIS AGREEMENT. ACCORDINGLY, PROVIDED THAT SUPPLIER AND AGENT BANK RECEIVE AT LEAST TWENTY-FOUR (24) HOURS WRITTEN NOTICE OF ANY REQUEST FOR HEARINGS IN CONNECTION WITH PROCEEDINGS INSTITUTED BY A CUSTOMER, SUPPLIER WAIVES, TO THE FULLEST EXTENT POSSIBLE UNDER APPLICABLE LAW, THE RIGHT TO NOTICE IN EXCESS OF TWENTY-FOUR (24) HOURS IN CONNECTION WITH ANY JUDICIAL PROCEEDINGS INSTITUTED BY A CUSTOMER TO ENFORCE THE RIGHT OF ACCESS.**

4    Court Approval.  In the event of any bankruptcy or insolvency proceeding involving Supplier, Supplier will exercise its commercial best efforts, in good faith, to obtain entry of a final order of a court of competent jurisdiction, confirming each Customers' rights under this Agreement and authorizing Supplier to enter into same, which order shall be sought promptly upon the commencement of such bankruptcy proceeding, but in no event later than the time periods set forth in Section 27 of the Accommodation Agreement.

5    License. This Section 5 is not intended to modify, and to the extent the Intellectual Property rights granted to a Customer under this Section 5 are not equal to or greater than the Intellectual Property rights granted to such Customer under the Purchase Orders, this Section 5 does not modify, any rights granted to Customers in the Purchase Order. For clarity, this Section 5 is intended to expand those rights. If necessary, subject to subsection (a) below, Supplier grants each Customer a non-exclusive worldwide, irrevocable, fully paid right and license to use any Intellectual Property to develop and manufacture the Component Parts for such Customer's use and/or use by third parties (the "License"). Such Customer's right to use the License shall include the right to sublicense third parties for the manufacture of the Component Parts.

(a)    Right to Use License.  Although the License is being granted to Customers as of the date set forth above, each Customer agrees that neither it nor its sublicensees will utilize the License unless such Customer invokes the Right of Access (and then it will only use the License during the Occupancy Period).

(b)    No Royalty.  For all purposes, Supplier has been fully paid for the License and other rights granted to Customers under this Agreement and no royalties, fees, payments, charges or other consideration shall be due from Customers on account of the License or this Agreement or any Customer's (or any sublicensee's) use of the License or other rights granted under this Agreement.

(c)    Protection of Ownership.  Each Customer shall treat and preserve the Intellectual Property in accordance with the same practices employed by such Customer to safeguard its own intellectual property against unauthorized use and disclosure and will only use such information, data and trade secrets during the Occupancy Period in connection with producing Component Parts. The foregoing obligations of each Customer shall not be applicable to information which is now or becomes hereafter available to the public through no action, conduct, admission or fault of such Customer. The provisions of this paragraph shall survive termination of this Agreement.

6    Rights of Customers; Limitations on Customers' Obligations. Unless a Customer exercises its Right of Access, in which case such Customer shall have the obligations outlined in this Agreement, such Customer shall not have any obligation or liability by reason of or arising out of this Agreement nor shall such Customer be required or obligated in any manner to perform or fulfill any of the obligations of Supplier.

7    Remedies. Subject to the terms of Section 2 above, upon a Default and the expiration of any applicable cure periods, each Customer shall have all rights and remedies provided in this Agreement, in any other agreements with Supplier, and all rights and remedies available to a secured creditor under applicable law; provided that Customers' rights as secured

creditors shall be limited to enforcing their Right of Access under this Agreement. Under no circumstances shall Customers have the right to assert or otherwise be allowed a secured monetary claim, based upon the liens and security interests granted pursuant to this Agreement, in any prospective bankruptcy proceeding in which Supplier is the debtor, or otherwise. Further, in connection with each Customer's rights and remedies under this Agreement:

(a)     Supplier waives any right it may have to require such Customer to foreclose its security interests and liens and/or reduce the Obligations to a monetary sum;

(b)     If a Customer exercises its Right of Access, such Customer shall be treated as a secured party in possession and such Customer's use and occupancy of the Operating Assets will not be deemed to be acceptance of such assets in satisfaction of the Obligations; and

(c)     All of such Customer's rights and remedies under this Agreement are cumulative and not exclusive of any rights and remedies under any other agreement or under applicable law or at equity.

8     Injunctive Relief. Each Customer represents and Supplier acknowledges that Customers will incur significant damages if Supplier fails to timely satisfy its obligations to Customers and Customers' assembly or other plant operations will be negatively impacted, and because Customers do not have an adequate remedy at law and would be irreparably harmed by such events, Supplier agrees that Customers shall be entitled to injunctive relief (both prohibitive and mandatory) upon a Default and/or in connection with any violations by Supplier of any terms or conditions of this Agreement. Customers agree to provide Agent Bank notice of any proceeding seeking injunctive relief simultaneously with providing such notice to Supplier.

9     Representations and Warranties. Supplier represents and warrants to each Customer that:

(a)     Title; No Other Security Interests. Except for the security interest granted under this Agreement to Customers and the liens and security interests granted to Agent Bank and the liens and security interests granted any other secured party of record, Supplier owns the Collateral free and clear of any and all security interests.

(b)     Addresses. Supplier's chief executive office is set forth in Exhibit B and shall not be changed without prior written notice to Customers, but the Operating Assets, wherever located, are covered by this Agreement. Supplier must immediately advise Customers in writing of any change in any of its names, trade names, addresses, or forms of organization.

(c)     Trade Names. Any and all trade names under which Supplier transacts any part of its business, and all former names of Supplier, are those which have been previously disclosed to Customers in writing.

(d)     Accuracy of Information. All information, certificates, or statements given to Customers under this Agreement are true and complete in all material respects, when given.

(e) <u>Description of Facility(ies)</u>. The legal description of the Facility(ies) attached as <u>Exhibit B</u> is a complete and accurate description of the Facility(ies) and includes all property on which all buildings and other facilities of Supplier necessary for or useful in the production of Component Parts are located.

(f) <u>Authority</u>. It has full power and authority to enter into this Agreement and perform all of its obligations hereunder.

10 <u>Covenants</u>. Supplier covenants and agrees with Customers that from and after the date of this Agreement until the Obligations are satisfied in full:

(a) <u>Further Documentation</u>. At any time and from time to time, upon the written request of a Customer, and at Supplier's sole expense, Supplier will promptly and duly execute and deliver any and all such further instruments and documents and take such further action as such Customer may reasonably request for the purpose of obtaining the full benefits of this Agreement and of the rights and powers herein granted. Further, Supplier hereby grants each Customer a power of attorney to execute on its behalf and file necessary or appropriate financing or continuation statements under the Code to perfect the security interests granted hereby.

(b) <u>Sales or Dispositions of Assets; Certain Uses Prohibited</u>. Except as otherwise set forth in the Accommodation Agreement, without the prior written consent of Customers (which consent will not be unreasonably withheld), Supplier will not sell, encumber or otherwise dispose of any Operating Assets except in the ordinary course of business and will not sell, encumber or otherwise dispose of the Facility(ies). Further, Supplier will not use any of the Operating Assets or the Facility(ies) in any way which would materially adversely affect Customers' Right of Access or Customers' other rights and remedies under this Agreement. Supplier acknowledges and agrees that it will be reasonable for a Customer to withhold consent if the proposed sale or encumbrance impairs, or may impair, Customer's rights under this Agreement or the Purchase Orders.

(c) <u>Limitations on Modifications of Agreements, etc</u>. Supplier will not, other than in the ordinary course of business: (i) amend, modify, terminate, or waive any provision of any Contract which might materially adversely affect Customers' Right of Access; or (ii) fail to exercise promptly and diligently each and every right which it may have under each Contract in any manner which could materially adversely affect Customers' Right of Access or a Customers' other rights or remedies under this Agreement or any other agreement between such Customer and Supplier.

(d) <u>Maintenance of Insurance</u>. Supplier must, at its expense, keep and maintain insurance on the Collateral, including the Operating Assets and the Facility(ies), against all risk of loss or damage from fire, theft, malicious mischief, explosion, sprinklers, and all other hazards or risks of physical damage included within the meaning of the term "extended coverage" in amounts as are ordinarily insured against by other similar businesses and shall furnish Customers evidence of said insurance, name Agent Bank as lender loss payee and additional insured, and name Customers as additional insureds.

(e)    <u>Right of Inspection; Cooperation</u>.    In addition to any rights Customers may have under the Purchase Orders or any other agreement with Supplier (including the Accommodation Agreement), each Customer and its representatives shall, upon reasonable request and at reasonable times, have the right to enter into and upon any premises where any of the Collateral, including the Operating Assets or the Facility(ies), is located for the purpose of inspecting the same, observing their use or otherwise protecting Customer's interests therein. Each Customer will take reasonable steps to maintain the confidentiality of information obtained by Customer, except as required by law.

(f)    <u>Notice of Default</u>.    Supplier will provide immediate notice to Customers, by way of electronic delivery and overnight express mail service, of its or its attorneys' or agents' receipt of any notice of default under Supplier's agreements with Agent Bank, or any other secured creditors including but not limited to taxing authorities. Supplier hereby grants to Customers the option, but not the obligation, to exercise whatever rights to cure defaults that Supplier has under such agreements or by law.

11    <u>Secured Party and Lessor Acknowledgments</u>.

(a)    Supplier will provide to Customers within thirty (30) days following the date of this Agreement, acknowledgments of any and all lessor(s) of the Facility(ies) and Operating Assets (to the extent leased) to Customers' rights hereunder, in a form substantially similar to <u>Exhibit D</u> attached hereto.

(b)    Supplier shall obtain Agent Bank's acknowledgment to the rights and interests granted to Customers under this Agreement by providing Customers a copy of the form attached as <u>Exhibit C</u> executed by a duly authorized representative of Agent Bank.

(c)    If, as of the Effective Date, Supplier has granted security interests in any of the Operating Assets or Facility(ies) to any party other than Customers, Supplier must deliver to Customers an acknowledgment from such secured creditors, mortgagees, and/or lessees in a form substantially similar to <u>Exhibit D</u> attached hereto within fifteen (15) business days of the Effective Date. Supplier shall not be required to obtain an acknowledgement from Unifin Financiera, S.A.B. DE C.V. If subsequent to the execution of this Agreement, Supplier intends to grant additional or further security interests, liens, mortgages or leaseholds in any of the Operating Assets or the Facility(ies) to any party other than Customers, fifteen (15) business days prior to granting such liens, security interests, mortgages or leaseholds, Supplier must deliver to Customers an acknowledgment from such secured creditors, mortgagees, and/or lessees in the form attached as <u>Exhibit C</u>.

12    <u>Effect on Purchase Contracts</u>.   The purpose of this Agreement is to preserve the rights and interests of Supplier and Customers under the Purchase Orders and, by entering into this Agreement, neither Customers nor Supplier are waiving or limiting any rights it may have under the Purchase Orders.  This Agreement shall be deemed to be incorporated by reference into, and shall constitute an amendment to all existing and future Purchase Orders regardless of whether any specific reference to this Agreement is made in any such Purchase Orders.  To the extent that any

term or provision in this Agreement is inconsistent with any term or condition of any such Purchase Order, the terms and conditions of this Agreement shall control.

13 Term. The rights granted to each Customer under this Agreement with respect to any one or more Facility(ies) shall continue until the date that is ten (10) days after the termination (whether by expiration or otherwise) of the Term (as defined in the Accommodation Agreement) with respect to such Facility, unless such Customer has exercised its Right of Access at such Facility(ies) prior to expiration of that time period. For any Facility as to which a Customer has exercised its Right of Access, the rights granted to such Customer under this Agreement with respect to such Facility and the Operating Assets related to such Facility shall continue until the earlier of (a) the expiration of the Occupancy Period at such Facility, or (b) when such Customer's requirements under the Purchase Orders with respect to production at such Facility are satisfied or all of the Component Parts produced at such Facility are resourced, or (c) upon the sale of the Operating Assets at such Facility to a Qualified Buyer (as defined in the Accommodation Agreement).

14 Confidential Information and Data. Without limiting Customers' rights under this Agreement, to the extent the Operating Assets include or a Customer or its designee(s) otherwise comes into possession of or becomes aware of, Supplier's trade secrets or proprietary information during such Customer's exercise of the Right of Access, such Customer and its designee(s) shall: (a) keep the information, data and trade secrets confidential; and (b) only use the information, data and trade secrets during the Occupancy Period in connection with producing the Component Parts. The provisions of this paragraph shall survive termination of this Agreement.

15 Severability. Should any provision of this Agreement be held invalid, prohibited or unenforceable in any one jurisdiction it shall, as to that jurisdiction only, be ineffective to the extent of such holding without invalidating the remaining provisions of this Agreement, and any such holding does not invalidate or render unenforceable that provision in any other jurisdiction wherein it would be valid and enforceable.

16 Authorization. The parties executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the entity that they represent and that their signatures bind said entities to the terms of this Agreement. This representation and warranty expressly survives the termination of this Agreement.

17 Section/Paragraph Headings. The section/paragraph headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation of this Agreement. All references to paragraphs, sections, Schedules and Exhibits are to paragraphs, sections, Schedules and Exhibits in or to this Agreement unless otherwise specified.

18 Interpretation. Unless the context requires otherwise, for purposes of this agreement:

(a) the singular includes the plural, and vice versa, including with respect to references to the Parties to this Agreement;

(b) all pronouns and their variations refer to the masculine, feminine, or

neuter, as the identity of the person or persons may require;

(c)     all definitions and references to an agreement, instrument, or document means that agreement, instrument, or document together with all exhibits and schedules to that agreement, instrument, or document, and any and all amendments, restatements, supplements, replacements, or modifications to that agreement, instrument, or document, as the same may be in effect at the time of such definition or reference;

(d)     "include," "includes," and "including" are to be treated as if followed by "without limitation" whether or not they are followed by these words or words with a similar meaning;

(e)     text that is shown in bold or IN ALL CAPITAL LETTERS is deemed conspicuous;

(f)     all accounting terms not otherwise specifically defined herein shall be construed in accordance with GAAP.

19     <u>No Waiver; Cumulative Remedies</u>. Customers and Supplier shall not by any act, delay, indulgence, omission or otherwise be deemed to have waived any right or remedy under this Agreement or of any breach of the terms and conditions of this Agreement. A waiver by a Customer or Supplier of any right or remedy under this Agreement on any one occasion shall not be construed as a bar to any right or remedy which such Customer or Supplier would otherwise have had on a subsequent occasion. No failure to exercise nor any delay in exercising on the part of a Customer or Supplier any right, power, or privilege under this Agreement, shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies under this Agreement are cumulative, may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by any other agreements or applicable law or at equity.

20     <u>Waivers and Amendments; Successors and Assigns</u>. No term or provision of this Agreement may be waived, altered, modified, or amended except by a written instrument, duly executed by Supplier and Customers (and consented to by Agent Bank in its reasonable discretion). This Agreement and all of Supplier's obligations are binding upon the successors and assigns of Supplier, and together with the rights and remedies of Customers under this Agreement, inure to the benefit of each Customer and each member of the Lending Group and their respective successors and assigns. Supplier may not assign or transfer any right or obligation under this Agreement without the prior written consent of Customers and Agent Bank. Any purported assignment in violation of this section will be null and void.

21     <u>No Contra Proferentem</u>.  The parties are competent and experienced in business, and have negotiated and reviewed this Agreement with their counsel.  Any ambiguous language in this Agreement should therefore not be construed against any party as the drafter of that language.

22     <u>Governing Law and Forum</u>. This Agreement shall be governed by, and be construed and interpreted in accordance with, the laws of the State of Michigan, without regard to conflicts

of laws principles.  Jurisdiction and venue shall be proper in the United States District Court for the Eastern District of Michigan or the Oakland County Circuit Court in the State of Michigan.

23     Notices. All notices, requests and other communications that are required or may be given under this Agreement must be in writing and shall be deemed to have been given on the date of delivery, if delivered by hand, electronic delivery or courier, or three (3) days after mailing, if mailed by certified or registered mail, postage prepaid, return receipt requested, addressed as set forth below (which addresses may be changed, from time to time, by notice given in the manner provided in this Section). For clarity, where notice is required to be given or received by a Supplier Mexican subsidiary, GNA will be designated to give or receive such notice, as the case may be, and a notice to a Mexican subsidiary will be deemed to have been given or received when the notice is given or received by GNA on behalf of the Mexican subsidiary. GNA will obtain from each Mexican subsidiary a power of attorney designating GNA to give and receive notice under this Agreement on its behalf):

|  |  |
|---|---|
| If to Supplier: | Gissing North America LLC<br>125 Allied Road<br>Auburn, Maine 04211<br>Attention: Steven Wybo<br>Email: steven.wybo@riveron.com |
| With a copy to: | Kerr, Russell and Weber, PLC<br>500 Woodward Ave., Suite 2500<br>Detroit, MI 48226<br>Attention:  Jason W. Bank<br>Email: jbank@kerr-russell.com |
| If to GM: | General Motors LLC<br>Cole Engineering Center<br>29755 Louis Chevrolet Road<br>Warren, MI  48090-9020<br>M/C 480-210-8S<br>Attention: Mark W. Fischer<br>Email: mark.w.fischer@gm.com |
|  | General Motors LLC<br>Aaron Silver, GPSC Legal Counsel<br>300 Renaissance Center, MC482-C23-A68<br>Detroit, MI 48265<br>E-Mail: aaron.silver@gm.com |
|  | and |
| With a copy to: | Honigman LLP<br>660 Woodward Avenue<br>2290 First National Building<br>Detroit, Michigan 48226 |

Attention: E. Todd Sable
Email: tsable@honigman.com

If to Toyota:    Toyota Motor Engineering & Manufacturing
North America, Inc.
8777 Platt Road
Saline, MI  48176
Attn: Wes Triplett
Email: wes.triplett@toyota.com

Toyota Motor North America, Inc.
6565 Headquarters Drive
Plano, TX  75024
Attn:  Meadow Clendenin
Email:  meadow.clendenin@toyota.com

and

With a copy to:    Frost Brown Todd LLC
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1900
Nashville, Tennessee 37201
Attn: Patricia Burgess
E-mail: pburgess@fbtlaw.com

24    No Other Intended Third Party Beneficiary. The parties hereto acknowledge and agree that the rights and interests of the parties under this Agreement are intended to benefit solely the parties to this Agreement, Agent Bank, and the other members of the Lending Group. The Lending Group is an intended third-party beneficiary of this Agreement and the Agent Bank is entitled to enforce this Agreement.

25    Counterparts. This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

26    Entire Agreement; Conflicts. This Agreement together with the Accommodation Agreement, the Purchase Orders, and any other agreements and schedules executed in connection with this Agreement or the Accommodation Agreement constitutes the entire understanding of the parties in connection with the subject matter hereof. The terms and conditions of the Purchase Orders shall be unaffected by this Agreement except to the extent that an inconsistency or conflict exists between the express terms of the Purchase Orders and this Agreement in which event the terms of this Agreement shall govern and control. To the extent any term or condition of this Agreement is inconsistent or in conflict with the terms of any other agreements between the parties,

the terms of this Agreement shall govern and control.

27     <u>CONSULTATION WITH COUNSEL</u>.

**THE PARTIES HERETO ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH AGREEMENT WITHOUT DURESS OR COERCION AND WITHOUT RELIANCE ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN THIS AGREEMENT**.

28     <u>WAIVER OF JURY TRIAL</u>.

**THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR ANY OTHER AGREEMENTS BETWEEN THE PARTIES. NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED**.

[Remainder of page intentionally left blank.]

Supplier and Customers have executed this Access Agreement as of the date first written above.

**SUPPLIER:**

**GISSING NORTH AMERICA LLC,**
   a Delaware limited liability company

By: _C. Paldo._
Name: _CLAUDIO CALADO_
Title: _CEO & President_

**GISSING TECHNOLOGIES LLC,**
   a Delaware limited liability company

By: _C. Paldo._
Name: _CLAUDIO CALADO_
Title: _CEO & President_

**GISSING SIDNEY LLC,**
   a Delaware limited liability company

By: _C. Paldo._
Name: _CLAUDIO CALADO_
Title: _CEO & President_

**GISSING SUMTER LLC,**
   a Delaware limited liability company

By: _C. Paldo._
Name: _CLAUDIO CALADO_
Title: _CEO & President_

**GISSING AUBURN LLC,**
   a Delaware limited liability company

By: _C. Paldo_
Name: _CLAUDIO CALADO_
Title: _CEO & President_

**GISSING TECHNOLOGIES MEXICO LLC,**
 a Delaware limited liability company

By: _C. Caldo._
Name: CLAUDIO CALADO
Title: CEO & President

**CONFORM AUTOMOTIVE, LLC,**
 a Michigan limited liability company

By: _____
Name: _____
Title: _____

**DTI MOLDED PRODUCTS, INC.,**
 a Michigan corporation

By: _C. Caldo._
Name: CLAUDIO CALADO
Title: CEO & President

**GISSING FREMONT LLC,**
 a Delaware limited liability company

By: _C. Caldo._
Name: CLAUDIO CALADO
Title: CEO President

**GISSING GREENVILLE LLC,**
 a Delaware limited liability company

By: _C. Caldo._
Name: CLAUDIO CALADO
Title: CEO President

44484599.1

**GISSING TECHNOLOGIES MEXICO LLC,**
 a Delaware limited liability company

By:_____
Name: _____
Title: _____

**CONFORM AUTOMOTIVE, LLC,**
 a Michigan limited liability company

By:_____
Name: _STEVEN PHILLIPS_
Title: _CEO_

**DTI MOLDED PRODUCTS, INC.,**
 a Michigan corporation

By:_____
Name: _____
Title: _____

**GISSING FREMONT LLC,**
 a Delaware limited liability company

By:_____
Name: _____
Title: _____

**GISSING GREENVILLE LLC,**
 a Delaware limited liability company

By:_____
Name: _____
Title: _____

44484769.8

**CUSTOMERS:**

**GENERAL MOTORS LLC,**
  a Delaware limited liability company

By: _____

Name: _____ M.W. FISCHER

Title: _____ DIRECTOR, SFRM

**TOYOTA MOTOR ENGINEERING &**
**MANUFACTURING NORTH AMERICA, INC.,**
  a Kentucky corporation

By: _____

Name: _____

Title: _____

44484599.1

**CUSTOMERS**:

**GENERAL MOTORS LLC,**
  a Delaware limited liability company

By:_____
Name: _____
Title: _____

**TOYOTA MOTOR ENGINEERING &**
**MANUFACTURING NORTH AMERICA,**
**INC.,**
  a Kentucky corporation

By:_____
Name: Robert Young
Title: Group Vice President, Purchasing Supplier Development

**Error! Unknown document property name.**

# EXHIBIT A
## FACILITIES

| Facility | Monthly Access Fee [1] | Occupancy Period [2] |
|---|---|---|
| 125 Allied Road, Auburn, Maine 04210 | $247,688 | Up to 9 Months |
| 320 Neeley Street, Sumter, South Carolina 29150 | $102,604 | Up to 9 Months |
| 1630 Ferguson Court, Sidney, Ohio 45365 | $57,375 | Up to 9 Months |
| 181 Peacock Hill RD, New Gloucester, Maine, 04260 | N/A | Up to 9 Months |
| 32500 Telegraph Road, Suite 207, Bingham Farms, Michigan 48025 | $8,222 | Up to 9 Months |
| 28031 Grand Oaks Ct., Wixom, Michigan 48393 | $6,343 | Up to 9 Months |
| 6815 Mowry Avenue, Newark, California 94560 | N/A | Up to 9 Months |
| 189 Milacron Drive, Fountain Inn, South Carolina 29644 | N/A | Up to 9 Months |
| Circuito de Las Colinas #321, Manzana 4, Lote 30, Parque Industrial Colinas de León, León Guanajuato, CP 37430, Mexico [3] | $276,000 | Up to 9 Months |
| **Total Monthly Access Fee** | **$698,232** | |

(a)

**Notes**

1)  Access Fee calculated using building and equipment appraisals divided by 48 or fixed asset register (excluding Mexico), Access Fee shown as monthly rate.

2)  Total Occupancy period will be up to 9 months.

3)  Mexico's Access Fee calculated using trailing three month averages for depreciation from historical financial and subject to change. Access Fee will be calculated based on the Monthly Access Fee less the historical run rate of depreciation for assets. The Lending Group does not have a first position lien right.

**EXHIBIT B**
**CHIEF EXECUTIVE OFFICE**

Gissing North America LLC
125 Allied Road
Auburn, Maine 04211

## EXHIBIT C
## ACKNOWLEDGMENT AND CONSENT

While not a party to the Access and Security Agreement (the "Access Agreement") made among General Motors LLC, for itself and on behalf of its subsidiaries and affiliates ("GM"), Toyota Motor Engineering & Manufacturing North America, Inc., for itself and on behalf of its subsidiaries and affiliates ("Toyota" and together with GM, "Customers" and each a "Customer"), Gissing North America LLC, f/k/a Conform Gissing International, LLC, a Delaware limited liability company ("GNA"), Gissing Technologies LLC, f/k/a Formed Fiber Technologies, LLC, a Delaware limited liability company ("GT"), Gissing Sidney LLC, f/k/a FFT Sidney, LLC, a Delaware limited liability company ("Sidney"), Gissing Sumter LLC, f/k/a FFT Sumter, LLC, a Delaware limited liability company ("Sumter"), Gissing Auburn LLC, f/k/a FFT Auburn, LLC, a Delaware limited liability company ("Auburn"), Gissing Technologies – Mexico LLC, f/k/a Formed Fiber Technologies – Mexico, LLC, a Delaware limited liability company ("Gissing Mexico"), DTI Molded Products, Inc., a Michigan corporation ("DTI"), Conform Automotive, LLC, a Michigan limited liability company ("Conform"), Gissing Fremont LLC, a Delaware limited liability company ("Fremont"), and Gissing Greenville LLC, a Delaware limited liability company ("Greenville," and collectively with GNA, GT, Sidney, Sumter, Auburn, Gissing Mexico, DTI, Conform, and Fremont, "Supplier"), dated July 8, The Huntington National Bank, a national banking association, in its capacity as agent (in that capacity, "Agent Bank"), for itself and the other financial institutions party to the Loan Documents from time to time as lenders (collectively, the "Lending Group") is party to various loan and/or security agreements with Supplier and certain of Supplier's affiliates (Supplier and such affiliates, collectively, the "Loan Parties") and has a security interest in all or substantially all of the Loan Parties' assets. In such capacity, Agent Bank acknowledges, consents to, and agrees that the exercise of its rights and remedies with respect to its liens and security interests in the Operating Assets (as defined in the Access Agreement) and Facilities (as defined in the Access Agreement) are subject to all applicable terms of the Access Agreement. The fact that Agent Bank is executing this Acknowledgment and Consent shall not in any way make it a guarantor or surety for Supplier's performance under the Access Agreement. Further, except as provided in the Access Agreement and the Accommodation Agreement, Agent Bank reserves all of its rights against Supplier and the other Loan Parties under its other agreements with Supplier and the other Loan Parties or applicable law.

Dated: _____, 2022

**THE HUNTINGTON NATIONAL BANK,
as Agent Bank (for itself and the Lending Group)**

By: _____

Name: _Barry S. O'Neill_

Title: _Senior Vice President_

44484769.6

**EXHIBIT D**
**LESSOR'S ACKNOWLEDGMENT AND CONSENT**

While not a party to the Access and Security Agreement (the "<u>Access Agreement</u>") made among General Motors LLC, for itself and on behalf of its subsidiaries and affiliates ("<u>GM</u>"), Toyota Motor Engineering & Manufacturing North America, Inc., for itself and on behalf of its subsidiaries and affiliates ("<u>Toyota</u>" and together with GM, "<u>Customers</u>" and each a "<u>Customer</u>"), Gissing North America LLC, f/k/a Conform Gissing International, LLC, a Delaware limited liability company ("<u>GNA</u>"), Gissing Technologies LLC, f/k/a Formed Fiber Technologies, LLC, a Delaware limited liability company ("<u>GT</u>"), Gissing Sidney LLC, f/k/a FFT Sidney, LLC, a Delaware limited liability company ("<u>Sidney</u>"), Gissing Sumter LLC, f/k/a FFT Sumter, LLC, a Delaware limited liability company ("<u>Sumter</u>"), Gissing Auburn LLC, f/k/a FFT Auburn, LLC, a Delaware limited liability company ("<u>Auburn</u>"), Gissing Technologies – Mexico LLC, f/k/a Formed Fiber Technologies – Mexico, LLC, a Delaware limited liability company ("<u>Gissing Mexico</u>"), DTI Molded Products, Inc., a Michigan corporation ("<u>DTI</u>"), Conform Automotive, LLC, a Michigan limited liability company ("<u>Conform</u>"), Gissing Fremont LLC, a Delaware limited liability company ("<u>Fremont</u>"), and Gissing Greenville LLC, a Delaware limited liability company ("Greenville," and collectively with GNA, GT, Sidney, Sumter, Auburn, Gissing Mexico, DTI, Conform, and Fremont, "<u>Supplier</u>"), dated July 8, the undersigned leases certain Facility(ies) commonly known as _____ (the "<u>Facility</u>"), and/or personal property to Supplier and, in such capacity, the undersigned acknowledges, consents to, and agrees with, and agrees to be bound by, the terms and conditions of the foregoing Access Agreement, including Customer's right to use the Operating Assets and the Facility during any Occupancy Period.

_____
Name of Lessor

Dated: _____, 2022

EXHIBIT 3

Tesla's Customer Addendum

EXHIBIT 4

Revised Exhibit A to Accommodation Agreement

4888-8393-8859_4

## Gissing North America
## Accommodation Agreement - Exhibit A
## Specified Accounts / Permitted Setoffs

**As of: June 27, 2022**

| | | |
|---|---|---|
| GM AR[1] | $ | 4,577,403.85 |
| Toyota AR [1] | | 731,763.11 |
| BMW AR[1] | | 93,500.00 |
| Tesla AR[1] | | 3,219,431.00 |
| **Total Open AR[2]** | **$** | **8,622,097.96** |

(1) Values shown reflects the minimum accounts payable owing by each customer to Supplier for open accounts payable position in customer's ledger. Subject to Supplier providing all documentation required for payment under the applicable Purchase Orders, Supplier and Customers will work in good faith to reconcile the outstanding accounts payable within thirty (30) days of the Effective Date. Notwithstanding the foregoing, any unreconciled accounts existing after the 10th business day following the Effective Date will be a Permitted Reserve.

(2) All amounts are subject to Setoff in accordance with Section 2 of the Agreement.

EXHIBIT 5

Revised Exhibit E to Accommodation Agreement

| Gissing North America<br>Accommodation Agreement - Exhibit E<br>Material Customers by Location | | | | | |
|---|---|---|---|---|---|
| Customer | CFA Mexico | Sidney | Auburn | Sumter | Canada |
| Total Tesla | X | | X | X | |
| Total GM | X | X | X | X | |
| Total Toyota | | X | X | X | |
| Total BMW | X | | | | |

CONFIDENTIAL DRAFT    SUBJECT TO CHANGE