======================================================================
======================================================================

# DEBTOR IN POSSESSION CREDIT AGREEMENT

among

## THE HUNTINGTON NATIONAL BANK
### (as Administrative Agent, Collateral Agent, and Lender)

and

## COMERICA BANK
### (as Lender)

and

## SUCH OTHER LENDERS THAT ARE NOW
## OR HEREAFTER BECOME A PARTY HERETO

and

## GISSING NORTH AMERICA LLC
## GISSING TECHNOLOGIES LLC
## GISSING SIDNEY LLC
## GISSING SUMTER LLC
## GISSING AUBURN LLC
## GISSING TECHNOLOGIES MEXICO, LLC
## GISSING FREMONT LLC
## GISSING GREENVILLE LLC
### (as Borrowers)

**August 8, 2022**

======================================================================
======================================================================

{10584541:5 }

4867-2680-0173_2

22-46160-lsg    Doc 22-1    Filed 08/09/22    Entered 08/09/22 11:39:28    Page 1 of 175

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS ...................................................................................... 3
    Section 1.1    Definitions ................................................................................ 3
    Section 1.2    Accounting Terms ................................................................. 26
    Section 1.3    Terms Generally ................................................................... 26
    Section 1.4    Confirmation of Recitals ...................................................... 27

ARTICLE II. AMOUNT AND TERMS OF CREDIT ............................................. 27
    Section 2.1    Amount and Nature of Credit. .............................................. 27
    Section 2.2    Revolving Credit. ................................................................. 27
    Section 2.3    [Reserved] ............................................................................ 27
    Section 2.4    [Reserved] ............................................................................ 27
    Section 2.5    Interest ................................................................................. 28
    Section 2.6    Evidence of Indebtedness .................................................... 28
    Section 2.7    Notice of Credit Event; Funding of Loans ........................... 28
    Section 2.8    Payment on Loans and Other Obligations. ........................... 29
    Section 2.9    Prepayment. .......................................................................... 30
    Section 2.10    Commitment and Other Fees; Reduction of Commitment ..... 30
    Section 2.11    Computation of Interest and Fees ........................................ 31
    Section 2.12    Mandatory Payments and Repayment. .................................. 31
    Section 2.13    Liability of Borrowers .......................................................... 31

ARTICLE III. ADDITIONAL PROVISIONS RELATING TO INCREASED CAPITAL;
TAXES .................................................................................................................... 32
    Section 3.1    Requirements of Law. ........................................................... 32
    Section 3.2    Taxes. ................................................................................... 33

ARTICLE IV. CONDITIONS PRECEDENT ......................................................... 34
    Section 4.1    Conditions to Each Credit Event .......................................... 34
    Section 4.2    Conditions to the First Credit Event .................................... 35

ARTICLE V. COVENANTS ................................................................................... 37
    Section 5.1    Insurance .............................................................................. 37
    Section 5.2    Retention of Consultant; Commercial Financial Audits, Filed Exams and
                    Appraisals. ........................................................................... 38
    Section 5.3    Financial Statements and Information. .................................. 38
    Section 5.4    Financial Records .................................................................. 40
    Section 5.5    Franchises; Change in Business. ........................................... 41
    Section 5.6    ERISA Pension and Benefit Plan Compliance ..................... 41
    Section 5.7    [Reserved] ............................................................................ 42
    Section 5.8    Borrowing ............................................................................. 42
    Section 5.9    Liens ..................................................................................... 42
    Section 5.10    Regulations T, U and X ........................................................ 43
    Section 5.11    Investments, Loans and Guaranties ...................................... 43
    Section 5.12    Merger and Sale of Assets .................................................... 43
    Section 5.13    Acquisitions ......................................................................... 43

i

# TABLE OF CONTENTS

Section 5.14    Notice ............................................................................................... 44
Section 5.15    Restricted Payments ........................................................................... 44
Section 5.16    Environmental Compliance ................................................................ 44
Section 5.17    Affiliate Transactions ......................................................................... 44
Section 5.18    Use of Proceeds .................................................................................. 45
Section 5.19    Corporate Names and Locations of Collateral .................................... 45
Section 5.20    Limitation on Creation of Subsidiary ................................................. 45
Section 5.21    Property Acquired Subsequent to the Closing Date and Right to Take
                Additional Collateral .......................................................................... 45
Section 5.22    [Reserved] ........................................................................................... 46
Section 5.23    Amendment of Organizational Documents; Prepetition Obligations ........... 46
Section 5.24    Collateral ............................................................................................. 46
Section 5.25    Further Assurances ............................................................................. 47
Section 5.26    Communications with Professionals .................................................... 48
Section 5.27    Executory Contracts ........................................................................... 48
Section 5.28    Limitation on Creation of Bank Accounts .......................................... 48
Section 5.29    Bankruptcy Cases ............................................................................... 50
Section 5.30    Cash Management Arrangements; Depositary Arrangements .............. 50
Section 5.31    Severance Payments ........................................................................... 51
Section 5.32    Maximum Cash Flow Variance ........................................................... 51
Section 5.33    [Reserved] ........................................................................................... 51
Section 5.34    Chief Restructuring Officer ................................................................ 51

ARTICLE VI. REPRESENTATIONS AND WARRANTIES ................................................ 51
Section 6.1     Corporate Existence; Subsidiaries; Foreign Qualification ................... 51
Section 6.2     Corporate Authority ........................................................................... 51
Section 6.3     Compliance with Laws and Contracts ................................................ 50
Section 6.4     Litigation and Administrative Proceedings ......................................... 51
Section 6.5     Title to Assets ..................................................................................... 51
Section 6.6     Liens and Security Interests ................................................................ 51
Section 6.7     Tax Returns ......................................................................................... 51
Section 6.8     Environmental Laws ........................................................................... 51
Section 6.9     Locations ............................................................................................. 52
Section 6.10    Continued Business ............................................................................. 52
Section 6.11    Employee Benefits Plans ..................................................................... 52
Section 6.12    Consents or Approvals ....................................................................... 53
Section 6.13    [Reserved.] .......................................................................................... 53
Section 6.14    Budget ................................................................................................. 53
Section 6.15    Regulations .......................................................................................... 53
Section 6.16    Material Agreements ........................................................................... 53
Section 6.17    Intellectual Property ........................................................................... 53
Section 6.18    Insurance ............................................................................................. 54
Section 6.19    Deposit Accounts ................................................................................ 54
Section 6.20    Accurate and Complete Statements .................................................... 54
Section 6.21    Investment Company; Other Restrictions ........................................... 54

# TABLE OF CONTENTS

Section 6.22    Defaults ........................................................................................ 54
Section 6.23    Existing Indebtedness ................................................................... 54

ARTICLE VII. EVENTS OF DEFAULT ................................................................... 54
Section 7.1    Payments ........................................................................................ 54
Section 7.2    Special Covenants ......................................................................... 54
Section 7.3    Other Covenants............................................................................. 55
Section 7.4    Representations and Warranties.................................................... 55
Section 7.5    Failure to Pay Post-Filing Date Indebtedness, Etc........................ 55
Section 7.6    ERISA Default ................................................................................ 55
Section 7.7    Change in Control ........................................................................... 55
Section 7.8    Money Judgment............................................................................. 55
Section 7.9    Material Adverse Change ............................................................... 55
Section 7.10   Security ........................................................................................... 55
Section 7.11   Validity of Loan Documents............................................................ 55
Section 7.12   Default Under Prepetition Credit Agreement .................................. 56
Section 7.13   Continued Operation of Businesses ............................................... 56
Section 7.14   Final Judgment .............................................................................. 56
Section 7.15   [Reserved] ..................................................................................... 59
Section 7.16   Relief from Automatic Stay ............................................................ 56
Section 7.17   Modification of Any Order .............................................................. 56
Section 7.18   Final Order ..................................................................................... 56
Section 7.19   Termination Event under Orders .................................................... 57
Section 7.20   Application for Superpriority Claim ................................................. 57
Section 7.21   Motions with Bankruptcy Court ...................................................... 57
Section 7.22   Suit against Lenders, etc ............................................................... 60
Section 7.23   Reorganization Plan or Disclosure Statement................................ 60
Section 7.24   [Reserved] ......................................................................................60
Section 7.25   Plan of Sale …………………………………………………………..60
Section 7.26   Resignation or Termination of CRO ………………………………...60

ARTICLE VIII. REMEDIES UPON DEFAULT........................................................ 61
Section 8.1    Remedies........................................................................................ 61
Section 8.2    Offsets............................................................................................. 62
Section 8.3    Application and Sharing of Setoff Amounts…………………………62
Section 8.4    Other Remedies .............................................................................. 63
Section 8.5    Application of Proceeds................................................................... 60

ARTICLE IX. PRIORITY AND SECURITY............................................................. 61
Section 9.1    Cash Management Arrangements; Depository Arrangements ........ 61
Section 9.2    Collections and Receipt of Proceeds by Collateral Agent .............. 62
Section 9.3    Superpriority Claims and Collateral Security .................................. 63
Section 9.4    Collateral Security Perfection ......................................................... 64
Section 9.5    No Discharge; Survival of Claims ................................................... 64

# TABLE OF CONTENTS

Section 9.6 Application of Collections ........................................................... 67

ARTICLE X. THE AGENT ............................................................................... 64
Section 10.1 Appointment and Authorization ................................................... 64
Section 10.2 Note Holders ................................................................................ 65
Section 10.3 Consultation With Counsel .......................................................... 65
Section 10.4 Documents ................................................................................... 65
Section 10.5 Agent and Affiliates .................................................................... 65
Section 10.6 Notice of Default ......................................................................... 66
Section 10.7 Action by Agent .......................................................................... 66
Section 10.8 Release of Collateral ................................................................... 66
Section 10.9 Delegation of Duties .................................................................... 70
Section 10.10 Indemnification of Agent ............................................................. 70
Section 10.11 Successor Agent .......................................................................... 70
Section 10.15 No Reliance on Agent's Customer Identification Program ........... 71

ARTICLE XI. MISCELLANEOUS .................................................................. 71
Section 11.1 Lenders' Independent Investigation ............................................. 71
Section 11.2 No Waiver; Cumulative Remedies ............................................... 72
Section 11.3 Amendments, Waivers and Consents ........................................... 72
Section 11.4 Notices ........................................................................................ 72
Section 11.5 Costs, Expenses and Taxes .......................................................... 73
Section 11.6 Indemnification ........................................................................... 70
Section 11.7 Obligations Several; No Fiduciary Obligations ............................ 70
Section 11.8 Execution in Counterparts ........................................................... 71
Section 11.9 Binding Effect; Borrowers' Assignment ...................................... 71
Section 11.10 Lender Assignments .................................................................... 71
Section 11.11 Sale of Participations ................................................................... 73
Section 11.12 Patriot Act Notice ....................................................................... 74
Section 11.13 Severability of Provisions; Captions; Attachments ...................... 74
Section 11.14 Investment Purpose ..................................................................... 74
Section 11.15 Entire Agreement ........................................................................ 74
Section 11.16 Legal Representation of Parties ................................................... 74
Section 11.17 Governing Law; Submission to Jurisdiction ................................. 74
Section 11.18 JURY TRIAL WAIVER ............................................................... 80

Exhibit A Form of Revolving Credit Note
Exhibit F Form of Borrowing Base Certificate
Exhibit G Form of Notice of Loan
Exhibit H Form of Compliance Certificate
Exhibit I Form of Assignment and Acceptance Agreement

Schedule 1 Commitments of Lenders
Schedule 3 Real Property
Schedule 4 Pledged Securities

# TABLE OF CONTENTS

Schedule 5       Pledged Notes
Schedule 6.1    Corporate Existence; Subsidiaries; Foreign Qualification
Schedule 6.4    Litigation and Administrative Proceedings
Schedule 6.5    Real Estate Owned
Schedule 6.9    Locations
Schedule 6.11  Employee Benefits Plans
Schedule 6.16  Material Agreements
Schedule 6.17  Intellectual Property
Schedule 6.18  Insurance
Schedule 6.19  Deposit Accounts

Annex 1         Form of Budget
Annex 2         Existing Mortgages
Annex 3         Other Prepetition Liens
Annex 4         Existing Indebtedness

{10584541:5 }                                                                              4867-2680-0173_2
22-46160-lsg    Doc 22-1    Filed 08/09/22    Entered 08/09/22 11:39:28    Page 6 of 175

This DEBTOR IN POSSESSION CREDIT AGREEMENT (as the same may from time to time be amended, restated or otherwise modified, this "Agreement") is made effective as of the 8th day of August, 2022, by and among GISSING NORTH AMERICA LLC (F/K/A CONFORM GISSING INTERNATIONAL, LLC), a Delaware limited liability company, GISSING TECHNOLOGIES LLC (F/K/A FORMED FIBER TECHNOLOGIES, LLC), a Delaware limited liability company, GISSING SIDNEY LLC (F/K/A FFT SIDNEY, LLC), a Delaware limited liability company, GISSING SUMTER LLC (F/K/A FFT SUMTER, LLC), a Delaware limited liability company, GISSING AUBURN LLC (F/K/A FFT AUBURN, LLC), a Delaware limited liability company, GISSING TECHNOLOGIES MEXICO LLC (F/K/A FORMED FIBER TECHNOLOGIES – MEXICO, LLC), a Delaware limited liability company, GISSING FREMONT LLC, a Delaware limited liability company, and GISSING GREENVILLE LLC, a Delaware limited liability company (collectively, "Borrowers" and, individually, each a "Borrower"), THE HUNTINGTON NATIONAL BANK, a national banking association, as administrative agent ("Agent"), and the lenders party hereto and each other Eligible Transferee, as hereinafter defined, that from time to time becomes a party hereto pursuant to Section 11.10 hereof (collectively, the "Lenders" and, individually, each a "Lender").

WITNESSETH:

WHEREAS, on August 8, 2022 (the "Filing Date"), the Borrowers (collectively, the "Debtors" and each a "Debtor") each filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan; and

WHEREAS, the Debtors intend to continue to operate their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, before the Filing Date, the Borrowers and non-debtors Conform Automotive, LLC, a Michigan limited liability company ("Conform"), and DTI Molded Products, Inc., a Michigan corporation ("DTI" and collectively with the Borrowers and Conform, the "Prepetition Borrowers"), The Huntington National Bank, a national banking association, in its capacity as agent, for itself and the other financial institutions and parties from time to time as lenders, together with their successors and assigns party to the Prepetition Credit Agreement (as defined below) (the "Prepetition Lenders"), entered into: (a) that certain Fifth Amended and Restated Credit and Security Agreement dated as of June 18, 2019, as amended by that certain First Amendment to Fifth Amended and Restated Credit and Security Agreement dated as of November 25, 2019, as further amended by that certain Second Amendment to Fifth Amended and Restated Credit and Security Agreement dated as of March 31, 2020, as further amended by that certain Third Amendment to Fifth Amended and Restated Credit and Security Agreement dated as of October 2, 2020, as further amended by that certain Fourth Amendment to Fifth Amended and Restated Credit and Security Agreement dated as of March 8, 2021, as further amended by that certain Fifth Amendment to Fifth Amended and Restated Credit and Security Agreement dated as of August 13, 2021, as further amended by that certain Sixth Amendment to Fifth Amended and Restated Credit and Security Agreement dated as of September 28, 2021, as further amended by that certain Seventh Amendment to Fifth Amended and Restated Credit and Security Agreement dated as of October 29, 2021, as further amended by that certain Forbearance Agreement dated as of November 30, 2021, as further amended that certain First

Amendment to Forbearance Agreement dated as of December 31, 2021, as further amended by that certain Second Amendment to Forbearance Agreement dated as of January 26, 2022, as further amended by that certain Third Amendment to Forbearance Agreement dated as of February 28, 2022, as further amended by that certain Fourth Amendment to Forbearance Agreement dated as of March 31, 2022, as further amended by that certain Fifth Amendment to Forbearance Agreement dated as of April 29, 2022, as further amended by that certain Sixth Amendment to Forbearance Agreement dated as of May 31, 2022, as further amended by that certain Seventh Amendment to Forbearance Agreement dated as of June 9, 2022, as further amended by that certain Eighth Amendment to Forbearance Agreement dated as of June 30, 2022, as further amended by that certain Ninth Amendment to Forbearance Agreement dated as of July 11, 2022, as further amended by that certain Tenth Amendment to Forbearance Agreement dated as of July 18, 2022, as further amended by that certain Eleventh Amendment to Forbearance Agreement dated as of August 4, 2022 (as the same have been amended and in effect from time to time prior to the Filing Date, the "Prepetition Credit Agreement"), pursuant to which the Prepetition Lenders extended credit to the Prepetition Borrowers on the terms set forth therein; and

WHEREAS, in addition to other advances and financial accommodations made by the Prepetition Lenders to the Prepetition Borrowers pursuant to the terms and provisions of the Prepetition Credit Agreement, the Prepetition Collateral Agent and the Prepetition Subordinated Participants executed and delivered: (i) that certain GM Prepetition Subordinated Participation Agreement pursuant to which GM purchased from the Prepetition Lenders a last-out, non-voting, subordinated participation in the Prepetition Obligations and the Obligations in accordance with the SOFA Amount, the Second SOFA Amount, and the Third SOFA Amount and in accordance with the Third SOFA Schedule, and (ii) that certain Tesla Prepetition Subordinated Participation Agreement pursuant to which Tesla purchased from the Prepetition Lenders a last-out, non-voting, subordinated participation in the Prepetition Obligations and the Obligations in accordance with the Tesla SOFA Amount and in accordance with the Tesla SOFA Schedule (the SOFA Amount, the Second SOFA Amount, the Third SOFA Amount, and the Tesla SOFA Amount are defined collectively as the "Over- Formula Advance Amount") and the Prepetition Lenders made the Over-Formula Advance Amount available to the Prepetition Borrowers; and

WHEREAS, as of August 8, 2022, the Prepetition Lenders under the Prepetition Credit Agreement and the other Notes and Loan Documents (defined therein) executed and delivered in connection therewith, are owed not less than: (i) $13,661,253.21 on the Eighth Amended and Restated Revolving Loan Note dated as of October 29, 2021, (ii) $4,350,000.00 on the Second Amended and Restated Equipment Term Loan Note dated as of October 29, 2021, (iii) $5,916,666.55 on the Second Amended and Restated Real Estate Term Loan Note dated as of October 29, 2021, (iv) $439,562.04 on the Second Amended and Restated CapEx Note dated as of October 29, 2021, and (v) $686,834.88 on the Amended and Restated Second Amendment CapEx Note dated as of October 29, 2021, constituting principal obligations incurred directly by the Prepetition Borrowers as of August 8, 2022, plus any unpaid interest, fees, costs and expenses, and including the Over-Formula Advance Amount (the "Prepetition Obligations"); and

WHEREAS, the Prepetition Obligations are secured by liens (the "Prepetition Liens") on substantially all of the existing and after-acquired assets of the Prepetition Borrowers, and such

liens are perfected and, except as otherwise permitted in the Prepetition Credit Agreement, have priority over other liens; and

WHEREAS, the Borrowers have requested that the Agent and the Lenders provide financing to the Borrowers pursuant to Section 364(c)(1), (2) and (3) and Section 364(d) of the Bankruptcy Code, and enter into this Agreement pursuant to which the Agent and the Lenders would extend to the Borrowers a revolving credit facility not to exceed at any one time outstanding $30,000,000 (less the unpaid principal amount outstanding at any time on the Prepetition Revolving Loans), of which the Agent and the Lenders would make available to the Borrowers not to exceed at any one time $8,800,000.00 prior to the entry of the Final Order and up to the remaining amount of the Total Commitment after the entry of the Final Order (in each case, as such amount may be reduced pursuant to this Agreement), to be available in the form of Revolving Loans advanced by the Agent and the Lenders from time to time at the request of and for the account of the Borrowers; and

WHEREAS, the Borrowers are unable to obtain funds or credit on any other terms; and

WHEREAS, the Agent and the Lenders are willing to extend such credit to the Borrowers on the terms and conditions set forth herein and in the other Loan Documents in accordance with Section 364(c)(1), (2) and (3) and Section 364(d) of the Bankruptcy Code, so long as:

(a)     such postpetition credit obligations are (i) secured by Liens on substantially all of the property and interests, real and personal, tangible and intangible, of the Borrowers, whether now owned or hereafter acquired, subject to priority only to certain Liens and claims in respect of the Carve Out (as defined below) as herein provided, and (ii) given super priority status as provided in the Orders (as defined below); and

(b)     the Prepetition Lenders receive certain adequate protection for the Borrowers' use, sale or lease of collateral, including the Borrowers' use of cash collateral, and the priming of the Prepetition Liens securing the Prepetition Obligations; and

WHEREAS, the Borrowers have agreed to provide such collateral, super priority claims and adequate protection subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, it is mutually agreed as follows:

## ARTICLE I.  DEFINITIONS

Section 1.1    Definitions.    As used in this Agreement, the following terms shall have the meanings set forth below:

"Accepted Bidder(s)" means that term as defined in Section 4.2(r) of this Agreement.

{10584541:5 }                                                                                                   4867-2680-0173_2

"Access Agreement" means that certain Access and Security Agreement dated July 18, 2022 as modified by Tesla's Joinder to Accommodation Agreement and Access Agreement dated as of July 29, 2022, by and among, the Borrowers, Agent, the Prepetition Lenders, GM, Toyota, BMW, and Tesla.

"Accommodation Agreement" means that certain Accommodation Agreement dated as of July 18, 2022, by and among, the Prepetition Borrowers, Agent, the Lenders, GM, Toyota, and BMW, and Tesla's Joinder to Accommodation Agreement and Access Agreement dated as of July 29, 2022, by and among, the Prepetition Borrowers, Agent, the Lenders, GM, Toyota, BMW, and Tesla (as the same may have been amended, restated, or modified from time to time).

"Accommodation Overadvance Amount" means the Third SOFA Amount, and the Tesla SOFA Amount in an amount up to (a) from entry of the Interim Order through and including the date of entry of the Final Order, $1,944,000, and (b) after the date of entry of the Final Order an additional amount up to $12,374,000.

"Account" means all accounts, as defined in the U.C.C.

"Account Debtor" means any Person obligated to pay all or any part of any Account in any manner and includes (without limitation) any Guarantor thereof.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person (other than a Borrower), or any business or division of any Person (other than a Borrower), (b) the acquisition of in excess of fifty percent (50%) of the outstanding capital stock (or other equity interest) of any Person (other than a Borrower), or (c) the acquisition of another Person (other than a Borrower) by a merger, amalgamation or consolidation or any other combination with such Person.

"Affiliate" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, directly or indirectly, (x) to vote ten percent (10%) or more of the securities having ordinary voting power for the election of directors of such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agreement" means that term as defined in the first paragraph hereof.

"Applicable Commitment Percentage" means, for each Lender with respect to the Total Commitment, the percentage, if any, set forth opposite such Lender's name under the column headed "Revolving Credit Commitment Percentage", as listed in Schedule 1 hereto.

"Applicable Margin" means three percent (3.0%) per annum.

"Asset Brokers" means that term as defined in Section 5.37 of this Agreement.

"Assignment Agreement" means an Assignment and Acceptance Agreement in the form of the attached Exhibit I.

"Authorized Officer" means a Financial Officer or other individual authorized by a Financial Officer in writing (with a copy to Agent) to handle certain administrative matters in connection with this Agreement.

"Avoidance Actions" means avoidance actions of the Borrowers under Chapter 5 of the Bankruptcy Code (and the proceeds thereof).

"Bank Product Agreements" means those certain cash management service and other agreements entered into from time to time between a Borrower and a Lender (or an affiliate of a Lender) in connection with any of the Bank Products.

"Bank Product Obligations" means all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by a Borrower to any Lender (or an affiliate of a Lender) pursuant to or evidenced by the Bank Product Agreements.

"Bank Products" means any service or facility extended to a Borrower by any Lender (or an affiliate of a Lender) including (a) credit cards and credit card processing services, (b) debit and purchase cards, (c) ACH (automated clearing house) transactions, and (d) cash management, including controlled disbursement, accounts or services.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan.

"BMW" means  BMW SLP S.A. de C.V.

"Borrower" and "Borrowers" means those terms as defined in the first paragraph hereof.

 "Borrowing Base" means an amount equal to the sum of the following:

(a) up to 90% of each Borrower's Eligible Accounts that are owed by Tesla, GM and Toyota as long as they are an Investment Grade Account Debtor, plus (b) up to 85% of all of each Borrower's other Eligible Accounts owing from Account Debtors located in the United States at such time (including Tesla, GM and Toyota if they are not an Investment Grade Account Debtor), plus (c) the lesser of (i) up to 85% of each Borrower's Eligible Accounts owing from Account Debtors located in Canada at such time and (ii) $3,500,000, plus (d) the lesser of (i) up to 85% of each Borrower's Eligible Tooling Accounts at such time or (ii) $4,500,000, plus (e) the lesser of (i) up to 85% of each Borrower's Eligible Foreign Accounts at such time and (ii) $2,000,000, plus (f) the lesser of (i) up to 55% of each Borrower's Eligible Inventory, valued at the lower of cost or market value, determined on a first in first out basis, at such time, and (ii) $8,000,000, plus (g) the SOFA Amount, plus (h) the Second SOFA Amount, plus (i) the Accommodation Overadvance Amount minus (j) the Innova Lease Reserve,

5

minus (k) the Fifth Amendment Reserve, minus (l) any other Reserves in effect on the Forbearance Eleventh Amendment Effective Date (August 4, 2022), minus (m) the Permitted Reserves. The Borrowers shall deliver to Agent (x) evidence acceptable to Agent that Tesla is an Investment Grade Account Debtor prior to the initial inclusion of Tesla's Eligible Accounts in subsection (a) of "Borrowing Base," and (ii) simultaneously with the delivery of each quarterly Compliance Certificate required to be delivered pursuant to Section 5.3, evidence acceptable to Agent that each of Tesla, GM and Toyota is an Investment Grade Account Debtor, which shall be a condition to the continued inclusion of the Tesla, GM and Toyota Eligible Accounts in subsection (a) of "Borrowing Base." The Agent may, in its Permitted Discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base (other than the SOFA Amount, Second SOFA Amount and the Accommodation Overadvance Amount), each upon one (1) Business Day notice to the Borrower Representative.

"Borrowing Base Certificate" means a Borrowing Base Certificate in the form of the attached Exhibit F.

"Borrower Representative" means Gissing North America LLC, a Delaware limited liability company.

"Budget" means a thirteen (13) week budget projecting on a week-by-week basis the Debtors': (i) sales; (ii) cash receipts; (iii) disbursements, including, without limitation, line items for payroll, trade debt, interest and fees under this Agreement, interest and fees on other indebtedness and professional fees); and (iv) amounts of Revolving Loans to be requested and outstanding, substantially in the form of the attached Annex 1 and in substance satisfactory to Agent and the Lenders, including as such budget is updated, amended or revised each week with the agreement of Agent, in its sole discretion.

"Business Day" means any day that is not a Saturday, a Sunday or another day of the year on which national banks are authorized or required to close in Cleveland, Ohio.

"Capital Distribution" means a payment made, liability incurred or other consideration given by a Borrower to any Person that is not a Borrower, for the purchase, acquisition, redemption, repurchase, payment or retirement of any capital stock or other equity interest of such Borrower or as a dividend, return of capital or other distribution (other than any stock dividend, stock split or other equity distribution payable only in capital stock or other equity of such Borrower) in respect of such Borrower's capital stock or other equity interest.

"Cash Reserve" means that term as defined in Section 8.5(a) of this Agreement.

"Carve-Out" shall have the meaning ascribed to it in the Interim Order and the Final Order.

"Cases" means, the Debtors' cases under Chapter 11 of the Bankruptcy Code pending in the United States Bankruptcy Court for the Eastern District of Michigan.

"Cash Collateral Account" means with respect to the Borrowers, that certain commercial deposit account maintained at Agent for the purpose of collecting the Borrowers' accounts and proceeds of other Collateral, the funds within which: (a) shall be the sole and exclusive property of the Agent for the benefit of the Agent and the Lenders and (b) the Agent shall have the irrevocable and exclusive right to withdraw until all of the Obligations are paid, performed, satisfied and enforced in full and the commitments of the Lenders to make Advances hereunder have terminated.

"Change in Control" means (a) the Permitted Holders shall cease to own, free and clear of all Liens or other encumbrances, directly or indirectly, 100% of the outstanding voting Equity Interests of each of Gissing North America LLC and ConForm Automotive, LLC on a fully diluted basis; (b) any merger or consolidation involving a Credit Party except as permitted by this Agreement; (c) any sale of all or substantially all of the property or assets of the Credit Parties taken as a whole; or (d) each Borrower shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of any existing or future Subsidiary.

"Chief Restructuring Officer" means that term as defined in Section 5.34 of this Agreement.

"Closing Date" means the date on which all of the conditions set forth in Section 4.2 are satisfied to the satisfaction of Agent, or waived in writing by, Agent.

"Code" means the Internal Revenue Code of 1986, as amended, together with the rules and regulations promulgated thereunder.

"Collateral" means all of the "Collateral", as defined in the Security Agreement.

"Collateral Agent" means The Huntington National Bank, National Association, acting as Collateral Agent for the Lenders pursuant to the Security Documents, and any successor designated as Collateral Agent pursuant to Section 10.12 hereof.

"Commitment" means, with respect to each Lender, (a) prior to the entry of the Final Order, the amount set forth opposite such Lender's name in Schedule 1 hereto directly below the column titled "Interim Order Commitment" (the "Interim Order Commitment") and (b) on or after the entry of the Final Order, the amount set forth opposite such Lender's name in Schedule 1 hereto directly below the column titled "Final Order Commitment" (the "Final Order Commitment"), in each case as may be reduced from time to time pursuant to the terms hereof.

"Commitment Period" means the period from the Closing Date to, but not including, the Maturity Date.

"Compliance Certificate" means a Compliance Certificate in the form of the attached Exhibit H.

"Consultant" means that term as defined in Section 5.2 of this Agreement.

{10584541:5 }
4867-2680-0173_2

"Control Agreement" means each Deposit Account Control Agreement among a Credit Party, Collateral Agent and a depository institution, dated on or after the Closing Date, and each Deposit Account Control Agreement, among a Credit Party, Prepetition Lender and a depository institution, in each case, as the same may from time to time be amended, restated or otherwise modified.

"Controlled Group" means the Borrowers and each Person required to be aggregated with a Borrower under Code Section 414(b), (c), (m) or (o).

"Credit Event" means the making by the Lenders of a Loan.

"Credit Party" means, singularly or collectively, as the context may require, each Borrower and any Guarantor.

"Creditors' Committee" means the official committee of unsecured creditors in the Debtors' Chapter 11 Cases.

"Debtors" means that term as defined in the first Whereas paragraph of this Agreement.

"Default" means an event or condition that constitutes, or with the lapse of any applicable grace period or the giving of notice or both would constitute, an Event of Default, and that has not been waived by the Required Lenders (or, if applicable, all of the Lenders) in writing.

"Default Rate" means with respect to any Loan, a rate per annum equal to five percent (5%) in excess of the Derived Base Rate otherwise applicable thereto.

"Deposit Account" means (a) a deposit account, as defined in the U.C.C., (b) any other deposit account, and (c) any demand, time, savings, checking, passbook or similar account maintained with a bank, savings and loan association, credit union or similar organization.

"Derived Base Rate" means a rate per annum equal to the Prime Rate plus the Applicable Margin.

"Dilution" means the aggregate amount of credits, returned goods, adjustments, deductions, setoffs, and recoupments and other adjustments of any kind granted by the Borrowers or taken by all Account Debtors in any period divided by the aggregate amount of the Borrowers' sales during such period on a trailing twelve (12) month basis, all as determined by Agent.

"DIP Liens" means that term as defined in Section 9.3 of this Agreement.

"Dollar" or the $ sign means lawful money of the United States of America.

"Eligible Accounts" means, at any time, Accounts of the Borrowers that the Agent determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans. Without limiting the Agent's discretion provided herein, Eligible Accounts shall not include any Account:

(a)     which is not subject to a first priority perfected security interest in favor of the Agent for the benefit of the Agent and the Lenders;

(b)     which is subject to any Lien other than a Permitted Lien that does not have priority over the Lien in favor of the Agent for the benefit of the Agent and the Lenders;

(c)     (i) which is unpaid more than 90 days after the date of the original invoice therefore, or (ii) which has been written off the books of the Borrowers or otherwise designated as uncollectible;

(d)     which is owing by an Account Debtor if more than 50% (which percentage shall be 25% for an Investment Grade Account Debtor) of the Accounts owing from such Account Debtor and its Affiliates are ineligible; with respect to which any covenant, representation, or warranty contained in this Agreement has been breached or is not true;

(e)     which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the Agent which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon a Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payments of interest;

(f)     for which the goods giving rise to such Account have not been shipped to the Account Debtor or its designee or for which the services giving rise to such Account have not been performed by a Borrower or if such Account was invoiced more than once;

(g)     with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(h)     which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(i)     which is owed by any Account Debtor which has sold all or substantially all of its assets;

9

(j)     except for Eligible Foreign Accounts, which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada (other than Quebec) or (ii) is not organized under applicable law of the U.S., any state of the U.S., Canada, or any province of Canada (other than the province of Quebec);

(k)     which is owed in any currency other than U.S. dollars;

(l)     which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a letter of credit acceptable to the Agent which is in the possession of the Agent, or (ii) the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the Lien of the Agent and the Lenders in such Account have been complied with to the Agent's satisfaction;

(m)     which is owed by any Affiliate, employee, officer, director, agent or stockholder of any Credit Party;

(n)     which for any Account Debtor exceeds a credit limit determined by the Agent in its Permitted Discretion and communicated to Borrower Representative, to the extent of such excess;

(o)     which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Credit Party is indebted, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor but only to the extent thereof;

(p)     which is subject to any counterclaim, defense or dispute;

(q)     which is subject to any deduction or setoff; provided that the portion of such Account not subject to such deduction or setoff will not be ineligible solely by reason of this clause (q);

(r)     which is evidenced by any promissory note, chattel paper, or instrument;

(s)     which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit a Borrower to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Borrower has filed such report or qualified to do business in such jurisdiction;

(t)     with respect to which a Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account

10

which was partially paid and such Borrower created a new receivable for the unpaid portion of such Account;

(u)    which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board of Governors of the Federal Reserve System;

(v)    which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than a Borrower has or has had an ownership interest in such goods, or which indicates any party other than a Borrower as payee or remittance party;

(w)    which is for tooling services;

(x)    which was created on cash on delivery terms; or

(y)    which the Agent determines in its Permitted Discretion may not be paid by reason of the Account Debtor's inability to pay.

In the event that an Account in excess of $300,000 that was previously an Eligible Account ceases to be an Eligible Account hereunder, the Borrower Representative shall notify the Agent thereof within 5 Business Days. In determining the amount of an Eligible Account, the face amount of an Account may, in the Agent's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrowers may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrowers to reduce the amount of such Account.

"Eligible Foreign Accounts" means at any time, Eligible Accounts of the Borrowers that the Agent determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans. Without limiting the Agent's discretion provided herein, Eligible Foreign Accounts shall not include any Account (a) was not invoiced by a Borrower or (b) is not payable by GM, GM de Mexico S.A. de C.V., any Mexican subsidiary of General Motors Company, Toyota, any Mexican subsidiary of Toyota Motor Corporation, Ford Motor Company, any Mexican subsidiary of Ford Motor Company, or other entities as the Agent may permit from time to time in its Permitted Discretion.

"Eligible Inventory" means, at any time, Inventory of the Borrowers that the Agent determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loans. Without limiting the Agent's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a)     which is not subject to a first priority perfected Lien in favor of the Agent for the benefit of the Agent and the Lenders;

(b)     which is subject to any Lien other than Permitted Liens that does not have priority over the Lien in favor of the Agent for the benefit of the Agent and the Lenders;

(c)     which is, in the Agent's Permitted Discretion, slow moving (unless otherwise agreed to by the Agent), obsolete, unmerchantable, defective, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(d)     with respect to which any covenant, representation, or warranty contained in this Agreement has been breached or is not true in any material respect and which does not conform to all standards imposed by any Governmental Authority to the extent applicable;

(e)     in which any Person other than a Borrower shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)     which is not finished goods or raw materials, or which constitutes work-in-process, spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)     which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers;

(h)     which is located in any location leased by a Borrower unless the lessor has delivered to the Agent a Waiver;

(i)     which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document (as defined in the U.C.C.) unless such warehouseman or bailee has delivered to the Agent a Waiver and such other documentation as the Agent may require;

(j)     which is being processed offsite at a third party location or outside processor, or is in transit to or from said third party location or outside processor;

(k)     which is a discontinued product or component thereof or which is the subject of a consignment by a Borrower as consignor;

(l)     which is perishable;

(m)     which contains or bears any intellectual property rights licensed to a Borrower unless the Agent is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(n)     which is not reflected in a current perpetual inventory report of the Borrowers;

(o)     for which reclamation rights have been asserted by the seller; or

(p)     any Inventory which is produced in violation of the Fair Labor Standards Act and is subject to the so-called "hot goods" provisions contained in 29 USC 2l5(a)(i), or which fails to comply with any standard imposed by any governmental Person having authority over the disposition, manufacture, or use of that Inventory.

In the event that Inventory in excess of $100,000 that was previously Eligible Inventory ceases to be Eligible Inventory hereunder, the Borrower Representative shall notify the Agent thereof within 5 Business Days.

"Eligible Tooling Accounts" means at any time, Accounts of the Borrowers that (a) are for tooling services, (b) are owed by Account Debtors that, in Agent's Permitted Discretion, have received Production Part Approval Process certification or approval, (c) are not unpaid more than 120 days after the date of the original invoice therefore, and (d) otherwise qualify as Eligible Accounts except for subsection (w) and/or clause (i) of subsection (c) of the definition of Eligible Accounts.

"Eligible Transferee" means a commercial bank, financial institution or other "accredited investor" (as defined in SEC Regulation D) that is not a Prepetition Borrower, a Borrower, a Subsidiary or an Affiliate.

"Environmental Laws" means all provisions of law (including the common law), statutes, ordinances, codes, rules, guidelines, policies, procedures, orders in council, regulations, permits, licenses, judgments, writs, injunctions, decrees, orders, awards and standards promulgated by a Governmental Authority or by any court, agency, instrumentality, regulatory authority or commission of any of the foregoing concerning environmental health or safety and protection of, or regulation of the discharge of substances into, the environment.

"Equipment" means all equipment, as defined in the U.C.C.

{10584541:5 }

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated pursuant thereto.

"ERISA Event" means (a) the existence of a condition or event with respect to an ERISA Plan that presents a risk of the imposition of an excise tax or any other liability on a Borrower or of the imposition of a Lien on the assets of a Borrower; (b) the engagement by a Controlled Group member in a non-exempt "prohibited transaction" (as defined under ERISA Section 406 or Code Section 4975) or a breach of a fiduciary duty under ERISA that could result in liability to a Borrower; (c) the application by a Controlled Group member for a waiver from the minimum funding requirements of Code Section 412 or ERISA Section 302 or a Controlled Group member is required to provide security under Code Section 401(a)(29) or ERISA Section 307; (d) the occurrence of a Reportable Event with respect to any Pension Plan as to which notice is required to be provided to the PBGC; (e) the withdrawal by a Controlled Group member from a Multiemployer Plan in a "complete withdrawal" or a "partial withdrawal" (as such terms are defined in ERISA Sections 4203 and 4205, respectively); (f) the involvement of, or occurrence or existence of any event or condition that makes likely the involvement of, a Multiemployer Plan in any reorganization under ERISA Section 4241; (g) the failure of an ERISA Plan (and any related trust) that is intended to be qualified under Code Sections 401 and 501 to be so qualified or the failure of any "cash or deferred arrangement" under any such ERISA Plan to meet the requirements of Code Section 401(k); (h) the taking by the PBGC of any steps to terminate a Pension Plan or appoint a trustee to administer a Pension Plan, or the taking by a Controlled Group member of any steps to terminate a Pension Plan; (i) the failure by a Controlled Group member or an ERISA Plan to satisfy any requirements of law applicable to an ERISA Plan; (j) the commencement, existence or threatening of a claim, action, suit, audit or investigation with respect to an ERISA Plan, other than a routine claim for benefits; or (k) any incurrence by or any expectation of the incurrence by a Controlled Group member of any liability for post-retirement benefits under any Welfare Plan, other than as required by ERISA Section 601, et. seq. or Code Section 4980B.

"ERISA Plan" means an "employee benefit plan" (within the meaning of ERISA Section 3(3)) that a Controlled Group member at any time sponsors, maintains, contributes to, has liability with respect to or has an obligation to contribute to such plan.

"Event of Default" means an event or condition that shall constitute an event of default as defined in Article VII hereof.

"Excluded Hedging Obligations" means with respect to any Guarantor, any Hedging Obligation if, and solely to the extent that, all or a portion of Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest pursuant to the Loan Document to secure, such Hedging Obligations (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such

{10584541:5 }

Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act as of the date of any such Guaranty of any such Guarantor or the grant of such security interest would otherwise have become effective with respect to such related Hedging Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"Excluded Taxes" means, in the case of each Lender, taxes imposed on or measured by its overall net income or branch profits, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such Lender, as the case may be, is organized or in which its principal office is located, or, in the case of any Lender, in which its applicable lending office is located.

"Existing Indebtedness" means that term as defined in Section 5.8 of this Agreement.

"Federal Funds Effective Rate" means, for any day, the rate per annum (rounded upward to the nearest one one-hundredth of one percent (1/100 of 1%)) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the Closing Date.

"Fifth Amendment Reserve" means that term as defined in the Fifth Amendment to Forbearance Agreement dated as of April 29, 2022.

"Filing Date" means that term as defined in the first Whereas paragraph of this Agreement.

"First Day Orders" means customary first day orders for a debtor in Chapter 11 of the Bankruptcy Code and in form and substance satisfactory to Agent.

"Final Order" means a final order of the Bankruptcy Court in the Cases authorizing and approving, among other things, this Agreement and the other Loan Documents under Section 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to Agent and its counsel. The Final Order shall, among other things, have:

    (a)    authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not greater than the Total Commitment provided for herein;

    (b)    granted the claim status and Liens described in Article IX and prohibited the granting of additional Liens on the assets of the Borrowers other than Permitted Liens;

    (c)    provided that such Liens are automatically perfected by the entry of the Final Order and also granted to Agent for the benefit of Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Agent, if Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered

necessary or advisable by Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of nonbankruptcy law and authorizing the enforcement of remedies under the DIP Loan Documents, Accommodation Agreement and Access Agreement; and

(d) authorized the assumption of the Accommodation Agreement and Access Agreement.

"Final Order Commitment" means that term as defined in the definition of "Commitment."

"Financial Officer" means any of the following officers of the Borrowers: chief executive officer, president, chief financial officer, chief restructuring officer, or treasurer.

"Forbearance Agreement" means that term as set forth in the third Whereas paragraph of this Agreement.

"GAAP" means generally accepted accounting principles in the United States as then in effect, which shall include the official interpretations thereof by the Financial Accounting Standards Board, applied on a basis consistent with the past accounting practices and procedures of the Borrowers.

"General Intangibles" means all (a) general intangibles, as defined in the U.C.C.; and (b) choses in action, causes of action, intellectual property, customer lists, corporate or other business records, inventions, designs, patents, patent applications, service marks, registrations, trade names, trademarks, copyrights, licenses, goodwill, computer software, rights to indemnification and tax refunds.

"GM" means General Motors LLC (for itself and on behalf of its subsidiaries and affiliates).

"GM Prepetition Subordinated Participation Agreement" means that certain Second Amended and Restated Subordinated Last-Out Participation Agreement dated as of July 18, 2022, by and between Prepetition Collateral Agent and GM, as the same was amended by that certain First Amendment to Second Amended and Restated Subordinated Last-Out Participation Agreement dated as of August 5, 2022, by and between Prepetition Collateral Agent and GM (as the same may be amended, restated or modified from time to time).

"Governmental Authority" means any nation or government, any state, province or territory or other political subdivision thereof, any governmental agency, department, authority, instrumentality, regulatory body, court, central bank or other governmental entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization exercising such functions.

"Guarantor" means a Person that shall have pledged its credit or property in any manner for the payment or other performance of the indebtedness, contract or other obligation of another and includes (without limitation) any guarantor (whether of payment or of collection), surety,

co-maker, endorser or Person that shall have agreed conditionally or otherwise to make any purchase, loan or investment in order thereby to enable another to prevent or correct a default of any kind.

"Hedging Contract" means any foreign exchange contract, currency swap agreement, futures contract, commodities hedge agreement, interest rate protection agreement, interest rate future agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, option agreement or any other similar hedging agreement or arrangement entered into by a Person in the ordinary course of business and not for speculative purposes.

"Hedging Obligation" means all liabilities of a Person under Hedging Contracts; provided that, with respect to any Credit Party, "Hedging Obligations" shall not include the Excluded Hedging Obligations of such Credit Party, if any.

"Indebtedness" means, for the Borrowers, without duplication, (a) all obligations to repay borrowed money, direct or indirect, incurred, assumed, or guaranteed, (b) all obligations in respect of the deferred purchase price of property or services (other than trade accounts payable incurred in the ordinary course of business, (c) all obligations under conditional sales or other title retention agreements, (d) all obligations (contingent or otherwise) under any letter of credit or banker's acceptance, (e) all net obligations under any currency swap agreement, interest rate swap, cap, collar or floor agreement or other interest rate management device or any Hedging Contract, (f) all synthetic leases, (g) all lease obligations that have been or should be capitalized on the books of the Borrowers in accordance with GAAP, (h) all obligations of the Borrowers with respect to asset securitization financing programs to the extent that there is recourse against the Borrowers or the Borrowers are liable (contingent or otherwise) under any such program, (i) all obligations to advance funds to, or to purchase assets, property or services from, any other Person in order to maintain the financial condition of such Person, (j) all indebtedness of the types referred to in subparts (a) through (i) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which a Borrower is a general partner or joint venturer, unless such indebtedness is expressly made non-recourse to a Borrower, (k) any other transaction (including forward sale or purchase agreements) having the commercial effect of a borrowing of money entered into by a Borrower to finance its operations or capital requirements, and (l) any guaranty of any obligation described in subparts (a) through (k) hereof.

"Innova Lease" means the Lease Agreement (as amended, and as may be further amended, modified, extended, or restated from time to time) between Mexico Subsidiary and Innova Dintel Guanajuato, S.A. de C.V. covering a building located at Colinas de Leon Industrial Park, in Leon, Guanajuato, Mexico.

"Innova Lease Reserve" means a Reserve in an amount equal to $1,121,000 for twelve (12) months of scheduled rent payments due under the Innova Lease.

"Interim Order" means an order of the Bankruptcy Court in the Cases authorizing and approving this Agreement on an interim basis under Section 364(c) of the Bankruptcy Code and entered at a preliminary hearing under Bankruptcy Rule 4001, in form and substance reasonably satisfactory to Agent and its counsel. The Interim Order shall, among other things, have:

(a)     authorized the transactions contemplated by this Agreement and the extension of credit under this Agreement in an amount not greater than the Interim Order Commitment;

(b)     authorized the payment by the Borrowers of the Borrowers' obligations under the Prepetition Credit Agreement to the extent provided in this Agreement;

(c)     granted the claim status and Liens described in Article IX, and prohibited the granting of additional Liens on the assets of the Borrowers other than Permitted Liens; and

(d)     provided that such Liens are automatically perfected by the entry of the Interim Order and also granted to the Agent for the benefit of the Lenders, relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of nonbankruptcy law.

"Interim Order Commitment" means that term as defined in the definition of "Commitment."

"Inventory" means all inventory, as defined in the U.C.C.

"Investment Banker" means that term as defined in Section 5.3 of this Agreement.

"Investment Grade Account Debtor" means an Account Debtor with a long term or corporate credit rating of BBB- or better by Standard & Poor's Rating Group and Baa3 or better by Moody's Investors Services, Inc.

"Landlord's Waiver" means a landlord's waiver or mortgagee's waiver, each in form and substance satisfactory to Agent, delivered by a Borrower in connection with this Agreement, as such waiver may from time to time be amended, restated or otherwise modified or replaced.

"Lender" and "Lenders" mean those terms as defined in the first paragraph hereof.

"Lien" means any mortgage, deed of trust, security interest, lien (statutory or other), charge, assignment, hypothecation, encumbrance on, pledge or deposit of, or conditional sale, leasing (other than Operating Leases), sale with a right of redemption or other title retention agreement and any capitalized lease with respect to any property (real or personal) or asset.

"Loan" means a Revolving Loan (including any Accommodation Overadvance Amount) granted to the Borrowers by the Lenders in accordance with Sections 2.1 and  2.2 hereof.

"Loan Documents" means, collectively, this Agreement, each Note, each Security Document, each Subordinated Participation Agreement, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

18

"Mandatory Prepayment" means that term as defined in Section 2.12(a) hereof.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Borrowers (other than the commencement of the Cases and the circumstances giving rise to its commencement), (b) the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Borrowers (other than the commencement of the Cases and the circumstances giving rise to its commencement) (c) the rights and remedies of Lender or the Lenders under any Loan Document, (d) the ability of any Credit Party to perform its obligations under any Loan Document to which it is a party, (other than, in any case, on account of the filing or pendency of the Cases) or (e) the legality, validity, binding effect or enforceability against any Credit Party of any Loan Document to which it is a party (other than, in any case, on account of the filing or pendency of the Cases).

"Material Recovery Event" means (a) any casualty loss in respect of assets of the Borrowers covered by casualty insurances, and (b) any compulsory transfer or taking under threat of compulsory transfer of any asset of the Borrowers by any Governmental Authority.

"Maturity Date" means the earliest to occur of (a) October 31, 2022, (b) the effective date of a sale of all or substantially all of the Debtors' assets or business pursuant to Section 363 of the Bankruptcy Code which is authorized by the Bankruptcy Court (and in the event of a series of transactions resulting in the sale of all or substantially all of the Debtors' assets or business, the latest of such sale) and (c) the Termination Date.

"Maximum Rate" means that term as defined in Section 2.5(f) hereof.

"Mexico Subsidiary" means  Gissing Guanajuato S. de R.L. de C.V.

"Moody's" means Moody's Investors Service, Inc., and any successor to such company.

"Mortgage" means each Open-End Mortgage, Assignment of Leases and Rents and Security Agreement (or deed of trust or comparable document) in effect as of the Closing Date in favor of the Prepetition Lenders and identified on Annex 2 hereto as an "Existing Mortgage."

"Multiemployer Plan" means a Pension Plan that is subject to the requirements of Subtitle E of Title IV of ERISA.

"Note" means a Revolving Credit Note or any other promissory note delivered pursuant to this Agreement.

"Notice of Loan" means a Notice of Loan in the form of the attached Exhibit G.

"Obligations" means, collectively, (a) all Indebtedness and other obligations incurred by the Borrowers in favor of the Collateral Agent, or any Lender (or any affiliate thereof) pursuant to this Agreement and the other Loan Documents, and includes the principal of and interest on all Loans; (b) each extension, renewal or refinancing of the foregoing, in whole or in part; (c) the Bank Product Obligations owing to any of the Lenders under the Bank Product Documents; (d) all obligations and liabilities of the Borrowers owing to any of the Lenders under Hedging

{10584541:5 }

Contracts; (e) the commitment and other fees, and any prepayment fees payable hereunder; and (f) all Related Expenses. "Obligations" shall not include the Excluded Hedging Obligations of such Credit Party, if any.

"Operating Leases" means all real or personal property leases under which a Borrower is bound or obligated as a lessee or sublessee and which, under GAAP, are not required to be capitalized on a balance sheet of such Borrower, provided that Operating Leases shall not include any such lease under which a Borrower is also bound as the lessor or sublessor.

"Orders" means, collectively, the Interim Order and the Final Order.

"Organizational Documents" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of incorporation, organization, operating agreement or equivalent formation documents, and Regulations (Bylaws), or equivalent governing documents, and any amendments to any of the foregoing.

"Other Prepetition Liens" means the prepetition liens and security interests (exclusive of those in respect of the Prepetition Credit Agreement) which are (a) valid, perfected and senior to the prepetition liens and security interests in respect of the Prepetition Credit Agreement and (b) not avoidable, including, without limitation, such liens and security interests listed on Annex 3 hereto.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, charges or similar taxes or levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Overadvance" means the amount, if any, by which the sum of the then outstanding principal balance of the Revolving Credit Note plus the then outstanding principal balance of the Prepetition Revolving Loan is in excess of the then-existing Borrowing Base.

"Over-Formula Advance Amount" means the SOFA Amount, the Second SOFA Amount, the Third SOFA Amount, and the Tesla SOFA Amount.

"Qualified Tooling Account" means an Account resulting from the sale of tooling that has received final written approval from a Borrower's customer, a copy of which approval has been provided to and is acceptable to Agent for the benefit of the Lenders in its sole discretion.

"Participant" means that term as defined in Section 11.11 hereof.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001, as amended from time to time.

"Payment in Full" means the irrevocable payment in full in cash in United States Dollars of all of the Obligations and all Prepetition Obligations.

{10584541:5 }

"PBGC" means the Pension Benefit Guaranty Corporation, and its successor.

"Pension Plan" means an ERISA Plan that is a "pension plan" (within the meaning of ERISA Section 3(2)).

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable business judgment (from the perspective of a secured asset based lender).

"Permitted Holders" means Gissing Automotive Systems, LLC, Steve Phillips, and William Vaughn.

"Permitted Liens" means that term as defined in Section 5.9 of this Agreement.

"Permitted Reserves" shall have the meaning set forth in Section 3(j) of the Forbearance Agreement; provided, however, that the following additional item shall also be included in the definition of Permitted Reserves: a Reserve for 100% of Budgeted Professional Fees (as defined in the Interim Order) in each budgeted week, which will be implemented at the beginning of each week and relieved upon payment of such Budgeted Professional Fees.

"Person" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, Governmental Authority or any other entity.

"Pledge Agreement" means any Pledge Agreement executed by a Borrower, on or after the Closing Date, as any of the foregoing may from time to time be amended, restated or otherwise modified.

"Pledged Notes" means the promissory notes payable to a Borrower, as described on Schedule 5 hereto, and any additional or future note that may hereafter from time to time be payable to a Borrower.

"Pledged Securities" means all of the shares of capital stock or other equity interest of a Subsidiary of a Credit Party, whether now owned or hereafter acquired or created, and all proceeds thereof; provided that Pledged Securities shall only include up to sixty-five percent (65%) of the shares of voting capital stock or other voting equity interest of any first-tier foreign subsidiary and shall not include any foreign subsidiary other than a first-tier foreign subsidiary. Schedule 4 hereto lists, as of the Closing Date, all of the Pledged Securities.

"Prepetition Borrowers" means the Borrowers, non-debtor Conform Automotive, LLC, a Michigan limited liability company, and non-debtor DTI Molded Products, Inc., a Michigan corporation.

"Prepetition Collateral" means "Collateral" as defined in the Prepetition Credit Agreement.

"Prepetition Collateral Agent" means The Huntington National Bank, a national banking association.

"Prepetition Credit Agreement" means that term as defined in the third Whereas paragraph of this Agreement.

"Prepetition Loan Documents" means the Prepetition Credit Agreement, each Guaranty Obligation, the Notes, (as defined in the Prepetition Credit Agreement), the Prepetition Subordinated Participation Agreement, and all security agreements, guaranties, promissory notes, pledge agreements, forbearance agreements, and related agreements and documents executed, delivered, issued or filed at any time in connection therewith.

"Prepetition Lender" means that term as defined in the third Whereas paragraph of this Agreement.

"Prepetition Liens" means that term as defined in the fifth Whereas paragraph of this Agreement.

"Prepetition Obligations" means that term as defined in the fourth Whereas paragraph of this Agreement.

"Prepetition Revolving Loans" means the revolving loans from the Prepetition Lenders to the Prepetition Borrowers under the Eighth Amended and Restated Revolving Loan Note dated as of October 29, 2021 and the Prepetition Credit Agreement.

"Prepetition Subordinated Participants" means GM and Tesla.

"Prepetition Term Loans" means the term loans from the Prepetition Lenders to the Prepetition Borrowers under the Second Amended and Restated Equipment Term Loan Note dated as of October 29, 2021, the Second Amended and Restated Real Estate Term Loan Note dated as of October 29, 2021, the Second Amended and Restated CapEx Note dated as of October 29, 2021, the Amended and Restated Second Amendment CapEx Note dated as of October 29, 2021, and the Prepetition Credit Agreement.

"Prime Rate" means the interest rate established from time to time by Agent as Agent's prime rate, whether or not such rate shall be publicly announced; the Prime Rate may not be the lowest interest rate charged by Agent for commercial or other extensions of credit. Each change in the Prime Rate shall be effective immediately from and after such change.

"Real Property" means each parcel of the real estate owned by the Borrowers as set forth on Schedule 3 hereto, together with all improvements and buildings thereon and all appurtenances, easements or other rights thereto belonging, and being defined collectively as the "Property" in each of the Mortgages.

"Register" means that term as described in Section 11.10(i) hereof.

"Regularly Scheduled Payment Date" means the last day of each calendar month.

"Related Expenses" means any and all costs, liabilities and expenses (including, without limitation, losses, damages, penalties, claims, actions, attorneys' fees, legal expenses, judgments, suits and disbursements) (a) incurred by Agent, Lenders, or Collateral Agent, or imposed upon or

{10584541:5 }

asserted against the Collateral Agent, Agent or any Lender in connection with the Cases, the negotiation or preparation of this Agreement or any attempt by the Agent, Collateral Agent, and the Lenders to (i) obtain, preserve, perfect or enforce any Loan Document or any security interest evidenced by any Loan Document; (ii) obtain payment, performance or observance of any and all of the Obligations; or (iii) maintain, insure, audit, collect, preserve, repossess or dispose of any of the collateral securing the Obligations or any part thereof, including, without limitation, costs and expenses for appraisals, assessments and audits of the Debtors or any such Collateral; or (b) incidental or related to (a) above, including, without limitation, interest thereupon from the date incurred, imposed or asserted until paid at the Default Rate.

"Related Writing" means each Loan Document, each Borrowing Base Certificate and any other assignment, mortgage, security agreement, guaranty agreement, subordination agreement, financial statement, audit report or other writing furnished by any Credit Party, or any of its officers, to the Agent and/or the Lenders pursuant to or otherwise in connection with this Agreement.

"Reportable Event" means a reportable event as that term is defined in Title IV of ERISA, except actions of general applicability by the Secretary of Labor under Section 110 of such Act.

"Required Lenders" shall mean, any two (2) or more Lenders (or one Lender if there is only one Lender) holding at least 51% of the Total Commitment or, if after the termination of the Total Commitment, the Revolving Credit Exposure; provided, however, that (i) any Lenders that are Affiliates shall be deemed to be one (1) Lender for purposes of determining "Required Lenders", and (ii) the Required Lenders shall not include any of the Subordinated Participants.

"Requirement of Law" means, as to any Person, any law, treaty, rule or regulation or determination or policy statement or interpretation of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property.

"Reserves" means any and all reserves (without duplication of any of the categories which would make Inventory, Equipment or Accounts not be "Eligible") that the Agent deems necessary in its Permitted Discretion to maintain (including reserves for accrued and unpaid interest on the Obligations, lease reserves, banking services reserves, reserves for rent at locations leased by any Credit Party and for consignee's, warehousemen's and bailee's charges, reserves for dilution of accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for contingent liabilities of any Credit Party, reserves for uninsured losses of any Credit Party and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Credit Party, in each case subject to the Accommodation Agreement and Permitted Reserves.

"Restricted Payment" means, with respect to a Borrower, (a) any Capital Distribution, (b) any amount paid by a Borrower in repayment, redemption, retirement or repurchase, directly or indirectly, of any Subordinated Indebtedness, (c) any amount paid by a Borrower in respect of any management, consulting or other similar arrangement with any shareholder of such Borrower or Affiliate, if any, or (d) any amount paid by a Borrower with respect to any pre-

Filing Date Indebtedness or obligations, other than pursuant to (i) the First Day Orders, (ii) this Agreement, or (iii) other orders of the Bankruptcy Court acceptable to the Required Lenders.

"Revolving Credit Exposure" means, at any time, the aggregate principal amount of all Revolving Loans outstanding.

"Revolving Credit Note" means a Revolving Credit Note, in the form of the attached Exhibit A, executed and delivered pursuant to Section 2.6(a) hereof.

"Revolving Loan" means a Loan made to the Borrowers by the Lenders in accordance with Section 2.2 hereof.

"Sales Plan" means that term as defined in Section 4.2(q) of this Agreement.

"SEC" means the United States Securities and Exchange Commission, or any governmental body or agency succeeding to any of its principal functions.

"Second SOFA Amount" means an amount equal to: (a) $2,119,468.00, minus (b) any amounts paid to GM by the Agent pursuant to the terms of the GM Prepetition Subordinated Participation Agreement.

"Security Agreement" means each Senior Security Agreement, executed and delivered by any or all of the Borrowers in favor of Collateral Agent, dated as of the Closing Date, and any other Security Agreement executed on or after the Closing Date, as the same may from time to time be amended, restated or otherwise modified.

"Security Documents" means each Security Agreement, each Pledge Agreement, each Mortgage, each Landlord's Waiver, each Control Agreement, each U.C.C. Financing Statement or similar filing as to a jurisdiction located outside of the United States of America, filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any Lien is granted by any or all of the Borrowers or any other Person to Collateral Agent, as security for the Obligations, or any part thereof, and each other agreement executed in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"SOFA Amount" means an amount equal to: (a) $1,388,587, minus (b) any amounts paid to GM by the Agent pursuant to the terms of the GM Prepetition Subordinated Participation Agreement.

"Special Trust Account" means that term as defined in Section 2.12(c) of this Agreement.

"Standard & Poor's" means Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc., and any successor to such company.

"Statutory Committee" means any committee appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

"Subordinated Participants" means GM and Tesla.

"Subordinated Participation" means the last out, non-voting one hundred percent (100%) participation in the Obligations by the Subordinated Participants on the terms and conditions set forth in the Subordinated Participation Agreements.

"Subordinated Participation Agreements" means the agreements between the Lenders and Subordinated Participants, respectively, in connection with the last out, non-voting one hundred percent (100%) participation in the Obligations by the Subordinated Participants.

"Subordinated Secured Lien" means that certain subordinated Lien in the amount of $5.7 million granted to Tesla by the Borrowers.

"Subsidiary" means (a) a corporation more than fifty percent (50%) of the Voting Power of which is owned, directly or indirectly, by a Borrower, (b) a partnership, limited liability company or unlimited liability company of which a Borrower, directly or indirectly, is a general partner or managing member, as the case may be, or otherwise has an ownership interest greater than fifty percent (50%) of all of the ownership interests in such partnership, limited liability company or unlimited liability company, or (c) any other Person (other than a corporation, partnership, limited liability company or unlimited liability company) in which a Borrower, directly or indirectly, has at least a majority interest in the Voting Power or the power to elect or direct the election of a majority of directors or other governing body of such Person.

"Superpriority Claim" means a claim against the Borrowers in the Cases which is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b), 506(c) and 507 of the Bankruptcy Code.

"Taxes" means any and all present or future taxes of any kind, including but not limited to, levies, imposts, duties, surtaxes, charges, fees, deductions or withholdings now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto) other than Excluded Taxes.

"Termination Date" means that term as defined in the Interim Order and the Final Order.

"Tesla" means Tesla, Inc., for itself and on behalf of its subsidiaries and affiliates.

"Tesla Prepetition Subordinated Participation Agreement" means that certain Subordinated Last-Out Participation Agreement dated as of July 29, 2022, by and between Prepetition Collateral Agent and Tesla, as the same was amended by that certain First Amendment to Subordinated Last-Out Participation Agreement dated as of August 5, 2022, by and between Prepetition Collateral Agent and Tesla (as the same may be amended, restated or modified from time to time).

"Tesla SOFA Amount" means an amount equal to (a) the lesser of (i) the amount funded in cash by Tesla pursuant to the Tesla Prepetition Subordinated Participation Agreement, and (ii) $10,920,000, minus (b) any amounts paid to Tesla by the Agent pursuant to the terms of the Tesla Prepetition Subordinated Participation Agreement.

"Tesla SOFA Schedule" means Schedule 1 to the Tesla Prepetition Subordinated Participation Agreement.

"Third SOFA Amount" means an amount equal to (a) the lesser of (i) the amount funded in cash by GM pursuant to the Third SOFA Schedule, and (ii) $4,943,138, minus (b) any amounts paid to GM by the Agent pursuant to the terms of its GM Prepetition Subordinated Participation Agreement and/or its Subordinated Participation Agreement.

"Third SOFA Schedule" means the Schedule attached to the Tenth Amendment to the Forbearance Agreement as Exhibit A, which may be amended from time to time pursuant to the terms and conditions of the Accommodation Agreement.

"Total Commitment" means (a) prior to the entry of the Final Order, the sum of each Lender's Interim Order Commitment and (b) on or after the entry of a Final Order, the sum of each Lender's Final Order Commitment, in each case as it may be reduced from time to time pursuant to the terms hereof.

"Toyota" means Toyota Motor Engineering & Manufacturing North America, Inc., for itself and on behalf of its subsidiaries and affiliates.

"U.C.C." means the Uniform Commercial Code, as in effect from time to time in Ohio.

"U.C.C. Financing Statement" means a financing statement filed or to be filed in accordance with the Uniform Commercial Code, as in effect from time to time, in the relevant state or states.

"Voting Power" means, with respect to any Person, the exclusive ability to control, through the ownership of shares of capital stock, partnership interests, membership interests or otherwise, the election of members of the board of directors or other similar governing body of such Person. The holding of a designated percentage of Voting Power of a Person means the ownership of shares of capital stock, partnership interests, membership interests or other interests of such Person sufficient to control exclusively the election of that percentage of the members of the board of directors or similar governing body of such Person.

"Waiver" means, collectively, any and all landlord's waivers, warehouseman's waivers, creditor's waivers, mortgagee waivers and processing facility and similar bailee's waivers, executed and delivered in connection with this Agreement, in form and substance satisfactory to the Agent.

"Welfare Plan" means an ERISA Plan that is a "welfare plan" within the meaning of ERISA Section 3(l).

Section 1.2   <u>Accounting Terms</u>.  Any accounting term not specifically defined in this Article I shall have the meaning ascribed thereto by GAAP.

Section 1.3   <u>Terms Generally</u>.  The foregoing definitions shall be applicable to the singular and plural forms of the foregoing defined terms.  Unless otherwise defined in this Article I, terms that are defined in the U.C.C. are used herein as so defined.

26

Section 1.4  Confirmation of Recitals.  The Borrowers, Agent, and the Lenders hereby confirm the statements set forth in the recitals of this Agreement.

ARTICLE II.  AMOUNT AND TERMS OF CREDIT

Section 2.1  Amount and Nature of Credit.

(a)  Subject to the terms and conditions of this Agreement and the Orders, the Lenders, during the Commitment Period and to the extent hereinafter provided, shall make Loans to the Borrowers at the request of the Borrower Representative, in such aggregate amount as the Borrower Representative shall request pursuant to the Total Commitment; provided that in no event shall the aggregate principal amount of all Loans outstanding under this Agreement be in excess of the lesser of (i) the Total Commitment minus (A) the outstanding balance of the Prepetition Revolving Loan and (B) the Reserves and Permitted Reserves and (ii) the Borrowing Base. Notwithstanding the foregoing, to the extent that there exists any amounts in the Cash Reserve, the Borrowers shall utilize such amounts in full before requesting a Loan hereunder.

(b)  Each Lender, for itself and not one for any other, agrees to make Loans, during the Commitment Period, on such basis that, immediately after the completion of any borrowing by the Borrowers, the sum of the aggregate outstanding principal amount of Loans made by such Lender plus the outstanding principal amount of Prepetition Revolving Loans made by such Lender shall not be in excess of the Commitment for such Lender.

(c)  If an Overadvance arises as the result of any reduction in the Borrowing Base, or arises in any manner on terms not otherwise approved of in advance by the Collateral Agent in writing, and such Overadvance continues for three (3) Business Days, such Overadvance shall constitute an Event of Default under Article VII of this Agreement.

Each borrowing from the Lenders shall be made pro rata according to the respective Applicable Commitment Percentages of the Lenders.

Section 2.2  Revolving Credit.  Subject to the terms and conditions of this Agreement and the Orders, during the Commitment Period, the Lenders shall make a Revolving Loan or Revolving Loans to the Borrowers in such amount or amounts as Borrowers, through an Authorized Officer, may from time to time request, but not exceeding in aggregate principal amount at any time outstanding hereunder the lesser of (i) the Total Commitment minus (A) the outstanding balance of the Prepetition Revolving Loans and (B) all Reserves and Permitted Reserves and (ii) the Borrowing Base.  Notwithstanding the foregoing, to the extent that there exist any amounts in the Cash Reserve, the Borrowers shall utilize such amounts in full before requesting a Loan hereunder.  Subject to the provisions of this Agreement, the Borrowers shall be entitled under this Section 2.2 to borrow funds, repay the same in whole or in part and re-borrow hereunder at any time and from time to time during the Commitment Period.

Section 2.3  [Reserved]

Section 2.4  [Reserved]

Section 2.5   Interest.

(a)   <u>Loans</u>. The Borrowers shall pay interest on the unpaid principal amount of a Loan that is outstanding from time to time from the date thereof until paid at the Derived Base Rate from time to time in effect. Interest on such Loan shall be payable, commencing September 1, 2022, and continuing on each Regularly Scheduled Payment Date thereafter and at the maturity thereof.

(b)   [Reserved]

(c)   [Reserved]

(d)   [Reserved]

(e)   <u>Default Rate</u>. Anything herein to the contrary notwithstanding, if an Event of Default shall occur (i) the principal of each Loan and the unpaid interest thereon shall bear interest, until paid, at the Default Rate and (ii) in the case of any other amount not paid when due from the Borrowers hereunder or under any other Loan Document, such amount shall bear interest at the Default Rate.

(f)   <u>Limitation on Interest</u>. In no event shall the rate of interest hereunder exceed the maximum rate allowable by law. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations.

Section 2.6   <u>Evidence of Indebtedness</u>. Upon the request of a Lender, to evidence the obligation of the Borrowers to repay the Revolving Loans made by such Lender and to pay interest thereon, the Borrowers shall execute a Revolving Credit Note payable to the order of such Lender in the principal amount of its Applicable Commitment Percentage of the Total Commitment, or, if less, the aggregate unpaid principal amount of Revolving Loans made by such Lender; provided that the failure of a Lender to request a Revolving Credit Note shall in no way detract from the Borrowers' obligations to such Lender hereunder.

Section 2.7   <u>Notice of Credit Event; Funding of Loans</u>.

(a)   <u>Notice of Credit Event</u>. The Borrowers, through an Authorized Officer, shall provide to Agent a Notice of Loan prior to 11:00 A.M. (Eastern time) on the proposed date of borrowing of any Loan.

{10584541:5 }

(b) <u>Funding of Loans</u>. Agent shall notify the other Lenders, if any, of the date and amount promptly upon the receipt of a Notice of Loan and, in any event, by 12:00 P.M. (Eastern time) on the date such Notice of Loan is received. On the date that the Credit Event set forth in such Notice of Loan is to occur, each Lender shall provide to Collateral Agent, not later than 1:00 P.M. (Eastern time), the amount in Dollars, in federal or other immediately available funds, required of it. If Collateral Agent shall elect to advance the proceeds of such Loan prior to receiving funds from such Lender, Collateral Agent shall have the right, upon prior notice to the Borrowers, to debit any account of the Borrowers or otherwise receive such amount from the Borrowers on demand, in the event that such Lender shall fail to reimburse Collateral Agent in accordance with this subsection. Collateral Agent shall also have the right to receive interest from such Lender at the Federal Funds Effective Rate in the event that such Lender shall fail to provide its portion of the Loan on the date requested and Collateral Agent shall elect to provide such funds.

Section 2.8    <u>Payment on Loans and Other Obligations</u>.

(a) <u>Payments Generally</u>. Each payment made hereunder by a Credit Party shall be made without any offset, abatement, recoupment, counterclaim, withholding or reduction whatsoever.

(b) <u>Payments from the Borrowers</u>. All payments (including prepayments) to Collateral Agent of the principal of or interest on each Loan or other payment, including but not limited to principal, interest, fees or any other amount owed by the Borrowers under this Agreement, shall be made in Dollars. All payments described in this subsection (b) shall be remitted to Collateral Agent, at the address of Collateral Agent for notices referred to in Section 11.4 hereof for the account of the Lenders not later than 11:00 A.M. (Eastern time) on the due date thereof in immediately available funds. Any such payments received by Collateral Agent after 11:00 A.M. (Eastern time) shall be deemed to have been made and received on the next Business Day.

(c) <u>Payments to Lenders</u>. Upon Collateral Agent's receipt of payments hereunder, Collateral Agent shall immediately distribute to the Lenders their respective ratable shares, if any, of the amount of principal, interest, and commitment and other fees received by Collateral Agent for the account of such Lender, provided, however, collections of Accounts paid by the Borrowers to the Collateral Agent in the ordinary course of business shall be applied by the Collateral Agent first to the outstanding balance of the Revolving Loans made to the Prepetition Borrowers under the Prepetition Loan Documents and second to the outstanding balance of the Revolving Loan Obligations of the Borrowers under this Agreement. Payments received by Collateral Agent shall be delivered to the Lenders in Dollars in immediately available funds. Each Lender shall record any principal, interest or other payment, the principal amounts of Loans, all prepayments and the applicable dates with respect to the Loans made, and payments received by such Lender, by such method as such Lender may generally employ; provided, however, that failure to make any such entry shall in no way detract from the obligations of the Borrowers under this Agreement or any Note. The aggregate unpaid amount of Loans and similar information with respect to the Loans set forth on the records of Agent shall be rebuttably presumptive evidence with respect to such information, including the amounts of principal, interest and fees owing to each Lender.

{10584541:5 }

(d) <u>Timing of Payments</u>.  Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Loan, shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next Business Day and such extension of time shall in each case be included in the computation of the interest payable on such Loan.

Section 2.9    <u>Prepayment</u>.

(a) <u>Right to Prepay</u>. The Borrowers shall have the right at any time or from time to time to prepay, on a pro rata basis for all of the Lenders, all or any part of the principal amount of the Loans with the proceeds of such prepayment to be distributed on a pro rata basis to the Lenders.  Such payment shall include interest accrued on the amount so prepaid to the date of such prepayment and any amount payable under Article III hereof with respect to the amount being prepaid.  Prepayments of Loans shall be without any premium or penalty.

(b) <u>Notice of Prepayment</u>.  The Borrowers shall give Collateral Agent notice of prepayment of a Loan by no later than 11:00 A.M. (Eastern time) on the Business Day on which such prepayment is to be made.

Section 2.10  <u>Commitment and Other Fees; Reduction of Commitment</u>

(a) <u>Commitment Fees</u>.  The Borrowers shall pay to Collateral Agent, for the ratable account of the Lenders, as a consideration for the Commitment, a commitment fee in the amount of one percent (1.00%) of the Total Commitment ($300,000.00) on the date of entry of the Interim Order.

(b) <u>Overadvance Fee</u>.  The Borrower shall pay an Overadvance fee in the amount of $500.00 for each day or portion thereof during which an Overadvance exists (other than the Accommodation Overadvance Amount), unless the Overadvance has been agreed to in writing in advance by the Collateral Agent without payment of any fee. The acceptance of payment of an Overadvance fee by the Collateral Agent shall not be deemed to constitute either consent to the Overadvance or a waiver of the resulting Event of Default, unless the Collateral Agent specifically consents to the Overadvance in writing and waives the Event of Default on whatever conditions the Collateral Agent deems appropriate in its reasonable discretion.

(c) [Reserved]

(d) <u>Optional Reduction of Revolving Credit Commitment</u>.  The Borrowers may, at any time and from time to time, permanently reduce in whole or ratably in part the Total Commitment to an amount not less than the then existing Revolving Credit Exposure, by giving Collateral Agent not fewer than five Business Days' (or thirty (30) days if the Total Commitment is to be reduced or terminated in its entirety) written notice of such reduction. Collateral Agent shall promptly notify each Lender of the date of each such reduction and such Lender's proportionate share thereof. If the Borrowers reduce in whole the Total Commitment, on the effective date of such reduction (the Borrowers having prepaid in full the unpaid principal balance, if any, of the Loans, together with all interest (if any), and commitment and other fees accrued and unpaid with respect thereto, all of the Revolving Credit Notes shall be delivered to Collateral Agent marked "Canceled" and Collateral Agent shall redeliver such Revolving Credit

Notes to the Borrowers. Any partial reduction in the Total Commitment shall be effective during the remainder of the Commitment Period.

Section 2.11 <u>Computation of Interest and Fees</u>.  Interest on Loans, Related Expenses, and commitment and other fees and charges hereunder shall be computed on the basis of a year having three hundred sixty (360) days and calculated for the actual number of days elapsed.

Section 2.12 <u>Mandatory Prepayments and Repayment</u>.

(a)  <u>Mandatory Prepayments</u>.  The Borrowers shall make mandatory prepayments (each a "Mandatory Prepayment") in accordance with the following provisions:

(i)  <u>Sale of Assets</u>.  On the first Business Day after receipt by the Borrowers of proceeds from any sale or other disposition of any assets by a Borrower to any Person other than (A) in the ordinary course of business or (B) pursuant to the Sales Plan, the Borrowers shall make a Mandatory Prepayment in an amount equal to one hundred percent (100%) of the net cash proceeds of such sale or other disposition.

(ii)  <u>Material Recovery Event</u>.  On the first Business Day after receipt by a Borrower of any proceeds from a Material Recovery Event, the Borrowers shall make a Mandatory Prepayment in an amount equal to one hundred percent (100%) of such proceeds (net of reasonable costs and taxes incurred in connection with such Material Recovery Event).

(iii)  <u>Tax Refund</u>.  On the first Business Day after receipt by a Borrower of any tax refund, the Borrowers shall make a Mandatory Prepayment in an amount equal to one hundred percent (100%) of such tax refund.

(iv)  <u>Overadvance</u>.  If on any date there is an unpaid Overadvance, the Borrowers shall repay on such date Loans in an aggregate amount equal to such Overadvance.

(b)  <u>Repayment</u>.  The Loans shall become due and payable in full, and the Borrowers shall repay the Loans in full, on the Maturity Date, together with any and all accrued and unpaid interest thereon, and any fees and other Obligations due and payable hereunder.

(c)  <u>Application of Mandatory Prepayments</u>.  Mandatory Prepayments under this Section 2.12 shall be paid by the Borrowers to Collateral Agent to be applied to the following: (i) first, to the then outstanding balance of the Prepetition Term Loans (in such order, as among the various Prepetition Term Loans, as determined by Agent in its sole discretion); (ii) second, to the outstanding balance of the Obligations of the Borrowers under this Agreement, with a corresponding permanent reduction of the Total Commitment in the amount of such payment; (iii) third, to the then outstanding balance of the Prepetition Revolving Loans; and (iv) fourth, held as cash collateral in accordance with Section 8.5.

Section 2.13 <u>Liability of Borrowers</u>.  The Borrowers acknowledge and agree that Agent and the Lenders are entering into this Agreement at the request of the Borrowers and with the understanding that the Borrowers are and shall remain fully liable for payment in full

of the Obligations.  The Borrowers agree that they are receiving or will receive a direct pecuniary benefit for each Loan made hereunder.

ARTICLE III.  ADDITIONAL PROVISIONS RELATING TO
INCREASED CAPITAL; TAXES.

Section 3.1    <u>Requirements of Law</u>.

(a)    If, after the Closing Date, (i) the adoption of or any change in any Requirement of Law or in the interpretation or application thereof by a Governmental Authority, or (ii) the compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority:

(A)    shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to such Lender in respect thereof (except for Taxes and Excluded Taxes which are governed by Section 3.2 hereof);

(B)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender; or

(C)    shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrowers shall pay to such Lender, promptly after receipt of a written request therefor (which shall include the method for calculating such amount), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this subsection (a), such Lender shall promptly notify the Borrowers (with a copy to Collateral Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that, after the Closing Date, the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof by a Governmental Authority or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder, to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration the policies of such Lender or corporation with respect to capital adequacy), then from time to time, upon submission by such Lender to the Borrowers (with a copy to Collateral Agent) of a written request therefor (which shall include the method for calculating such amount), the Borrowers shall promptly pay or cause to be paid to such Lender such additional amount or amounts as will compensate such Lender for such reduction.

32

(c)   A certificate as to any additional amounts payable pursuant to this Section 3.1 submitted by a Lender to the Borrowers (with a copy to Collateral Agent) shall be conclusive absent manifest error.  In determining any such additional amounts, such Lender may use any method of averaging and attribution that it (in its commercially reasonable discretion) shall deem applicable.  The obligations of the Borrowers pursuant to this Section 3.1 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 3.2   Taxes.

(a)   All payments made by any Credit Party under any Loan Document shall be made free and clear of, and without deduction or withholding for or on account of any Taxes or Other Taxes.  If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to any Lender hereunder, the amounts so payable to such Lender shall be increased to the extent necessary to yield to such Lender (after deducting, withholding and payment of all Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the Loan Documents.

(b)   Whenever any Taxes or Other Taxes are required to be withheld and paid by a Credit Party, such Credit Party shall timely withhold and pay such taxes to the relevant Governmental Authorities.  As promptly as possible thereafter, the Borrowers shall send to Collateral Agent for its own account or for the account of the relevant Lender, as the case may be, a certified copy of an original official receipt received by such Credit Party showing payment thereof or other evidence of payment reasonably acceptable to Collateral Agent or such Lender.  If such Credit Party shall fail to pay any Taxes or Other Taxes when due to the appropriate Governmental Authority or fails to remit to Collateral Agent the required receipts or other required documentary evidence, such Credit Party and the Borrowers shall indemnify Collateral Agent and the appropriate Lenders on demand for any incremental taxes, interest or penalties that may become payable by Collateral Agent or such Lender as a result of any such failure.

(c)   If any Lender shall be so indemnified by a Credit Party, such Lender shall use reasonable efforts to obtain the benefits of any refund, deduction or credit for any taxes or other amounts with respect to the amount paid by such Credit Party and shall reimburse such Credit Party to the extent, but only to the extent, that such Lender shall receive a refund with respect to the amount paid by such Credit Party or an effective net reduction in taxes or other governmental charges (including any taxes imposed on or measured by the total net income of such Lender) of the United States or any state or subdivision or any other Governmental Authority thereof by virtue of any such deduction or credit, after first giving effect to all other deductions and credits otherwise available to such Lender.  If, at the time any audit of such Lender's income tax return is completed, such Lender determines, based on such audit, that it shall not have been entitled to the full amount of any refund reimbursed to such Credit Party as aforesaid or that its net income taxes shall not have been reduced by a credit or deduction for the full amount reimbursed to such Credit Party as aforesaid, such Credit Party, upon request of such Lender, shall promptly pay to such Lender the amount so refunded to which such Lender shall not have been so entitled, or the amount by which the net income taxes of such Lender shall not have been so reduced, as the case may be.

(d)   Each Lender that is not (i) a citizen or resident of the United States of America, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof), or (iii) an estate or trust that is subject to federal income taxation regardless of the source of its income (any such Person, a "Non-U.S. Lender") shall deliver to the Borrowers and Collateral Agent two copies of either U.S. Internal Revenue Service Form W-8BEN or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement with respect to such interest and a Form W-8BEN, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by Credit Parties under this Agreement and the other Loan Documents.  Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement or such other Loan Document. In addition, each Non-U.S. Lender shall deliver such forms or appropriate replacements promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender.  Each Non-U.S. Lender shall promptly notify the Borrowers at any time it determines that such Lender is no longer in a position to provide any previously delivered certificate to the Borrowers (or any other form of certification adopted by the U.S. taxing authorities for such purpose).  Notwithstanding any other provision of this subsection (d), a Non-U.S. Lender shall not be required to deliver any form pursuant to this subsection (d) that such Non-U.S. Lender is not legally able to deliver.

(e)   The agreements in this Section 3.2 shall survive the termination of the Loan Documents and the payment of the Loans and all other amounts payable hereunder.

ARTICLE IV.  CONDITIONS PRECEDENT

Section 4.1   <u>Conditions to Each Credit Event</u>.  The obligation of the Agent and the Lenders to participate in any Credit Event shall be conditioned, in the case of each Credit Event, upon the following:

(a)   all conditions precedent as listed in Section 4.2 hereof required to be satisfied prior to the first Credit Event shall have been satisfied prior to or as of the first Credit Event;

(b)   the Borrowers shall have submitted a Notice of Loan and otherwise complied with Section 2.7 hereof;

(c)   no Default or Event of Default shall then exist or immediately after such Credit Event would exist; and

(d)   each of the representations and warranties contained in Article VI hereof shall be true in all material respects as if made on and as of the date of such Credit Event, except to the extent that any thereof expressly relate to an earlier date.

Each request by the Borrowers for a Credit Event shall be deemed to be a representation and warranty by each of the Borrowers as of the date of such request as to the satisfaction of the conditions precedent specified in subsections (c) and (d) above.

34

Section 4.2   Conditions to the First Credit Event.  The Borrowers shall cause the following conditions to be satisfied on or prior to the Closing Date.  The obligation of the Lenders to participate in the first Credit Event is subject to the Borrowers satisfying each of the following conditions prior to or concurrently with such Credit Event:

(a)   Commencement of the Cases.  The Cases of the Borrowers shall have commenced on or before August 8, 2022.

(b)   Entry of Interim Order.  The Cases shall have commenced and the Bankruptcy Court shall have entered the Interim Order, such Interim Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed.

(c)   Accommodation Agreement and Access Agreement.  The Bankruptcy Court shall have ordered that the Accommodation Agreement and Access Agreement are authorized and approved under section 363(b) of the Bankruptcy Code.

(d)   Notes as Requested; Agreement.   The Borrowers shall have executed and delivered to each Lender requesting a Revolving Credit Note such Lender's Revolving Credit Note.  The Borrowers shall have executed and delivered to Collateral Agent this Agreement in sufficient counterparts for each Lender and Collateral Agent.

(e)   Security Agreements.   The Borrowers shall have executed and delivered to Collateral Agent a Security Agreement and such other documents or instruments, as may be required by Collateral Agent to create or perfect the Liens of Collateral Agent in the assets of the Borrowers, all to be in form and substance satisfactory to Collateral Agent.

(f)   Officer's Certificate, Resolutions, Organizational Documents.   The Borrowers shall have delivered to Collateral Agent an officer's certificate certifying the names of the officers of the Borrowers authorized to sign the Loan Documents, together with the true signatures of such officers and certified copies of (i) the resolutions of the board of directors/members/managers, as applicable, of each of the Borrowers evidencing approval of the execution and delivery of the Loan Documents and the execution of other Related Writings to which any Borrower is a party, and (ii) the Organizational Documents of each Borrower.

(g)   Good Standing and Full Force and Effect Certificates.  Each Borrower shall have delivered to Collateral Agent a good standing certificate or full force and effect certificate, as the case may be, issued on or about the Closing Date by the Secretary of State in the state where such Borrower is incorporated, organized, or qualified to do business.

(h)   Closing Fee and Other Fees.  The Borrowers shall have (i) paid to Collateral Agent, for the benefit of the Lenders, the Commitment Fees set forth in Section 2.10(a) of this Agreement, and (ii) paid all legal fees and expenses of Collateral Agent in connection with the preparation, negotiation, execution, and delivery of the Loan Documents.

(i)   Insurance Certificate.  The Borrowers shall have delivered to Collateral Agent evidence of insurance on ACORD 25 and 28 form, and otherwise satisfactory to Collateral Agent, of adequate real property, personal property and liability insurance of the Borrowers, with Collateral Agent, listed as mortgagee loss payee and additional insured.

35

(j) **Initial Budget**. The Borrowers shall have prepared and delivered to Collateral Agent the initial Budget and Collateral Agent shall have approved the initial Budget, in its sole discretion.

(k) **Borrowing Base Certificate**. The Borrowers shall have delivered to Collateral Agent an initial Borrowing Base Certificate.

(l) **Closing Certificate**. The Borrowers shall have delivered to Collateral Agent an officer's certificate certifying that, as of the Closing Date, (i) all conditions precedent set forth in this Article IV have been satisfied, (ii) no Default or Event of Default exists nor immediately after the first Credit Event will exist, and (iii) each of the representations and warranties contained in Article VI hereof are true and correct as of the Closing Date.

(m) **Collateral Matters**.

(i) Collateral Agent shall have received evidence that the completion of all recordings and filings necessary or, in the reasonable opinion of Collateral Agent, desirable to perfect and protect the security interests purported to be created by this Agreement and the other Security Documents have been taken;

(ii) Collateral Agent shall have in its possession all of the Pledged Notes which shall be endorsed in blank; and

(iii) Collateral Agent shall have received evidence that all other actions necessary or, in the reasonable opinion of Collateral Agent, desirable to perfect and protect the DIP Lien in the Collateral have been taken, or arrangements therefor have been made on a basis satisfactory to Collateral Agent and shall be in place.

(n) **First Day Orders**. The Bankruptcy Court shall have entered the First Day Orders, in form and substance acceptable to Collateral Agent, including, without limitation, an order approving Borrowers' use of the cash management system specified therein.

(o) **Prepetition Interest, Fees and Expenses**. The Prepetition Lenders shall have received payment of all fees and expenses incurred and accrued and unpaid interest due and payable under the Prepetition Credit Agreement to the extent authorized by the Bankruptcy Court or in any order entered by the Bankruptcy Court.

(p) **Control Agreements**. Collateral Agent shall have received Control Agreements with respect to each of the bank accounts listed on Schedule 6.19 hereto.

(q) **Sales Plan and Timetable**. Collateral Agent shall have received a specific plan and timetable ("Sales Plan") for effecting the sale of the businesses and assets of the Borrowers, in form and substance satisfactory to Collateral Agent and the Required Lenders, which shall include, without limitation, the following milestones:

(i) The Borrowers shall file with the Bankruptcy Court, on or before August 19, 2022 at 5:00 p.m. (Eastern Time), a motion, in form and substance reasonably satisfactory to Collateral Agent, the Required Lenders, GM, Tesla, Toyota, and BMW, and requesting

entry by the Bankruptcy Court of an order approving auction, bid and sale procedures for the sale of the Borrowers' assets to one or more "Qualified Buyers" (as defined in the Accommodation Agreement);

(ii)     The Borrowers shall obtain from the Bankruptcy Court, on or before September 12, 2022, an order approving the bidding procedures, and providing that all bids are due by October 7, 2022;

(iii)     The Borrowers shall conduct, on or before October 11, 2022, at or before 5:00 p.m. (Eastern Time), an auction for the sale of their assets to one or more Qualified Buyers and at the conclusion of the auction selected one or more Qualified Buyers ("Accepted Bidder(s)"), acceptable to the Collateral Agent and the Required Lenders;

(iv)     A hearing to approve the proposed sale (the "Sale Hearing") to the Accepted Bidders pursuant to Section 363 of the Bankruptcy shall be conducted by the Bankruptcy Court on or before October 17, 2022 at 5:00 p.m. (Eastern Time), or as soon as reasonably practicable thereafter based upon the Bankruptcy Court's availability;

(v)     The Borrowers shall obtain, within two Business Days of the Sale Hearing, an order from the Bankruptcy Court approving the proposed sale to the Accepted Bidder(s); and

(vi)     The closing of the sale(s) to the Accepted Bidder(s) shall occur on or before October 31, 2022.

(r)     Miscellaneous.  The Borrowers shall have provided to Collateral Agent and the Lenders such other items and shall have satisfied such other conditions as may be reasonably required by Collateral Agent or the Lenders.

## ARTICLE V.  COVENANTS

Section 5.1    Insurance.  The Borrowers shall at all times maintain insurance upon its Inventory, Equipment and other personal and real property in such form, written by such companies, in such amounts, for such periods, and against such risks as may be acceptable to Collateral Agent, in its commercially reasonable discretion, with provisions satisfactory to Collateral Agent for payment of all losses thereunder to Collateral Agent and the Borrowers as their interests may appear (loss payable endorsement in favor of Collateral Agent), and, if required by Collateral Agent, the Borrowers shall deposit the policies with Collateral Agent. Any such policies of insurance shall provide for no fewer than thirty (30) days prior written notice of cancellation to Collateral Agent.  Any sums received by Collateral Agent in payment of insurance losses, returns, or unearned premiums under the policies shall be applied as set forth in Section 2.12(c) hereof.  Collateral Agent is hereby authorized to act as attorney-in-fact for the Borrowers in obtaining, adjusting, settling and canceling such insurance and indorsing any drafts.  In the event of failure to provide such insurance as herein provided, Collateral Agent may, at its option, provide such insurance and the Borrowers shall pay to Collateral Agent, upon demand, the cost thereof.  Should the Borrowers fail to pay such sum to Collateral Agent upon demand, interest shall accrue thereon, from the date of demand until paid in full, at the Default Rate.  Within ten days of Collateral Agent's written request, the

{10584541:5 }                                                                                                    4867-2680-0173_2
22-46160-lsg    Doc 22-1    Filed 08/09/22    Entered 08/09/22 11:39:28    Page 43 of 175

Borrowers shall furnish to Collateral Agent such information about the insurance of the Borrowers as Collateral Agent may from time to time reasonably request, which information shall be prepared in form and detail reasonably satisfactory to Collateral Agent and certified by a Financial Officer.

Section 5.2    Retention of Consultant; Commercial Financial Audits, Filed Exams and Appraisals.

(a)    The Borrowers agree that any consultant retained by Collateral Agent's counsel, McDonald Hopkins LLC or any other Person (the "Consultant"), selected by McDonald Hopkins LLC, as a consultant, may, among other things, make visits to, and discuss financial and operational matters with, the Borrowers. Such Consultant shall not be limited in the frequency of visits to the facilities of the Borrowers, subject to reasonable notice and accommodation of the operating needs of the Borrowers. The Borrowers shall cooperator with such Consultant and provide such Consultant with all information reasonably requested by such Consultant in connection with its engagement by McDonald Hopkins LLC.

(b)    Upon the request of Collateral Agent, the Borrowers will obtain and deliver to Collateral Agent, or, if Collateral Agent so elects, will cooperate with Collateral Agent in Collateral Agent's obtaining, a report of an independent collateral auditor satisfactory to Collateral Agent (which collateral auditor may be affiliated with Collateral Agent) with respect to the Collateral.  All such reports shall be conducted and made at the expense of the Borrowers.

(c)    Upon the request of Collateral Agent, the Borrowers will obtain and deliver to Collateral Agent, or, if Collateral Agent so elects, will cooperate with Collateral Agent in Collateral Agent's obtaining, a report of an appraiser or appraisers satisfactory to Collateral Agent (which appraiser or appraisers may be affiliated with Collateral Agent) with respect to the other assets of any Credit Party.  All such appraisals shall be conducted and made at the expense of the Borrowers.

(d)    Upon the request of Collateral Agent, the Borrowers will cooperate with Collateral Agent in Collateral Agent's obtaining field exams with respect to any Credit Party. All such field exams shall be conducted and made at the expense of the Borrowers. Prior to the occurrence of an Event of Default under this Agreement, the Borrowers shall be required to pay for no more than one field exam through the Maturity Date, but upon the occurrence of an Event of Default, this limitation shall not apply.

Section 5.3    **Financial Statements and Information.**

(a)    Monthly Financials. The Borrowers shall deliver to Collateral Agent, within thirty (30) days after the end of each calendar month a balance sheet of the Borrowers as to the end of each such month and a statement of income of the Borrowers (including a statement of revenues and expenses for each of the Borrowers' business segments and corporate charges) and cash flows for such month and for the period from the beginning of the fiscal year to the end of such month, prepared in accordance with GAAP, in form and detail satisfactory to Collateral Agent, certified by a Financial Officer or the Chief Restructuring Officer, subject to audit, footnotes, and normal year-end adjustments, and accompanied by a Financial Officer's or the Chief

Restructuring Officer's certificate to the effect that there exists no Default or Event of Default, or if any Default or Event of Default exists, specifying the nature thereof, the period of existence thereof, and what action the Borrowers propose to take with respect thereto.

(b) <u>Annual Audit Report</u>. The Borrowers shall deliver to Collateral Agent, within one hundred-twenty (120) days after the end of each fiscal year of the Borrowers, (i) an annual audit report of the Borrowers for that year prepared in accordance with GAAP, in form and detail satisfactory to Collateral Agent and certified by an opinion of an independent public accountant satisfactory to Collateral Agent that shall not be qualified except with respect to uncertainties inherent in the Cases resulting in substantial doubt about the Borrowers' ability to continue as a going concern, which report shall include balance sheets and statements of income (loss), stockholders' equity and cash flows for that period, and (ii) unaudited schedules to the annual audit report prepared in accordance with GAAP, and in form and detail satisfactory to Collateral Agent.

(c) <u>Borrowing Base</u>. The Borrowers shall deliver to Collateral Agent each day (and at such other times and for such other periods as Collateral Agent may request) a Borrowing Base Certificate prepared by a Financial Officer or the Chief Restructuring Officer and an Accounts aging report and a summary Inventory report, each in form and substance satisfactory to Collateral Agent and signed by a Financial Officer or the Chief Restructuring Officer.

(d) <u>Compliance Certificate</u>. The Borrowers shall deliver to Collateral Agent, concurrently with the delivery of the financial statements set forth in subsections (a) and (b) above, a Compliance Certificate.

(e) <u>Management Report</u>. The Borrowers shall deliver to Collateral Agent, concurrently with the delivery of the quarterly and annual financial statements set forth in subsections (a) and (b) above, a copy of any management report, letter or similar writing furnished to the Borrowers by the accountants in respect of the Borrowers' systems, operations, financial condition or properties.

(f) <u>Reports; Filings in the Cases</u>. The Borrowers shall deliver to Collateral Agent concurrently with:

(i) the filing thereof, copies of all pleadings, motions, applications, information and other papers and documents of any kind filed by or on behalf of the Debtors in the Cases;

(ii) the giving thereof, copies of all written reports given by or on behalf of the Debtors to any Statutory Committee; and

(iii) the giving thereof, copies of all written reports, including without limitation, the monthly report of operations, to the United States Trustee.

(g) <u>Updated Budget</u>. Before 12:00 p.m. (Eastern time) on Thursday of each week, the Borrowers shall deliver to Collateral Agent (i) an updated Budget reflecting sales, receipts, disbursements and the amounts of Loans of the Borrowers for the immediately preceding calendar week and the following consecutive thirteen calendar weeks, substantially in the form

of Annex 1 hereto, which updated Budget shall be in form and substance satisfactory to Collateral Agent and (ii) before 12:00 p.m. (Eastern time) on Thursday of each week, a report, certified by the Chief Restructuring Officer, of the actual performance during the prior calendar week, (i) itemizing and cumulatively totaling all post-Filing Date receipts and disbursements of the Borrowers for the previous calendar week (i.e. Sunday through Saturday) and actual Loans obtained under this Agreement, (ii) setting forth a comparison of the actual performance (including with respect to sales and collections) for such prior week against the forecast set forth in the Budget for such week, (iii) setting forth a comparison of the actual performance (including with respect to sales and collections) for the period beginning on the Filing Date through the previous calendar week against the cumulative forecast set forth in the Budget for such period, and (iv) itemizing expenses incurred but not paid (and the terms thereof) during the previous calendar week, which report shall be in form and substance satisfactory to Collateral Agent.

(h)    Notice of Litigation.  Promptly, and in any event within three (3) Business Days after the Borrowers obtain knowledge thereof, the Borrowers shall provide notice to Collateral Agent of the commencement of or any significant development in the Cases or any other litigation or governmental proceeding pending against any Borrower which involves an amount in excess of $25,000, or would be reasonably likely to have a Material Adverse Effect.

(i)    Claims Against Collateral.   Immediately upon becoming aware thereof, the Borrowers shall notify Collateral Agent of any notices in writing of any setoffs, claims, withholdings or other defenses to which any of the Collateral, or any of Collateral Agent's or Lenders' rights with respect to the Collateral, are subject.

(j)    Financial Information of the Borrowers.  The Borrowers shall deliver to Collateral Agent, within five (5) days of the written request of Collateral Agent or any Lender, such other information about the financial condition, properties and operations of the Borrowers as Collateral Agent or such Lender may from time to time reasonably request, which information shall be submitted in form and detail reasonably satisfactory to Collateral Agent or such Lender and certified by a Financial Officer of the Borrowers.

(k)    Marketing and Sale Process Report.  Before 12:00 p.m. (Eastern time) each Thursday, the Borrowers shall deliver to Collateral Agent, a written status report prepared by the Borrowers and any Investment Banker regarding the sales process of the Debtors' assets, which report shall include, without limitation, the name of each Person that has contacted the Debtors or any Investment Banker (or that the Debtors or the Investment Banker has contacted) regarding the sale.  Without limiting the foregoing, the Borrowers shall provide Collateral Agent with an update each day of any significant development in the sale process, including, without limitation, the name of any Person that enters into a confidentiality agreement, requests due diligence materials or makes any proposal with respect to Debtors' assets.

Section 5.4    Financial Records.  The Borrowers shall (a) at all times maintain true and complete records and books of account, including, without limiting the generality of the foregoing, prepare authentic invoices for all of the Accounts and appropriate provisions for possible losses and liabilities, all in accordance with GAAP; (b) render to Collateral Agent, forthwith upon each request of Collateral Agent or any Lender, such financial statements of the Borrowers' financial condition and operations, including but not limited to the Borrowers'

tax returns, and such reports of the Accounts, as Collateral Agent or any Lender may from time to time request; (c) give Collateral Agent prompt written notice whenever any Account Debtor shall become in default in any manner or assert any defense or offset and whenever any other event, omission, condition or thing having a material adverse effect on any Account shall occur or arise; (d) forward to Collateral Agent, upon request of Collateral Agent or any Lender, whenever made, (i) invoices, sales journals or other documents satisfactory to Collateral Agent or such Lender, as the case may be, that summarize the Accounts, certified by an officer of the Borrowers, (ii) within the time specified by Collateral Agent, an aging report of the Accounts then outstanding setting forth, in such form and detail and with such representations and warranties as Collateral Agent or such Lender may from time to time reasonably require, the unpaid balances of all invoices billed respectively during that period and during each of the three next preceding periods, and certified by an officer of the Borrowers, and (iii) with respect to the Inventory and any other Collateral, such reports and other documents that are satisfactory to Collateral Agent and the Lenders; and (e) at all reasonable times (during normal business hours and upon notice to the Borrowers) permit Collateral Agent or any Lender, or any representative of Collateral Agent or such Lender, to examine the Borrowers' books and records and to make excerpts therefrom and transcripts thereof.

        Section 5.5   <u>Franchises; Change in Business</u>.

      (a)  Each Borrower shall preserve and maintain at all times its existence, and its rights and franchises, if any, necessary for its business, except as otherwise permitted pursuant to Section 5.12 hereof.

      (b)  The Borrowers shall not engage in any business if, as a result thereof, the general nature of the business of the Borrowers taken as a whole would be substantially changed from the general nature of the business the Borrowers are engaged in on the Closing Date.

        Section 5.6   <u>ERISA Pension and Benefit Plan Compliance</u>.  The Borrowers shall not incur any material accumulated funding deficiency within the meaning of ERISA, or any material liability to the PBGC, established thereunder in connection with any ERISA Plan. The Borrowers shall furnish to the Collateral Agent (a) as soon as possible and in any event within thirty (30) days after any Borrower knows or has reason to know that any Reportable Event with respect to any ERISA Plan has occurred, a statement of a Financial Officer of the Borrowers setting forth details as to such Reportable Event and the action that the Borrowers propose to take with respect thereto, together with a copy of the notice of such Reportable Event given to the PBGC if a copy of such notice is available to the Borrowers, and (b) promptly after receipt thereof a copy of any notice the Borrowers, or any member of a Controlled Group may receive from the PBGC or the Internal Revenue Service with respect to any ERISA Plan administered by the Borrowers; provided that this latter clause shall not apply to notices of general application promulgated by the PBGC or the Internal Revenue Service. The Borrowers shall promptly notify Collateral Agent of any material taxes assessed, proposed to be assessed or that the Borrowers have reason to believe may be assessed against the Borrowers by the Internal Revenue Service with respect to any ERISA Plan. As used in this Section 5.6 "material" means the measure of a matter of significance that shall be determined as being an amount equal to five percent (5%) of Net Worth.  As soon as

practicable, and in any event within twenty (20) days, after the Borrowers shall become aware that an ERISA Event shall have occurred, the Borrowers shall provide Collateral Agent with notice of such ERISA Event with a certificate by a Financial Officer of the Borrowers setting forth the details of the event and the action the Borrowers or another Controlled Group member proposes to take with respect thereto. The Borrowers shall, at the request of Collateral Agent, deliver or cause to be delivered to Collateral Agent true and correct copies of any documents relating to the ERISA Plan of the Borrowers.

Section 5.7   [Reserved]

Section 5.8   <u>Borrowing</u>.  The Borrowers shall not create, incur or have outstanding any Indebtedness of any kind; provided that this Section 5.8 shall not apply to the following:

(a)   the Loans and any other Indebtedness under this Agreement; and

(b)   Indebtedness existing as of the Filing Date ("Existing Indebtedness"), without giving effect to any subsequent extension, renewal or refinancing thereof.

Section 5.9   <u>Liens</u>.  Each Borrower shall not create, assume or suffer to exist (upon the happening of a contingency or otherwise) any Lien upon any of its property or assets, whether now owned or hereafter acquired; provided that this Section 5.9 shall not apply to the following and the Liens listed on Schedule 5.9 (each, a "Permitted Lien"):

(a)   Liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with GAAP;

(b)   other statutory Liens or Liens of carriers, customs brokers and warehousemen or shippers incidental to the conduct of its business or the ownership of its property and assets that (i) were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of its property or assets or materially impair the use thereof in the operation of its business;

(c)   Liens on property or assets of a Subsidiary, if any, to secure obligations of such Subsidiary to a Credit Party in existence on the Filing Date;

(d)   any Lien granted to Collateral Agent or any Lender pursuant to this Agreement, the other Loan Documents or the Orders;

(e)   the Prepetition Liens, the Other Prepetition Liens, and Subordinated Secured Lien; or

(f)   easements or other minor defects or irregularities in title of real property not interfering in any material respect with the use of such property in the business of such Borrower.

The Borrower shall not enter into any contract or agreement (other than a contract or agreement entered into in connection with the purchase or lease of fixed assets that prohibits Liens on such

42

fixed assets) that would prohibit Collateral Agent or the Lenders from acquiring a security interest, mortgage or other Lien on, or a collateral assignment of, any of the property or assets of the Borrowers.

Nothing contained in this Section 5.9 subordinates the Liens in favor of Collateral Agent or the Lenders under the Loan Documents to any Permitted Lien that is not valid, perfected and entitled to priority over Collateral Agent's or the Lenders' Liens under applicable law or that is avoidable under the Bankruptcy Code.

Section 5.10 <u>Regulations T, U and X</u>. The Borrowers shall not take any action that would result in any non-compliance of the Loans with Regulations T, U or X, or any other applicable regulation, of the Board of Governors of the Federal Reserve System.

Section 5.11 <u>Investments, Loans and Guaranties</u>. The Borrowers shall not (a) make or hold any investment in any stocks, bonds or securities of any kind, (b) be or become a party to any joint venture or other partnership, (c) make or keep outstanding any advance or loan to any Person, or (d) be or become a Guarantor of any kind (other than a Guarantor of Payment under the Prepetition Loan Documents); provided that this Section 5.11 shall not apply to the following:

(i) any endorsement of a check or other medium of payment for deposit or collection through normal banking channels or similar transaction in the normal course of business; or

(ii) any investment in direct obligations of the United States of America or in certificates of deposit issued by a member bank (having capital resources in excess of One Hundred Million Dollars ($100,000,000)) of the Federal Reserve System.

For purposes of this Section 5.11, the amount of any investment in equity interests shall be based upon the initial amount invested and shall not include any appreciation in value or return on such investment but shall take into account repayments, redemptions and return of capital.

Section 5.12 <u>Merger and Sale of Assets</u>. The Borrowers shall not merge, amalgamate or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business consistent with past practices or as agreed by Collateral Agent and the Required Lenders.

Section 5.13 <u>Acquisitions</u>. No Borrower shall effect an Acquisition without the prior written consent of the Required Lenders.

Section 5.14  Notice.

(a)  The Borrowers shall cause a Financial Officer of the Borrowers to promptly notify Collateral Agent and the Lenders, in writing, whenever a Default or Event of Default may occur hereunder or any representation or warranty made in Article VI hereof or elsewhere in this Agreement or in any Related Writing may for any reason cease in any material respect to be true and complete.

(b)  Promptly upon becoming aware thereof, the Borrowers will give Collateral Agent and the Lenders written notice about any condition or event that the Borrowers determine has or is reasonably likely to have a Material Adverse Effect.

(c)  The Borrowers shall give Collateral Agent prompt written notice if the Internal Revenue Service shall allege the nonpayment or underpayment of any tax by the Borrowers or threaten to make any assessment in respect thereof.

Section 5.15  Restricted Payments.  The Borrowers shall not make or commit itself to make any Restricted Payment.

Section 5.16  Environmental Compliance.  The Borrowers shall comply in all material respects with any and all Environmental Laws including, without limitation, all Environmental Laws in jurisdictions in which any Borrower owns or operates a facility or site, arranges for disposal or treatment of hazardous substances, solid waste or other wastes, accepts for transport any hazardous substances, solid waste or other wastes or holds any interest in real property or otherwise. The Borrowers shall furnish to Collateral Agent and the Lenders, promptly after receipt thereof, a copy of any notice any Borrower may receive from any Governmental Authority or private Person or otherwise that any material litigation or proceeding pertaining to any environmental, health or safety matter has been filed or is threatened against any Borrower, any real property in which any Borrower holds any interest or any past or present operation of any Borrower.  The Borrowers shall not allow the release or disposal of hazardous waste, solid waste or other wastes on, under or to any real property in which any Borrower holds any ownership interest or performs any of its operations, in violation of any Environmental Law.  As used in this Section 5.16, "litigation or proceeding" means any demand, claim, notice, suit, suit in equity action, administrative action, investigation or inquiry whether brought by any Governmental Authority or private Person or otherwise. The Borrowers shall defend, indemnify and hold Collateral Agent and the Lenders harmless against all costs, expenses, claims, damages, penalties and liabilities of every kind or nature whatsoever (including attorneys' fees) arising out of or resulting from the noncompliance of any Borrower with any Environmental Law.  Such indemnification shall survive any termination of this Agreement.

Section 5.17  Affiliate Transactions.  The Borrowers shall not, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate (other than a Credit Party) on terms that shall be less favorable to the Borrowers than those that might be obtained at the time in a transaction with a non-Affiliate.

Section 5.18  Use of Proceeds.

(a)  Use of Proceeds.  The proceeds of all Revolving Loans may be used for the general corporate and working capital purposes of the Borrowers solely in accordance with the then current Budget.

(b)  Other Uses.  Notwithstanding anything to the contrary contained in this Agreement, none of the (i) Carve Out, (ii) prepetition or postpetition collateral proceeds or (iii) proceeds of the Revolving Loans shall be used to object to or challenge in any way, any claims, Liens or cash collateral held by or on behalf of the Prepetition Lenders; provided that the above identified amounts may be used by the Creditors' Committee to investigate (X) the validity, enforceability, perfection or priority of the Prepetition Liens and the Prepetition Collateral securing the Prepetition Obligations or (Y) the validity, priority, status or amount of the Prepetition Obligations, in each case within the time period established by the Bankruptcy Court and set forth in the Final Order; provided, further, however, that the aggregate amount of such expenses incurred by the Creditors' Committee for any such investigation herein shall not exceed $20,000. Nothing in this Agreement shall prevent Collateral Agent or any Lender from objecting to any fees and expenses in the Cases.

Section 5.19  Corporate Names and Locations of Collateral.  Each Borrower shall not change its corporate name, unless, in each case, such Borrower shall provide Collateral Agent and the Lenders with at least thirty (30) days prior written notice thereof.  The Borrowers shall promptly notify Collateral Agent of (a) any change in any location where any Borrower's Inventory or Equipment is maintained, and any new locations where any Borrower's Inventory or Equipment is to be maintained; (b) any change in the location of the office where any Borrower's records pertaining to its Accounts are kept; (c) the location of any new places of business and the changing or closing of any of its existing places of business; and (d) any change in any Borrower's chief executive office.  In the event of any of the foregoing or if deemed appropriate by Collateral Agent, Agent is hereby authorized to file new U.C.C. Financing Statements describing the Collateral and otherwise in form and substance sufficient for recordation wherever necessary or appropriate, as determined in Collateral Agent's sole discretion, to perfect or continue perfected the security interest of Collateral Agent in the Collateral.  The Borrower shall pay all filing and recording fees and taxes in connection with the filing or recordation of such U.C.C. Financing Statements and shall promptly reimburse Collateral Agent therefor if Collateral Agent pays the same.  Such amounts shall be Related Expenses hereunder.

Section 5.20  Limitation on Creation of Subsidiary.  The Borrowers shall not establish, create or acquire any new or additional Subsidiaries.

Section 5.21  Property Acquired Subsequent to the Closing Date and Right to Take Additional Collateral.  The Borrowers shall provide Collateral Agent with prompt written notice with respect to any real or personal property (other than Accounts, Inventory, Equipment and General Intangibles and other property acquired in the ordinary course of business) acquired by the Borrower subsequent to the Closing Date.  In addition to any other right Collateral Agent and the Lenders may have pursuant to this Agreement or otherwise, upon written request of Collateral Agent, whenever made, the Borrowers shall grant to

45

Collateral Agent as additional security for the Obligations, a first Lien on any real or personal property of the Borrowers (other than for leased Equipment or Equipment subject to a purchase money security interest in which the lessor or purchase money lender with respect to such Equipment holds a first priority security interest, in which case, Collateral Agent shall have the right to obtain a security interest junior only to such owner), including, without limitation, such property acquired subsequent to the Closing Date, in which Collateral Agent does not have a first priority Lien.  The Borrowers agree, within ten days after the date of such written request, to secure all of such Indebtedness by delivering to Collateral Agent security agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as Collateral Agent may require. The Borrowers shall pay all recordation, legal and other expenses in connection therewith.

Section 5.22 [Reserved]

Section 5.23 <u>Amendment of Organizational Documents; Prepetition Obligations</u>. Without the prior written consent of Collateral Agent, each Borrower shall not amend its Organizational Documents. The Borrowers shall not amend, modify or change in any manner any agreement relating to any Prepetition Obligation, without the prior written consent of Collateral Agent.

Section 5.24 <u>Collateral</u>.  The Borrowers shall:

(a)   at all reasonable times allow Collateral Agent and any Lender by or through any of their respective officers, agents, employees, attorneys, or accountants to (i) examine, inspect, and make extracts from the Borrowers' books and other records, including, without limitation, the tax returns of the Borrowers; (ii) arrange for verification of the Borrowers' Accounts, under reasonable procedures, directly with Account Debtors or by other methods; and (iii) examine and inspect the Borrowers' Inventory and Equipment, wherever located;

(b)   promptly furnish to Collateral Agent and any Lender upon request (i) additional statements and information with respect to the Collateral, and all writings and information relating to or evidencing any of the Borrowers' Accounts (including, without limitation, computer printouts or typewritten reports listing the mailing addresses of all present Account Debtors), and (ii) any other writings and information as Collateral Agent or such Lender may reasonably request;

(c)   notify Collateral Agent in writing promptly upon the creation of any Accounts with respect to which the Account Debtor is the United States of America or any other Governmental Authority, or any foreign government or instrumentality thereof or any business that is located in a foreign country;

(d)   notify Collateral Agent in writing whenever a material amount of the Inventory of any Borrower is located at a location of a third party (other than a Borrower) that is not listed on <u>Schedule 6.9</u> hereto and cause to be executed any bailee's waiver, processor's waiver or similar document or notice that may be required by Collateral Agent or the Lenders;

(e)   immediately notify Collateral Agent and the Lenders in writing of any information that any Borrower has or may receive with respect to the Collateral that might in any

manner materially and adversely affect the value of the Collateral (taken as a whole) or the rights of Collateral Agent or the Lenders with respect thereto;

(f) maintain the Borrowers' equipment in good operating condition and repair, ordinary wear and tear excepted, making all necessary replacements thereof so that the value and operating efficiency thereof shall at all times be maintained and preserved;

(g) deliver to Collateral Agent to hold as security for the Obligations, within ten Business Days upon the written request of Collateral Agent, all certificated investment property owned by a Credit Party, in suitable form for transfer by delivery, or accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to Collateral Agent, or in the event such investment property is in the possession of a securities intermediary or credited to a securities account, execute with the related securities intermediary an investment property control agreement over such securities account in favor of Collateral Agent, in form and substance reasonably satisfactory to Collateral Agent; and

(h) upon request of Collateral Agent, promptly take such action and promptly make, execute, and deliver all such additional and further items, deeds, assurances, instruments and any other writings as Collateral Agent may from time to time deem necessary or appropriate, require, including, without limitation, chattel paper, to carry into effect the intention of this Agreement, or so as to completely vest in and ensure to Collateral Agent and the Lenders their respective rights hereunder and in or to the Collateral and the Real Property.

The Borrowers hereby authorize Collateral Agent to file U.C.C. Financing Statements with respect to the Collateral. If certificates of title or applications for title are issued or outstanding with respect to any of the Inventory or Equipment of any Borrower, such Borrower shall, upon request of Collateral Agent, (i) execute and deliver to Collateral Agent a short form security agreement, in form and substance reasonably satisfactory to Collateral Agent, and (ii) deliver such certificate or application to Collateral Agent and cause the interest of Collateral Agent to be properly noted thereon. The Borrowers hereby authorize Collateral Agent, or its respective designated agents (but without obligation by Collateral Agent to do so), to incur Related Expenses (whether prior to, upon, or subsequent to any Default or Event of Default), and the Borrowers shall promptly repay, reimburse, and indemnify Collateral Agent for any and all Related Expenses. If the Borrowers fail to keep and maintain its Equipment in good operating condition, ordinary wear and tear excepted, Collateral Agent may (but shall not be required to) so maintain or repair all or any part of any Borrower's Equipment and the cost thereof shall be a Related Expense. All Related Expenses are payable to Collateral Agent, as applicable, upon demand therefor; Collateral Agent may, at its option, debit Related Expenses directly to any deposit account of the Borrowers located at Collateral Agent.

Section 5.25 Further Assurances. The Borrowers shall, promptly upon request by Collateral Agent, or the Required Lenders through Collateral Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, (b) provide title insurance, appraisals, environmental reports and other due diligence with respect to the real estate as may be required by Collateral Agent, and (c) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances

47

and other instruments as Collateral Agent, or the Required Lenders through Collateral Agent, may reasonably require from time to time in order to carry out more effectively the purposes of the Loan Documents.

Section 5.26 <u>Communications with Professionals</u>. The Borrowers authorize Collateral Agent, Consultant, Lenders or any of Collateral Agent's or Lenders' representatives and counsel to communicate directly with the Borrowers' professionals, including, without limitation, the Chief Restructuring Officer, Borrowers' counsel, Borrowers' Investment banker, and other professionals retained by the Borrowers, and further authorize such professionals to disclose to Collateral Agent, the Lenders, Consultant, or Collateral Agent's and the Lenders' representatives and counsel, as the case may be, such information as may be reasonably requested by any such Person with respect to the business, financial condition or other affairs of the Borrowers; provided that the Borrowers' professionals shall not be required to disclose privileged or confidential information to the extent that disclosure cannot be made without compromising such information's privileged or confidential status.

Section 5.27 <u>Executory Contracts</u>. Prior to the Debtors rejecting any contract or making any motion to reject any contract, the Borrowers shall notify Collateral Agent in writing of the Debtors' reasons why such rejection will be in the best interests of the Debtors and will not have a Material Adverse Effect on the Borrowers.

Section 5.28 <u>Limitation on Creation of Bank Accounts</u>. The Borrowers will not: (a) establish any bank accounts other than those in existence on the Filing Date without Collateral Agent's prior written consent, (b) violate directly or indirectly any Control Agreement with respect to any such bank accounts, or (c) deposit into any payroll accounts any amounts in excess of amounts necessary to pay current payroll and related tax obligations from such accounts.

Section 5.29 <u>Bankruptcy Cases</u>. The Borrowers will not (a) seek, consent or suffer to exist any modification, stay, vacation or amendment to the Orders, unless Collateral Agent has consented to such modification, stay, vacation or amendment in writing, (b) seek or consent to nor shall the Bankruptcy Court have permitted a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a), 507(b), 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority claim of Collateral Agent and the Lenders in respect of the Obligations, except for the Carve Out, or (c) seek, consent or suffer to exist any Lien on any Collateral, having a priority equal or superior to the Lien in favor of Collateral Agent or the Lenders in respect of the Obligations, or equal or superior to the Prepetition Liens in favor of the Prepetition Lenders, except for the Carve Out and Permitted Liens.

Section 5.30 <u>Cash Management Arrangements; Depositary Arrangements</u>. The Borrowers shall:

(a) Maintain in place cash management arrangements in accordance with the First Day Orders in connection with the Cases relating to the Debtor's cash management system and

in form and substance reasonably satisfactory to Collateral Agent. Without limiting the generality of the foregoing, the parties agree that:

(i)      all cash and cash equivalents held by the Borrowers and all proceeds of receivables and other accounts, chattel paper, general intangibles, instruments and other payment rights for which any Borrower is an obligee shall be deposited into either the Cash Collateral Account or any bank accounts of the Borrowers subject to any of the Control Agreements; and

(ii)      all cash and cash equivalents held by the Borrowers and all such proceeds of receivables and other accounts, chattel paper, general intangibles, instruments and other payment rights shall, on each Business Day or such other frequency as may be agreed to by Collateral Agent, be transferred to the Cash Collateral Account, to the extent not already transferred to the Cash Collateral Account, for application to the Prepetition Obligations or the Obligations pursuant to the provisions hereof.

(b)   In the event that any Borrower receives any cash, checks or other cash proceeds of Collateral, promptly upon receipt thereof, in the identical form received (except for any endorsements thereon which may be required by Collateral Agent), cause such cash, checks and cash proceeds to be paid directly into the Cash Collateral Account or into any deposit account subject to a Control Agreement.

(c)   Except to the extent that the Borrowers shall be required to make payments to Collateral Agent or any other Person pursuant to the terms of this Agreement or the other Loan Documents, and subject to the rights and remedies that may from time to time be available to Collateral Agent and the Lenders upon the occurrence of an Event of Default, the Borrowers may use funds in the Cash Collateral Account for the disbursements set forth in the Budget, subject in any case to the terms and conditions of this Agreement and the other Loan Documents.

Section 5.31 Severance Payments.   The Borrowers shall make no Severance Payments except as otherwise consented to in writing by Collateral Agent.

Section 5.32 Maximum Cash Flow Variance.  The Borrowers shall not have a ten percent (10%) or greater unfavorable cumulative net cash flow variance when compared to the Budget at any time following the Filing Date measured for each one-week period covered by the Budget. For purposes of the calculation in this Section 5.32, the Accommodation Overadvance Amount and customer funding provided by Toyota and BMW will be excluded from the calculation.

Section 5.33 [Reserved]

Section 5.34 Chief Restructuring Officer.   Steven Wybo of Riveron shall be retained by the Borrowers as their chief restructuring officer or such other financial advisor experienced in restructuring operations of distressed companies (the "Chief Restructuring Officer"), reasonably acceptable to Collateral Agent, in each case on terms and conditions acceptable to Collateral Agent and shall continue to retain a Chief Restructuring Officer unless otherwise permitted by Collateral Agent.

49

## ARTICLE VI.  REPRESENTATIONS AND WARRANTIES

Section 6.1  <u>Corporate Existence; Subsidiaries; Foreign Qualification</u>.  Each Borrower is duly organized, validly existing and in good standing under the laws of its state or jurisdiction of incorporation or organization, and is duly qualified and authorized to do business and is in good standing as a foreign entity in the jurisdictions set forth opposite its name on <u>Schedule 6.1</u> hereto, which are all of the states or jurisdictions where the character of its property or its business activities makes such qualification necessary, except where a failure to so qualify would not reasonably be expected to have a Material Adverse Effect.  <u>Schedule 6.1</u> hereto sets forth, as of the Closing Date, each Subsidiary of a Borrower, if any (and whether such Subsidiary is a Dormant Subsidiary) and each Person that is an owner of a Borrower's stock, its state of formation, and its relationship to such Borrower, including the percentage of equity owned by a company, each Person that owns the stock or other equity interest of a Borrower, the location of its chief executive office and its principal place of business.

Section 6.2  <u>Corporate Authority</u>.  Each of the Borrowers has the right and power and is duly authorized and empowered to enter into, execute and deliver the Loan Documents to which it is a party and to perform and observe the provisions of the Loan Documents.  The Loan Documents to which each Credit Party is a party have been duly authorized and approved by such Credit Party's board of directors or other governing body, as applicable, and are the valid and binding obligations of such Credit Party, enforceable against such Credit Party in accordance with their respective terms and the Orders.  The execution, delivery and performance of the Loan Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a Lien (other than Liens permitted under Section 5.9 hereof) upon any assets or property of the Borrowers under the provisions of, such Borrower's Organizational Documents or any material agreement entered into after the Filing Date to which a Borrower is a party.

Section 6.3  <u>Compliance with Laws and Contracts</u>.  Each Borrower:

(a)  holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any Governmental Authority necessary for the conduct of its business and is in material compliance with all applicable laws relating thereto;

(b)  is in material compliance with all federal, state, local, or foreign applicable statutes, rules, regulations, and orders including, without limitation, those relating to environmental protection, occupational safety and health, and equal employment practices;

(c)  has ensured that no Person who owns a controlling interest in or otherwise controls Borrower is (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, or any other similar lists maintained by OFAC pursuant to any authorizing statute, executive order or regulation, or (ii) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar executive orders;

{10584541:5 }                                                                                                            4867-2680-0173_2

(d)   is in material compliance with all applicable Bank Secrecy Act ("BSA") and anti-money laundering laws and regulations; and

(e)   is in compliance, in all material respects, with the Patriot Act.

Section 6.4   <u>Litigation and Administrative Proceedings</u>.   Except as disclosed on <u>Schedule 6.4</u> hereto and the Cases, on the Closing Date there are (a) no lawsuits, actions, investigations, or other proceedings pending or, to the best knowledge of the Borrowers, threatened against the Borrowers or any Borrower, or in respect of which any Borrower may have any liability, in any court or before any Governmental Authority, arbitration board, or other tribunal, (b) no orders, writs, injunctions, judgments, or decrees of any court or Governmental Authority to which a Borrower is a party or by which the property or assets of a Borrower are bound, except with respect to the Cases, and (c) no grievances, disputes, or controversies outstanding with any union or other organization of the employees of a Borrower, or threats of work stoppage, strike, or pending demands for collective bargaining.

Section 6.5   <u>Title to Assets</u>.   Except as set forth on Schedule 6.5 hereto, Each Borrower has good title to and ownership of all material property it purports to own, which property is free and clear of all Liens, except for Permitted Liens.  As of the Closing Date, the applicable Borrower owns the real property listed on <u>Schedule 6.5</u> hereto.

Section 6.6   <u>Liens and Security Interests</u>.   Upon the entry of the Final Order, except for Permitted Liens, (a) there is and will be no U.C.C. Financing Statement or similar notice of Lien outstanding covering any personal property of the Borrowers; (b) there is and will be no mortgage outstanding covering any real property of the Borrowers; and (c) no real or personal property of the Borrowers is subject to any Lien of any kind.  The Collateral and the Collateral Agent's rights with respect to the Collateral are not subject to any set off, claims, withholding or other defenses other than those arising in the ordinary course of business consistent with past practices.

Section 6.7   <u>Tax Returns</u>.   All federal, state and local tax returns and other reports required by law to be filed in respect of the income, business, properties and employees of the Borrowers have been filed (or extended as permitted by applicable law) and except as related to the Borrowers' failure to fund any ERISA Plan obligations to the minimum levels required by law, all taxes, assessments, fees and other governmental charges that are due and payable have been paid, except as otherwise permitted herein.  The provision for taxes on the books of the Borrowers is adequate for all years not closed by applicable statutes and for the current fiscal year.

Section 6.8   <u>Environmental Laws</u>.   The Borrowers are in material compliance with all Environmental Laws, including, without limitation, all Environmental Laws in all jurisdictions in which any Borrower owns or operates, or has owned or operated, a facility or site, arranges or has arranged for disposal or treatment of hazardous substances, solid waste or other wastes, accepts or has accepted for transport any hazardous substances, solid waste or other wastes or holds or has held any interest in real property or otherwise. No litigation or proceeding arising under, relating to or in connection with any Environmental Law is pending or, to the best knowledge of the Borrowers threatened, against any Borrower, any real

51

property in which a Borrower holds or has held an interest or any past or present operation of a Borrower. No release, threatened release or disposal of hazardous waste, solid waste or other wastes is occurring, or has occurred (other than those that are currently being remediated in accordance with Environmental Laws), on, under or to any real property in which a Borrower holds any interest or performs any of its operations, in violation of any Environmental Law. As used in this Section 6.8, "litigation or proceeding" means any demand, claim, notice, suit, suit in equity, action, administrative action, investigation or inquiry whether brought by any Governmental Authority or private Person, or otherwise.

Section 6.9 <u>Locations</u>. As of the Closing Date, each Borrower has places of business or maintains its Accounts, Inventory and Equipment at the locations (including third party locations) set forth on <u>Schedule 6.9</u> hereto, and each Borrower's chief executive office is set forth on <u>Schedule 6.9</u> hereto. <u>Schedule 6.9</u> further specifies whether each location, as of the Closing Date, (a) is owned by a Borrower, or (b) is leased by a Borrower from a third party, and, if leased by a Borrower from a third party, if a Landlord's Waiver has been requested. As of the Closing Date, <u>Schedule 6.9</u> correctly identifies the name and address of each third party location where assets of a Borrower are located.

Section 6.10 <u>Continued Business</u>. Except as set forth and disclosed in the Accommodation Agreement, there exists no actual, pending, or, to the Borrowers' knowledge, any threatened termination, cancellation or limitation of, or any modification or change in the business relationship of any Borrower and any customer or supplier, or any group of customers or suppliers, whose purchases or supplies, individually or in the aggregate, are material to the business of a Borrower, and other than the filing of the Cases, there exists no present condition or state of facts or circumstances that would have a Material Adverse Effect or prevent a Borrower from conducting such business or the transactions contemplated by this Agreement in substantially the same manner in which it was previously conducted.

Section 6.11 <u>Employee Benefits Plans</u>. <u>Schedule 6.11</u> hereto identifies each ERISA Plan as of the Closing Date. No ERISA Event has occurred or is expected to occur with respect to an ERISA Plan. Full payment has been made of all amounts that a Controlled Group member is required, under applicable law or under the governing documents, to have paid as a contribution to or a benefit under each ERISA Plan. The liability of each Controlled Group member with respect to each ERISA Plan has been fully funded based upon reasonable and proper actuarial assumptions, has been fully insured, or has been fully reserved for on its financial statements. No changes have occurred or are expected to occur that would cause a material increase in the cost of providing benefits under the ERISA Plan. With respect to each ERISA Plan that is intended to be qualified under Code Section 401(a), (a) the ERISA Plan and any associated trust operationally comply with the applicable requirements of Code Section 401(a); (b) the ERISA Plan and any associated trust have been amended to comply with all such requirements as currently in effect, other than those requirements for which a retroactive amendment can be made within the "remedial amendment period" available under Code Section 401(b) (as extended under Treasury Regulations and other Treasury pronouncements upon which taxpayers may rely); (c) the ERISA Plan and any associated trust have received a favorable determination letter from the Internal Revenue Service stating that the ERISA Plan qualifies under Code Section 401(a), that the associated trust qualifies under Code Section 501(a) and, if applicable, that any cash or deferred arrangement under the

52

ERISA Plan qualifies under Code Section 401(k), unless the ERISA Plan was first adopted at a time for which the above-described "remedial amendment period" has not yet expired; (d) the ERISA Plan currently satisfies the requirements of Code Section 410(b), subject to any retroactive amendment that may be made within the above-described "remedial amendment period"; and (e) no contribution made to the ERISA Plan is subject to an excise tax under Code Section 4972. With respect to any Pension Plan, the "accumulated benefit obligation" of Controlled Group members with respect to the Pension Plan (as determined in accordance with Statement of Accounting Standards No. 87, "Employers' Accounting for Pensions") does not exceed the fair market value of Pension Plan assets.

Section 6.12 <u>Consents or Approvals</u>. Except for the entry of the Orders, no consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person is required to be obtained or completed by the Borrowers in connection with the execution, delivery or performance of any of the Loan Documents, that has not already been obtained or completed.

Section 6.13 [Reserved]

Section 6.14 <u>Budget</u>. The Borrowers have delivered to Collateral Agent the initial Budget, covering the thirteen (13) week period commencing with the week during which the Closing Date occurred. The Budget has been prepared in good faith based upon assumptions which the Borrowers believe to be reasonable assumptions. To the knowledge of the Borrowers, no facts exist that (individually or in the aggregate) would result in any material change to the Budget.

Section 6.15 <u>Regulations</u>. The Borrowers are not engaged principally or as one of their important activities, in the business of extending credit for the purpose of purchasing or carrying any "margin stock" (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States of America). Neither the granting of any Loan nor the use of the proceeds of any Loan will violate, or be inconsistent with, the provisions of Regulation T, U or X or any other Regulation of such Board of Governors.

Section 6.16 <u>Material Agreements</u>. Except as disclosed on <u>Schedule 6.16</u> hereto, as of the Closing Date, the Borrowers are not a party to any (a) debt instrument (excluding the Loan Documents); (b) lease (capital, operating or otherwise), whether as lessee or lessor thereunder; (c) contract, commitment, agreement, or other arrangement involving the purchase or sale of any inventory by it, or the license of any right to or by it; (d) contract, commitment, agreement, or other arrangement with any of its "Affiliates" (as such term is defined in the Securities Exchange Act of 1934, as amended); (e) management or employment contract or contract for personal services, with any of its Affiliates that is not otherwise terminable at will or on less than ninety (90) days' notice without liability; (f) collective bargaining agreement; or (g) other contract, agreement, understanding, or arrangement with a third party that, as to subsections (a) through (g), above, if violated, breached, or terminated for any reason, would have or would be reasonably expected to have a Material Adverse Effect.

Section 6.17 <u>Intellectual Property</u>. The Borrowers own, possess or have the right to use all of their material patents, patent applications, industrial designs, designs, trademarks,

service marks, copyrights and licenses, and rights with respect to the foregoing necessary for the conduct of their businesses without any known conflict with the rights of others. Except as set forth on Schedule 6.17 hereto, the Borrowers do not own any intellectual property, including, without limitation, any patents, patent applications, trademarks, service marks, copyrights, licenses, and rights with respect to the foregoing.

Section 6.18 Insurance. The Borrowers maintain with financially sound and reputable insurers insurance with coverage and limits as required by law and as is customary with Persons engaged in the same businesses as the Borrowers. Schedule 6.18 hereto sets forth all insurance carried by the Borrowers on the Closing Date, setting forth in detail the amount and type of such insurance and the current expiration date of each insurance policy.

Section 6.19 Deposit Accounts. Schedule 6.19 hereto lists all banks and other financial institutions at which the Borrowers maintain deposit or other accounts as of the Closing Date, and Schedule 6.19 hereto correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

Section 6.20 Accurate and Complete Statements. The Loan Documents and the written statements made by the Borrowers in connection with any of the Loan Documents do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or in the Loan Documents not misleading. After due inquiry by the Borrowers, there is no known fact that the Borrowers have not disclosed to Collateral Agent and the Lenders that has or is likely to have a Material Adverse Effect.

Section 6.21 Investment Company; Other Restrictions. Each Borrower is not (a) an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or (b) any foreign, federal, state or local statute or regulation limiting its ability to incur Indebtedness.

Section 6.22 Defaults. No Default or Event of Default exists hereunder, nor will any begin to exist immediately after the execution and delivery hereof.

Section 6.23 Existing Indebtedness. Annex 4 hereto sets forth a true and complete list of all Indebtedness of the Borrowers as of the Closing Date (the "Existing Indebtedness"), in each case showing the aggregate principal amount thereof and the name of any other entity which directly or indirectly guaranteed such Indebtedness.

## ARTICLE VII. EVENTS OF DEFAULT

Each of the following shall constitute an Event of Default hereunder:

Section 7.1 Payments. If the principal of or interest on any Loan or any amount owing pursuant to Section 2.10(a) or (b) shall not be paid in full when due and payable.

Section 7.2 Special Covenants. If any Borrower shall fail or omit to perform and observe Section 5.3(h), 5.6, 5.8, 5.9, 5.11, 5.12, 5.13, 5.15, 5.18, 5.20, 5.21, 5.27, 5.28, 5.31, 5.32, or 5.34 hereof.

Section 7.3   Other Covenants.  If any Borrower shall fail or omit to perform and observe any agreement or other provision (other than those referred to in Section 7.1 or 7.2 hereof) contained or referred to in this Agreement or any Related Writing that is on a Borrower's part to be complied with, and that Default shall not have been fully corrected within fifteen (15) days after the earlier of (a) any Financial Officer of a Borrower becoming aware of the occurrence thereof, or (b) the giving of written notice thereof to a Borrower by Collateral Agent or the Required Lenders that the specified Default is to be remedied.

Section 7.4   Representations and Warranties.  If any representation, warranty or statement made in or pursuant to this Agreement or any Related Writing or any other material information furnished by the Borrowers to Collateral Agent or the Lenders, or any thereof, or any other holder of any Note, shall be false or erroneous.

Section 7.5   Failure to Pay Post-Filing Date Indebtedness, Etc.  Any Borrower shall (a) fail to pay any Indebtedness arising after the Filing Date when and as the same shall become due and payable (giving effect to any applicable grace period under the instrument evidencing such Indebtedness) (except as may be permitted by the Bankruptcy Code) or (b) fail to comply with any order of the Bankruptcy Court in any material respect.

Section 7.6   ERISA Default.  The occurrence of one or more ERISA Events that (a) the Collateral Agent determines could reasonably be expected to have a Material Adverse Effect, or (b) results in a Lien on any of the assets of any Borrower.

Section 7.7   Change in Control.  If any Change in Control shall occur.

Section 7.8   Money Judgment.  A final judgment or order for the payment of money shall be rendered against any Borrower or all Borrowers by a court of competent jurisdiction, that remains unpaid or unstayed and undischarged for a period (during which execution shall not be effectively stayed) of thirty (30) days after the date on which the right to appeal has expired, provided that the aggregate of all such judgments for the Borrowers shall exceed Five Hundred Thousand Dollars ($500,000).

Section 7.9   Material Adverse Change.  There shall have occurred any condition or event that Collateral Agent or the Required Lenders determine has or is reasonably likely to have a Material Adverse Effect.

Section 7.10  Security.  If any Lien granted in this Agreement or any other Loan Document in favor of Collateral Agent shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement or the Orders and the Borrowers have failed to promptly execute appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by Collateral Agent, in its reasonable discretion) and the Borrowers have failed to promptly execute appropriate documents to correct such matters.

Section 7.11  Validity of Loan Documents.  (a) Any material provision, in the reasonable opinion of Collateral Agent, of any Loan Document shall at any time for any reason (other than a partial or full written release in accordance with the terms thereof) cease to be valid, binding and enforceable against any Credit Party; (b) the validity, binding effect

55

or enforceability of any Loan Document against any Credit Party shall be contested by any Credit Party; (c) any Credit Party shall deny that it has any or further liability or obligation under any Loan Document; or (d) any Loan Document shall be cancelled, terminated, revoked, rescinded, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to Agent and the Lenders the benefits purported to be created thereby.

Section 7.12  Default Under DIP Order.  Borrower is in violation of its obligations under the Interim Order or Final Order.

Section 7.13  Continued Operation of Business.  Any Borrower shall be enjoined from conducting any part of its business as a debtor-in-possession; there shall occur any act of terrorism or other "force majeure" event disrupting any material portion of the business of a Borrower, which in each such case referred to in this Section 7.13 shall continue for a period of five (5) or more days and could reasonably be expected to have a Material Adverse Effect.

Section 7.14  Final Judgment.  There shall remain undischarged for more than thirty (30) days any final judgment arising after the Filing Date or execution action against any Borrower, or relief from the automatic stay of Section 362(a) of the Bankruptcy Code shall be granted to any creditor or creditors of any Borrower with respect to assets having an aggregate value in excess of $500,000, or where the deprivation of any Borrower of such assets could reasonably be expected to have a Material Adverse Effect.

Section 7.15  [Reserved]

Section 7.16  Relief from Automatic Stay.  If the Borrowers or any Borrower shall default in the payment when due of any principal of or interest on any post-Filing Date Indebtedness, or any pre-Filing Date Indebtedness if, by order of the Bankruptcy Court issued with respect to such Indebtedness, the default thereunder entitles the holder thereof to relief from the automatic stay under Section 362 of the Bankruptcy Code, in excess of $20,000 in the aggregate of such post-Filing Date or pre-Filing Date Indebtedness.

Section 7.17  Modification of Any Order.  The Bankruptcy Court shall enter any order (i) amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying any Order, or any other order with respect to the Cases, affecting adversely in any respect this Agreement, (ii) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in any of the Cases, (iii) dismissing the Cases or converting any of the Cases to a Chapter 7 case, or (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on a material portion of the assets of any Borrower or where the deprivation of such assets of a Borrower would reasonably be expected to have a Material Adverse Effect.

Section 7.18  Order.  The Bankruptcy Court shall fail to enter (i) the Interim Order on or before August 11, 2022 and (ii) the Final Order within twenty (20) days after the entry of the Interim Order.

Section 7.19 <u>Termination Event under Orders</u>.  The occurrence of a Termination Event (as defined in the Orders) under either of the Orders.

Section 7.20 <u>Application for Superpriority Claim</u>.  An application shall be filed by the Borrowers or any Borrower for the approval of any other Superpriority Claim in the Cases which is pari passu with or senior to the claims of Collateral Agent and the Lenders against the Borrowers unless after giving effect to the transactions contemplated by such application, all Obligations (whether contingent or otherwise) shall be paid in full in cash and the Total Commitment shall be terminated, or the Bankruptcy Court shall determine that any such Superpriority Claim has arisen.

Section 7.21 <u>Motions with Bankruptcy Court</u>.  The Borrowers shall file a motion in the Cases (i)  to use cash collateral of the Collateral Agent or of the Prepetition Lenders under Section 363(c) of the Bankruptcy Code without the Collateral Agent's or the Prepetition Lenders', as applicable, consent, except for the payment of payroll and payroll-related expenses and as otherwise approved in the Orders and the First Day Orders, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, (iii) to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (iv) to take any other action or actions adverse to the Collateral Agent and the Lenders or the Prepetition Lenders or their rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating any of the Prepetition Obligations or Collateral Agent's,  the Lenders', or the Prepetition Lenders' interest in any of the Collateral.

Section 7.22 <u>Suit against Lenders, etc</u>.  A suit or action against any of Collateral Agent, the Lenders, or the Prepetition Lenders shall be commenced by the Borrowers, any federal, state environmental protection or health and safety agency or any Statutory Committee in the Cases, which suit or action asserts any claim or legal or equitable remedy contemplating subordination of any claim or Lien of the Lenders, Collateral Agent, or the Prepetition Lenders, and shall remain undismissed for fifteen (15) days after its commencement and, with respect to any suit or action by any such federal or state agency or Statutory Committee, a preliminary order for relief or judgment or decree shall have been entered in such suit or action against the Lenders, Collateral Agent, or the Prepetition Lenders and, in the case of a preliminary order, such preliminary order has not been stayed within ten (10) days after its entry.

Section 7.23 <u>Reorganization Plan or Disclosure Statement</u>.  Without the prior written consent of Collateral Agent and the Required Lenders, a reorganization plan or a related disclosure statement or any draft thereof is distributed by or on behalf of the Borrowers and/or any Borrower to any Person and such reorganization plan or disclosure statement does not provide for the Payment in Full upon the effectiveness of such plan of reorganization.  Without the prior consent of the Prepetition Lenders, a reorganization plan or a related disclosure statement or any draft thereof is distributed by or on behalf of the Borrowers and/or any Borrower to any Person and such reorganization plan or disclosure statement provides for the impairment of the rights, claims or interests of the Prepetition Lenders.

{10584541:5 }

Section 7.24  [Reserved]

Section 7.25  <u>Plan of Sale</u>.  The Borrowers shall fail to perform or observe any provision or requirement set forth in the Sales Plan on or before the time set forth in the Sales Plan for the performance or observance or such provision or requirement.

Section 7.26  <u>Resignation or Termination of Chief Restructuring Officer</u>.  The Chief Restructuring Officer shall be terminated, resigns or otherwise ceases service, unless a replacement Chief Restructuring Officer satisfactory to Collateral Agent shall have been (i) in the case of termination retained immediately and (b) in any other case selected not later than the date five (5) Business Days after such resignation or cessation of service, and retained not later than thirty (30) days after, resignation (or other departure or cessation of service) of the existing Chief Restructuring Officer.

ARTICLE VIII.  REMEDIES UPON DEFAULT

Section 8.1   <u>Remedies</u>.  If any Event of Default shall occur and then be continuing, Collateral Agent may, and shall upon the written instruction of Required Lenders (which for purposes of such instruction shall include Collateral Agent in its capacity as a Lender), by written notice to the Borrowers, take any or all of the following actions, without prejudice to the rights of Collateral Agent or any Lender to enforce its claims against the Borrowers, except as otherwise specifically provided for in this Agreement: (i) declare the Total Commitment terminated, whereupon the Commitment of each Lender shall forthwith terminate immediately and any commitment fees shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Loans and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; (iii) subject to the notice provisions of the following paragraph, enforce, as Collateral Agent (or direct the Collateral Agent to enforce), any or all of the Liens and security interests created pursuant to the Security Documents; and (iv) subject to the notice provisions of the following paragraph, apply any cash collateral held pursuant to this Agreement to repay the Obligations.

In addition to and not in derogation of the above paragraph, upon the occurrence of an Event of Default, Collateral Agent shall provide the Debtors, the United States Trustee for the Eastern District of Michigan and any Statutory Committee with five (5) days' prior notice of the exercise of remedies under this Section 8.1 and under the Security Documents, which such notice will specify the Event of Default and the basis therefor and will be given by Collateral Agent via facsimile or email.  During such notice period, the Borrowers shall have the right to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred; provided, that the Borrowers shall have no right to use or seek to use the cash Collateral during such notice period, except for the payment of payroll and payroll-related expenses.  Unless during such notice period the Borrowers obtain an order of the Bankruptcy Court to the effect that an Event of Default has not occurred, upon the expiration of such notice period, Collateral Agent and the Lenders shall have relief from the automatic stay without further notice or court order, and Collateral Agent may foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral permitted by the Security

{10584541:5 }

Documents and other nonbankruptcy law, including, without limitation, the exercise of rights of setoff, the collection of accounts receivable and application of the proceeds thereof to the Obligations, and occupation of the premises of the Borrowers to sell the Collateral, and any right of the Borrowers to use cash collateral shall cease.

In addition, at the expiration of any five day notice period referred to above, in case any one or more Events of Default shall have occurred and be continuing, and whether or not the Lenders shall have accelerated the maturity of the Loans pursuant to clause (ii) above, each Lender, if owed any amount with respect to the Loans or other Obligations, may, and the Collateral Agent shall if directed by the Required Lenders (which for purposes of such direction shall include Collateral Agent in its capacity as a Lender), and may in its sole discretion, on behalf of the Lenders, proceed to protect and enforce its rights by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations to such Lender are evidenced, including as permitted by applicable law the obtaining of the ex parte appointment of a receiver, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of such Lender.

No remedy herein conferred upon Collateral Agent or the Lenders is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

The Collateral Agent is hereby authorized by the Credit Parties and the Lenders, from time to time in the Collateral Agent's sole discretion after the occurrence of an Event of Default, (each, a "Protective Advance") to make a Revolving Loan to the Borrowers which the Collateral Agent, in its sole discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Revolving Loan advances and other Obligations, or (iii) to pay any other amount chargeable to the Borrowers pursuant to the terms of this Agreement; provided that (A) the maximum amount of Protective Advances made shall not exceed Two Million Five Hundred Thousand Dollars ($2,500,000) in the aggregate at any time outstanding without the prior  written consent of the Required Lenders and (B) no Protective Advance shall exceed the Total Commitment.

> Section 8.2   Offsets.  If there shall occur or exist any Event of Default referred to in Article VII hereof or if the maturity of the Obligations is accelerated pursuant to Section 8.1 hereof, each Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of the Obligations then owing by any Borrower to such Lender (including, without limitation, any participation purchased or to be purchased pursuant to Section 8.3 hereof), whether or not the same shall then have matured, any and all deposit (general or special) balances and all other indebtedness then held or owing by such Lender (including, without limitation, by branches and agencies or any affiliate of such Lender, wherever located) to or for the credit or account of such Borrower, all without notice to or demand upon any Borrower or any other Person, all such notices and demands being hereby expressly waived by each of the Borrowers.

{10584541:5 }                                                                                                    4867-2680-0173_2

Section 8.3    Application and Sharing of Set-Off Amounts.  Each Lender further agrees with the other Lenders that, if it at any time it shall receive any payment for or on behalf of the Borrowers on any Indebtedness owing by a Borrower to that Lender (whether by voluntary payment, by realization upon security, by reason of offset of any deposit or other Indebtedness, by counterclaim or cross-action, by enforcement of any right under any Loan Document, or otherwise), it shall  purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared on a pro-rata basis, based upon their respective shares of the Total Commitment.

Section 8.4    Other Remedies.  The remedies in this Article VIII are in addition to, not in limitation of, any other right, power, privilege, or remedy, either in law, in equity, or otherwise, to which the Lenders may be entitled.  Collateral Agent shall exercise the rights under this Article VIII and all other collection efforts on behalf of the Lenders and no Lender shall act independently with respect thereto, except as otherwise specifically set forth in this Agreement.

Section 8.5    Application of Proceeds.

(a)    Payments Prior to Exercise of Remedies.  Prior to the exercise by Collateral Agent on behalf of the Lenders of remedies under this Agreement or the other Loan Documents, and prior to the sale of all or substantially all assets of the Borrowers at one or more locations, all monies received by Collateral Agent shall be applied, unless otherwise required or provided by the terms of this Agreement (including section 2.12 of this Agreement) or the other Loan Documents or Orders or by applicable law, as follows (provided that Collateral Agent shall have the right at all times to apply any payment received from the Borrowers and/or a Borrower first to the payment of all Obligations (to the extent not paid by the Borrowers) incurred by Collateral Agent or Lenders pursuant to Section 11.5 hereof and to the payment of Related Expenses):

(i)    first, to Collateral Agent for application to the then outstanding balance of the Prepetition Revolving Loans;

(ii)    second, to the Collateral Agent to the outstanding balance of the Obligations of the Borrowers under this Agreement;

(iii)    third, to Collateral Agent to establish a reserve in an aggregate amount not to exceed the aggregate amount of disbursements permitted under the Budget for the period commencing on the date of receipt of such monies and ending on the last date of the then current Budget (the "Cash Reserve"); and

(iv)    Fourth, to Collateral Agent to be paid to the Prepetition Lenders for application to the Prepetition Obligations (other than (i) above) in accordance with the Prepetition Loan Documents.

Nothing in the foregoing vitiates any rights of Subordinated Participants or Prepetition Subordinated Participants under the Subordinated Participation Agreements.

{10584541:5 }  4867-2680-0173_2

(a) <u>Payments Subsequent to Exercise of Remedies</u>. After the exercise by Collateral Agent or Lenders of remedies under this Agreement or the other Loan Documents, or upon the sale of all or substantially all assets of the Borrowers at one or more locations all monies received by Collateral Agent shall be applied, unless otherwise required by the terms of the other Loan Documents or by applicable law, as follows:

(i) first, to the payment of all Obligations (to the extent not paid by the Borrowers) incurred by Collateral Agent or Lenders pursuant to Section 11.5 hereof and to the payment of Related Expenses;

(ii) second, to Collateral Agent for application to the then outstanding balance of the Prepetition Revolving Loans;

(iii) third to the payment pro rata of (A) interest then accrued and payable on the outstanding Loans, and (B) any fees then accrued and payable to Collateral Agent or the Lenders;

(iv) fourth, (A) to the outstanding principal on the Loans, (B) to the Indebtedness under any Hedging Contract with a Lender, such amount to be based upon the net termination obligation of the Borrowers under such Hedging Contract, and (C) to the Bank Product Obligations owing to Lenders under Bank Product Agreements; with such payment to be pro rata among (A), (B) and (C) hereof;

(v) fifth, to Collateral Agent to be paid to the Prepetition Lenders for application to the Prepetition Obligations (other than (ii) above) in accordance with the Prepetition Loan Documents; and

(vi) finally, any remaining surplus after all of the Obligations have been paid in full, to the Borrowers (for distribution) or to whomsoever shall be lawfully entitled thereto.

Nothing in the foregoing vitiates any rights of Subordinated Participants or Prepetition Subordinated Participants under the Subordinated Participation Agreements.

## ARTICLE IX.  PRIORITY AND SECURITY

Section 9.1  <u>Cash Management Arrangements; Depository Arrangements</u>.  The Borrowers shall:

(a)  Maintain in place cash management arrangements in accordance with the First Day Orders in connection with the Cases relating to the Borrowers' cash management systems and in form and substance reasonably satisfactory to the Collateral Agent.  Without limiting the generality of the foregoing, the parties agree that:

(i)  all cash and cash equivalents held by the Borrowers and all proceeds of receivables and other accounts, chattel paper, general intangibles, instruments and other payment rights for which any of the Credit Parties is an obligee shall be deposited into either the Cash Collateral Account or any bank accounts of the Borrowers; and

(ii)     all cash and cash equivalents held by the Borrowers and all such proceeds of receivables and other accounts, chattel paper, general intangibles, instruments and other payment rights shall, on the last Business Day of each week or such other frequency as may be agreed to by the Collateral Agent, be transferred to the Cash Collateral Account for application to the then outstanding balance of the Prepetition Revolving Loans, and then to the Obligations under this Agreement, pursuant to the provisions hereof.

(b)     In the event that the Borrowers receive any cash, checks or other cash proceeds of Collateral, promptly upon receipt thereof, in the identical form received (except for any endorsements thereon which may be required by the Collateral Agent), cause such cash, checks and cash proceeds to be paid directly into the Cash Collateral Account.

(c)     Except to the extent that the Borrowers shall be required to make payments to Collateral Agent or any other Person pursuant to the terms of this Agreement or the other Loan Documents, and subject to the rights and remedies that may from time to time be available to the Collateral Agent and the Lenders, upon the occurrence of an Event of Default, the Borrowers may use funds in the Cash Collateral Account for the purposes set forth in Section 5.18, subject in any case to the terms and conditions of this Agreement and the other Loan Documents, and no such funds may be applied to the Prepetition Obligations except as otherwise provided in this Agreement or any other Loan Document or as permitted by the Bankruptcy Court or in any order entered by the Bankruptcy Court.

Section 9.2   <u>Collections and Receipt of Proceeds by Collateral Agent</u>.   The Borrowers hereby constitute and appoint Collateral Agent, or Collateral Agent's designated agent, as each Borrower's attorney in fact to exercise, at any time all or any of the following powers which, being coupled with an interest, shall be irrevocable until the complete and full payment of all of the Obligations:

(a)     to receive, retain, acquire, take, endorse, assign, deliver, accept, and deposit, in the name of Collateral Agent or the Borrowers, any and all of any Borrower's cash, instruments, chattel paper, documents, proceeds of Accounts, proceeds of Inventory, collection of Accounts, and any other writings relating to any of the Collateral.   Each Borrower hereby waives presentment, demand, notice of dishonor, protest, notice of protest, and any and all other similar notices with respect thereto, regardless of the form of any endorsement thereof.   Collateral Agent shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto;

(b)     to transmit to Account Debtors, on any or all of any Borrower's Accounts, notice of assignment to Collateral Agent thereof and security interest of Collateral Agent and the Lenders therein, and to request from such Account Debtors at any time, in the name of Collateral Agent or any or all of the Borrowers, information concerning any or all of the Borrowers' Accounts and the amounts owing thereon;

(c)     to transmit to purchasers of any or all of the Borrowers' Inventory, notice of Collateral Agent's and the Lenders' security interest therein, and to request from such purchasers at any time, in the name of Collateral Agent or the Borrowers, information concerning the Borrowers' Inventory and the amounts owing thereon by such purchasers;

{10584541:5 }   4867-2680-0173_2

(d)  to notify and require Account Debtors on any of the Borrowers' Accounts and purchasers of the Borrowers' Inventory to make payment of their indebtedness directly to Collateral Agent;

(e)  to enter into or assent to such amendment, compromise, extension, release or other modification of any kind of, or substitution for, the Accounts, or any thereof, as Collateral Agent, in its sole discretion, may deem to be advisable;

(f)  to enforce the Accounts or any thereof, or any other Collateral, by suit or otherwise, to maintain any such suit or other proceeding in the name of Collateral Agent or the Borrowers, and to withdraw any such suit or other proceeding.  The Borrowers agree to lend every assistance requested by Collateral Agent in respect of the foregoing, all at no cost or expense to Collateral Agent and including, without limitation, the furnishing of such witnesses and of such records and other writings as Collateral Agent may require in connection with making legal proof of any Account.  The Borrowers agree to reimburse Collateral Agent in full for all court costs and attorneys' fees and every other cost, expense or liability, if any, incurred or paid by Collateral Agent in connection with the foregoing, which obligation of the Borrowers shall constitute Obligations, shall be secured by the Collateral and shall bear interest, until paid, at the Default Rate; and

(g)  to accept all collections in any form relating to the Collateral, including remittances that may reflect deductions, and to deposit the same, into the Borrowers' Cash Collateral Account or, at the option of Collateral Agent, to apply them as a payment against the Prepetition Obligations, the Loans or any other Obligations in accordance with this Agreement.

Section 9.3   Superpriority Claims and Collateral Security.  The Borrowers hereby represent, warrant and covenant that, except as otherwise expressly provided in this Section 9.3, upon the entry of the Interim Order with respect to Revolving Loans made pursuant to such Order and thereafter, the Final Order:

(a)  subject to the Carve Out and Other Prepetition Liens, the Obligations shall be:

(i)  secured (A) pursuant to Sections 364(d)(1) of the Bankruptcy Code by first priority security interests in and priming liens on all of the assets of the Debtors that secured the Prepetition Obligations, including, without limitation, all goods (including without limitation, equipment and inventory), deposit accounts, investment property, accounts, chattel paper, instruments, documents, letter-of-credit rights, commercial tort claims, insurance claims, supporting obligations and liens, real estate interests and general intangibles of the Debtors of any nature, whether now owned or hereafter acquired, (B) pursuant to Section 364(c)(2) of the Bankruptcy Code a first priority security interest and liens on any assets of the Borrowers that are not otherwise subject to a lien, and (C) pursuant to Section 364(c)(3) a best available lien junior in priority only to any Other Prepetition Lien. (the "DIP Liens"); and

(ii)  entitled to Superpriority Claim status pursuant to Section 364(c)(1) of the Bankruptcy Code senior to any Superpriority Claim granted as adequate protection in respect to the claims of the Prepetition Lenders and any other claims of any entity,

including, without limitation, any claims under Sections 503, 507, 1113 and 1114 of the Bankruptcy Code; and

(b) the DIP Liens are not subject to any transfers or liens preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code.

Section 9.4  Collateral Security Perfection.  The Borrowers agree to take all actions that Collateral Agent may reasonably request as a matter of nonbankruptcy law to perfect and protect Collateral Agent's and the Lenders' Liens upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental approvals and providing such other instruments and documents in recordable form as Collateral Agent may request.  The Borrowers hereby irrevocably authorize Collateral Agent at any time and from time to time to file in any filing office in any U.C.C. jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as "all assets of the Borrower", as applicable, or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the U.C.C. of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by Article 9 of the U.C.C. of any jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Borrower is an organization, the type of organization and any organization identification number issued to Borrower and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates.  Each Borrower agrees to furnish any such information to Collateral Agent promptly upon Collateral Agent's request.

Section 9.5  No Discharge; Survival of Claims.  The Borrowers agree that (a) the Obligations shall not be discharged by the entry of an order confirming a reorganization plan (and each Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge), (b) the Superpriority Claim granted to Collateral Agent and the Lenders pursuant to the Orders and the Liens granted to Collateral Agent and the Lenders pursuant to the Orders and the other Security Documents, shall not be affected in any manner by the entry of an order confirming a reorganization plan and (c) the Borrowers shall not propose or support any reorganization plan that is not conditioned upon the Payment In Full on or prior to the Maturity Date, and, with respect to Obligations arising pursuant to Section 11.5 after such date, thereafter for the Payment in Full of such Obligations in cash when due and payable.

ARTICLE X.  THE AGENT

The Lenders authorize Agent and Agent hereby agrees to act as Collateral Agent for the Lenders under this Agreement and the other Loan Documents upon the terms and conditions set forth elsewhere in this Agreement, and upon the following terms and conditions:

Section 10.1 Appointment and Authorization.  Each Lender hereby irrevocably appoints and authorizes Collateral Agent to take such action as agent on its behalf and to exercise such powers hereunder as are delegated to Collateral Agent by the terms hereof,

together with such powers as are reasonably incidental thereto.  Neither Collateral Agent nor any of its affiliates, directors, officers, attorneys or employees shall (a) be liable for any action taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or willful misconduct (as determined by a court of competent jurisdiction), or be responsible in any manner to any of the Lenders for the effectiveness, enforceability, genuineness, validity or due execution of this Agreement or any other Loan Documents, (b) be under any obligation to any Lender to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions hereof or thereof on the part of the Borrowers, or the financial condition of the Borrowers, (c) be liable to the Borrowers for consequential damages resulting from any breach of contract, tort or other wrong in connection with the negotiation, documentation, administration or collection of the Loans or any of the Loan Documents.  Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, Collateral Agent shall not have any duty or responsibility except those expressly set forth herein, nor shall Collateral Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Collateral Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in other Loan Documents with reference to Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Section 10.2  <u>Note Holders</u>.  Collateral Agent may treat the payee of any Note as the holder thereof (or, if there is no Note, the holder of the interest as reflected on the books and records of Collateral Agent) until written notice of transfer shall have been filed with Collateral Agent, signed by such payee and in form satisfactory to Collateral Agent.

Section 10.3  <u>Consultation With Counsel</u>.  Collateral Agent may consult with legal counsel selected by Collateral Agent and shall not be liable for any action taken or suffered in good faith by Collateral Agent in accordance with the opinion of such counsel.

Section 10.4  <u>Documents</u>.  Collateral Agent shall not be under any duty to examine into or pass upon the validity, effectiveness, genuineness or value of any Loan Document or any other Related Writing furnished pursuant hereto or in connection herewith or the value of any collateral obtained hereunder, and Collateral Agent shall be entitled to assume that the same are valid, effective and genuine and what they purport to be.

Section 10.5  <u>Agent and Affiliates</u>.  The Huntington National Bank and its affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the Borrowers and their Affiliates as though The Huntington National Bank was not Collateral Agent hereunder and without notice to or consent of any Lender.  Each Lender acknowledges that, pursuant to such activities, The Huntington National Bank or its affiliates may receive information regarding the Borrowers or any Affiliate (including information that may be subject to confidentiality obligations in favor

{10584541:5 } 4867-2680-0173_2

the Borrowers or such Affiliates) and acknowledge that Collateral Agent shall be under no obligation to provide such information to other Lenders. With respect to Loans, Agent and its affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though Agent were not Collateral Agent, and the terms "Lender" and "Lenders" include Agent and its affiliates, to the extent applicable, in their individual capacities.

Section 10.6 <u>Notice of Default</u>. Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless Collateral Agent has received notice from a Lender or the Borrowers referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Collateral Agent receives such a notice, Collateral Agent shall give notice thereof to the Lenders. Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that, unless and until Collateral Agent shall have received such directions, Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable, in its discretion, for the protection of the interests of the holders of the Obligations.

Section 10.7 <u>Action by Collateral Agent</u>. Subject to the other terms and conditions hereof, so long as Collateral Agent shall be entitled, pursuant to Section 10.6 hereof, to assume that no Default or Event of Default shall have occurred and be continuing, Collateral Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights that may be vested in it by, or with respect to taking or refraining from taking any action or actions that it may be able to take under or in respect of, this Agreement. Collateral Agent shall incur no liability under or in respect of this Agreement by acting upon any notice, certificate, warranty or other paper or instrument believed by it to be genuine or authentic or to be signed by the proper party or parties, or with respect to anything that it may do or refrain from doing in the reasonable exercise of its judgment, or that may seem to it to be necessary or desirable in the premises. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Collateral Agent as a result of Collateral Agent's acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

Section 10.8 <u>Release of Collateral</u>. In the event of a transfer of assets permitted by Section 5.12 hereof (or otherwise permitted pursuant to this Agreement) where the proceeds of such transfer are applied in accordance with the terms of this Agreement to the extent required to be so applied, Collateral Agent, at the request and expense of the Borrowers, is hereby authorized by the Lenders to (a) release such Collateral from this Agreement, and (b) duly assign, transfer and deliver to the Borrowers (without recourse and without any representation or warranty) such Collateral as is then (or has been) so transferred or released and as may be in possession of Collateral Agent and has not theretofore been released pursuant to this Agreement.

Section 10.9 <u>Delegation of Duties</u>. Collateral Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or

66

attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. Collateral Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct, as determined by a court of competent jurisdiction.

Section 10.10    <u>Indemnification of Agent</u>.    The Lenders agree to indemnify Collateral Agent (to the extent not reimbursed by the Borrowers) ratably, according to their respective Applicable Commitment Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees and expenses) or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against Collateral Agent, in its capacity as Collateral Agent, in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted by Collateral Agent with respect to this Agreement or any other Loan Document, provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees and expenses) or disbursements resulting from Collateral Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction, or from any action taken or omitted by Collateral Agent in any capacity other than as Collateral Agent under this Agreement or any other Loan Document. No action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 10.10. The undertaking in this Section 10.10 shall survive repayment of the Loans, cancellation of the Notes, if any, termination of the Total Commitment, any foreclosure under, or modification, release or discharge of, any or all of the Loan Documents, termination of this Agreement and the resignation or replacement of the Collateral Agent.

Section 10.11    <u>Successor Collateral Agent</u>.    Collateral Agent may resign as Collateral Agent hereunder by giving not fewer than ten (10) days prior written notice to the Borrowers and the Lenders. If Collateral Agent shall resign under this Agreement, then either (a) the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders (with the consent of the Borrowers so long as an Event of Default has not occurred and which consent shall not be unreasonably withheld), or (b) if a successor agent shall not be so appointed and approved within the ten (10) day period following Collateral Agent's notice to the Lenders of its resignation, then Collateral Agent shall appoint a successor agent that shall serve as collateral agent until such time as the Required Lenders appoint a successor collateral agent. If no successor agent has accepted appointment as Collateral Agent by the date that is ten (10) days following a retiring Collateral Agent's notice of resignation, the retiring Collateral Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of Collateral Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. Upon its appointment, such successor agent shall succeed to the rights, powers and duties as agent, and the term "Collateral Agent" means such successor effective upon its appointment, and the former agent's rights, powers and duties as agent shall be terminated without any other or further act or deed on the part of such former agent or any of the parties to this Agreement. After any retiring Collateral Agent's resignation as Collateral Agent, the provisions of this Article X shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement and the other Loan Documents.

{10584541:5 }                                                                                                                     4867-2680-0173_2

Section 10.12   No Reliance on Collateral Agent's Customer Identification Program. Each Lender acknowledges and agrees that neither such Lender, nor any of its affiliates, participants or assignees, may rely on Collateral Agent to carry out such Lender's or its affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other anti-terrorism law, including any programs involving any of the following items relating to or in connection with the Borrowers, their Affiliates or agents, the Loan Documents or the transactions hereunder: (a) any identity verification procedures, (b) any record keeping, (c) any comparisons with government lists, (d) any customer notices or (e) any other procedures required under the CIP Regulations or such other laws.

ARTICLE XI.  MISCELLANEOUS

Section 11.1 Lenders' Independent Investigation. Each Lender, by its signature to this Agreement, acknowledges and agrees that Collateral Agent has not made any representation or warranty, express or implied, with respect to the creditworthiness, financial condition, or any other condition of the Borrowers or with respect to the statements contained in any information memorandum furnished in connection herewith or in any other oral or written communication between Collateral Agent and such Lender. Each Lender represents that it has made and shall continue to make its own independent investigation of the creditworthiness, financial condition and affairs of the Borrowers in connection with the extension of credit hereunder, and agrees that Collateral Agent does not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto (other than such notices as may be expressly required to be given by Collateral Agent to the Lenders hereunder), whether coming into its possession before the first Credit Event hereunder or at any time or times thereafter.  Each Lender further represents that it has reviewed each of the Loan Documents.

Section 11.2 No Waiver; Cumulative Remedies. No omission or course of dealing on the part of Collateral Agent, any Lender or the holder of any Note (or, if there is no Note, the holder of the interest as reflected on the books and records of Agent) in exercising any right, power or remedy hereunder or under any of the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder or under any of the Loan Documents. The remedies herein provided are cumulative and in addition to any other rights, powers or privileges held under any Loan Documents or by operation of law, by contract or otherwise.

Section 11.3 Amendments, Waivers and Consents.

(a)   General Rule.  No amendment, modification, termination, or waiver of any provision of any Loan Document nor consent to any variance therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b) <u>Exceptions to the General Rule</u>.  Notwithstanding the provisions of subsection (a) of this Section 11.3:

(i)     Subject to subparts (ii) and (iii) below, consent of each Lender affected thereby shall be required with respect to (A) any increase in the Commitment of such Lender hereunder, (B) the extension of maturity of the Loans, the payment date of interest or scheduled principal thereunder, or the payment date of commitment or other fees payable hereunder, (C) any reduction in the stated rate of interest on the Loans (provided that the institution of the Default Rate and a subsequent removal of the Default Rate shall not constitute a decrease in interest rate pursuant to this Section 11.3), or in any amount of interest or scheduled principal due on any Loan, or any reduction in the stated rate of commitment fees payable hereunder or any change in the manner of pro rata application of any payments made by the Borrowers to the Lenders hereunder, (D) any change in any percentage voting requirement, voting rights, or the Required Lenders definition in this Agreement, (E) the release of all or substantially all of the Collateral securing the Obligations (in each case, except as expressly provided in the Loan Documents), or (F) any amendment to this Section 11.3(a) or Section 8.3 or 8.5 hereof.

(ii)     <u>Provisions Relating to Special Rights and Duties</u>.  No provision of this Agreement affecting Collateral Agent in its capacity as such shall be amended, modified or waived without the consent of Collateral Agent.

(c) <u>Generally</u>.  Notice of amendments or consents ratified by the Lenders hereunder shall be forwarded by Collateral Agent to all of the Lenders.  Each Lender or other holder of a Note (or interest in any Loan) shall be bound by any amendment, waiver or consent obtained as authorized by this Section 11.3, regardless of its failure to agree thereto.

Section 11.4  <u>Notices</u>.  All notices, requests, demands and other communications provided for hereunder shall be in writing and, if to a Borrower, mailed or delivered to it, addressed to it at the address specified on the signature pages of this Agreement, if to a Lender, mailed or delivered to it, addressed to the address of such Lender specified on the signature pages of this Agreement, or, as to each party, at such other address as shall be designated by such party in a written notice to each of the other parties.  All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when hand delivered, delivered by overnight courier or two Business Days after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt (if received during a Business Day, otherwise the following Business Day), except that notices from a Borrower to Collateral Agent or the Lenders pursuant to any of the provisions hereof shall not be effective until received.  For purposes of Article II hereof, Collateral Agent and the Lenders shall be entitled to rely on telephonic instructions from any person that Collateral Agent or any Lender, as the case may be, in good faith believes is an Authorized Officer, and the Borrowers shall hold Collateral Agent and each Lender harmless from any loss, cost or expense resulting from any such reliance.

Section 11.5  <u>Costs, Expenses and Taxes</u>.  The Borrowers agree to pay on demand all costs and expenses of Collateral Agent and the Lenders and all Related Expenses,

including but not limited to, (a) syndication, administration, travel and out-of-pocket expenses, including but not limited to attorneys' fees and expenses, of Collateral Agent and the Lenders in connection with the preparation, negotiation and closing of the Loan Documents and the administration of the Loan Documents, the collection and disbursement of all funds hereunder and the other instruments and documents to be delivered hereunder, (b) extraordinary expenses of Collateral Agent and the Lenders in connection with the administration of the Loan Documents and the other instruments and documents to be delivered hereunder, and (c) the reasonable fees and out-of-pocket expenses of special counsel for Collateral Agent and the Lenders, if any, with respect to the foregoing, and of local counsel, if any, who may be retained by said special counsel with respect thereto. The Borrowers also agree to pay on demand all costs and expenses of Collateral Agent and the Lenders, including reasonable attorneys' fees and expenses, in connection with the restructuring or enforcement of the Obligations, this Agreement or any Related Writing. In addition, the Borrowers shall pay any and all stamp, transfer, documentary and other taxes, assessments, charges and fees payable or determined to be payable in connection with the execution and delivery of the Loan Documents, and the other instruments and documents to be delivered hereunder, and agree to hold Collateral Agent and each Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or failure to pay such taxes or fees.  All obligations provided for in this Section 11.5 shall survive any termination of this Agreement.

Section 11.6 <u>Indemnification</u>.  The Borrowers agree to defend, indemnify and hold harmless Collateral Agent and the Lenders (and their respective affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees) or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against Collateral Agent or any Lender in connection with any investigative, administrative or judicial proceeding (whether or not such Lender or Collateral Agent shall be designated a party thereto) or any other claim by any Person relating to or arising out of any Loan Document or any actual or proposed use of proceeds of the Loans or any of the Obligations, or any activities of the Borrowers or their Affiliates; provided that none of any Lender or Collateral Agent (nor their respective affiliates, officers, directors, attorneys, agents and employees) shall have the right to be indemnified under this Section 11.6 for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction. All obligations provided for in this Section 11.6 shall survive any termination of this Agreement.

Section 11.7 <u>Obligations Several; No Fiduciary Obligations</u>.  The obligations of the Lenders hereunder are several and not joint. Nothing contained in this Agreement and no action taken by Collateral Agent or the Lenders pursuant hereto shall be deemed to constitute Collateral Agent or the Lenders a partnership, association, joint venture or other entity. No default by any Lender hereunder shall excuse the other Lenders from any obligation under this Agreement; but no Lender shall have or acquire any additional obligation of any kind by reason of such default. The relationship between the Borrowers and the Lenders with respect to the Loan Documents and the Related Writings is and shall be solely that of debtor and creditors, respectively, and none of Collateral Agent or any Lender shall have any fiduciary

{10584541:5 }
4867-2680-0173_2

obligation toward any Credit Party with respect to any such documents or the transactions contemplated thereby.

Section 11.8 <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts and by facsimile or .pdf signature, each of which counterparts when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

Section 11.9 <u>Binding Effect; Borrowers' Assignment</u>. This Agreement shall become effective when it shall have been executed by the Borrowers, Collateral Agent (on its own behalf and, by signing as Collateral Agent) and each Lender and thereafter shall be binding upon and inure to the benefit of the Borrowers, Collateral Agent and each of the Lenders and their respective successors and assigns, except that the Borrowers shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of Collateral Agent and all of the Lenders.

Section 11.10 <u>Lender Assignments</u>.

(a) <u>Assignments of Commitments</u>. Each Lender shall have the right at any time or times to assign to an Eligible Transferee (other than to a Lender that shall not be in compliance with this Agreement), without recourse, all or a percentage of all of the following: (i) such Lender's Commitment, (ii) all Loans made by that Lender, and (iii) such Lender's Notes, and any participation purchased pursuant to Section 8.3 hereof.

(b) <u>Prior Consent</u>. No assignment may be consummated pursuant to this Section 11.10 without the prior written consent of Collateral Agent (other than an assignment by any Lender to any affiliate of such Lender which affiliate is an Eligible Transferee and either wholly-owned by a Lender or is wholly-owned by a Person that wholly owns, either directly or indirectly, such Lender, or to another Lender), which consent of Collateral Agent shall not be unreasonably withheld. Anything herein to the contrary notwithstanding, any Lender may at any time make a collateral assignment of all or any portion of its rights under the Loan Documents to a Federal Reserve Bank, and no such assignment shall release such assigning Lender from its obligations hereunder.

(c) <u>Minimum Amount</u>. Each such assignment shall be in a minimum amount of the lesser of Five Hundred Thousand ($500,000) of the assignor's Commitment and interest herein or the entire amount of the assignor's Commitment and interest herein.

(d) <u>Assignment Fee</u>. Unless the assignment shall be to an affiliate of the assignor or the assignment shall be due to merger of the assignor or for regulatory purposes, either the assignor or the assignee shall remit to Collateral Agent, for its own account, an administrative fee of Three Thousand Five Hundred Dollars ($3,500), unless the Collateral Agent waives all or any portion of such fee in writing.

(e) <u>Assignment Agreement</u>. Unless the assignment shall be due to merger of the assignor or a collateral assignment for regulatory purposes, the assignor shall (i) cause the assignee to execute and deliver to the Borrowers and Collateral Agent an Assignment

Agreement, and (ii) execute and deliver, or cause the assignee to execute and deliver, as the case may be, to Collateral Agent such additional amendments, assurances and other writings as Collateral Agent may reasonably require.

(f) <u>Non-U.S. Assignee</u>.  If the assignment is to be made to an assignee that is organized under the laws of any jurisdiction other than the United States or any state thereof, the assignor Lender shall cause such assignee, at least five Business Days prior to the effective date of such assignment, (i) to represent to the assignor Lender (for the benefit of the assignor Lender, Collateral Agent and the Borrowers) that under applicable law and treaties no taxes will be required to be withheld by Collateral Agent, the Borrowers or the assignor with respect to any payments to be made to such assignee in respect of the Loans hereunder, (ii) to furnish to the assignor Lender (and, in the case of any assignee registered in the Register (as defined below), Collateral Agent and the Borrowers) either U.S. Internal Revenue Service Form W-8ECI or U.S. Internal Revenue Service Form W-8BEN, as applicable (wherein such assignee claims entitlement to complete exemption from U.S. federal withholding tax on all payments hereunder), and (iii) to agree (for the benefit of the assignor, Collateral Agent and the Borrowers) to provide to the assignor Lender (and, in the case of any assignee registered in the Register, to Collateral Agent and the Borrowers) a new Form W-8ECI or Form W-8BEN, as applicable, upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable U.S. laws and regulations and amendments duly executed and completed by such assignee, and to comply from time to time with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

(g) <u>Deliveries by the Borrowers</u>.  Upon satisfaction of all applicable requirements specified in subsections (a) through (f) above, the Borrowers shall execute and deliver (i) to Collateral Agent, the assignor and the assignee, any consent or release (of all or a portion of the obligations of the assignor) required to be delivered by the Borrowers in connection with the Assignment Agreement, and (ii) to the assignee, if requested, and the assignor, if applicable, an appropriate Note or Notes.  After delivery of the new Note or Notes, the assignor's Note or Notes, if any, being replaced shall be returned to the Borrowers marked "replaced".

(h) <u>Effect of Assignment</u>.  Upon satisfaction of all applicable requirements set forth in subsections (a) through (g) above, and any other condition contained in this Section 11.10, (i) the assignee shall become and thereafter be deemed to be a "Lender" for the purposes of this Agreement, (ii) the assignor shall be released from its obligations hereunder to the extent that its interest has been assigned, (iii) in the event that the assignor's entire interest has been assigned, the assignor shall cease to be and thereafter shall no longer be deemed to be a "Lender" and (iv) the signature pages hereto and <u>Schedule 1</u> hereto shall be automatically amended, without further action, to reflect the result of any such assignment.

(i) <u>Collateral Agent to Maintain Register</u>.  Collateral Agent shall maintain at the address for notices referred to in Section 11.4 hereof a copy of each Assignment Agreement delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrowers, Collateral Agent and the Lenders may treat each Person whose name is recorded in the Register as the owner of the Loan recorded therein for all purposes of this

Agreement. The Register shall be available for inspection by the Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.

Section 11.11    Sale of Participations.  Any Lender may, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time sell participations to one or more Eligible Transferees (each a "Participant") in all or a portion of its rights or obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of the Commitment and the Loans and participations owing to it and the Note, if any, held by it); provided that:

(a)  any such Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged;

(b)  such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations;

(c)  the parties hereto shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and each of the other Loan Documents;

(d)  such Participant shall be bound by the provisions of Section 8.3 hereof, and the Lender selling such participation shall obtain from such Participant a written confirmation of its agreement to be so bound; and

(e)  no Participant (unless such Participant is itself a Lender) shall be entitled to require such Lender to take or refrain from taking action under this Agreement or under any other Loan Document, except that such will not, without such Participant's consent, take action of the type described as follows:

(i)    increase the portion of the participation amount of any Participant over the amount thereof then in effect, or extend the Commitment Period, without the written consent of each Participant affected thereby; or

(ii)    reduce the principal amount of or extend the time for any payment of principal of any Loan, or reduce the rate of interest or extend the time for payment of interest on any Loan, or reduce the commitment fee, without the written consent of each Participant affected thereby.

The Borrowers agree that any Lender that sells participations pursuant to this Section 11.11 shall still be entitled to the benefits of Article III hereof, notwithstanding any such transfer; provided, however, that the obligations of the Borrowers shall not increase as a result of such transfer and the Borrowers shall have no obligation to any Participant.

The Borrowers acknowledge and agree that the Lenders have sold the Prepetition Subordinated Participations and the Subordinated Participations to the Subordinated Participants in connection with the Accommodation Overadvance Amount, and consent to the provisions of the Subordinated Participation Agreements and agree not to take any action inconsistent therewith. For clarity, the Prepetition Subordinated Participations and the Subordinated

Participations shall be governed by the terms of the Subordinated Participation Agreements and not by this Section 11.11.

Section 11.12    Patriot Act Notice.  Each Lender and Collateral Agent (for itself and not on behalf of any other party) hereby notifies the Credit Parties that, pursuant to the requirements of the Patriot Act, such Lender and Collateral Agent are required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender or Collateral Agent, as applicable, to identify the Credit Parties in accordance with the Patriot Act. The  Borrowers shall provide, to the extent commercially reasonable, such information and take such actions as are reasonably requested by Collateral Agent or a Lender in order to assist Collateral Agent or such Lender in maintaining compliance with the Patriot Act.

Section 11.13    Severability of Provisions; Captions; Attachments.  Any provision of this Agreement that shall be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. The several captions to sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement.  Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

Section 11.14    Investment Purpose.  Each of the Lenders represents and warrants to the Borrowers that it is entering into this Agreement with the present intention of acquiring any Note issued pursuant hereto (or, if there is no Note, the interest as reflected on the books and records of Agent) for investment purposes only and not for the purpose of distribution or resale, it being understood, however, that each Lender shall at all times retain full control over the disposition of its assets.

Section 11.15    Entire Agreement.  This Agreement, any Note, any other Loan Document, the Accommodation Agreement, the Access Agreement, or any other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.

Section 11.16    Legal Representation of Parties.  The Loan Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other Loan Document to be construed or interpreted against any party shall not apply to any construction or interpretation hereof or thereof.

Section 11.17    Governing Law; Submission to Jurisdiction.

(a)    Governing Law.  This Agreement, each of the Notes and any Related Writing shall be governed by and construed in accordance with the laws of the State of Ohio and the respective rights and obligations of the Borrowers, Collateral Agent and the Lenders shall be governed by Ohio law, without regard to principles of conflicts of laws.

(b) <u>Submission to Jurisdiction</u>.  The Borrowers hereby irrevocably submits to the non-exclusive jurisdiction of any Ohio state or federal court sitting in Ohio, and the Bankruptcy Court over any action or proceeding arising out of or relating to this Agreement, the Obligations or any Related Writing, and the Borrowers hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such Ohio state or federal court or the Bankruptcy Court. Each Borrower hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts, and waives any claim that any such courts lack jurisdiction over the Borrowers.  Each Borrowers, on behalf of itself and its Subsidiaries, if any, hereby irrevocably waives, to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue in any action or proceeding in any such court as well as any right it may now or hereafter have to remove such action or proceeding, once commenced, to another court on the grounds of FORUM NON CONVENIENS or otherwise.  The Borrowers agree that a final, nonappealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

{10584541:5 }                                                           4867-2680-0173_2

Section 11.18 <u>JURY TRIAL WAIVER</u>. TO THE EXTENT PERMITTED BY LAW, THE BORROWERS, COLLATERAL AGENT AND EACH LENDER WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG THE BORROWERS, COLLATERAL AGENT AND THE LENDERS, OR ANY THEREOF, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO. THIS WAIVER SHALL NOT IN ANY WAY AFFECT, WAIVE, LIMIT, AMEND OR MODIFY COLLATERAL AGENT'S OR ANY LENDER'S ABILITY TO PURSUE REMEDIES PURSUANT TO ANY CONFESSION OF JUDGMENT OR COGNOVIT PROVISION CONTAINED IN ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT AMONG THE BORROWERS, COLLATERAL AGENT AND THE LENDERS, OR ANY THEREOF.

IN WITNESS WHEREOF, the parties have executed and delivered this Debtor in Possession Credit Agreement as of the date first set forth above.

**BORROWERS:**

**GISSING NORTH AMERICA LLC,**
a Delaware limited liability company

By: _____
Name:  Steven R. Wybo
Title:   Chief Restructuring Officer

**GISSING TECHNOLOGIES LLC,**
a Delaware limited liability company

By: _____
Name:  Steven R. Wybo
Title:   Chief Restructuring Officer

**GISSING SIDNEY LLC,**
a Delaware limited liability company

By: _____
Name:  Steven R. Wybo
Title:   Chief Restructuring Officer

**GISSING SUMTER LLC,**
a Delaware limited liability company

By: _____
Name:  Steven R. Wybo
Title:   Chief Restructuring Officer

**GISSING AUBURN LLC,**
a Delaware limited liability company

By: _____
Name:  Steven R. Wybo
Title:   Chief Restructuring Officer

**GISSING TECHNOLOGIES MEXICO LLC,**
a Delaware limited liability company

By: _____
Name:  Steven R. Wybo
Title:   Chief Restructuring Officer

**GISSING FREMONT LLC,**
  a Delaware limited liability company

By: _____

Name: _Steven R. Wybo_

Title: _Chief Restructuring Officer_

**GISSING GREENVILLE LLC,**
  a Delaware limited liability company

By: _____

Name: _Steven R. Wybo_

Title: _Chief Restructuring Officer_

Address for the Borrowers:
Gissing North America LLC
32500 Telegraph Road
Suite 207
Bingham Farms, Michigan 48025
Attention: Steven Wybo
Email: steven.wybo@riveron.com

With a copy to:
Wolfson Bolton PLLC
3150 Livernois Rd, Suite 275
Troy, Michigan 48083
Attention: Scott A. Wolfson
Email: swolfson@wolfsonbolton.com

**AGENT:**

**THE HUNTINGTON NATIONAL BANK,**
a national banking association

By: _____
Name: BARRY S. ONEAL
Title: Senior Vice President

Address for Agent:
The Huntington National Bank
200 Public Square, CM64
Cleveland, Ohio 44114
Attention: Gissing North America Account Manager
Email: ABLoperations@huntington.com

With a copy to:
McDonald Hopkins LLC
600 Superior Avenue, East
Suite 2100
Cleveland, Ohio 44114
Attention: Scott N. Opincar, Esq.
Email: sopincar@mcdonaldhopkins.com

**LENDER:**

**COMERICA BANK,**
a Texas banking association

By: _____
Name: _____
Title: _____

Address for Comerica Bank:
Cynthia Jones
Comerica Bank
Mail Code 7356
3551 Hamlin Road
Auburn Hills, Michigan 48326
Email: CBJones@comerica.com

**AGENT:**

**THE HUNTINGTON NATIONAL BANK,**
a national banking association

By: _____
Name: _____
Title: _____

Address for Agent:
The Huntington National Bank
200 Public Square, CM64
Cleveland, Ohio 44114
Attention: Gissing North America Account Manager
Email: ABLoperations@huntington.com

With a copy to:
McDonald Hopkins LLC
600 Superior Avenue, East
Suite 2100
Cleveland, Ohio 44114
Attention: Scott N. Opincar, Esq.
Email: sopincar@mcdonaldhopkins.com

**LENDER:**

**COMERICA BANK,**
a Texas banking association

By: _____
Name: Cynthia B. Jones
Title:   Vice President

Address for Comerica Bank:
Cynthia Jones
Comerica Bank
Mail Code 7356
3551 Hamlin Road
Auburn Hills, Michigan 48326
Email: CBJones@comerica.com

Principal Amount: Up to $_____.00                    _____, 2022
Maturity Date: October 31, 2022

FOR VALUE RECEIVED, the undersigned, **GISSING NORTH AMERICA LLC (F/K/A CONFORM GISSING INTERNATIONAL, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES LLC (F/K/A FORMED FIBER TECHNOLOGIES, LLC)**, a Delaware limited liability company, **GISSING SIDNEY LLC (F/K/A FFT SIDNEY, LLC)**, a Delaware limited liability company, **GISSING SUMTER LLC (F/K/A FFT SUMTER, LLC)**, a Delaware limited liability company, **GISSING AUBURN LLC (F/K/A FFT AUBURN, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES MEXICO LLC (F/K/A FORMED FIBER TECHNOLOGIES – MEXICO, LLC)**, a Delaware limited liability company, **GISSING FREMONT LLC**, a Delaware limited liability company, and **GISSING GREENVILLE LLC**, a Delaware limited liability company (collectively, the "Borrowers"), promise to pay, on the last day of the Commitment Period, as defined in the Credit Agreement (as hereinafter defined), to the order of **THE HUNTINGTON NATIONAL BANK**, a national banking association ("Lender") at the office of The Huntington National Bank, as Collateral Agent, as hereinafter defined, 200 Public Square, CM64, Cleveland, Ohio 44114, Attention: Gissing North America Account Manager, the aggregate unpaid principal amount of all Revolving Loans, as defined in the Credit Agreement, made by Lender to the Borrowers pursuant to Section 2.2 of the Credit Agreement in lawful money of the United States of America.

As used herein, "Credit Agreement" means the Debtor in Possession Credit Agreement dated as of August 8, 2022, by and among the Borrowers, the Lenders, and the Collateral Agent (as defined therein), as the same may from time to time be further amended, restated or otherwise modified. Each capitalized term used herein that is defined in the Credit Agreement and not otherwise defined herein shall have the meaning ascribed to it in the Credit Agreement.

The Borrowers also promise to pay interest on the unpaid principal amount of each Revolving Loan from time to time outstanding, from the date of such Revolving Loan until the payment in full thereof, at the rates per annum that shall be determined in accordance with the provisions of Section 2.5(a) of the Credit Agreement. Such interest shall be payable on each date provided for in such Section 2.5(a); provided that interest on any principal portion that is not paid when due shall be payable on demand.

The portions of the principal sum hereof from time to time representing Loans, interest owing thereon, and payments of principal and interest of any thereof, shall be shown on the records of Lender by such method as Lender may generally employ; provided that failure to make any such entry shall in no way detract from the obligations of the Borrowers under this Note.

{10584541:5 }        F-1

If this Note shall not be paid at maturity, whether such maturity occurs by reason of lapse of time or by operation of any provision for acceleration of maturity contained in the Credit Agreement, the principal hereof and the unpaid interest thereon shall bear interest, until paid, at a rate per annum equal to the Default Rate (as defined in the Credit Agreement). All payments of principal of and interest on this Note shall be made in immediately available funds.

This Note is the Revolving Credit Note referred to in the Credit Agreement. Reference is made to the Credit Agreement for a description of the right of the undersigned to anticipate payments hereof, the right of the holder hereof to declare this Note due prior to its stated maturity, and other terms and conditions upon which this Note is issued.

Except as expressly provided in the Credit Agreement, The Borrowers expressly waive presentment, demand, protest and notice of any kind. This Note shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflicts of laws provisions.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Borrowers have caused this Note to be been executed and delivered as of the date first set forth above.

**GISSING NORTH AMERICA LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**GISSING TECHNOLOGIES LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**GISSING SIDNEY LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**GISSING SUMTER LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**GISSING AUBURN LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**GISSING TECHNOLOGIES MEXICO LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**GISSING FREMONT LLC,**
  a Delaware limited liability company


By: _____
Name: _____
Title: _____

**GISSING GREENVILLE LLC,**
  a Delaware limited liability company


By: _____
Name: _____
Title: _____

EXHIBIT F
FORM OF
BORROWING BASE CERTIFICATE

See attached form.

**BORROWING BASE REPORT**

| | Domestic AR Aging | GM and Toyota AR | Tooling AR Aging | Canadian AR Aging | Foreign OEM AR Aging | Approved Tesla A/R | Inventory | Consolidated |
|---|---|---|---|---|---|---|---|---|
| Company: Giesing North America LLC | Certificate # 1 | | | | | | | |
| Commitment: 30,000,000.00 | | | | | | | | |
| Description: ABL Managed Line of Credit | | | | | | | | |
| 1. Control Balance from Previous Certificate @ | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| a) Inventory Month-end Adjustments | | | | | | | $0.00 | |
| 2. Adds: A) Invoices From:      Thru | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| B) Other Positive Adjustments | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| C) Intercompany Sales | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| D) Chrysler and Volkswagen | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| 3. Less: A) Credits issued (Date/ #) From     Thru | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| B) Write-Offs/ Negative Adjustments | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| C) Intercompany Credits | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| D) Chrysler and Volkswagen | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| 4. Less: A) Gross Collections From:   Thru | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| B) Discounts | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| C) Non AR Cash | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | | |
| 5. Control Balance This Certificate (Lines 1+2+3+4) @ | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 5a. Unapplied Cash - Year to Date GL 211005 | $0.00 | | | | | | | |
| **6. Less: Ineligibles @ DATE** | | | | | | | | |
| A) All GM and Toyota Gross AR | $0.00 | $0.00 | $0.00 | $0.00 | | | | |
| B) Past Due (90 days from invoice date/ Tooling 120 days) / Work in Process | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| C) Credits in prior / Obsolete (Slow Moving ) Inventory | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| D) Cross aging (50%, except for GM/Toyota 25%) / Outside Processors | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| E) Contras / Capitalization Reserve GL #148550 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| F) A/R Trade Adjust (GL#130110) / Packaging and Cartons | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| G) Denied Access States / Sumter on-hold (Returns/non saleable) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| H) Foreign (CAD Quebec) / Additional Slow Moving Sumter | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| I) Intercompany / Labels | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| J) No PPAP Approval  / Non Conforming | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| K) Debit Memos and Short Pays / Other | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| L) Other / Other | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| M) Other / Other | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |
| 7. Total Ineligible | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 8. Eligible Collateral | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 9. Approved Advance Rate | 85.00% | 90.00% | 85.00% | 85.00% | 85.00% | 90.00% | 55.00% | |
| 10. Net Collateral Value  (line 8 X line 9) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 11. Maximum Tooling/OEM Value / CAD/ Maximum Inventory Value | | | $4,500,000.00 | $3,500,000.00 | $2,000,000.00 | | $8,000,000.00 | |
| 12. Lesser of Line 11 (Tooling / Inventory) or Line 10 | | | $0.00 | $0.00 | $0.00 | | $0.00 | |
| **Availability Calculation** | | | | | | | | |
| 13. Total Collateral Value (Line 10 A/R + Line 12) | | | | | | | | $0.00 |
| 14. Plus: SOFA | | | | | | | | $0.00 |
| 15. Total Collateral plus SOFA | | | | | | | | $0.00 |
| 16. Maximum Credit Line | | | | | | | | $30,000,000.00 |
| 17. Lesser of Line 15 (collateral limit) or Line 16 (credit limit) | | | | | | | | $0.00 |
| 18. a) Less: Reserves | | | | | | | | $0.00 |
| b) Less: Mexico Reserves | | | | | | | | $0.00 |
| 19. Net Availability | | | | | | | | $0.00 |
| 20. PrePetition Loans Outstanding | | | | | | | | |
| a)  Balance from previous Borrowing Base | | | | | | | | $0.00 |
| c)  Cash Receipts | | | | | | | | $0.00 |
| d) Ending Loan Balance | | | | | | | | $0.00 |
| 21.  Post Petition Loans  Outstanding | | | | | | | | |
| a)  Balance from previous Borrowing Base | | | | | | | | $0.00 |
| b)  Advances | | | | | | | | $0.00 |
| c)  Cash Receipts | | | | | | | | $0.00 |
| d) Ending Loan Balance | | | | | | | | $0.00 |
| 22. Ending Availability (line 18 minus line 19 minus line 20) | | | | | | | | $0.00 |

This Borrowing Base Report is delivered to the Bank pursuant to a certain Debtor in Possession Credit Agreement, together with all the amendments thereto (the "Agreement") between the undersigned and the Bank.  All capitalized terms not defined in this Report shall have the same meanings in the Agreement.  The undersigned certifies the following:  (1) each of the accounts referenced on line 8 above is an Eligible Account;  (2) all of the inventory referenced above is Eligible Inventory;  (3) any other collateral against which an advance has been requested hereunder is eligible collateral under the terms of the Agreement;  (4) the above calculations are true and accurate in all respects;  (5) each of the warranties contained in the Agreement are true and correct, except to the extent that the same relate to an earlier date; and (6) no Event of Default or Pending Default exists.

Company:   Giesing North America LLC  _____

Date:  _____

Authorized Signer:  _____

Authorized Signature:  _____

[Date]_____, 2022

The Huntington National Bank
200 Public Square, CM64
Cleveland, Ohio 44114
Attention: Gissing North America Account Manager[1]

Ladies and Gentlemen:

 The undersigned, **GISSING NORTH AMERICA LLC (F/K/A CONFORM GISSING INTERNATIONAL, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES LLC (F/K/A FORMED FIBER TECHNOLOGIES, LLC)**, a Delaware limited liability company, **GISSING SIDNEY LLC (F/K/A FFT SIDNEY, LLC)**, a Delaware limited liability company, **GISSING SUMTER LLC (F/K/A FFT SUMTER, LLC)**, a Delaware limited liability company, **GISSING AUBURN LLC (F/K/A FFT AUBURN, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES MEXICO LLC (F/K/A FORMED FIBER TECHNOLOGIES – MEXICO, LLC)**, a Delaware limited liability company, **GISSING FREMONT LLC**, a Delaware limited liability company, and **GISSING GREENVILLE LLC**, a Delaware limited liability company (collectively, the "Borrowers"), refers to the Debtor in Possession Credit Agreement, dated as of August 8, 2022 (as amended, restated or otherwise modified from time to time, the "Credit Agreement", the terms defined therein being used herein as therein defined), among the undersigned, the Lenders (as defined in the Credit Agreement), and the Collateral Agent (as defined in the Credit Agreement), and hereby gives you notice, pursuant to Section 2.7 of the Credit Agreement that the Borrowers hereby requests a Loan under the Credit Agreement, and in connection therewith sets forth below the information relating to the Loan (the "Proposed Loan") as required by Section 2.7 of the Credit Agreement:

 (a) The Business Day of the Proposed Loan is _____, 20__.

 (b) The amount of the Proposed Loan is $_____.

 The undersigned hereby certifies on behalf of the Borrowers that the following statements are true on the date hereof, and will be true on the date of the Proposed Loan:

 (i) the representations and warranties contained in each Loan Document are correct, before and after giving effect to the Proposed Loan and the application of the proceeds therefrom, as though made on and as of such date;

---

[1] Confirm.

{10584541:5 }  G-1

4867-2680-0173_2

22-46160-lsg  Doc 22-1  Filed 08/09/22  Entered 08/09/22 11:39:28  Page 93 of 175

(ii)     no event has occurred and is continuing, or would result from such Proposed Loan, or the application of proceeds therefrom, that constitutes a Default or Event of Default; and

(iii)     the conditions set forth in Section 2.7 and Article IV of the Credit Agreement have been satisfied.

**GISSING NORTH AMERICA LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING TECHNOLOGIES LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING SIDNEY LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING SUMTER LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING AUBURN LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING TECHNOLOGIES MEXICO LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING FREMONT LLC,**
 a Delaware limited liability company


By: _____
Name: _____
Title: _____

**GISSING GREENVILLE LLC,**
 a Delaware limited liability company


By: _____
Name: _____
Title: _____

4867-2680-0173_2

{10584541:5 }   G-4

4867-2680-0173_2

For Fiscal Quarter ended _____

THE UNDERSIGNED HEREBY CERTIFIES THAT:

(1)     I am the Chief Restructuring officer of **GISSING NORTH AMERICA LLC (F/K/A CONFORM GISSING INTERNATIONAL, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES LLC (F/K/A FORMED FIBER TECHNOLOGIES, LLC)**, a Delaware limited liability company, **GISSING SIDNEY LLC (F/K/A FFT SIDNEY, LLC)**, a Delaware limited liability company, **GISSING SUMTER LLC (F/K/A FFT SUMTER, LLC)**, a Delaware limited liability company, **GISSING AUBURN LLC (F/K/A FFT AUBURN, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES MEXICO LLC (F/K/A FORMED FIBER TECHNOLOGIES – MEXICO, LLC)**, a Delaware limited liability company, **GISSING FREMONT LLC**, a Delaware limited liability company, and **GISSING GREENVILLE LLC**, a Delaware limited liability company (collectively, the "Borrowers");

(2)     I am familiar with the terms of that certain Debtor in Possession Credit Agreement, dated as of August 8, 2022, among the undersigned, the lenders from time to time named on Schedule 1 thereto (together with their respective successors and assigns, collectively the "Lenders"), and The Huntington National Bank, a national banking association,  as Collateral Agent (as the same may from time to time be amended, restated or otherwise modified, the "Credit Agreement", the terms defined therein being used herein as therein defined), and the terms of the other Loan Documents, and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and condition of Borrowers during the accounting period covered by the attached financial statements;

(3)     The review described in paragraph (2) above did not disclose, and I have no knowledge of, the existence of any condition or event that constitutes or constituted a Default or Event of Default, at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate;

(4)     The representations and warranties made by the Borrowers contained in each Loan Document are true and correct as though made on and as of the date hereof; and

4867-2680-0173_2

IN WITNESS WHEREOF, I have signed this certificate the ___ day of _____, 20___.

**GISSING NORTH AMERICA LLC,**
  a Delaware limited liability company

By: _____
Name: Steven Wybo
Title: Chief Restructuring Officer

**GISSING TECHNOLOGIES LLC,**
  a Delaware limited liability company

By: _____
Name: Steven Wybo
Title: Chief Restructuring Officer

**GISSING SIDNEY LLC,**
  a Delaware limited liability company

By: _____
Name: Steven Wybo
Title: Chief Restructuring Officer

**GISSING SUMTER LLC,**
  a Delaware limited liability company

By: _____
Name: Steven Wybo
Title: Chief Restructuring Officer

**GISSING AUBURN LLC,**
  a Delaware limited liability company

By: _____
Name: Steven Wybo
Title: Chief Restructuring Officer

**GISSING TECHNOLOGIES MEXICO LLC,**
  a Delaware limited liability company

By: _____
Name: Steven Wybo
Title: Chief Restructuring Officer

**GISSING FREMONT LLC,**
  a Delaware limited liability company

By: _____
Name: Steven Wybo
Title: Chief Restructuring Officer

**GISSING GREENVILLE LLC,**
  a Delaware limited liability company

By: _____
Name: Steven Wybo
Title: Chief Restructuring Officer

EXHIBIT I
FORM OF
ASSIGNMENT AND ACCEPTANCE AGREEMENT

This Assignment and Acceptance Agreement (this "Assignment Agreement") between _____ (the "Assignor") and _____ (the "Assignee") is dated as of _____, 20_.  The parties hereto agree as follows:

1. <u>Preliminary Statement</u>.  Assignor is a party to a Debtor in Possession Credit Agreement, dated as of August 8, 2022 (as the same may from time to time be amended, restated or otherwise modified, the "Credit Agreement"), by and among **GISSING NORTH AMERICA LLC (F/K/A CONFORM GISSING INTERNATIONAL, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES LLC (F/K/A FORMED FIBER TECHNOLOGIES, LLC)**, a Delaware limited liability company, **GISSING SIDNEY LLC (F/K/A FFT SIDNEY, LLC)**, a Delaware limited liability company, **GISSING SUMTER LLC (F/K/A FFT SUMTER, LLC)**, a Delaware limited liability company, **GISSING AUBURN LLC (F/K/A FFT AUBURN, LLC)**, a Delaware limited liability company, **GISSING TECHNOLOGIES MEXICO LLC (F/K/A FORMED FIBER TECHNOLOGIES – MEXICO, LLC)**, a Delaware limited liability company, **GISSING FREMONT LLC**, a Delaware limited liability company, and **GISSING GREENVILLE LLC**, a Delaware limited liability company (collectively, the "Borrowers"), the lenders named on <u>Schedule 1</u> thereto (together with their respective successors and assigns, collectively, the "Lenders" and, individually, each a "Lender"), and THE HUNTINGTON NATIONAL BANK, a national banking association ("Collateral Agent").  Capitalized terms used herein and not otherwise defined herein shall have the meanings attributed to them in the Credit Agreement.

2. <u>Assignment and Assumption</u>.  Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor, an interest in and to Assignor's rights and obligations under the Credit Agreement, effective as of the Assignment Effective Date (as hereinafter defined), equal to the percentage interest specified on <u>Annex 1</u> hereto (hereinafter, the "Assigned Percentage") of Assignor's right, title and interest in and to (a) the Commitment, (b) any Loan made by Assignor that is outstanding on the Assignment Effective Date, (c) any Note delivered to Assignor pursuant to the Credit Agreement, and (d) the Credit Agreement and the other Related Writings.  After giving effect to such sale and assignment and on and after the Assignment Effective Date, Assignee shall be deemed to have one or more Applicable Commitment Percentages under the Credit Agreement equal to the Applicable Commitment Percentages set forth in subpart II.A on <u>Annex 1</u> hereto and an Assigned Amount as set forth on subpart I.B. of <u>Annex 1</u> hereto (hereinafter, the "Assigned Amount").

3. <u>Assignment Effective Date</u>.  The Assignment Effective Date (the "Assignment Effective Date") shall be [_____ __, ____] (or such other date agreed to by Collateral Agent).  On or prior to the Assignment Effective Date, Assignor shall satisfy the following conditions:

(a)  receipt by Collateral Agent of this Assignment Agreement, including <u>Annex 1</u> hereto, properly executed by Assignor and Assignee and accepted and consented to by Collateral

Agent and, if necessary pursuant to the provisions of Section 11.10(b) of the Credit Agreement, by the Borrowers;

(b)　　receipt by Collateral Agent from Assignor of a fee of Three Thousand Five Hundred Dollars ($3,500), if required by Section 11.10(d) of the Credit Agreement;

(c)　　receipt by Collateral Agent from Assignee of an administrative questionnaire, or other similar document, which shall include (i) the address for notices under the Credit Agreement, (ii) the address of its Lending Office, (iii) wire transfer instructions for delivery of funds by Collateral Agent, (iv) and such other information as Collateral Agent shall request; and

(d)　　receipt by Collateral Agent from Assignor or Assignee of any other information required pursuant to Section 11.10 of the Credit Agreement or otherwise necessary to complete the transaction contemplated hereby.

4.　　<u>Payment Obligations</u>.　In consideration for the sale and assignment of Loans hereunder, Assignee shall pay to Assignor, on the Assignment Effective Date, the amount agreed to by Assignee and Assignor.　Any interest, fees and other payments accrued prior to the Assignment Effective Date with respect to the Assigned Amount shall be for the account of Assignor.　Any interest, fees and other payments accrued on and after the Assignment Effective Date with respect to the Assigned Amount shall be for the account of Assignee.　Each of Assignor and Assignee agrees that it will hold in trust for the other party any interest, fees or other amounts which it may receive to which the other party is entitled pursuant to the preceding sentence and to pay the other party any such amounts which it may receive promptly upon receipt thereof.

5.　　<u>Credit Determination; Limitations on Assignor's Liability</u>.　Assignee represents and warrants to Assignor, the Borrowers, Collateral Agent and the Lenders (a) that it is capable of making and has made and shall continue to make its own credit determinations and analysis based upon such information as Assignee deemed sufficient to enter into the transaction contemplated hereby and not based on any statements or representations by Assignor; (b) Assignee confirms that it meets the requirements to be an assignee as set forth in Section 10.10 of the Credit Agreement; (c) Assignee confirms that it is able to fund the Loans as required by the Credit Agreement; (d) Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement and the Related Writings are required to be performed by it as a Lender thereunder; and (e) Assignee represents that it has reviewed each of the Loan Documents and by its signature to this Assignment Agreement, agrees to be bound by and subject to the terms and conditions of any such Intercreditor Agreement, if any, as if it were an original party thereto.　It is understood and agreed that the assignment and assumption hereunder are made without recourse to Assignor and that Assignor makes no representation or warranty of any kind to Assignee and shall not be responsible for (i) the due execution, legality, validity, enforceability, genuineness, sufficiency or collectability of the Credit Agreement or any Related Writings, (ii) any representation, warranty or statement made in or in connection with the Credit Agreement or any of the Related Writings, (iii) the financial condition or creditworthiness of the Borrowers, (iv) the performance of or compliance with any of the terms or provisions of the Credit Agreement or any of the Related

Writings, (v) the inspection of any of the property, books or records of the Borrowers, or (vi) the validity, enforceability, perfection, priority, condition, value or sufficiency of any collateral securing or purporting to secure the Loans. Neither Assignor nor any of its officers, directors, employees, agents or attorneys shall be liable for any mistake, error of judgment, or action taken or omitted to be taken in connection with the Loans, the Credit Agreement or the Related Writings, except for its or their own bad faith or willful misconduct. Assignee appoints Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement as are delegated to Collateral Agent by the terms thereof.

6. <u>Indemnity</u>. Assignee agrees to indemnify and hold Assignor harmless against any and all losses, cost and expenses (including, without limitation, attorneys' fees) and liabilities incurred by Assignor in connection with or arising in any manner from Assignee's performance or non-performance of obligations assumed under this Assignment Agreement.

7. <u>Subsequent Assignments</u>. After the Assignment Effective Date, Assignee shall have the right, pursuant to Section 11.10 of the Credit Agreement to assign the rights which are assigned to Assignee hereunder, provided that (a) any such subsequent assignment does not violate any of the terms and conditions of the Credit Agreement, any of the Related Writings, or any law, rule, regulation, order, writ, judgment, injunction or decree and that any consent required under the terms of the Credit Agreement or any of the Related Writings has been obtained, (b) the assignee under such assignment from Assignee shall agree to assume all of Assignee's obligations hereunder in a manner satisfactory to Assignor, and (c) Assignee is not thereby released from any of its obligations to Assignor hereunder.

8. <u>Reductions of Aggregate Amount of Commitments</u>. If any reduction in the Total Commitment occurs between the date of this Assignment Agreement and the Assignment Effective Date, the percentage of the Total Commitment assigned to Assignee shall remain the percentage specified in Section 1 hereof and the dollar amount of the Commitment of Assignee shall be recalculated based on the reduced Total Commitment.

9. <u>Acceptance of Agent; Notice by Assignor</u>. This Assignment Agreement is conditioned upon the acceptance and consent of Collateral Agent and, if necessary pursuant to Section 11.10 of the Credit Agreement, upon the acceptance and consent of the Borrowers; provided that the execution of this Assignment Agreement by Collateral Agent and, if necessary, by the Borrowers is evidence of such acceptance and consent.

10. <u>Entire Agreement</u>. This Assignment Agreement embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

11. <u>Governing Law</u>. This Assignment Agreement shall be governed by the laws of the State of Ohio, without regard to conflicts of laws.

12. <u>Notices</u>. Notices shall be given under this Assignment Agreement in the manner set forth in the Credit Agreement. For the purpose hereof, the addresses of the parties hereto

(until notice of a change is delivered) shall be the address set forth under each party's name on the signature pages hereof.

13. <u>Counterparts</u>. This Assignment Agreement may be executed in any number of counterparts, by different parties hereto in separate counterparts and by facsimile signature, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

[Remainder of page intentionally left blank.]

14.   JURY TRIAL WAIVER.  EACH OF THE UNDERSIGNED, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, AMONG AGENT, ANY OF THE LENDERS, AND ANY OF THE BORROWERS, OR ANY THEREOF, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG EACH OF THEM IN CONNECTION WITH THIS INSTRUMENT OR ANY NOTE OR OTHER AGREEMENT, INSTRUMENT OR DOCUMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH OR THE TRANSACTIONS RELATED HERETO. THIS WAIVER SHALL NOT IN ANY WAY AFFECT, WAIVE, LIMIT, AMEND OR MODIFY COLLATERAL AGENT'S OR ANY LENDER'S ABILITY TO PURSUE REMEDIES PURSUANT TO ANY CONFESSION OF JUDGMENT OR COGNOVIT PROVISION CONTAINED IN ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT AMONG THE BORROWERS, COLLATERAL AGENT AND THE LENDERS, OR ANY THEREOF.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement by their duly authorized officers as of the date first above written.

ASSIGNOR:

Address:_____
        Attn:_____   By:_____
        Phone:_____   Name:_____
        Fax:_____   Title:_____


ASSIGNEE:

Address:_____   _____
        Attn:_____
        Phone:_____   By:_____
        Fax:_____   Name:_____
                                    Title:_____

Accepted and Consented to this \_\_\_ day
of \_\_\_, 20\_\_:

THE HUNTINGTON NATIONAL BANK,
  As Collateral Agent


By:_____
Name:_____
Title:_____

Accepted and Consented to this ___ day
of _____, 20__:


[INSERT SIGNATURES OF THE BORROWERS
IF REQUIRED]


**GISSING NORTH AMERICA LLC,**
 a Delaware limited liability company


By: _____
Name: _____
Title: _____

**GISSING TECHNOLOGIES LLC,**
 a Delaware limited liability company


By: _____
Name: _____
Title: _____

**GISSING SIDNEY LLC,**
 a Delaware limited liability company


By: _____
Name: _____
Title: _____

**GISSING SUMTER LLC,**
 a Delaware limited liability company


By: _____
Name: _____
Title: _____

**GISSING AUBURN LLC,**
 a Delaware limited liability company


By: _____
Name: _____
Title: _____

**GISSING TECHNOLOGIES MEXICO LLC,**
 a Delaware limited liability company


By: _____
Name: _____
Title: _____

**GISSING FREMONT LLC,**
 a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GISSING GREENVILLE LLC,**
 a Delaware limited liability company

By: _____
Name: _____
Title: _____

{10584541:5 } I-8

4867-2680-0173_2

ANNEX 1
TO
TO ASSIGNMENT AND ACCEPTANCE AGREEMENT

On and after the Assignment Effective Date, after giving effect to all other assignments being made by Assignor on the Assignment Effective Date, the Commitment of Assignee, and, if this is less than an assignment of all of Assignor's interest, Assignor, shall be as follows:

I.      INTEREST BEING ASSIGNED TO ASSIGNEE

     A.      <u>Revolving Credit Commitment</u>

        Assigned Amount              $0.00

II.     ASSIGNEE'S COMMITMENT (as of the Assignment Effective Date)

     A.      <u>Revolving Credit Commitment</u>

        Applicable Commitment Percentage of
           Revolving Credit Commitment     0%
        Assignee's amount of the Revolving Credit
           Commitment             $0.00

## SCHEDULE 1
## COMMITMENTS OF LENDERS

| | REVOLVING CREDIT COMMITMENT PERCENTAGE | INTERIM ORDER COMMITMENT | FINAL ORDER COMMITMENT |
|---|---|---|---|
| The Huntington National Bank | 59.01639344% | $5,193,442.62 | $17,704,918.03 |
| Comerica Bank | 40.98360656% | $3,606,557.38 | $12,295,081.97 |
| TOTALS | 100% | $8,800,000.00 | $30,000,000.00 |

## SCHEDULE 3
## OWNED REAL PROPERTY

125 Allied Road, Auburn, Maine 04210, owned by Gissing Technologies LLC
320 Neeley Street, Sumter, South Carolina 29150, owned by Gissing Technologies LLC

## SCHEDULE 4
## PLEDGED SECURITIES

| Subsidiary Name | Owner Name | Percentage Interest | State of Formation and Identification Number | State(s) Qualified to Do Business |
|---|---|---|---|---|
| DTI Molded Products, Inc. | Gissing North America LLC (formerly known as ConForm Gissing International, LLC) | 100% | MI - 800116241 | Michigan |
| Gissing Technologies LLC | Gissing North America LLC (formerly known as ConForm Gissing International, LLC) | 100% | DE - 3692965 | Delaware, Michigan, Ohio, Maine, South Carolina |
| Gissing Sidney LLC | Gissing North America LLC (formerly known as ConForm Gissing International, LLC) | 100% | DE – 5458356 | Delaware, Michigan, Ohio |
| Gissing Sumter LLC | Gissing Technologies LLC (formerly known as Formed Fiber Technologies, LLC) | 100% | DE – 5458350 | Delaware, Michigan South Carolina |
| Gissing Auburn LLC | Gissing Technologies LLC (formerly known as Formed Fiber Technologies, LLC) | 100% | DE – 5458358 | Delaware, Michigan, Maine |
| Gissing Technologies Mexico LLC | Gissing Technologies LLC (formerly known as Formed Fiber Technologies, LLC) | 100% | DE - 6087107 | Delaware |
| Gissing Guanajuato S. de R.L. de C.V. | Gissing Technologies LLC (formerly known as Formed Fiber | 0.03% | Mexico | Mexico |

| Subsidiary Name | Owner Name | Percentage Interest | State of Formation and Identification Number | State(s) Qualified to Do Business |
|---|---|---|---|---|
| | Technologies, LLC) | | | |
| Gissing Guanajuato S. de R.L. de C.V. | Gissing Technologies Mexico LLC (formerly known as Formed Fiber Technologies – Mexico, LLC) | 99.97% | Mexico | Mexico |
| Gissing Mexico S. de R.L. de C.V. | Gissing Technologies Mexico LLC (formerly known as Formed Fiber Technologies- Mexico, LLC) | 0.03% | Mexico | Mexico |
| Gissing Mexico S. de R.L. de C.V. | Gissing North America LLC (formerly known as ConForm Gissing International, LLC) | 99.97% | Mexico | Mexico |
| Gissing Fremont LLC | Gissing Technologies LLC (formerly known as Formed Fiber Technologies, LLC) | 100% | DE - 4415921 | Delaware, Michigan, California |
| Gissing Greenville LLC | Gissing Technologies LLC (formerly known as Formed Fiber Technologies, LLC) | 100% | DE - 4415762 | Delaware, Michigan, South Carolina |

**SCHEDULE 5**
**PLEDGED NOTES**

None.

<u>**SCHEDULE 5.9**</u>
<u>**PERMITTED LIENS**</u>

1. Liens under that certain Access and Security Agreement dated as of July 18, 2022 by and between General Motors, LLC, Toyota Motor Engineering & Manufacturing North America, Inc., Grantors, DTI Molded Products, Inc., and Conform Automotive, LLC and documents related thereto.
2. Delaware UCC No. 20210681493 filed December 29, 2021 by FRIMO, Inc. against Gissing Greenville LLC and Gissing North America LLC
3. Delaware UCC No. 20220926550 filed February 2, 2022 by Advanced Engineering Solutions, Inc. against Gissing North America LLC
4. Michigan UCC No. 20211229000100-6 filed December 29, 2021 by FRIMO, Inc. against Gissing North America LLC and Gissing Greenville LLC
5. Delaware UCC No. 20191636633 filed March 8, 2019 by Gissing Automotive Systems, LLC against Conform Gissing International, LLC
6. Delaware UCC No. 20192184849 filed March 29, 2019 by Gissing Automotive Systems, LLC against Conform Gissing International, LLC
7. Delaware UCC No. 20186227017 filed September 10, 2018 by De Lage Landen Financial Services, Inc. against Gissing Technologies LLC
8. Delaware UCC No. 20202571257 filed April 9, 2020 by Bank of the West against Gissing Technologies LLC
9. Delaware UCC No. 20202572149 filed April 9, 2020 by Bank of the West against Gissing Technologies LLC
10. Delaware UCC No. 2020257222 filed April 9, 2020 by Bank of the West against Gissing Technologies LLC
11. Delaware UCC No. 20202572354 filed April 9, 2020 by Bank of the West against Gissing Technologies LLC
12. Maine UCC No. 20200107109000173 filed January 7, 2020 by Toyota Industries Commercial Finance, Inc. against Gissing Technologies LLC
13. Maine UCC No. 20200519109000106 filed May 19, 2020 by Reko International Group Inc. against Gissing Technologies LLC
14. Delaware UCC No. 20180755872 filed February 1, 2018 by Steven B. Phillips, William H. Vaughn, and Gissing Automotive Systems, LLC against Formed Fiber Technologies, LLC
15. Delaware UCC No. 20195922609 filed August 26, 2019 by Reko International Group Inc. against Formed Fiber Technologies, LLC
16. Delaware UCC No. 20203513340 filed May 19, 2020 by Reko International Group Inc. against Formed Fiber Technologies, Inc. and Gissing Sidney LLC
17. Delaware UCC No. 20225294970 filed June 24, 2022 by Skylark Machine, Inc. against Gissing Sidney LLC
18. Ohio UCC No. OH00240051249 filed May 19, 2020 by Reko International Group Inc. against Gissing Sidney LLC
19. Ohio UCC No. OH00264456073 filed June 24, 2022 by Skylark Machine, Inc. against Gissing Sidney LLC

**SCHEDULE 6.1**
**CORPORATE EXISTENCE; SUBSIDIARIES; FOREIGN QUALIFICATION**

1.     **Gissing North America LLC (f/k/a ConForm Gissing International, LLC)**

    State of organization:
        Delaware

    Foreign jurisdictions:
        Michigan

    Direct Subsidiaries:
        DTI Molded Products, Inc.
        Gissing Sidney LLC
        Gissing Technologies LLC
        Gissing Mexico S. de R.L. de C.V.

    Indirect Subsidiaries:
        Gissing Auburn LLC
        Gissing Sumter LLC
        Gissing Fremont LLC
        Gissing Greenville LLC
        Gissing Technologies Mexico LLC
        Gissing Guanajuato S. de R.L. de C.V.

    Equity Owners:
        Gissing Automotive Systems, LLC, a Michigan limited liability company (92%)
        Steven B. Phillips (4%)
        William H. Vaughn (4%)

    Address of chief executive office and principal place of business:
        32500 Telegraph Rd., Suite 207
        Bingham Farms, MI 48025

2.     **Gissing Technologies LLC (f/k/a/ Formed Fiber Technologies, LLC)**

    State of organization:
        Delaware

    Foreign jurisdictions:
        Michigan
        Maine
        Ohio
        South Carolina

    Direct Subsidiaries:
        Gissing Auburn LLC
        Gissing Sumter LLC
        Gissing Fremont LLC
        Gissing Greenville LLC
        Gissing Technologies Mexico LLC

Indirect Subsidiaries:
    Gissing Guanajuato S. de R.L. de C.V.

Equity Owners:
    Gissing North America LLC, a Delaware limited liability company (100%)

Address of chief executive office and principal place of business:
    32500 Telegraph Rd., Ste. 207
    Bingham Farms, MI 48025

**3.**    **Gissing Auburn LLC (f/k/a FFT Auburn, LLC)**

State of organization:
    Delaware

Foreign jurisdictions:
    Maine
    Michigan

Subsidiaries:
    None

Equity Owners:
    Gissing Technologies LLC, a Delaware limited liability company (100%)

Address of chief executive office and principal place of business:
    125 Allied Road
    Auburn, Maine 04210

**4.**    **Gissing Sidney LLC (f/k/a/ FFT Sidney, LLC)**

State of organization:
    Delaware

Foreign jurisdictions:
    Michigan
    Ohio

Subsidiaries:
    None

Equity Owners:
    Gissing North America LLC, a Delaware limited liability company (100%)

Address of chief executive office and principal place of business:
    1630 Ferguson Court
    Sidney, Ohio 45365

5. **Gissing Sumter LLC (f/k/a/ FFT Sumter, LLC)**

State of organization:
    Delaware

Foreign jurisdictions:
    Michigan
    South Carolina

Subsidiaries:
    None

Equity Owners:
    Gissing Technologies LLC, a Delaware limited liability company (100%)

Address of chief executive office and principal place of business:
    320 Neeley Street
    Sumter, SC 29150

6. **Gissing Technologies Mexico LLC (f/k/a/Formed Fiber Technologies – Mexico, LLC)**

State of organization:
    Delaware

Foreign jurisdictions:
    None

Subsidiaries:
    Gissing Guanajato S. de R.L. de C.V. (99.97%)

Equity Owners:
    Gissing Technologies LLC, a Delaware limited liability company (100%)

Address of chief executive office and principal place of business:
    32500 Telegraph Rd., Suite 207
    Bingham Farms, MI 48025

7. **Gissing Fremont LLC**

State of organization:
    Delaware

Foreign jurisdictions:
    California
    Michigan

Subsidiaries:
    None

Equity Owners:
    Gissing Technologies LLC, a Delaware limited liability company (100%)

Address of chief executive office and principal place of business:
    6815 Mowry Avenue
    Newark, CA 94560

**8.     <u>Gissing Greenville LLC</u>**

State of organization:
    Delaware

Foreign jurisdictions:
    Michigan
    South Carolina

Subsidiaries:
    None

Equity Owners:
    Gissing Technologies LLC, a Delaware limited liability company (100%)

Address of chief executive office and principal place of business:
    189 Milacron Drive
    Fountain Inn, SC 29644

**SCHEDULE 6.4**
**LITIGATION AND ADMINISTRATIVE PROCEEDINGS**

1. *Mitsuiya Industries Co., Ltd. v. Gissing North America, LLC, et al.*, Case No. 2:20-cv-10941 (United States District Court for the Eastern District of Michigan, filed April 16, 2020)
2. *Atco Industries Inc. v. Gissing North America*, Case No. 2022-192648-CB (Oakland County Circuit Court, Michigan, filed February 18, 2022)
3. *Frimo Inc. v. Gissing North America*, Case No. 2022-193085-CB (Oakland County Circuit Court, Michigan, filed April 28, 2022)
4. *HQS Automotive Inc. v. Gissing North America*, Case No. 2022-193837-CB (Oakland County Circuit Court, Michigan, filed April 26, 2022)
5. *Century Tool & Gage v Gissing North America*, Case No. 2022-195227-CB (Oakland County Circuit Court, Michigan, filed July 22, 2022)

**<u>SCHEDULE 6.5</u>**
**<u>REAL ESTATE OWNED</u>**

125 Allied Road, Auburn, Maine 04210, owned by Gissing Technologies LLC
320 Neeley Street, Sumter, South Carolina 29150, owned by Gissing Technologies LLC

## SCHEDULE 6.9
## LOCATIONS

*Owned Real Property:*

    125 Allied Road, Auburn, Maine 04210

    320 Neeley Street, Sumter, South Carolina 29150

*Leased Real Property:*

    1630 Ferguson Court, Sidney, Ohio 45365

    181 Peacock Hill RD, New Gloucester ME 04260

    32500 Telegraph Road, Suite 207, Bingham Farms, MI 48025

    6815 Mowry Avenue, Newark, CA 94560

    189 Milacron Drive, Fountain Inn, SC 29644

    28031 Grand Oaks Court, Wixom, MI 48393

*Third Party Locations:*

| | |
|---|---|
| Allen Manufacturing Inc. | Complex 41 Canal Street<br>Lewiston, ME 04240 |
| Fiber Conversions | 21 East Elm Street<br>Broadalbin, NY 12025 |
| Vistech Manufacturing | 114 Packham Ave.<br>Stratford, ON Canada |
| Advanced Interior Solutions , Inc. | 250 Advanced Drive<br>Springboro, OH 45066 |
| Alliance Interiors | 4521 West Mt. Hope<br>Lansing, MI 48917 |
| Gissing Guanajuato S. de R.L. de C.V. | Circuito de Las Colinas #321, Manzana 4, Lote 30<br>Parque Industrial Colinas de León<br>León Guanajuato CP 37430<br>Mexico |

## SCHEDULE 6.11
## EMPLOYEE BENEFITS PLANS

1. Empower Retirement – Gissing North America 401(k) Plan
2. Blue Cross Blue Shield of Michigan – Health and Vision
3. Delta Dental of Michigan – Dental
4. Dearborn Group – Disability
5. Cincinnati Life – Life Insurance
6. Patriot Insurance Company – Car and Home
7. Nationwide Mutual Insurance Company – Pet Insurance
8. MetLife – Legal Plan

## SCHEDULE 6.16
## MATERIAL AGREEMENTS

1. Third Amended and Restated Subordinated Promissory Note dated as of June 18, 2019 made by Gissing North America LLC in favor of Gissing Automotive Systems LLC, Steven B. Phillips, and William H. Vaughn
2. First Amended and Restated Subordinated Promissory Note dated as of June 18, 2019 made by Gissing North America LLC in favor of Gissing Automotive Systems, LLC
3. Accommodation Agreement dated as of July 18, 2022 between Borrowers, General Motors LLC, Toyota Motor Engineering & Manufacturing, Inc., BMW SLP S.A. de C.V., and the Agent
4. Tesla's Joinder to Accommodation Agreement and Access Agreement dated as of July 29, 2022 between Borrowers, Tesla, Inc., General Motors LLC, Toyota Motor Engineering & Manufacturing, Inc., BMW SLP S.A. de C.V., and the Agent

## SCHEDULE 6.17
## INTELLECTUAL PROPERTY

Trademarks:

| Mark* | Country | US Serial Number | Registration Date | Record Owner |
|---|---|---|---|---|
| ULTRA G | USA | 90499395 | 12/14/2021 | Gissing North America, LLC |
| eLOFT | USA | 85033919 | 12/27/2011 | Gissing Technologies, LLC |
| ecoStaple | USA | 85382415 | 3/6/2012 | Gissing Technologies, LLC |
| COLOR-FI | USA | 78479660 | 11/22/2005 | Gissing Technologies, LLC |
| COLORGUARD | USA | 76196472 | 5/18/2004 | Gissing Technologies, LLC |
| MAT-FORM | USA | 73592907 | 12/30/1986 | Gissing Technologies, LLC |
| CON-FORM | USA | 73443795 | 2/26/1985 | Gissing Technologies, LLC |
|  | USA | 90770790 | 6/28/2022 | Gissing North America, LLC |

*Borrowers have filed trademark registrations in other countries in respect of some or all of the above-listed trademarks.

License Agreements:
- Software License Agreement between Formed Fiber Technologies, Inc. and Infor (US), Inc. dated April 30, 2004, as amended on or about February 17, 2016 and March 1, 2016.
- IQMS Software License and Support Services Agreement dated July 30, 2015 between IQMS and FFT Holdings, LLC.
- Microsoft Agreement dated March 2, 2011 between Formed Fiber Technologies and Microsoft Licensing, GP.
- Volume Licensing – Enterprise Agreement and Enrollment - updated Statement between Microsoft and FFT Holdings, LLC dated February 28, 2014 as further evidenced by the Volume Licensing Agreement (Agreement # E6266898) dated March 1, 2014.
- Invoice to Master Agreement with SoftwareOne by Formed Fiber Technologies dated February 24, 2014.
- Patent License Agreement dated as of January 1, 2021 by and between Gissing Automotive Systems, LLC and Gissing North America LLC

Domain Names and Websites:
FORMEDFIBER.Com
COLORFI.COM
Gissinggroup.com

## SCHEDULE 6.18
## INSURANCE

| Type of Insurance | Amount of Insurance | Expiration Date |
|---|---|---|
| Corporate Risk / Domestic Property (Chubb) | $100,000,000 | 8/21/2022 |
| Workers Comp (MEMIC) | $1,000,000 per accident | 8/21/2022 |
| Workers Comp (Ohio Bureau of WC) | | 8/21/2022 |
| D&O (AXIS) | $10,250,000 | 11/1/2022 |
| Foreign (AIG) | $4,000,000 | 8/21/2022 |
| Cyber (Cowbell) | $1,000,000 | 5/15/2023 |
| Terrorism (Hiscox) | $100,000,000 | 8/21/2022 |
| Flood (Auto Owners) | $500,000 building, $500,000 contents | 8/21/2022 |
| Auto (Travelers) | | 8/21/2022 |

## SCHEDULE 6.19
## DEPOSIT ACCOUNTS

| Borrower | Bank | Contact Information | Account Number | Purpose |
|---|---|---|---|---|
| Gissing North America LLC | Huntington Bank | Nelson Raucher (412) 667-6483 Candace Sulea (216) 515-0784 | 01668429048 | Deposit Account |
| Gissing North America LLC | Huntington Bank | Nelson Raucher (412) 667-6483 Candace Sulea (216) 515-0784 | 01668429051 | Operating Account |
| Gissing Sidney LLC | Huntington Bank | Nelson Raucher (412) 667-6483 Candace Sulea (216) 515-0784 | 01598372058 | Not utilized |
| Gissing North America LLC | Huntington Bank | Nelson Raucher (412) 667-6483 Candace Sulea (216) 515-0784 | 01668464595 | Cash Disbursement Account for paper checks |
| Gissing North America LLC | Huntington Bank | Nelson Raucher (412) 667-6483 Candace Sulea (216) 515-0784 | 01668464634 | Cash Disbursement payroll account for paper checks |

Annex 1
Form of Budget

See attached.

| Gissing North America DIP Budget & Borrowing Base USD in Thousands W/E --> | 1 Proj. 8/7/22 | 2 Proj. 8/14/22 | 3 Proj. 8/21/22 | 4 Proj. 8/28/22 | 5 Proj. 9/4/22 | 6 Proj. 9/11/22 | 7 Proj. 9/18/22 | 8 Proj. 9/25/22 | 9 Proj. 10/2/22 | 10 Proj. 10/9/22 | 11 Proj. 10/16/22 | 12 Proj. 10/23/22 | 13 Proj. 10/30/22 | Proj. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Debtor-in-Possession Budget** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| Production | 1,194 | 2,539 | 2,126 | 3,219 | 2,145 | 2,442 | 2,819 | 3,167 | 2,322 | 2,377 | 2,398 | 2,391 | 2,772 | 31,912 |
| Customer Funding | 4,107 | - | - | 1,985 | - | 3,972 | - | - | 4,106 | - | - | - | - | 14,170 |
| Miscellaneous | - | - | - | - | - | - | - | - | - | - | - | - | 115 | 115 |
| **Total Receipts** | 5,300 | 2,539 | 2,126 | 5,204 | 2,145 | 6,414 | 2,819 | 3,167 | 6,429 | 2,377 | 2,398 | 2,391 | 2,887 | 46,197 |
| **Disbursements** | | | | | | | | | | | | | | |
| Materials | (1,471) | (1,377) | (1,358) | (1,414) | (1,452) | (1,403) | (1,359) | (1,428) | (1,334) | (1,380) | (1,340) | (1,310) | (1,310) | (17,937) |
| Personnel | (276) | (550) | (550) | (553) | (300) | (300) | (550) | (550) | (550) | (300) | (550) | (550) | (550) | (6,129) |
| Freight | (263) | (229) | (247) | (191) | (299) | (278) | (282) | (307) | (241) | (233) | (223) | (223) | (223) | (3,239) |
| Facility | (432) | (282) | (88) | (128) | (150) | (138) | (146) | (153) | (124) | (124) | (120) | (115) | (115) | (2,113) |
| Contract Services | (285) | (106) | (102) | (101) | (99) | (99) | (103) | (103) | (103) | (103) | (103) | (101) | (98) | (1,505) |
| Rent | (3) | (3) | (3) | (3) | (160) | (3) | (3) | (3) | (160) | (3) | (3) | (3) | (3) | (348) |
| Tooling | (238) | - | - | - | - | - | - | (3) | - | - | - | - | - | (241) |
| Mexico Funding | (755) | (600) | (845) | (1,190) | (535) | (475) | (1,170) | (605) | (660) | (475) | (600) | (875) | (700) | (9,485) |
| Professional Fees | (848) | (42) | (42) | (64) | (363) | (60) | (62) | (42) | (570) | (41) | (749) | (41) | (2,483) | (5,408) |
| Debt Service | (372) | (300) | - | - | (413) | - | - | - | (397) | - | - | - | - | (1,481) |
| Taxes | (27) | - | - | (40) | (370) | - | - | (40) | (20) | - | - | (40) | (20) | (557) |
| Capital Expenditures | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (130) |
| All Other | (4) | (1) | (4) | (2) | (4) | (4) | (11) | (11) | (11) | (12) | (11) | (10) | (9) | (99) |
| **Total Disbursements** | (4,982) | (3,500) | (3,250) | (3,697) | (4,155) | (2,776) | (3,695) | (3,254) | (4,181) | (2,679) | (3,707) | (3,276) | (5,520) | (48,672) |
| **Net Cash Flow** | 318 | (961) | (1,124) | 1,507 | (2,010) | 3,638 | (876) | (87) | 2,247 | (302) | (1,309) | (886) | (2,632) | (2,476) |
| NCF Excluding Customer Funding | (3,788) | (961) | (1,124) | (478) | (2,010) | (334) | (876) | (87) | (1,859) | (302) | (1,309) | (886) | (2,632) | (16,645) |
| **Borrowing Base** | | | | | | | | | | | | | | |
| **Accounts Receivable Roll-Forward** | | | | | | | | | | | | | | |
| Beginning Balance - AR | 12,293 | 13,258 | 13,142 | 13,311 | 12,383 | 12,555 | 12,361 | 11,790 | 10,871 | 10,919 | 10,912 | 10,884 | 10,864 | 12,293 |
| [+] Sales | 2,389 | 2,474 | 2,347 | 2,342 | 2,369 | 2,300 | 2,300 | 2,300 | 2,422 | 2,422 | 2,422 | 2,422 | 2,422 | 30,929 |
| [-] Collections | (1,424) | (2,591) | (2,178) | (3,271) | (2,196) | (2,494) | (2,870) | (3,219) | (2,374) | (2,429) | (2,450) | (2,442) | (2,824) | (32,760) |
| Ending Balance - AR | 13,258 | 13,142 | 13,311 | 12,383 | 12,555 | 12,361 | 11,790 | 10,871 | 10,919 | 10,912 | 10,884 | 10,864 | 10,462 | 10,462 |
| [-] Other AR Ineligibles | (5,857) | (5,857) | (5,857) | (5,774) | (5,774) | (5,774) | (5,774) | (4,960) | (4,960) | (4,960) | (4,960) | (4,832) | (4,832) | (4,832) |
| Eligible Receivables | 7,400 | 7,284 | 7,453 | 6,608 | 6,781 | 6,586 | 6,016 | 5,911 | 5,959 | 5,952 | 5,925 | 6,032 | 5,630 | 5,630 |
| Advance Rate (%) - AR | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% | 87.4% |
| AR Availability | 6,464 | 6,363 | 6,511 | 5,772 | 5,923 | 5,753 | 5,255 | 5,163 | 5,205 | 5,199 | 5,175 | 5,269 | 4,918 | 4,918 |
| **Inventory Roll-Forward** | | | | | | | | | | | | | | |
| Ending Balance - Inv. | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 | 6,688 |
| [-] Inv. Ineligibles | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) | (1,247) |
| Eligible Inventory | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 | 5,440 |
| Advance Rate (%) - Inv. | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% |
| Inventory Availability | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 | 2,992 |
| **Reserves** | | | | | | | | | | | | | | |
| Real Estate | (1,492) | (1,492) | (1,492) | (1,492) | (1,142) | (1,142) | (1,142) | (1,142) | (1,142) | (1,142) | (1,142) | (1,142) | (1,142) | (1,142) |
| Payroll | (850) | (850) | (850) | (850) | (850) | (850) | (850) | (850) | (850) | (850) | (850) | (850) | (850) | (850) |
| Professional Fees - BK | | (270) | (500) | (730) | (685) | (915) | (1,145) | (1,375) | (1,330) | (1,560) | (1,242) | (1,542) | - | - |
| **Total Reserves** | (2,342) | (2,612) | (2,842) | (3,072) | (2,677) | (2,907) | (3,137) | (3,367) | (3,322) | (3,552) | (3,234) | (3,534) | (1,992) | (1,992) |
| **Total Available Collateral** | 7,114 | 6,743 | 6,661 | 5,692 | 6,238 | 5,838 | 5,110 | 4,789 | 4,876 | 4,640 | 4,933 | 4,727 | 5,918 | 5,918 |
| **Revolver Availability** | | | | | | | | | | | | | | |
| **Revolver Roll-Forward (Excl. Funding)** | | | | | | | | | | | | | | |
| Beginning Balance | 3,421 | 3,103 | 4,064 | 5,187 | 3,680 | 5,690 | 2,052 | 2,928 | 3,015 | 768 | 1,070 | 2,379 | 3,265 | 3,421 |
| Net Cash (In) Out | (318) | 961 | 1,124 | (1,507) | 2,010 | (3,638) | 876 | 87 | (2,247) | 302 | 1,309 | 886 | 2,632 | 2,476 |
| Ending Balance | 3,103 | 4,064 | 5,187 | 3,680 | 5,690 | 2,052 | 2,928 | 3,015 | 768 | 1,070 | 2,379 | 3,265 | 5,897 | 5,897 |
| Total Available Collateral | 7,114 | 6,743 | 6,661 | 5,692 | 6,238 | 5,838 | 5,110 | 4,789 | 4,876 | 4,640 | 4,933 | 4,727 | 5,918 | 5,918 |
| **Net Availability** | 4,012 | 2,679 | 1,473 | 2,012 | 548 | 3,786 | 2,181 | 1,773 | 4,108 | 3,570 | 2,555 | 1,463 | 21 | 21 |

CONFIDENTIAL DRAFT - SUBJECT TO MATERIAL CHANGE

**File** (over col 1) ... **§363** (over col 13)

| | W/E --> | 1 Proj. 8/7/22 | 2 Proj. 8/14/22 | 3 Proj. 8/21/22 | 4 Proj. 8/28/22 | 5 Proj. 9/4/22 | 6 Proj. 9/11/22 | 7 Proj. 9/18/22 | 8 Proj. 9/25/22 | 9 Proj. 10/2/22 | 10 Proj. 10/9/22 | 11 Proj. 10/16/22 | 12 Proj. 10/23/22 | 13 Proj. 10/30/22 | Proj. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BK Pro Fees - Accrual** | | | | | | Deadline | | | Submit | | | Pay | | Final | |
| Riveron - Debtor CRO | | 250 | 80 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 1,155 |
| Wolfson Bolton - Debtor Counsel | | 210 | 100 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 1,135 |
| Kerr Russell - Debtor Counsel | | 35 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 95 |
| McDonald Hopkins - HNB Counsel | | 90 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 50 | 50 | 440 |
| Bodman - Comerica Counsel | | 34 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 50 | 50 | 384 |
| A&M - Lender Financial Advisor | | 185 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 45 | 45 | 525 |
| Livingstone Partners - I-Banker | | 25 | | | | 25 | | | | 25 | | | | 25 | 100 |
| Filing Fee | | | 10 | | | | | | | | | | | | 10 |
| US Trustee Fees | 0.80% | | | | | | | | | 228 | | | | 121 | 350 |
| Epiq - Claims Agent | | | 20 | 20 | 40 | 40 | 40 | 40 | 20 | 20 | 20 | 20 | 20 | 20 | 320 |
| UCC - Counsel | | | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 300 |
| UCC - Financial Advisor | | | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 300 |
| **Total Professional Fees - Accrual** | | 829 | 340 | 300 | 320 | 345 | 320 | 320 | 300 | 553 | 300 | 300 | 370 | 516 | 5,113 |
| **BK Pro Fees - Cash** | | | | | | Deadline | | | Submit | | | Pay | | Final | |
| Riveron - Debtor CRO | | 250 | | | | | | | | | | 244 | | 661 | 1,155 |
| Wolfson Bolton - Debtor Counsel | | 210 | | | | | | | | | | 260 | | 665 | 1,135 |
| Kerr Russell - Debtor Counsel | | 35 | | | | | | | | | | 16 | | 44 | 95 |
| McDonald Hopkins - HNB Counsel | | 90 | | | | 100 | | | | 100 | | | | 150 | 440 |
| Bodman - Comerica Counsel | | 34 | | | | 100 | | | | 100 | | | | 150 | 384 |
| A&M - Lender Financial Advisor | | 185 | | | | 100 | | | | 100 | | | | 140 | 525 |
| Livingstone Partners - I-Banker | | 25 | | | | | | | | | | 20 | | 55 | 100 |
| Filing Fee | | - | | | | | | | | | | 8 | | 2 | 10 |
| US Trustee Fees | | - | | | | | | | | 228 | | | | 121 | 350 |
| Epiq - Claims Agent | | - | 20 | 20 | 40 | 40 | 40 | 40 | 20 | 20 | 20 | 20 | 20 | 20 | 320 |
| UCC - Counsel | | - | | | | | | | | | | 80 | | 220 | 300 |
| UCC - Financial Advisor | | - | | | | | | | | | | 80 | | 220 | 300 |
| **Total** | | 829 | 20 | 20 | 40 | 340 | 40 | 40 | 20 | 548 | 20 | 728 | 20 | 2,448 | 5,113 |
| Ordinary Course Pro Fees | | 19 | 22 | 22 | 24 | 23 | 20 | 22 | 22 | 22 | 21 | 21 | 21 | 35 | 295 |
| **Total Professional Fees - Cash** | | 848 | 42 | 42 | 64 | 363 | 60 | 62 | 42 | 570 | 41 | 749 | 41 | 2,483 | 5,408 |
| **_Memo - Professional Fee Reserve_** | | | | | | | | | | | | | | | |
| Non-Customer Accrual | | | 320 | 600 | 880 | 885 | 1,165 | 1,445 | 1,725 | 1,730 | 2,010 | 1,582 | 1,932 | - | |
| Less: UCC Professionals | | | (50) | (100) | (150) | (200) | (250) | (300) | (350) | (400) | (450) | (340) | (390) | - | |
| **Total Professional Fee Reserve** | | | 270 | 500 | 730 | 685 | 915 | 1,145 | 1,375 | 1,330 | 1,560 | 1,242 | 1,542 | - | |

CONFIDENTIAL DRAFT - SUBJECT TO MATERIAL CHANGE

Annex 2
Existing Mortgages

See attached.

BOOK:1147 PAGE:001826

FILED, RECORDED, INDEXED
11/23/2010   01:43:17 PM
REC. FEE:    28.00  CD FEE:       .00
STATE FEE:     .00  TOTAL FEES:  28.00
PAGES:       22
VICKI M. MCCARTHY - REGISTER OF DEEDS
SUMTER COUNTY BY: R. Carter

**THIS MORTGAGE COVERS GOODS WHICH ARE OR ARE TO BECOME FIXTURES, IS EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING AND IS TO BE FILED IN THE REAL ESTATE RECORDS.**

**TO THE EXTENT PROVIDED IN THE NOTE, INTEREST AND DISCOUNT WILL BE DEFERRED, ACCRUED OR CAPITALIZED.**

**MORTGAGE,
ASSIGNMENT OF LEASES AND RENTS,
AND SECURITY AGREEMENT**

(Maximum Principal Indebtedness Not to Exceed $22,000,000.00)

**THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT** (this "Mortgage") is made effective as of the 22nd day of October 2010 between the Mortgagor, FORMED FIBER TECHNOLOGIES, LLC, a Delaware limited liability company ("Mortgagor"), whose address is 125 Allied Road, Auburn, Maine 04211, and the Mortgagee, **FIRSTMERIT BANK, N.A.,** a national banking association ("Mortgagee"), whose address is 3 Cascade Plaza, 2nd Floor, Akron, Ohio 44308, Attention: Formed Fiber Technologies Account Manager.

WHEREAS, Mortgagor, FORMED FIBER TECNOLOGIES, INC., a Delaware corporation (individually, each a "Borrower" and, collectively, "Borrowers"), and Mortgagee are the parties to that certain Credit and Security Agreement dated as of October 22, 2010 (as heretofore and hereafter amended, replaced or supplemented, the "Credit Agreement");

WHEREAS, pursuant to the Credit Agreement, Borrowers have secured financing from the Mortgagee in an aggregate principal amount not to exceed Twenty-Two Million and 00/100 Dollars ($22,000,000), evidenced by that certain Revolving Note dated as of October 22, 2010, in the original principal amount of Twenty Million Dollars ($20,000,000) (the "Revolving

Note") and that certain Capex Note dated as of October 22, 2010, in the original principal amount of Two Million Dollars ($2,000,000) (the "Capex Note" and, together with the Revolving Note, collectively, the "Notes") , with the maturity date of the Notes secured hereby being October 21, 2013; and

WHEREAS, Mortgagee requires as a condition precedent to the making of the Loans and the effectiveness of the Credit Agreement that Mortgagor provide this Mortgage as additional security for all of each Borrower's obligations under the Credit Agreement and the Notes and the Mortgagor is willing to do so;

NOW THEREFORE, TO SECURE to Mortgagee (a) the repayment of the Obligations (as defined in the Credit Agreement), and all renewals, extensions and modifications thereof; (b) the repayment of any future advances, with interest thereon, made by Mortgagee to any Borrower pursuant to Paragraph 28 hereof (herein "Future Advances"); (c) the performance of the covenants and agreements of Borrowers contained in this Mortgage, the Credit Agreement or any other Loan Document, as applicable; (d) the payment of all other sums with interest thereon advanced in accordance herewith to protect the security of this Mortgage; and (e) the performance of the covenants and agreements of Mortgagor herein contained (all of the foregoing items (a) through (e) are collectively herein referred to as the "Obligations"), Mortgagor does hereby mortgage, grant, convey and assign to Mortgagee, as security, that certain real property located in the County of Sumter, State of South Carolina, and more particularly described in Exhibit A attached hereto and incorporated herein (the "Real Estate"):

TOGETHER with Mortgagor's right, title and interest in (a) all buildings, improvements, structures and tenements now situated or hereafter erected on said premises, , and (b) all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water, water rights, and water stock appurtenant to said premises, and (c) all fixtures, machinery, equipment, engines, boilers, incinerators, building materials, appliances and goods of every nature whatsoever now owned or hereafter acquired by Mortgagor and located in, on, or about said premises, or used or intended to be used in connection with said premises, or intended and designated (wherever located) to be incorporated into the structure(s) situated on said premises, including without limitation, Mortgagor's right, title and interest in fixtures and equipment for supplying or distributing heating, cooling, electricity, gas, water, sewage, air and light, elevators and related machinery and equipment, fire prevention and extinguishing apparatus, security and access control apparatus, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, mirrors, cabinets, paneling, unattached rugs, carpet and other attached floor coverings, furniture, furnishings, pictures, antennas, trees and plants, and all other property now owned or hereafter acquired by Mortgagor and used in or about the above-described premises; all of which, including replacements and additions thereto, being hereby deemed a part of the premises encumbered by this Mortgage and being hereinafter referred to as the "Property."

{2455415:6}

2

TO HAVE AND TO HOLD the Property unto Mortgagee, its successors and assigns, to its own proper use and benefit forever, subject, however, to the terms and conditions herein.

PROVIDED, HOWEVER, that if Mortgagor shall promptly pay or cause to be paid to Mortgagee the principal and interest payable under the Notes, at the times and in the manner stipulated therein, herein, and in all other instruments securing the Notes, all without any deduction or credit for taxes or other similar charges paid by Mortgagor, and shall keep, perform and observe all the covenants and promises in the Notes and any other Loan Document, and any renewal, extension or modification thereof, and in this Mortgage and in all other instruments securing the Notes, to be kept, performed or observed by Mortgagor, then this Mortgage, and all the properties, interest and rights hereby granted, conveyed and assigned shall cease and be void, but shall otherwise remain in full force and effect.

Mortgagor covenants that Mortgagor is lawfully seized of the real estate hereby conveyed, except for those items shown on attached Exhibit B (the "Permitted Exceptions"), and has the right to mortgage, grant, convey and assign the Property, that the Property is unencumbered, except for the Permitted Exceptions, and that Mortgagor will warrant and defend generally the title to the Property against all claims and demands, whatsoever, subject to the Permitted Exceptions.

The Credit Agreement, together with all agreements, documents and mortgages referred to therein or at any time now or hereafter executed and/or delivered in connection therewith or related thereto, including, but not limited to, this Mortgage, as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, substituted for or replaced, are collectively referred to herein as the "Loan Documents."

Mortgagor and Mortgagee covenant and agree as follows:

1.    **Payment of Principal and Interest.** Borrowers shall promptly pay when due the principal and the interest on the indebtedness evidenced by the Notes, any extensions or renewals thereof, prepayment and late charges as provided in the Notes, and the principal and interest on any of the Obligations or other sums secured by this Mortgage.

2.    **Funds for Taxes, Insurance, and Other Charges.** In the event of a default and during the continuance of any event of default on any premium payment on an insurance policy or if Mortgagor fails to pay yearly water and sewer rates and taxes or assessments when due, or if Mortgagee in its sole discretion deems it necessary, Mortgagor shall be required to pay to Mortgagee on the day any installments of principal and interest are payable under the Notes, or in such other date as Mortgagee may specify, until the Obligations are paid in full, a sum equal to a percentage, to be specified by Mortgagee, of the yearly water and sewer rates and taxes and assessments ("Funds") which may attain priority over this Mortgage, and ground rents on the Property, if any, plus a percentage, to be specified by Mortgagee, of the yearly premium

{2455415:6}                                           3

installments for hazard insurance, all as reasonably estimated initially and from time to time by Mortgagee on the basis of assessments and bills and reasonable estimates thereof. Mortgagee may require Mortgagor to pay to Mortgagee, in advance, such other Funds for other taxes, charges, premiums, assessments and impositions in connection with Mortgagor or the Property which Mortgagee shall reasonably deem necessary to protect Mortgagee's interests (collectively, "Other Impositions"). Unless otherwise provided by applicable law, Mortgagee, at Mortgagee's option, may require Funds for Other Impositions to be paid by Mortgagor in a lump sum or in periodic installments.

The Funds may be commingled with the general funds of Mortgagee who shall not be liable for interest thereon. The Funds shall be held by Mortgagee and Mortgagee shall apply the Funds to pay said rates, taxes, assessments, insurance premiums, and Other Impositions so long as Mortgagor is not in breach of any covenant or agreement of Mortgagor in this Mortgage. No interest shall be paid to Mortgagor on the Funds, and unless said agreement is made or applicable law requires such interest to be paid, Mortgagee shall not be required to pay Mortgagor any interest or earnings on the Funds. The Funds are pledged as additional security for the sums secured by this Mortgage and shall be subject to the right of set off.

If the amount of the Funds held by Mortgagee, together with future monthly installments of Funds payable prior to the due date of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents, as they fall due, such excess shall be credited to Mortgagor on periodic installments of Funds. If the amount of the Funds held by Mortgagee shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Mortgagor shall pay to Mortgagee any amount necessary to make up the deficiency within seven (7) days from the date notice is mailed by Mortgagee to Mortgagor requesting payment thereof. Nothing in this Paragraph shall be deemed to obligate Mortgagee to pay such charges when due if the Funds are insufficient or if the Mortgagor shall fail to supply Mortgagee with the proper invoice when payment is due.

Upon Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, beyond any applicable cure period, Mortgagee may apply, in any amount and in any order as Mortgagee shall determine in Mortgagee's sole discretion, any Funds held by Mortgagee at the time of application (a) to pay rents, taxes, assessments, insurance premiums and Other Impositions which are now or will hereafter become due or (b) as a credit against sums secured by this Mortgage. Upon payment in full of all sums secured by this Mortgage, Mortgagee shall, within thirty (30) days, refund to Mortgagor any Funds held by Mortgagee.

3. **Charges; Liens.** Mortgagor shall pay all water and sewer rates, taxes, liens, assessments and other charges, fines and Other Impositions attributable to the Property, and leasehold payments or ground rents, if any, by Mortgagor making payment, when due directly to the payee thereof. Mortgagor shall promptly furnish to Mortgagee all notices of amounts due

under this Paragraph, and Mortgagor shall promptly furnish Mortgagee receipts evidencing such payment. Mortgagor shall promptly discharge any lien or claim which has or may obtain priority over this Mortgage; provided that Mortgagor shall not be required to discharge any such lien so long as Mortgagor shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Mortgagee, or shall in good faith contest such lien by, or defend enforcement of such lien in, legal proceedings which operate to prevent the enforcement of the lien or forfeiture of the Property or any part thereof, to the reasonable satisfaction of Mortgagee. In the event any such lien or claim is not promptly discharged, Mortgagee may, at its option, require Mortgagor to deposit with Mortgagee such amounts or such bonds as are acceptable to Mortgagee to assure the priority of this Mortgage. Mortgagor further agrees to pay to Mortgagee any reasonable and actual costs it may advance in order to protect the priority of its lien, including, but not limited to, court costs and attorney fees. Mortgagee shall be and hereby is authorized and empowered to do, as mortgagee, all things provided to be done in the mechanic's lien law of the State of South Carolina (including Title 29, Chapter 5, of the Code of Laws of South Carolina (1976) as amended), and all acts amendatory or supplementary thereto.

4. **Hazard Insurance.** Mortgagor shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, rent loss and other casualties, liabilities, contingencies, and hazards covered by special form policies of insurance and such other hazards as Mortgagee may reasonably require or as may be required by applicable law (including flood insurance required by Paragraph 36 hereof), and in such amounts complying with Section 4.11 of the Credit Agreement and for such periods as Mortgagee may reasonably require; provided, however, that Mortgagee shall not require that the amount of such coverage exceed that amount of coverage required to pay sums secured by this Mortgage unless required by applicable law.

In the event of loss, Mortgagor shall give immediate written notice to the insurance carrier and to Mortgagee. Mortgagor hereby authorizes and empowers Mortgagee as attorney-in-fact for Mortgagor to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Mortgagee's expenses incurred in the collection of such proceeds; provided, however, that nothing contained in this Paragraph shall require Mortgagee to incur any expense or take any action hereunder. Mortgagor further authorizes Mortgagee, at Mortgagee's option, (a) to hold the balance of such proceeds to be used to reimburse Mortgagor for the cost of reconstruction or repair of the Property or (b) to apply the balance of such proceeds to the payment of the sums secured by this Mortgage, whether or not then due.

If the insurance proceeds are held by Mortgagee to reimburse Mortgagor for the cost of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition or such other condition as Mortgagee may approve in writing, which approval shall not be unreasonably withheld, delayed or conditioned. Mortgagee may, at Mortgagee's

option, condition disbursement of said proceeds on Mortgagee's approval of such plans and specifications of an architect reasonably satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen and such other evidence of costs, percentage completion of construction, application of payments, and satisfaction of liens as Mortgagee may reasonably require. If the insurance proceeds are applied to the payment of the sums secured by this Mortgage, any such application of proceeds to principal shall not extend or postpone the due dates of the monthly installments referred to in Paragraphs 1 and 2 hereof or change the amounts of such installments. If the Property is sold pursuant to Paragraph 18 hereof or if Mortgagee acquires title to the Property, Mortgagee shall have all of the right, title and interest of Mortgagor in and to any insurance policies and unearned premiums thereon and in and to the proceeds resulting from any damage to the Property prior to such sale or acquisition.

5. **Preservation and Maintenance of Property.** Mortgagor (a) shall not commit waste or permit impairment or deterioration of the Property, (b) shall not abandon the Property, (c) shall restore or repair promptly and in a good and workmanlike manner all or any part of the Property to the equivalent of its original condition, or such other condition as Mortgagee may approve in writing, in the event of any damage, injury or loss thereto, whether or not insurance proceeds are available to cover in whole or in part the costs of such restoration or repair, (d) shall keep the Property, including improvements, fixtures, equipment, machinery and appliances thereon in good repair and shall replace Mortgagor's fixtures, equipment, machinery and appliances on the Property when necessary to keep such items in good repair, (e) shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property, and (f) shall give notice in writing to Mortgagee of and, unless otherwise directed in writing by Mortgagee, appear in and defend (to the extent necessary to protect Mortgagor's and Mortgagee's respective interests in the Property) any action or proceeding purporting to affect the Property, the security of this Mortgage or the rights or powers of Mortgagee. Neither Mortgagor nor any tenant or other person shall remove or demolish any improvement now existing or hereafter erected on the Property or any fixture, equipment, machinery or appliance in or on the Property except when incident to the replacement of fixtures, equipment, machinery and appliances with items of like kind and except in connection with tenant improvements or cosmetic changes to the Property.

6. **Use of Property.** Unless required by applicable law or unless Mortgagee has otherwise agreed in writing, which agreement shall not be unreasonably withheld, delayed or conditioned, Mortgagor shall not allow changes in the use for which all or any part of the Property was intended at the time this Mortgage was executed, which use is stipulated to be for commercial purposes and any other lawful uses incidental or related thereto. Mortgagor shall not initiate or acquiesce in a change in the zoning classification of the Property without Mortgagee's prior written consent.

{2455415:6}

6

7. **Protection of Mortgagee's Security.** If Mortgagor fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which affects Mortgagee's interest in the Property, including, but not limited to, insolvency, eminent domain, foreclosure, code endorsements, deed restrictions and registrations, or arrangements or proceedings involving a bankrupt or decedent, Mortgagee at Mortgagee's option, may make such appearances, disburse such sums, and take such action as is necessary to protect Mortgagee's interest, including, but not limited to, (a) disbursement of attorney's fees, (b) entry upon the Property to make repairs, and (c) procurement of satisfactory insurance.

Any amounts disbursed by Mortgagee pursuant to this Paragraph 7, with interest thereon, shall become additional indebtedness of Mortgagor secured by this Mortgage. Unless Mortgagor and Mortgagee agree to other terms of payment, such amount shall be payable upon notice from Mortgagee to Mortgagor requesting payment thereof, and shall bear interest from the date of disbursement at the highest rate allowable under any document evidencing the Obligations. Mortgagor hereby covenants and agrees that Mortgagee shall be subrogated to the lien of any mortgage or other lien discharged, in whole or in part, by the indebtedness secured hereby. Nothing contained in this Paragraph 7 shall require Mortgagee to incur any expense or take any action hereunder.

8. **Environmental Matters.** Mortgagor represents and warrants that Mortgagor shall obtain all permits, licenses and other authorizations which are required under any Environmental Law (as hereinafter defined) and will comply, in all material respects, with all terms and conditions of the required permits, licenses and authorizations, and with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Environmental Laws.

Mortgagor shall establish and maintain, at its expense, a system to assure and monitor its continued compliance with all Environmental Laws in all of its operations at the Property, which system may include annual reviews of such compliance by employees or agents of Mortgagor who are familiar with the requirements of the Environmental Laws. Copies of all environmental surveys, audits, assessments, feasibility studies and results of remedial investigations shall be promptly furnished, or caused to be furnished, by Mortgagor to Mortgagee upon Mortgagee's request. Mortgagor shall take prompt and appropriate action to respond to any non-compliance with any of the Environmental Laws at the Property and shall regularly report to Mortgagee on such response.

Mortgagor shall give both oral and written notice to Mortgagee immediately upon the receipt by Mortgagor of any notice of, or its otherwise obtaining knowledge of (i) the occurrence of any event involving the release, spill or discharge, threatened or actual, of any Hazardous Material at the Property, or (ii) any investigation, proceeding, complaint, order, directive, claims, citation or notice with respect to: (A) any non-compliance with or violation of any Environmental Law by Mortgagor at the Property, or (B) the release, spill or discharge,

{2455415:6}                                         7

threatened or actual, of any Hazardous Material at the Property, or (C) the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials (as hereinafter defined) at the Property or (D) any other environmental, health or safety matter, which affects Mortgagor or its business, operations or assets or any properties at which it transported, stored or disposed of any Hazardous Materials at the Property.

Without limiting the generality of the foregoing, whenever Mortgagee reasonably determines that there is non-compliance, or any condition which requires any action by or on behalf of Mortgagor, in order to avoid any material non-compliance with any Environmental Law at the Property, Mortgagor shall, at Mortgagee's request and the reasonable expense of Mortgagor: (i) cause an independent environmental engineer reasonably acceptable to Mortgagee to conduct such tests of the Property where the non-compliance or alleged non-compliance with such Environmental Laws has occurred as to such non-compliance and prepare and deliver to Mortgagee a report as to such non-compliance setting forth the results of such tests, a proposed plan for responding to any environmental problems described therein, and an estimate of the costs thereof and (ii) provide to Mortgagee a supplemental report of such engineer whenever the scope of such non-compliance, or the response of Mortgagor thereto or the estimated costs thereof shall change in any material respect.

In the event of any use, spill, discharge or clean-up of any Hazardous Material on, under or at the Property or any part thereof, which could result in an order, suit or other action against Mortgagor and/or any part of the Property by any governmental agency or otherwise, or any complaint, order, citation or notice with regard to air emission, water discharges, noise emissions or any other environmental, health or safety matter affecting Mortgagor or any of the Property, and the failure of Mortgagor, after written notice, to clean up or remove such Hazardous Material or resolve such event in accordance with all applicable Environmental Laws, Mortgagee shall have the right, but not the obligation, to take such actions as it deems reasonably necessary or advisable to clean up, remove, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Material or complaint, order, citation or notice. Any and all sums expended by Mortgagee for such purposes, together with interest thereon at the then highest applicable rate payable on any of the Secured Obligations, shall be immediately due and payable by Mortgagor and shall be Secured Obligations secured by this Mortgage.

Mortgagor shall indemnify, defend and hold harmless Mortgagee and its directors, officers, employees, agents, invitees, representatives, successors and assigns from and against any and all losses, claims, damages, liabilities, costs, and expenses (including reasonable attorneys' fees and legal expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material, including, without limitation, the costs of any required or necessary repair, cleanup or other remedial work with respect to the Property and the preparation and implementation of any closure, remedial or other required plans. All

{2455415:6}

8

representations, warranties, covenants and indemnifications in this Paragraph 8 shall survive the release or satisfaction of this Mortgage or the foreclosure hereof.

For purposes hereof, the term "Hazardous Materials" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law). For purposes hereof, the term "Environmental Laws" shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to the business of Mortgagor and facilities (whether or not owned by it), including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals, or hazardous, toxic or dangerous substances, materials or wastes.

9.    **Inspections.**  Mortgagee may make or cause to be made reasonable entries upon and inspections of the Property upon reasonable advance notice.  Additionally, Mortgagee shall have the right to inspect the books and records of the operation of the Property and make copies thereof during normal business hours and upon notice to Mortgagor.  In accordance with Article 9 of the Credit Agreement, Mortgagor shall keep its books and records in accordance with generally accepted accounting principles covering the operation of the Property, and Mortgagor shall furnish to Mortgagee Mortgagor's financial statements and tax return at Mortgagee's request.

10.    **Condemnation.**  Mortgagor shall promptly notify Mortgagee of any action or proceeding relating to any condemnation or other taking, whether direct or indirect, of the Property, or part thereof, and Mortgagor shall appear in and prosecute any such action or proceedings unless otherwise directed by Mortgagee in writing.  Mortgagor authorizes Mortgagee, at Mortgagee's option, as attorney-in-fact for Mortgagor to commence, appear in and prosecute, in Mortgagee's or Mortgagor's name any action or proceeding relating to any condemnation or other taking of the Property, whether direct or indirect, and to settle or compromise any claim in connection with such condemnation or other taking. The proceeds of any award, payment or claim for damages, direct or consequential, in connection with any

{2455415:6}

condemnation or other taking, whether direct or indirect, of the Property, or part thereof, or for conveyances in lieu of condemnation, are hereby assigned to and shall be paid to Mortgagee, subject to the terms and provisions of this Mortgage.

Mortgagor authorizes Mortgagee to apply such awards, payments, proceeds or damages, after the deduction of Mortgagee's expenses incurred in the collection of such amounts, at Mortgagee's option, to restoration or repair of the Property or to payment of the sums secured by this Mortgage, whether or not then due. Unless Mortgagor and Mortgagee otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in Paragraphs 1 and 2 hereof or change the amount of such installments. Mortgagor agrees to execute such further evidence of assignment of any awards, proceeds, damages or claims arising in connection with such condemnation or taking as Mortgagee may require.

11. **Mortgagor and Lien Not Released.** From time to time, Mortgagee may, at Mortgagee's option, without giving notice to or obtaining the consent of Mortgagor, Mortgagor's successors or assigns or of any junior lienholder or guarantors, without liability on Mortgagee's part and notwithstanding Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, extend the time for payment of said indebtedness or any part thereof, reduce the payments thereon, release anyone liable on any of said indebtedness, accept a renewal note or notes therefor, modify the terms and time of payment of said indebtedness, release from the lien of this Mortgage any part of the Property, take or release other or additional security, reconvey any part of the Property, consent to any map or plan of the Property, consent to the granting of any easement, join in any extension or subordination agreement, agree in writing with Mortgagor to modify the rate of interest or period of amortization of any note, or change the amount of the monthly installments payable thereunder. Any actions taken by Mortgagee pursuant to the terms of this Paragraph shall not affect the obligation of Mortgagor or Mortgagor's successors or assigns to pay the sums secured by this Mortgage and to observe the covenants of Mortgagor contained herein, shall not affect the guaranty of any person, corporation, partnership or other entity for payment of the indebtedness secured hereby, and shall not affect the lien or priority of lien hereof on the Property. Mortgagor shall pay Mortgagee a reasonable service charge, together with such title insurance premiums and attorney's fees as may be incurred at Mortgagee's option for any such action if taken at Mortgagor's request.

12. **Forbearance by Mortgagee Not a Waiver.** Any forbearance by Mortgagee in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Mortgagee of payment of any sum secured by this Mortgage after the due date of such payment shall not be a waiver of Mortgagee's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Mortgagee shall not be a waiver of Mortgagee's right to accelerate the maturity of the indebtedness secured by this Mortgage.

{2455415:6}

10

Mortgagee's receipt of any awards, proceeds or damages under Paragraphs 4 and 10 hereof shall not operate to cure or waive Mortgagor's default in payment of sums secured by this Mortgage.

13. **Estoppel Certificate.** Mortgagor shall, within fifteen (15) days of a written request from Mortgagee, furnish Mortgagee with a written statement, duly acknowledged, setting forth the sums secured by this Mortgage and any right of set-off, counterclaim or other defense which exists against such sums and the obligations of this Mortgage.

14. **Uniform Commercial Code Security Agreement.** In addition to being a mortgage and assignment of rents, this Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code of the State of South Carolina, § 36-9-101 et seq., Code of Laws of South Carolina (1976) as amended ("Uniform Commercial Code") for any of the items specified above as part of the Property which under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants Mortgagee a security interest in said items. Mortgagor agrees that Mortgagee may file this Mortgage, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. For this purpose, the respective addresses of Mortgagor, as debtor, and Lender, as secured party, are as set forth on page 1 of this Mortgage. Any reproduction of this Mortgage or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Mortgagor agrees to execute and deliver to Mortgagee, or authorize Mortgagee to file, upon Mortgagee's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Mortgage in such form as Mortgagee may require to perfect a security interest with respect to said items. Mortgagor shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements Mortgagee may reasonably require. Without the prior written consent of Mortgagee, Mortgagor shall not create or suffer to be created pursuant to the Uniform Commercial Code any other security interest in said items, including replacements and additions thereto. Upon Mortgagor's breach of any covenant or agreement of Mortgagor contained in this Mortgage, including the covenants to pay when due all sums secured by this Mortgage, Mortgagee shall have the remedies of a secured party under the Uniform Commercial Code and, at Mortgagee's option, may also invoke the remedies provided in Paragraph 24 of this Mortgage as to such items. In exercising any of said remedies, Mortgagee may proceed against the items of real property and any items of personal property specified above as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Mortgagee's remedies under the Uniform Commercial Code or of the remedies provided in Paragraph 24 of this Mortgage.

15. **Leases of the Property.** Mortgagor shall comply with and observe Mortgagor's obligations as landlord under all leases of the Property or any part thereof. Mortgagor, at Mortgagee's request, shall furnish Mortgagee with executed copies of all leases now existing or hereafter made of all or any part of the Property, and all leases now or hereafter entered into will

{2455415:6}                                        11

be in form and substance subject to the approval of Mortgagee. Unless otherwise directed by Mortgagee, all leases of the Property shall specifically provide that such leases are subordinate to this Mortgage; that the tenant attorns to Mortgagee, such attornment to be effective upon Mortgagee's acquisition of title to the Property; that the tenant agrees to execute such further evidences of attornment as Mortgagee may from time to time request, that the attornment of the tenant shall not be terminated by foreclosure. Except as may be specifically permitted by the Credit Agreement, Mortgagor shall notify Mortgagee of its intent to (i) consent, execute, modify, surrender or terminate, either orally or in writing, any lease now existing or hereafter made, any lease of the Property, (ii) permit an assignment or sublease of such a lease, or (iii) request or consent to the subordination of any lease of all or any part of the Property to any lien subordinate to this Mortgage. If Mortgagor becomes aware that any tenant proposes to do, or is doing, any act or thing which may give rise to any right of set-off against rent, Mortgagor shall (a) take such steps as shall be reasonably calculated to prevent the accrual of any right to a set-off against and (b) notify Mortgagee thereof and of the amount of said set-offs.

Mortgagor does hereby assign to Mortgagee all leases now existing or hereafter made of all or any part of the Property and all security deposits made by tenants in connection with such leases of the Property. Mortgagee shall have all of the rights and powers possessed by Mortgagor prior to such assignment and Mortgagee shall have the right to modify, extend or terminate such existing leases and to execute new leases, in Mortgagee's sole discretion.

16.     **Remedies Cumulative.** All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage, the Notes, or as afforded by law or equity and may be exercised concurrently, independently or successively.

17.     **Acceleration in Case of Mortgagor's Insolvency.** If Mortgagor shall voluntarily file a petition under the Federal Bankruptcy Code, as such Code may from time to time be amended, or under any similar or successor Federal Statute relating to bankruptcy, insolvency, arrangements or reorganizations, or under any state bankruptcy or insolvency act, or file an answer in an involuntary proceeding admitting insolvency or failure to pay debts as they come due, or if Mortgagor shall fail within twenty (20) days to obtain a vacation, stay or dismissal of involuntary proceedings brought for the reorganization, dissolution or liquidation of Mortgagor, or if an order for relief under the Federal Bankruptcy Code shall be entered against Mortgagor, or if a trustee, receiver or custodian shall be appointed for Mortgagor, or any Mortgagor's property, or if such Property shall become subject to the jurisdiction of a Federal bankruptcy court or similar state court, or if Mortgagor, shall make an assignment for the benefit of Mortgagor's creditors, or if there is an attachment, execution or other judicial seizure of any portion of Mortgagor's assets and such seizure is not discharged within twenty (20) days, then Mortgagee may, at Mortgagee's option, declare all of the sums secured by this Mortgage to be immediately due and payable without prior notice to Mortgagor, and Mortgagee may invoke any remedies permitted by Paragraph 24 of this Mortgage. Any attorneys' fees and other expenses incurred by Mortgagee in connection with Mortgagor's bankruptcy or any of the other aforesaid

{2455415:6}                                    12

events shall be additional indebtedness of Mortgagor secured by this Mortgage pursuant to Paragraph 7 hereof.

18. **Transfer of the Property and Interest Therein.** Except as may be specifically permitted by the Credit Agreement, if all or any part of the Property or an interest therein is sold, transferred, encumbered or otherwise conveyed by Mortgagor, without Mortgagee's prior written consent, or if any contract to do any of the same is entered into by Mortgagor without Mortgagee's prior written consent, excluding the lease of all or any part of the Property in the ordinary course of Mortgagor's business, and a transfer by devise, descent or by operation of law upon the death of a joint tenant, it shall be deemed to increase the Mortgagee's risk and Mortgagee may, at Mortgagee's option, either declare all the sums secured by this Mortgage to be immediately due and payable, or may consent to said conveyance in writing and may increase the interest rate of the indebtedness evidenced by the Notes and/or impose whatever conditions it may reasonably deem necessary to compensate it for the increased risk.

Any change in the legal or beneficial ownership of Mortgagor which changes the identity of any person or persons having, directly or indirectly, more than ten percent (10%) of either the legal or beneficial ownership of Mortgagor or of the Property, shall be deemed to be a transfer within the meaning of this Paragraph. Such transfer shall not be made, created, or suffered to be made or created, without Mortgagee's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

19. **Notice.** Except for any notice required under applicable law to be given in another manner, any notice to Mortgagor provided for in this Mortgage shall be given by mailing such notice by certified or registered mail, return receipt requested, to Mortgagor at the address set forth above or as carried on the records of the Mortgagee. Any notice to Mortgagee shall be given by certified or registered mail, return receipt requested, to Mortgagee's address stated herein or to such other address as Mortgagee may designate by notice to Mortgagor as provided herein, with a copy to McDonald Hopkins LLC, 600 Superior Avenue, East, Suite 2100, Cleveland, Ohio 44114, Attention James E. Stief.

20. **Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements contained herein shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Mortgagor and Mortgagee, subject to the provision of Paragraph 19 hereof. All covenants and agreements of Mortgagor shall be joint and several. In exercising any rights hereunder or taking any actions provided for herein, Mortgagee may act through its employees, agents or independent contractors as authorized by Mortgagee.

21. **Governing Law; Severability.** This Mortgage shall be governed by the laws of South Carolina. In the event that any provision of this Mortgage or the Notes conflict with applicable law, such conflict shall not affect other provisions of this Mortgage or the Notes which can be given effect without the conflicting provisions, and to this end the provisions of

this Mortgage or the Notes are declared to be severable. In the event that any applicable law limiting the amount of interest or other charge permitted to be collected from Mortgagor is interpreted so that any charge provided for in this Mortgage or the Notes, whether considered separately or together with other charges levied in connection with this Mortgage or the Notes violates such law, and Mortgagor is entitled to the benefit of such law, such charge is hereby reduced to the extent necessary to eliminate such violation. The amounts, if any, previously paid to Mortgagee in excess of the amounts payable to Mortgagee pursuant to such charges as reduced shall be applied by Mortgagee to reduce the principal of the indebtedness evidenced by the Notes. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Mortgagor has been violated, all indebtedness which is secured by this Mortgage or evidenced by the Notes and which constitutes interest, as well as all other charges levied in connection with such indebtedness which constitute interest, shall be deemed to be uniformly allocated and spread over the stated term of the Notes.

22.    **Waiver of Statute of Limitations.** Mortgagor hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Mortgage or to any action brought to enforce the Notes or any other obligation secured by this Mortgage.

23.    **Waiver of Marshalling.** Notwithstanding the existence of any other security interests in the Property held by Mortgagee or by any other party, Mortgagee shall have the right to determine the order in which any or all of the Property shall be subjected to the remedies provided herein. Mortgagee shall have the right to determine the order in which any or all portions of the indebtedness secured hereby are satisfied from the proceeds realized upon the exercise of the remedies provided herein. Mortgagor, any party who consents to this Mortgage, and any party who now or hereafter acquires a security interest in the Property and who has actual or constructive notice hereof hereby, waives any and all right to require the marshalling of assets in connection with the exercise of any of the remedies permitted by applicable law or provided herein.

24.    **Acceleration Remedies.** Upon (a) Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, including, but not limited to, any covenant to pay when due any sums secured by this Mortgage (other than any breach of any covenant or agreement set forth in Paragraphs 3, 5 (a)-(e) and 8 hereof), (b) Mortgagor's breach of any covenant or agreement of Mortgagor as set forth in Paragraphs 3, 5 (a) – (e) and 8 hereof, which breach shall continue for fifteen (15) days from the occurrence of such breach, (c) upon an Event of Default (as defined in the Credit Agreement), or (d) breach by any Borrower of any covenant or agreement of such Borrower in the Notes, Credit Agreement, or any other Loan Document, Mortgagee at Mortgagee's option, but subject to the terms and provisions of the Credit Agreement, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding and may invoke any other remedies permitted by applicable law. Mortgagee shall be entitled to

{2455415:6}                                    14

collect all reasonable and actual costs and expenses incurred in pursuing such remedies, including, but not limited to costs of documentary evidence, abstracts and title reports.

25. **Assignment of Leases, Rents, Appointment of Receiver, Mortgagee in Possession**. As part of the consideration for the indebtedness evidenced by the Notes, Mortgagor hereby absolutely and unconditionally grants, assigns and transfers to Mortgagee all of the Mortgagor's right, title and interest in, to and under all leases, subleases, licenses, concessions, tenancies and any other agreements creating the right of possession or the right of use without a transfer of title, whether written or oral, now or hereafter existing, and covering all or any part of the Property, together with any and all security deposits made thereunder, all extensions, amendments, modifications, renewals and replacements of any thereof, and any guaranties of the lessee's, sublessee's, licensee's, concessionaire's, tenant's or user's obligations under any thereof. As further consideration for the indebtedness evidenced by the Notes, Mortgagor hereby absolutely and unconditionally assigns, grants and transfers to Mortgagee all the rents and revenues of the Property, including those now due, past due, or to become due by virtue of any lease or other agreement for the occupancy or use of all or any part of the Property, regardless of to whom the rents and revenues of the Property are payable. Mortgagor hereby authorizes Mortgagee or Mortgagee's agents to collect the aforesaid rents and revenues and hereby directs each tenant of the Property to pay such rents to Mortgagee or Mortgagee's agents; provided, however, that prior to written notice given by Mortgagee to Mortgagor of the breach by Mortgagor of any covenant or agreement in this Mortgage, Mortgagor shall collect and receive all rents and revenues of the Property as trustee for the benefit of Mortgagee and Mortgagor, to apply the rents and revenues so collected to the sums secured by this Mortgage hereof with the balance, so long as no such breach has occurred, to the account of Mortgagor, it being intended by Mortgagor and Mortgagee that this assignment of rents constitutes an absolute assignment and not an assignment for additional security only. Upon delivery of written notice by Mortgagee to Mortgagor of breach by Mortgagor of any covenant or agreement in this Mortgage, and without the necessity of Mortgagee entering upon and taking and maintaining full control of the Property in person, by agent or by a court-appointed receiver, Mortgagee shall immediately be entitled to possession of all rents and revenues of the Property as specified in this section as the same become due and payable, including but not limited to rents then due and unpaid, and all such rents shall immediately upon delivery of such notice be held by Mortgagor as trustee for the benefit of Mortgagee only; provided, however, that the written notice by Mortgagee to Mortgagor of any such breach shall contain a statement that Mortgagee exercises its rights to such rents. Mortgagor agrees that commencing upon delivery of such written notice of Mortgagor's breach by Mortgagee to Mortgagor, each tenant of the Property shall make such rents payable to and pay such rents to Mortgagee or Mortgagee's agents on Mortgagee's written demand to each tenant therefor, delivered to each tenant personally, by mail or delivering such demand to each rental unit, without any liability on the part of said tenant to inquire further as to the existence of a default by Mortgagor.

Mortgagor hereby covenants that Mortgagor has not executed any prior assignment of said rents and that Mortgagor has not performed, and will not perform, any acts or has not executed, and will not execute, any Mortgage which would prevent Mortgagee from exercising its rights under this section. At the time of execution of this Mortgage there has been no anticipation or prepayment of any of the rents of the Property for more than two (2) months prior to the due dates of such rents. Mortgagor covenants that Mortgagor will not hereafter collect or accept payment of any rents of the Property more than one (1) month prior to the due dates of such rents. Mortgagor further covenants that Mortgagor will execute and deliver to Mortgagee such further assignments of rents and revenues of the Property as Mortgagee may from time to time request.

To the extent permitted by law, upon Mortgagor's breach of any covenant or agreement in this Mortgage, Mortgagee may, in person, by agent or by a court-appointed receiver, regardless of the adequacy of Mortgagee's security, enter upon and take and maintain full control of the Property in order to perform all acts necessary and appropriate for the operation and maintenance thereof including, but not limited to, the execution, cancellation or modification of leases, the collection of all rents and revenues of the Property, the making of repairs to the Property and the execution or termination of contracts providing for the management or maintenance of the Property, all on such terms as are deemed best to protect the security of this Mortgage. In the event Mortgagee elects to seek the appointment of a receiver for the Property upon Mortgagor's breach of any covenant or agreement in this Mortgage, Mortgagor hereby expressly consents to the appointment of such receiver. Any receiver so appointed shall be entitled to receive a reasonable fee for so managing the Property.

All rents and revenues collected subsequent to delivery of written notice by Mortgagee to Mortgagor of the breach by Mortgagor of any covenant or agreement in this Mortgage shall be applied first to the costs, if any, of taking control of and managing the Property and collecting the rents, including, but not limited to, reasonable attorney's fees, receiver's fees, premiums on receiver's bonds, costs of repairs to the Property, premiums on insurance policies, taxes, assessments and other charges on the Property, and the costs of discharging any obligation or liability of Mortgagor as lessor or landlord of the Property and then to the sums secured by this Mortgage. Mortgagee or the receiver shall have access to the books and records used in the operation and maintenance of the Property and shall be liable to account only for those rents actually received. Mortgagee shall not be liable to Mortgagor, anyone claiming under or through Mortgagor or anyone having an interest in the Property by reason of anything done or left undone by Mortgagee under this section prior to the time Mortgagee takes possession or control of the Property.

If the rents of the Property are not sufficient to meet the costs, if any, of taking control of and managing the Property and collecting the rents, any funds expended by Mortgagee for such purposes shall become indebtedness of Mortgagor to Mortgagee secured by this Mortgage pursuant to Paragraph 7 hereof. Unless Mortgagee and Mortgagor agree in writing to other terms

{2455415:6}                                                    16

of payment, such amounts shall be payable upon notice from Mortgagee to Mortgagor requesting payment thereof and shall bear interest from the date of disbursement at the rate stated in the Notes.

Any entering upon and taking and maintaining of control of the Property by Mortgagee or the receiver and any application of rents as provided herein shall not cure or waive any default hereunder or invalidate any other right or remedy of Mortgagee under applicable law or as provided herein. This assignment of rents shall terminate at such time as this Mortgage ceases to secure indebtedness held by Mortgagee.

26. **Release.** Upon payment of all of the Obligations, this Mortgage shall automatically terminate and Mortgagee shall immediately cause evidence of such satisfaction to be recorded. Mortgagor shall pay Mortgagee's reasonable costs incurred in discharging this Mortgage.

27. **Mechanics Liens.** Without limitation of any of the rights and remedies available to Mortgagee hereunder or at law or in equity, Mortgagor and Mortgagee covenant that Mortgagee is authorized to do all things provided to be done by a mortgagee under Title 29, Chapter 5, of the Code of Laws of South Carolina (1976) as amended, subject to the terms and provisions contained herein and in the Notes.

28. **Future Advances.** This Mortgage secures, in accordance with Section 29-3-50, Code of Laws of South Carolina (1976) as amended, all future advances and re-advances that may subsequently be made to Mortgagor by Mortgagee, evidenced by the aforesaid Notes, or any other promissory notes, and all modifications, renewals and extensions thereof (provided, however, that nothing contained herein shall create an obligation on the part of Mortgagee to make future advances or re-advances to Mortgagor), the maximum amount of all indebtedness outstanding at any one time secured hereby not to exceed Twenty-Two Million and No/100 Dollars ($22,000,000.00), plus interest thereon, all charges and expenses of collection incurred by Mortgagee, including court costs, and reasonable attorneys' fees.

29. **South Carolina Provision.** Notwithstanding any provision to the contrary contained herein, where any provision of this Mortgage is inconsistent with any provision of South Carolina law regulating the creation or enforcement of a lien or security interest in real or personal property including, but not by way of limitation, the Code of Laws of South Carolina 1976, as amended, modified and/or replaced from time to time, the provisions of South Carolina law shall take precedence over the provisions of this Mortgage, but shall not invalidate or render unenforceable any other provisions of this Mortgage that can be construed in a manner consistent with South Carolina law.

30. **Continuance of Lien.** Repayment to the Mortgagee of all of the indebtedness of Borrowers shall not terminate the lien of this Mortgage unless it is released by the Mortgagee at

{2455415:6}

17

the request of the Mortgagor; otherwise it shall remain in full force to secure future advances subject to Paragraph 28 hereof and indebtedness made under any revolving credit agreements, irrespective of any additional security that may be taken as to such indebtedness. The lien of this Mortgage shall be unaffected by renewals, extensions, or partial releases hereunder.

31. **Waiver of Appraisement.** The Mortgagor agrees to the fullest extent permitted by law that in case of an Event of Default on its part hereunder, neither the Mortgagor nor anyone claiming through or under it shall or will set up, claim or seek to take advantage of any appraisement, valuation, stay extension or redemption laws now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this Mortgage, or the absolute sale of the Premises or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereat, and the Mortgagor, for itself and all who may at any time claim through or under it, hereby waives, to the fullest extent that it may lawfully so do, the benefit of all such laws, and any and all right to have the assets comprising the Premises marshaled upon any foreclosure of the lien hereof or appraised for the purpose of reducing any deficiency judgment obtained by the Mortgagee against the Mortgagor and agrees that the Mortgagee or any court having jurisdiction to foreclose such lien may sell the Premises in part or as an entirety.

32. **Instrument Under Seal.** The Mortgage is intended to be and shall be construed as an instrument under seal.

33. **Security Agreement.** This Mortgage shall constitute a security agreement pursuant to the Uniform Commercial Code for any portion of the Property which, under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants to Mortgagee a security interest in all such property. Mortgagee shall have all rights and remedies of a secured party under the Uniform Commercial Code as well as all other rights and remedies available at law or in equity.

34. **Consumer Transactions.** Notwithstanding anything herein to the contrary, no debt or other liability, as described herein shall be secured by the within Mortgage, if it shall hereafter be created in a "consumer credit transaction" as defined in Title 1, Consumer Credit Protection Act, 15 U.S.C.A., Sections 1601 et. seq., as amended, or any successor federal statute, or any applicable state statute containing substantially similar provisions.

35. **Captions.** The captions and headings of the Paragraphs of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

36. **Flood Insurance.** If any part of the Property lies within a "special flood hazard area" as defined and specified by the United State Department of Housing and Urban Development pursuant to the Flood Disaster Protection Act of 1973 as now in effect; Mortgagor shall (i) promptly purchase and pay the premiums for flood insurance policies as Mortgagee reasonably deems required so that Mortgagee shall be deemed in compliance with the rules and

{2455415:6}

18

regulations and provisions of the Flood Disaster Protection Act of 1973 as then in effect; and (ii) deliver such policies to Mortgagee together with evidence satisfactory to Mortgagee that the premiums therefor have been paid. Such policies of flood insurance shall be in a form satisfactory to Mortgagee, shall name Mortgagee as an insured thereunder, shall provide that losses thereunder be payable to Mortgagee pursuant to such forms of loss payable clause as Mortgagee may approve, shall be for an amount at least equal to the indebtedness evidenced by the Notes or the maximum limit of coverage made available with respect to any of the Property under the National Flood Insurance Act of 1968, as amended, whichever is less, and shall be noncancellable as to Mortgagee except upon thirty (30) days prior written notice given by the insurer to Mortgagee. Within thirty (30) days prior to the expiration date of each such flood insurance policy, Mortgagor shall deliver to Mortgagee a renewal policy or endorsement together with evidence satisfactory to Mortgagee that the premium therefor has been paid. Mortgagor hereby indemnifies, saves and holds Mortgagee harmless from any losses incurred by Mortgagee arising out of Mortgagor's failure to obtain or maintain such insurance.

37. **JURY WAIVER.** MORTGAGOR WAIVES THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS MORTGAGE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has executed this mortgage as of the date set forth above.

**FORMED FIBER TECHNOLOGIES, LLC,**
a Delaware limited liability company

_~~Tino M Wood~~_
Witness 1

By: _~~Kelley MacKinnon~~_
Name: Kelly MacKinnon
Title: Chief Financial Officer

_~~Wendy A Faichan~~_
Witness 2

STATE OF _Maine_ )
                        ) SS:
COUNTY OF _Androscoggin_ )

The foregoing instrument was acknowledged before me this 17th day of _November_ 2010, by Kelly MacKinnon, the Chief Financial Officer of Formed Fiber Technologies, LLC, on behalf of Formed Fiber Technologies, LLC.

_~~Bonnie J Morissette~~_
Notary Public for _Maine_
My commission expires: _4/1/2015_
[SEAL]
=

BONNIE J. MORISSETTE
Notary Public, Maine
My Commission Expires April 1, 2015

****MUST HAVE NOTARY SEAL AFFIXED****

Signature Page to
Mortgage (South Carolina)

## EXHIBIT A

### Description of Real Estate

All that certain piece or parcel or lot of land with improvements thereon, situate, lying and being in the State of South Carolina, County of Sumter, being shown and delineated as 42.36 acres, more or less, on a plat of Martin Color-Fi, Inc. and General Electric Capital Corporation, as Agent and Individually, prepared by Edwards Land Surveyors, Inc., dated July 3, 2000, and recorded in the Office of the Register of Deeds for Sumter County, South Carolina in Book 2000, page 481. Reference to said plat is made for a fuller description, with all measurements being more or less.

Being the same property conveyed to *Martin Color-Fi*, Inc., a South Carolina corporation, by deed of Harold Milton Moise and Albert D. Moise, dated June 28, 1988, and recorded with the Register of Deeds Office for Sumter County, South Carolina on June 29, 1988 in Book 471, at Page 1729. By Articles of Merger dated November 17, 2003, and filed with the South Carolina Secretary of State on November 17, 2003, Martin Color-Fi, Inc., a South Carolina corporation, merged into Martini Acquisition, Inc., a Delaware corporation, with the surviving entity being called Martin Color-Fi, Inc., a Delaware corporation. By Articles of Merger dated November 17, 2003, and filed with the Delaware Secretary of State, Martin Color-Fi, Inc., a Delaware corporation, merged into Formed Fiber Technologies, LLC, a Delaware limited liability company, with the latter entity being the surviving entity.

## EXHIBIT B

### Permitted Exceptions

1. Taxes and assessments for the year 2010, and subsequent years, which are a lien but are not yet due and payable.

2. Easement granted to Carolina Power & Light Company by instrument recorded in Book W-5, Page 430; Book X-5, Page 86; Book X-6, Page 451; Book I-10, Page 487; Book R-6, Page 334; Book 421, Page 378; Book 461, Page 78; Book O-9, Page 1564; and Book F-9, Book 195, in the Office of the ROD for Sumter County, South Carolina.

3. Easement granted to American Telephone and Telegraph Company by instrument recorded in Deed Book W-5, Page 528, in the Office of the ROD for Sumter County, South Carolina.

4. Easement granted for Railroad Sidetract reserved in deed recorded in Book 432, Page 1409, in the Office of the ROD for Sumter County, South Carolina.

5. 10' Drainage Easement recorded in Book 88, Page 683, in the Office of the ROD for Sumter County, South Carolina.

{2455415:6}                                         E-B

## OPEN-END MORTGAGE,
## ASSIGNMENT OF LEASES AND RENTS,
## AND SECURITY AGREEMENT

(Maximum Principal Indebtedness Not to Exceed $22,000,000.00)

**THIS OPEN-END MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT** (this "Mortgage") is made this 22nd day of October 2010 between the Mortgagor, FORMED FIBER TECHNOLOGIES, LLC, a Delaware limited liability company ("Mortgagor"), whose address is 125 Allied Road, Auburn, Maine 04211, and the Mortgagee, **FIRSTMERIT BANK, N.A.,** a national banking association ("Mortgagee"), whose address is 3 Cascade Plaza, 2nd Floor, Akron, Ohio 44308, Attention: Formed Fiber Technologies Account Manager.

WHEREAS, Mortgagor, FORMED FIBER TECNOLOGIES, INC., a Delaware corporation (individually, each a "Borrower" and, collectively, "Borrowers"), and Mortgagee are the parties to that certain Credit and Security Agreement dated as of the date hereof (as heretofore and hereafter amended, replaced or supplemented, the "Credit Agreement");

WHEREAS, pursuant to the Credit Agreement, Borrowers have secured financing from the Mortgagee in an aggregate principal amount not to exceed Twenty-Two Million and 00/100 Dollars ($22,000,000), evidenced by that certain Revolving Note dated as of the date hereof in the original principal amount of Twenty Million Dollars ($20,000,000) (the "Revolving Note") and that certain Capex Note dated as of the date hereof in the original principal amount of Two Million Dollars ($2,000,000) (the "Capex Note" and, together with the Revolving Note, collectively, the "Notes"); and

WHEREAS, Mortgagee requires as a condition precedent to the making of the Loans and the effectiveness of the Credit Agreement that Mortgagor provide this Mortgage as additional security for all of each Borrower's obligations under the Credit Agreement and the Notes and the Mortgagor is willing to do so;

NOW THEREFORE, TO SECURE to Mortgagee (a) the repayment of the Obligations (as defined in the Credit Agreement), and all renewals, extensions and modifications thereof; (b)

the repayment of any future advances, with interest thereon, made by Mortgagee to any Borrower pursuant to Paragraph 28 hereof (herein "Future Advances"); (c) the performance of the covenants and agreements of Borrowers contained in this Mortgage, the Credit Agreement or any other Loan Document, as applicable; (d) the payment of all other sums with interest thereon advanced in accordance herewith to protect the security of this Mortgage; and (e) the performance of the covenants and agreements of Mortgagor herein contained (all of the foregoing items (a) through (e) are collectively herein referred to as the "Obligations"), Mortgagor does hereby mortgage, grant, convey and assign to Mortgagee, as security, that certain real property located in the County of Androscoggin, State of Maine, and more particularly described in Exhibit A attached hereto and incorporated herein (the "Real Estate"):

TOGETHER with all buildings, improvements, structures and tenements now situated or hereafter erected on said premises, and all heretofore or hereafter vacated alleys and streets abutting said premises, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water, water rights, and water stock appurtenant to said premises, and all fixtures, machinery, equipment, engines, boilers, incinerators, building materials, appliances and goods of every nature whatsoever now owned or hereafter acquired by Mortgagor and located in, on, or about said premises, or used or intended to be used in connection with said premises, or intended and designated (wherever located) to be incorporated into the structure(s) situated on said premises, including without limitation fixtures and equipment for supplying or distributing heating, cooling, electricity, gas, water, sewage, air and light, elevators and related machinery and equipment, fire prevention and extinguishing apparatus, security and access control apparatus, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, mirrors, cabinets, paneling, unattached rugs, carpet and other attached floor coverings, furniture, furnishings, pictures, antennas, trees and plants, and all other property now owned or hereafter acquired by Mortgagor and used in or about the above-described premises; all of which, including replacements and additions thereto, being hereby deemed a part of the premises encumbered by this Mortgage and being hereinafter referred to as the "Property."

Mortgagor covenants that Mortgagor is lawfully seized of the real estate hereby conveyed, except for those items shown on attached Exhibit B (the "Permitted Exceptions"), and has the right to mortgage, grant, convey and assign the Property, that the Property is unencumbered, except for the Permitted Exceptions, and that Mortgagor will warrant and defend generally the title to the Property against all claims and demands, whatsoever, subject to the Permitted Exceptions.

The Credit Agreement, together with all agreements, documents and mortgages referred to therein or at any time now or hereafter executed and/or delivered in connection therewith or related thereto, including, but not limited to, this Mortgage, as all of the foregoing now exist or

may hereafter be amended, modified, supplemented, extended, renewed, restated, substituted for or replaced, are collectively referred to herein as the "Loan Documents."

Mortgagor and Mortgagee covenant and agree as follows:

1.      **Payment of Principal and Interest.** Borrowers shall promptly pay when due the principal and the interest on the indebtedness evidenced by the Notes, any extensions or renewals thereof, prepayment and late charges as provided in the Notes, and the principal and interest on any of the Obligations or other sums secured by this Mortgage.

2.      **Funds for Taxes, Insurance, and Other Charges.** In the event of a default and during the continuance of any event of default on any premium payment on an insurance policy or if Mortgagor fails to pay yearly water and sewer rates and taxes or assessments when due, or if Mortgagee in its sole discretion deems it necessary, Mortgagor shall be required to pay to Mortgagee on the day any installments of principal and interest are payable under the Notes, or in such other date as Mortgagee may specify, until the Obligations are paid in full, a sum equal to a percentage, to be specified by Mortgagee, of the yearly water and sewer rates and taxes and assessments ("Funds") which may attain priority over this Mortgage, and ground rents on the Property, if any, plus a percentage, to be specified by Mortgagee, of the yearly premium installments for hazard insurance, all as reasonably estimated initially and from time to time by Mortgagee on the basis of assessments and bills and reasonable estimates thereof. Mortgagee may require Mortgagor to pay to Mortgagee, in advance, such other Funds for other taxes, charges, premiums, assessments and impositions in connection with Mortgagor or the Property which Mortgagee shall reasonably deem necessary to protect Mortgagee's interests (collectively, "Other Impositions"). Unless otherwise provided by applicable law, Mortgagee, at Mortgagee's option, may require Funds for Other Impositions to be paid by Mortgagor in a lump sum or in periodic installments.

The Funds may be commingled with the general funds of Mortgagee who shall not be liable for interest thereon. The Funds shall be held by Mortgagee and Mortgagee shall apply the Funds to pay said rates, taxes, assessments, insurance premiums, and Other Impositions so long as Mortgagor is not in breach of any covenant or agreement of Mortgagor in this Mortgage. No interest shall be paid to Mortgagor on the Funds, and unless said agreement is made or applicable law requires such interest to be paid, Mortgagee shall not be required to pay Mortgagor any interest or earnings on the Funds. The Funds are pledged as additional security for the sums secured by this Mortgage and shall be subject to the right of set off.

If the amount of the Funds held by Mortgagee, together with future monthly installments of Funds payable prior to the due date of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents, as they fall due, such excess shall be credited to Mortgagor on periodic installments of Funds. If the amount of the Funds held by Mortgagee shall not be sufficient to

{2466127:3}                                    3

pay taxes, assessments, insurance premiums and ground rents as they fall due, Mortgagor shall pay to Mortgagee any amount necessary to make up the deficiency within seven (7) days from the date notice is mailed by Mortgagee to Mortgagor requesting payment thereof. Nothing in this Paragraph 2 shall be deemed to obligate Mortgagee to pay such charges when due if the Funds are insufficient or if the Mortgagor shall fail to supply Mortgagee with the proper invoice when payment is due.

Upon Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, beyond any applicable cure period, Mortgagee may apply, in any amount and in any order as Mortgagee shall determine in Mortgagee's sole discretion, any Funds held by Mortgagee at the time of application (a) to pay rents, taxes, assessments, insurance premiums and Other Impositions which are now or will hereafter become due or (b) as a credit against sums secured by this Mortgage. Upon payment in full of all sums secured by this Mortgage, Mortgagee shall, within thirty (30) days, refund to Mortgagor any Funds held by Mortgagee.

3. **Open-End Mortgage.** This Mortgage is an Open-End Mortgage under 33 M.R.S. Section 505 and is intended to secure the unpaid balances of loan advances to be made under the Notes after this Mortgage has been delivered to the appropriate county recorder's office for recordation. The maximum amount of the unpaid principal indebtedness secured hereby, exclusive of interest thereon, and advances for the payment of taxes, assessments, insurance premiums or costs incurred for the protection of the Property, which may be outstanding at any time is Twenty-Two Million and 00/100 Dollars ($22,000,000). In no event shall the limitation on the principal amount of Obligations secured hereby limit or impair the security interests and liens of Mortgagee in property of Mortgagor as provided under the other Loan Documents.

4. **Charges: Liens.** Mortgagor shall pay all water and sewer rates, taxes, liens, assessments and other charges, fines and Other Impositions attributable to the Property, and leasehold payments or ground rents, if any, by Mortgagor making payment, when due directly to the payee thereof. Mortgagor shall promptly furnish to Mortgagee all notices of amounts due under this Paragraph 4, and Mortgagor shall promptly furnish Mortgagee receipts evidencing such payment. Mortgagor shall promptly discharge any lien or claim which has or may obtain priority over this Mortgage; provided that Mortgagor shall not be required to discharge any such lien so long as Mortgagor shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Mortgagee, or shall in good faith contest such lien by, or defend enforcement of such lien in, legal proceedings which operate to prevent the enforcement of the lien or forfeiture of the Property or any part thereof, to the reasonable satisfaction of Mortgagee. In the event any such lien or claim is not promptly discharged, Mortgagee may, at its option, require Mortgagor to deposit with Mortgagee such amounts or such bonds as are acceptable to Mortgagee to assure the priority of this Mortgage. Mortgagor further agrees to pay to Mortgagee any reasonable and actual costs it may advance in order to protect the priority of its lien, including, but not limited to, court costs and attorney fees. Mortgagee shall be and hereby is

{2466127;3}                                   4

authorized and empowered to do, as mortgagee, all things provided to be done in the mechanic's lien law of the State of Maine and all acts amendatory or supplementary thereto.

5.    **Hazard Insurance.**  Mortgagor shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, rent loss and other casualties, liabilities, contingencies, and hazards covered by special form policies of insurance and such other hazards as Mortgagee may reasonably require or as may be required by applicable law (including flood insurance required by Paragraph 35 hereof), and in such amounts complying with Section 4.11 of the Credit Agreement and for such periods as Mortgagee may reasonably require; provided, however, that Mortgagee shall not require that the amount of such coverage exceed that amount of coverage required to pay sums secured by this Mortgage unless required by applicable law.

In the event of loss, Mortgagor shall give immediate written notice to the insurance carrier and to Mortgagee. Mortgagor hereby authorizes and empowers Mortgagee as attorney-in-fact for Mortgagor to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Mortgagee's expenses incurred in the collection of such proceeds; provided, however, that nothing contained in this Paragraph 5 shall require Mortgagee to incur any expense or take any action hereunder.  Mortgagor further authorizes Mortgagee, at Mortgagee's option, (a) to hold the balance of such proceeds to be used to reimburse Mortgagor for the cost of reconstruction or repair of the Property or (b) to apply the balance of such proceeds to the payment of the sums secured by this Mortgage, whether or not then due.

If the insurance proceeds are held by Mortgagee to reimburse Mortgagor for the cost of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition or such other condition as Mortgagee may approve in writing, which approval shall not be unreasonably withheld, delayed or conditioned.  Mortgagee may, at Mortgagee's option, condition disbursement of said proceeds on Mortgagee's approval of such plans and specifications of an architect reasonably satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen and such other evidence of costs, percentage completion of construction, application of payments, and satisfaction of liens as Mortgagee may reasonably require.  If the insurance proceeds are applied to the payment of the sums secured by this Mortgage, any such application of proceeds to principal shall not extend or postpone the due dates of the monthly installments referred to in Paragraphs 1 and 2 hereof or change the amounts of such installments. If the Property is sold pursuant to Paragraph 19 hereof or if Mortgagee acquires title to the Property, Mortgagee shall have all of the right, title and interest of Mortgagor in and to any insurance policies and unearned premiums thereon and in and to the proceeds resulting from any damage to the Property prior to such sale or acquisition.

{2466127:3}                                    5

6. **Preservation and Maintenance of Property.** Mortgagor (a) shall not commit waste or permit impairment or deterioration of the Property, (b) shall not abandon the Property, (c) shall restore or repair promptly and in a good and workmanlike manner all or any part of the Property to the equivalent of its original condition, or such other condition as Mortgagee may approve in writing, in the event of any damage, injury or loss thereto, whether or not insurance proceeds are available to cover in whole or in part the costs of such restoration or repair, (d) shall keep the Property, including improvements, fixtures, equipment, machinery and appliances thereon in good repair and shall replace Mortgagor's fixtures, equipment, machinery and appliances on the Property when necessary to keep such items in good repair, (e) shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property, and (f) shall give notice in writing to Mortgagee of and, unless otherwise directed in writing by Mortgagee, appear in and defend (to the extent necessary to protect Mortgagor's and Mortgagee's respective interests in the Property) any action or proceeding purporting to affect the Property, the security of this Mortgage or the rights or powers of Mortgagee. Neither Mortgagor nor any tenant or other person shall remove or demolish any improvement now existing or hereafter erected on the Property or any fixture, equipment, machinery or appliance in or on the Property except when incident to the replacement of fixtures, equipment, machinery and appliances with items of like kind and except in connection with tenant improvements or cosmetic changes to the Property.

7. **Use of Property.** Unless required by applicable law or unless Mortgagee has otherwise agreed in writing, which agreement shall not be unreasonably withheld, delayed or conditioned, Mortgagor shall not allow changes in the use for which all or any part of the Property was intended at the time this Mortgage was executed, which use is stipulated to be for commercial purposes and any other lawful uses incidental or related thereto. Mortgagor shall not initiate or acquiesce in a change in the zoning classification of the Property without Mortgagee's prior written consent.

8. **Protection of Mortgagee's Security.** If Mortgagor fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which affects Mortgagee's interest in the Property, including, but not limited to, insolvency, eminent domain, foreclosure, code endorsements, deed restrictions and registrations, or arrangements or proceedings involving a bankrupt or decedent, Mortgagee at Mortgagee's option, may make such appearances, disburse such sums, and take such action as is necessary to protect Mortgagee's interest, including, but not limited to, (a) disbursement of attorney's fees, (b) entry upon the Property to make repairs, and (c) procurement of satisfactory insurance.

Any amounts disbursed by Mortgagee pursuant to this Paragraph 8, with interest thereon, shall become additional indebtedness of Mortgagor secured by this Mortgage. Unless Mortgagor and Mortgagee agree to other terms of payment, such amount shall be payable upon notice from Mortgagee to Mortgagor requesting payment thereof, and shall bear interest from the date of disbursement at the highest rate allowable under any document evidencing the Obligations.

{2466127:3}                                    6

Mortgagor hereby covenants and agrees that Mortgagee shall be subrogated to the lien of any mortgage or other lien discharged, in whole or in part, by the indebtedness secured hereby. Nothing contained in this Paragraph 8 shall require Mortgagee to incur any expense or take any action hereunder.

9. **Environmental Matters**. Mortgagor represents and warrants that Mortgagor shall obtain all permits, licenses and other authorizations which are required under any Environmental Law (as hereinafter defined) and will comply, in all material respects, with all terms and conditions of the required permits, licenses and authorizations, and with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Environmental Laws.

Mortgagor shall establish and maintain, at its expense, a system to assure and monitor its continued compliance with all Environmental Laws in all of its operations at the Property, which system may include annual reviews of such compliance by employees or agents of Mortgagor who are familiar with the requirements of the Environmental Laws. Copies of all environmental surveys, audits, assessments, feasibility studies and results of remedial investigations shall be promptly furnished, or caused to be furnished, by Mortgagor to Mortgagee upon Mortgagee's request. Mortgagor shall take prompt and appropriate action to respond to any non-compliance with any of the Environmental Laws at the Property and shall regularly report to Mortgagee on such response.

Mortgagor shall give both oral and written notice to Mortgagee immediately upon the receipt by Mortgagor of any notice of, or its otherwise obtaining knowledge of (i) the occurrence of any event involving the release, spill or discharge, threatened or actual, of any Hazardous Material at the Property, or (ii) any investigation, proceeding, complaint, order, directive, claims, citation or notice with respect to: (A) any non-compliance with or violation of any Environmental Law by Mortgagor at the Property, or (B) the release, spill or discharge, threatened or actual, of any Hazardous Material at the Property, or (C) the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials (as hereinafter defined) at the Property or (D) any other environmental, health or safety matter, which affects Mortgagor or its business, operations or assets or any properties at which it transported, stored or disposed of any Hazardous Materials at the Property.

Without limiting the generality of the foregoing, whenever Mortgagee reasonably determines that there is non-compliance, or any condition which requires any action by or on behalf of Mortgagor, in order to avoid any material non-compliance with any Environmental Law at the Property, Mortgagor shall, at Mortgagee's request and the reasonable expense of Mortgagor: (i) cause an independent environmental engineer reasonably acceptable to Mortgagee to conduct such tests of the Property where the non-compliance or alleged non-compliance with such Environmental Laws has occurred as to such non-compliance and prepare and deliver to Mortgagee a report as to such non-compliance setting forth the results of

{2466127:3}                                      7

such tests, a proposed plan for responding to any environmental problems described therein, and an estimate of the costs thereof and (ii) provide to Mortgagee a supplemental report of such engineer whenever the scope of such non-compliance, or the response of Mortgagor thereto or the estimated costs thereof shall change in any material respect.

In the event of any use, spill, discharge or clean-up of any Hazardous Material on, under or at the Property or any part thereof, which could result in an order, suit or other action against Mortgagor and/or any part of the Property by any governmental agency or otherwise, or any complaint, order, citation or notice with regard to air emission, water discharges, noise emissions or any other environmental, health or safety matter affecting Mortgagor or any of the Property, and the failure of Mortgagor, after written notice, to clean up or remove such Hazardous Material or resolve such event in accordance with all applicable Environmental Laws, Mortgagee shall have the right, but not the obligation, to take such actions as it deems reasonably necessary or advisable to clean up, remove, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Material or complaint, order, citation or notice. Any and all sums expended by Mortgagee for such purposes, together with interest thereon at the then highest applicable rate payable on any of the Secured Obligations, shall be immediately due and payable by Mortgagor and shall be Secured Obligations secured by this Mortgage.

Mortgagor shall indemnify, defend and hold harmless Mortgagee and its directors, officers, employees, agents, invitees, representatives, successors and assigns from and against any and all losses, claims, damages, liabilities, costs, and expenses (including reasonable attorneys' fees and legal expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material, including, without limitation, the costs of any required or necessary repair, cleanup or other remedial work with respect to the Property and the preparation and implementation of any closure, remedial or other required plans. All representations, warranties, covenants and indemnifications in this Paragraph 9 shall survive the release or satisfaction of this Mortgage or the foreclosure hereof.

For purposes hereof, the term "Hazardous Materials" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law). For purposes hereof, the term "Environmental Laws" shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental

{2466127:3}                                        8

matters, as now or at any time hereafter in effect, applicable to the business of Mortgagor and facilities (whether or not owned by it), including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals, or hazardous, toxic or dangerous substances, materials or wastes.

10. **Inspections.** Mortgagee may make or cause to be made reasonable entries upon and inspections of the Property upon reasonable advance notice. Additionally, Mortgagee shall have the right to inspect the books and records of the operation of the Property and make copies thereof during normal business hours and upon notice to Mortgagor. In accordance with Article 9 of the Credit Agreement, Mortgagor shall keep its books and records in accordance with generally accepted accounting principles covering the operation of the Property, and Mortgagor shall furnish to Mortgagee Mortgagor's financial statements and tax return at Mortgagee's request.

11. **Condemnation.** Mortgagor shall promptly notify Mortgagee of any action or proceeding relating to any condemnation or other taking, whether direct or indirect, of the Property, or part thereof, and Mortgagor shall appear in and prosecute any such action or proceedings unless otherwise directed by Mortgagee in writing. Mortgagor authorizes Mortgagee, at Mortgagee's option, as attorney-in-fact for Mortgagor to commence, appear in and prosecute, in Mortgagee's or Mortgagor's name any action or proceeding relating to any condemnation or other taking of the Property, whether direct or indirect, and to settle or compromise any claim in connection with such condemnation or other taking. The proceeds of any award, payment or claim for damages, direct or consequential, in connection with any condemnation or other taking, whether direct or indirect, of the Property, or part thereof, or for conveyances in lieu of condemnation, are hereby assigned to and shall be paid to Mortgagee, subject to the terms and provisions of this Mortgage.

Mortgagor authorizes Mortgagee to apply such awards, payments, proceeds or damages, after the deduction of Mortgagee's expenses incurred in the collection of such amounts, at Mortgagee's option, to restoration or repair of the Property or to payment of the sums secured by this Mortgage, whether or not then due. Unless Mortgagor and Mortgagee otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in Paragraphs 1 and 2 hereof or change the amount of such installments. Mortgagor agrees to execute such further evidence of assignment of any awards, proceeds, damages or claims arising in connection with such condemnation or taking as Mortgagee may require.

{2466127:3}

9

12. **Mortgagor and Lien Not Released.** From time to time, Mortgagee may, at Mortgagee's option, without giving notice to or obtaining the consent of Mortgagor, Mortgagor's successors or assigns or of any junior lienholder or guarantors, without liability on Mortgagee's part and notwithstanding Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, extend the time for payment of said indebtedness or any part thereof, reduce the payments thereon, release anyone liable on any of said indebtedness, accept a renewal note or notes therefor, modify the terms and time of payment of said indebtedness, release from the lien of this Mortgage any part of the Property, take or release other or additional security, reconvey any part of the Property, consent to any map or plan of the Property, consent to the granting of any easement, join in any extension or subordination agreement, agree in writing with Mortgagor to modify the rate of interest or period of amortization of any note, or change the amount of the monthly installments payable thereunder. Any actions taken by Mortgagee pursuant to the terms of this Paragraph 12 shall not affect the obligation of Mortgagor or Mortgagor's successors or assigns to pay the sums secured by this Mortgage and to observe the covenants of Mortgagor contained herein, shall not affect the guaranty of any person, corporation, partnership or other entity for payment of the indebtedness secured hereby, and shall not affect the lien or priority of lien hereof on the Property. Mortgagor shall pay Mortgagee a reasonable service charge, together with such title insurance premiums and attorney's fees as may be incurred at Mortgagee's option for any such action if taken at Mortgagor's request.

13. **Forbearance by Mortgagee Not a Waiver.** Any forbearance by Mortgagee in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Mortgagee of payment of any sum secured by this Mortgage after the due date of such payment shall not be a waiver of Mortgagee's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Mortgagee shall not be a waiver of Mortgagee's right to accelerate the maturity of the indebtedness secured by this Mortgage. Mortgagee's receipt of any awards, proceeds or damages under Paragraphs 5 and 11 hereof shall not operate to cure or waive Mortgagor's default in payment of sums secured by this Mortgage.

14. **Estoppel Certificate.** Mortgagor shall, within fifteen (15) days of a written request from Mortgagee, furnish Mortgagee with a written statement, duly acknowledged, setting forth the sums secured by this Mortgage and any right of set-off, counterclaim or other defense which exists against such sums and the obligations of this Mortgage.

15. **Uniform Commercial Code Security Agreement.** In addition to being an Open-End Mortgage and Assignment of Rents, this Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified above as part of the Property which under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants Mortgagee a security interest in said items. Mortgagor agrees that Mortgagee may file this Mortgage in the real estate records or

other appropriate index, as a financing statement for any of the items specified above as part of the Property. This Mortgage shall be sufficient as a financing statement. In addition, Mortgagor agrees to execute and deliver to Mortgagee, or authorize Mortgagee to file, upon Mortgagee's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Mortgage in such form as Mortgagee may require to perfect a security interest with respect to said items. Mortgagor shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements Mortgagee may reasonably require. Without the prior written consent of Mortgagee, Mortgagor shall not create or suffer to be created pursuant to the Uniform Commercial Code any other security interest in said items, including replacements and additions thereto. Upon Mortgagor's breach of any covenant or agreement of Mortgagor contained in this Mortgage, including the covenants to pay when due all sums secured by this Mortgage, Mortgagee shall have the remedies of a secured party under the Uniform Commercial Code and, at Mortgagee's option, may also invoke the remedies provided in Paragraph 25 hereof as to such items. In exercising any of said remedies, Mortgagee may proceed against the items of real property and any items of personal property specified above as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Mortgagee's remedies under the Uniform Commercial Code or of the remedies provided in Paragraph 25 hereof.

16. **Leases of the Property.** Mortgagor shall comply with and observe Mortgagor's obligations as landlord under all leases of the Property or any part thereof. Mortgagor, at Mortgagee's request, shall furnish Mortgagee with executed copies of all leases now existing or hereafter made of all or any part of the Property, and all leases now or hereafter entered into will be in form and substance subject to the approval of Mortgagee. Unless otherwise directed by Mortgagee, all leases of the Property shall specifically provide that such leases are subordinate to this Mortgage; that the tenant attorns to Mortgagee, such attornment to be effective upon Mortgagee's acquisition of title to the Property; that the tenant agrees to execute such further evidences of attornment as Mortgagee may from time to time request, that the attornment of the tenant shall not be terminated by foreclosure. Except as may be specifically permitted by the Credit Agreement, Mortgagor shall notify Mortgagee of its intent to (i) consent, execute, modify, surrender or terminate, either orally or in writing, any lease now existing or hereafter made, any lease of the Property, (ii) permit an assignment or sublease of such a lease, or (iii) request or consent to the subordination of any lease of all or any part of the Property to any lien subordinate to this Mortgage. If Mortgagor becomes aware that any tenant proposes to do, or is doing, any act or thing which may give rise to any right of set-off against rent, Mortgagor shall (a) take such steps as shall be reasonably calculated to prevent the accrual of any right to a set-off against and (b) notify Mortgagee thereof and of the amount of said set-offs.

Mortgagor does hereby assign to Mortgagee all leases now existing or hereafter made of all or any part of the Property and all security deposits made by tenants in connection with such leases of the Property. Mortgagee shall have all of the rights and powers possessed by

Mortgagor prior to such assignment and Mortgagee shall have the right to modify, extend or terminate such existing leases and to execute new leases, in Mortgagee's sole discretion.

17.  **Remedies Cumulative.** All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage, the Notes, or as afforded by law or equity and may be exercised concurrently, independently or successively.

18.  **Acceleration in Case of Mortgagor's Insolvency.** If Mortgagor shall voluntarily file a petition under the Federal Bankruptcy Code, as such Code may from time to time be amended, or under any similar or successor Federal Statute relating to bankruptcy, insolvency, arrangements or reorganizations, or under any state bankruptcy or insolvency act, or file an answer in an involuntary proceeding admitting insolvency or failure to pay debts as they come due, or if Mortgagor shall fail within twenty (20) days to obtain a vacation, stay or dismissal of involuntary proceedings brought for the reorganization, dissolution or liquidation of Mortgagor, or if an order for relief under the Federal Bankruptcy Code shall be entered against Mortgagor, or if a trustee, receiver or custodian shall be appointed for Mortgagor, or any Mortgagor's property, or if such Property shall become subject to the jurisdiction of a Federal bankruptcy court or similar state court, or if Mortgagor, shall make an assignment for the benefit of Mortgagor's creditors, or if there is an attachment, execution or other judicial seizure of any portion of Mortgagor's assets and such seizure is not discharged within twenty (20) days, then Mortgagee may, at Mortgagee's option, declare all of the sums secured by this Mortgage to be immediately due and payable without prior notice to Mortgagor, and Mortgagee may invoke any remedies permitted by Paragraph 25 hereof. Any attorneys' fees and other expenses incurred by Mortgagee in connection with Mortgagor's bankruptcy or any of the other aforesaid events shall be additional indebtedness of Mortgagor secured by this Mortgage pursuant to Paragraph 8 hereof.

19.  **Transfer of the Property and Interest Therein.** Except as may be specifically permitted by the Credit Agreement, if all or any part of the Property or an interest therein is sold, transferred, encumbered or otherwise conveyed by Mortgagor, without Mortgagee's prior written consent, or if any contract to do any of the same is entered into by Mortgagor without Mortgagee's prior written consent, excluding the lease of all or any part of the Property in the ordinary course of Mortgagor's business, and a transfer by devise, descent or by operation of law upon the death of a joint tenant, it shall be deemed to increase the Mortgagee's risk and Mortgagee may, at Mortgagee's option, either declare all the sums secured by this Mortgage to be immediately due and payable, or may consent to said conveyance in writing and may increase the interest rate of the indebtedness evidenced by the Notes and/or impose whatever conditions it may reasonably deem necessary to compensate it for the increased risk.

Any change in the legal or beneficial ownership of Mortgagor which changes the identity of any person or persons having, directly or indirectly, more than ten percent (10%) of either the legal or beneficial ownership of Mortgagor or of the Property, shall be deemed to be a transfer

within the meaning of this Paragraph 19. Such transfer shall not be made, created, or suffered to be made or created, without Mortgagee's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

20. **Notice.** Except for any notice required under applicable law to be given in another manner, any notice to Mortgagor provided for in this Mortgage shall be given by mailing such notice by certified or registered mail, return receipt requested, to Mortgagor at the address set forth above or as carried on the records of the Mortgagee. Any notice to Mortgagee shall be given by certified or registered mail, return receipt requested, to Mortgagee's address stated herein or to such other address as Mortgagee may designate by notice to Mortgagor as provided herein, with a copy to McDonald Hopkins LLC, 600 Superior Avenue, East, Suite 2100, Cleveland, Ohio 44114, Attention James E. Stief.

21. **Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements contained herein shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Mortgagor and Mortgagee, subject to the provision of Paragraph 19 hereof. All covenants and agreements of Mortgagor shall be joint and several. In exercising any rights hereunder or taking any actions provided for herein, Mortgagee may act through its employees, agents or independent contractors as authorized by Mortgagee.

22. **Governing Law; Severability.** This Mortgage shall be governed by the law of the jurisdiction in which the Property is located. In the event that any provision of this Mortgage or the Notes conflict with applicable law, such conflict shall not affect other provisions of this Mortgage or the Notes which can be given effect without the conflicting provisions, and to this end the provisions of this Mortgage or the Notes are declared to be severable. In the event that any applicable law limiting the amount of interest or other charge permitted to be collected from Mortgagor is interpreted so that any charge provided for in this Mortgage or the Notes, whether considered separately or together with other charges levied in connection with this Mortgage or the Notes violates such law, and Mortgagor is entitled to the benefit of such law, such charge is hereby reduced to the extent necessary to eliminate such violation. The amounts, if any, previously paid to Mortgagee in excess of the amounts payable to Mortgagee pursuant to such charges as reduced shall be applied by Mortgagee to reduce the principal of the indebtedness evidenced by the Notes. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Mortgagor has been violated, all indebtedness which is secured by this Mortgage or evidenced by the Notes and which constitutes interest, as well as all other charges levied in connection with such indebtedness which constitute interest, shall be deemed to be uniformly allocated and spread over the stated term of the Notes.

23. **Waiver of Statute of Limitations.** Mortgagor hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Mortgage or to any action brought to enforce the Notes or any other obligation secured by this Mortgage.

{2466127:3}                                13

24.    **Waiver of Marshalling.** Notwithstanding the existence of any other security interests in the Property held by Mortgagee or by any other party, Mortgagee shall have the right to determine the order in which any or all of the Property shall be subjected to the remedies provided herein. Mortgagee shall have the right to determine the order in which any or all portions of the indebtedness secured hereby are satisfied from the proceeds realized upon the exercise of the remedies provided herein. Mortgagor, any party who consents to this Mortgage, and any party who now or hereafter acquires a security interest in the Property and who has actual or constructive notice hereof hereby, waives any and all right to require the marshalling of assets in connection with the exercise of any of the remedies permitted by applicable law or provided herein.

25.    **Acceleration Remedies.** Upon (a) Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, including, but not limited to, any covenant to pay when due any sums secured by this Mortgage (other than any breach of any covenant or agreement set forth in Paragraph 4, 6 (a)-(e) and 9 hereof), (b) Mortgagor's breach of any covenant or agreement of Mortgagor as set forth in Paragraph 4, 6 (a) – (e) and 9 hereof, which breach shall continue for fifteen (15) days from the occurrence of such breach, (c) upon an Event of Default (as defined in the Credit Agreement), or (d) breach by any Borrower of any covenant or agreement of such Borrower in the Notes, Credit Agreement, or any other Loan Document, Mortgagee at Mortgagee's option, but subject to the terms and provisions of the Credit Agreement, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding or otherwise and may invoke any other remedies permitted by applicable law or as provided herein. Mortgagee shall be entitled to collect all reasonable and actual costs and expenses incurred in pursuing such remedies, including, but not limited to costs of documentary evidence, abstracts and title reports.

26.    **Assignment of Leases, Rents, Appointment of Receiver, Mortgagee in Possession.** As part of the consideration for the indebtedness evidenced by the Notes, Mortgagor hereby absolutely and unconditionally grants, assigns and transfers to Mortgagee all of the Mortgagor's right, title and interest in, to and under all leases, subleases, licenses, concessions, tenancies and any other agreements creating the right of possession or the right of use without a transfer of title, whether written or oral, now or hereafter existing, and covering all or any part of the Property, together with any and all security deposits made thereunder, all extensions, amendments, modifications, renewals and replacements of any thereof, and any guaranties of the lessee's, sublessee's, licensee's, concessionaire's, tenant's or user's obligations under any thereof. As further consideration for the indebtedness evidenced by the Notes, Mortgagor hereby absolutely and unconditionally assigns, grants and transfers to Mortgagee all the rents and revenues of the Property, including those now due, past due, or to become due by virtue of any lease or other agreement for the occupancy or use of all or any part of the Property, regardless of to whom the rents and revenues of the Property are payable. Mortgagor hereby authorizes Mortgagee or Mortgagee's agents to collect the aforesaid rents and revenues and hereby directs

each tenant of the Property to pay such rents to Mortgagee or Mortgagee's agents; provided, however, that prior to written notice given by Mortgagee to Mortgagor of the breach by Mortgagor of any covenant or agreement in this Mortgage, Mortgagor shall collect and receive all rents and revenues of the Property as trustee for the benefit of Mortgagee and Mortgagor, to apply the rents and revenues so collected to the sums secured by this Mortgage hereof with the balance, so long as no such breach has occurred, to the account of Mortgagor, it being intended by Mortgagor and Mortgagee that this assignment of rents constitutes an absolute assignment and not an assignment for additional security only. Upon delivery of written notice by Mortgagee to Mortgagor of breach by Mortgagor of any covenant or agreement in this Mortgage, and without the necessity of Mortgagee entering upon and taking and maintaining full control of the Property in person, by agent or by a court-appointed receiver, Mortgagee shall immediately be entitled to possession of all rents and revenues of the Property as specified in this Paragraph 26 as the same become due and payable, including but not limited to rents then due and unpaid, and all such rents shall immediately upon delivery of such notice be held by Mortgagor as trustee for the benefit of Mortgagee only; provided, however, that the written notice by Mortgagee to Mortgagor of any such breach shall contain a statement that Mortgagee exercises its rights to such rents. Mortgagor agrees that commencing upon delivery of such written notice of Mortgagor's breach by Mortgagee to Mortgagor, each tenant of the Property shall make such rents payable to and pay such rents to Mortgagee or Mortgagee's agents on Mortgagee's written demand to each tenant therefor, delivered to each tenant personally, by mail or delivering such demand to each rental unit, without any liability on the part of said tenant to inquire further as to the existence of a default by Mortgagor.

Mortgagor hereby covenants that Mortgagor has not executed any prior assignment of said rents and that Mortgagor has not performed, and will not perform, any acts or has not executed, and will not execute, any Mortgage which would prevent Mortgagee from exercising its rights under this Paragraph 26. At the time of execution of this Mortgage there has been no anticipation or prepayment of any of the rents of the Property for more than two (2) months prior to the due dates of such rents. Mortgagor covenants that Mortgagor will not hereafter collect or accept payment of any rents of the Property more than one (1) month prior to the due dates of such rents. Mortgagor further covenants that Mortgagor will execute and deliver to Mortgagee such further assignments of rents and revenues of the Property as Mortgagee may from time to time request.

Upon Mortgagor's breach of any covenant or agreement in this Mortgage, Mortgagee may, in person, by agent or by a court-appointed receiver, regardless of the adequacy of Mortgagee's security, enter upon and take and maintain full control of the Property in order to perform all acts necessary and appropriate for the operation and maintenance thereof including, but not limited to, the execution, cancellation or modification of leases, the collection of all rents and revenues of the Property, the making of repairs to the Property and the execution or termination of contracts providing for the management or maintenance of the Property, all on such terms as are deemed best to protect the security of this Mortgage. In the event Mortgagee

{2466127:3}                              15

elects to seek the appointment of a receiver for the Property upon Mortgagor's breach of any covenant or agreement in this Mortgage, Mortgagor hereby expressly consents to the appointment of such receiver. Any receiver so appointed shall be entitled to receive a reasonable fee for so managing the Property.

All rents and revenues collected subsequent to delivery of written notice by Mortgagee to Mortgagor of the breach by Mortgagor of any covenant or agreement in this Mortgage shall be applied first to the costs, if any, of taking control of and managing the Property and collecting the rents, including, but not limited to, reasonable attorney's fees, receiver's fees, premiums on receiver's bonds, costs of repairs to the Property, premiums on insurance policies, taxes, assessments and other charges on the Property, and the costs of discharging any obligation or liability of Mortgagor as lessor or landlord of the Property and then to the sums secured by this Mortgage. Mortgagee or the receiver shall have access to the books and records used in the operation and maintenance of the Property and shall be liable to account only for those rents actually received. Mortgagee shall not be liable to Mortgagor, anyone claiming under or through Mortgagor or anyone having an interest in the Property by reason of anything done or left undone by Mortgagee under this Paragraph 26 prior to the time Mortgagee takes possession or control of the Property.

If the rents of the Property are not sufficient to meet the costs, if any, of taking control of and managing the Property and collecting the rents, any funds expended by Mortgagee for such purposes shall become indebtedness of Mortgagor to Mortgagee secured by this Mortgage pursuant to Paragraph 8 hereof. Unless Mortgagee and Mortgagor agree in writing to other terms of payment, such amounts shall be payable upon notice from Mortgagee to Mortgagor requesting payment thereof and shall bear interest from the date of disbursement at the rate stated in the Notes.

Any entering upon and taking and maintaining of control of the Property by Mortgagee or the receiver and any application of rents as provided herein shall not cure or waive any default hereunder or invalidate any other right or remedy of Mortgagee under applicable law or as provided herein. This assignment of rents shall terminate at such time as this Mortgage ceases to secure indebtedness held by Mortgagee.

27.   **Release.**   Upon payment of all of the Obligations, this Mortgage shall automatically terminate and Mortgagee shall immediately cause evidence of such satisfaction to be recorded. Mortgagor shall pay Mortgagee's reasonable costs incurred in discharging this Mortgage.

28.   **Future Advances.**   Any future and additional loan advances to Mortgagor by Mortgagee, with interest thereon, shall be secured by this Mortgage. At no time shall the principal amount of the indebtedness secured by this Mortgage, not including sums advanced in

accordance herewith to protect the security of this Mortgage, exceed Twenty-Two Million and 00/100 Dollars ($22,000,000).

29. **Continuance of Lien.** Repayment to the Mortgagee of all of the indebtedness of Borrowers shall not terminate the lien of this Mortgage unless it is released by the Mortgagee at the request of the Mortgagor; otherwise it shall remain in full force to secure future advances and indebtedness made under any revolving credit agreements, irrespective of any additional security that may be taken as to such indebtedness. The lien of this Mortgage shall be unaffected by renewals, extensions, or partial releases hereunder.

30. **Waiver of Appraisement.** The Mortgagor agrees to the fullest extent permitted by law that in case of an Event of Default on its part hereunder, neither the Mortgagor nor anyone claiming through or under it shall or will set up, claim or seek to take advantage of any appraisement, valuation, stay extension or redemption laws now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this Mortgage, or the absolute sale of the Premises or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereat, and the Mortgagor, for itself and all who may at any time claim through or under it, hereby waives, to the fullest extent that it may lawfully so do, the benefit of all such laws, and any and all right to have the assets comprising the Premises marshaled upon any foreclosure of the lien hereof or appraised for the purpose of reducing any deficiency judgment obtained by the Mortgagee against the Mortgagor and agrees that the Mortgagee or any court having jurisdiction to foreclose such lien may sell the Premises in part or as an entirety.

31. **Instrument Under Seal.** The Mortgage is intended to be and shall be construed as an instrument under seal.

32. **Security Agreement.** This Mortgage shall constitute a security agreement pursuant to the Uniform Commercial Code for any portion of the Mortgaged Property which, under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants to Mortgagee a security interest in all such property. Mortgagee shall have all rights and remedies of a secured party under the Uniform Commercial Code as well as all other rights and remedies available at law or in equity.

33. **Consumer Transactions.** Notwithstanding anything herein to the contrary, no debt or other liability, as described herein shall be secured by the within Mortgage, if it shall hereafter be created in a "consumer credit transaction" as defined in Title 1, Consumer Credit Protection Act, 15 U.S.C.A., Sections 1601 et. seq., as amended, or any successor federal statute, or any applicable state statute containing substantially similar provisions.

34. **Captions.** The captions and headings of the Paragraphs of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

{2466127:3}                                                        17

35. **Flood Insurance.** If any part of the Property lies within a "special flood hazard area" as defined and specified by the United State Department of Housing and Urban Development pursuant to the Flood Disaster Protection Act of 1973 as now in effect; Mortgagor shall (i) promptly purchase and pay the premiums for flood insurance policies as Mortgagee reasonably deems required so that Mortgagee shall be deemed in compliance with the rules and regulations and provisions of the Flood Disaster Protection Act of 1973 as then in effect; and (ii) deliver such policies to Mortgagee together with evidence satisfactory to Mortgagee that the premiums therefor have been paid. Such policies of flood insurance shall be in a form satisfactory to Mortgagee, shall name Mortgagee as an insured thereunder, shall provide that losses thereunder be payable to Mortgagee pursuant to such forms of loss payable clause as Mortgagee may approve, shall be for an amount at least equal to the indebtedness evidenced by the Notes or the maximum limit of coverage made available with respect to any of the Property under the National Flood Insurance Act of 1968, as amended, whichever is less, and shall be noncancellable as to Mortgagee except upon thirty (30) days prior written notice given by the insurer to Mortgagee. Within thirty (30) days prior to the expiration date of each such flood insurance policy, Mortgagor shall deliver to Mortgagee a renewal policy or endorsement together with evidence satisfactory to Mortgagee that the premium therefor has been paid. Mortgagor hereby indemnifies, saves and holds Mortgagee harmless from any losses incurred by Mortgagee arising out of Mortgagor's failure to obtain or maintain such insurance.

36. **JURY WAIVER.** MORTGAGOR WAIVES THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS MORTGAGE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has executed this mortgage as of the date set forth above.

**FORMED FIBER TECHNOLOGIES, LLC,**
a Delaware limited liability company

By: _Kelly MacKinnon_
Name: Kelly MacKinnon
Title: Chief Financial Officer

STATE OF Maine )
                          ) SS:
COUNTY OF Androscoggin )

Then personally appeared the above named Kelly MacKinnon, Chief Financial Officer of **FORMED FIBER TECHNOLOGIES, LLC,** and acknowledged the foregoing instrument to be his/her free act and deed in his/her said capacity and the free act and deed of said corporation.

SEAL

_Bonnie J Morissette_
Notary Public

BONNIE J MORISSETTE
Notary Public, Maine
My Commission Expires April 1, 2015

Signature Page to
Mortgage (Maine)

## EXHIBIT A

### Description of Real Estate

A certain lot or parcel of land, with the buildings thereon, situated in Auburn, in the County of Androscoggin, and State of Maine, bounded and described as follows:

BEGINNING at the intersection of the southeasterly line of the location of the Maine Central Railroad with the southerly line of land conveyed to the Maine Turnpike Authority by Everett L. Rand by deed dated August 5, 1954, recorded in the Androscoggin County Registry of Deeds, Book 709, Page 439; thence the line runs in a southwesterly direction by said railroad location a distance of one thousand five hundred seventeen (1,517) feet to a line of land now or formerly of Glenn H. Hilmer, formerly of J.B. Oliver; thence the line runs in a southeasterly direction by said Hilmer land and along a fence a distance of seven hundred forty (740) feet to a point; thence the line runs in a southwesterly direction by said Hilmer land which is marked by a fence a distance of six hundred seventy-five (675) feet, more or less, to a corner; thence the line runs in a southeasterly direction by the line of land of said Hilmer partly marked by a stone wall and partly by a fence a distance of one thousand two hundred (1,200) feet, more or less, to a point marked by an iron pin in the ground at the road leading from Danville Corner to Danville Junction; thence the line runs in a general northeasterly direction by said road a distance of three hundred ninety-six and thirteen hundredths (396.13) feet to an iron pipe set in the ground; thence continuing by said road a distance of one hundred ninety-seven and sixty-four hundredths (197.64) feet to an iron pipe set in the ground, thence continuing by said road a distance of one hundred ninety-eight and forty-three hundredths (198.43) feet to an iron pipe set in the ground; thence continuing by said road a distance of three hundred ten and forty-six hundredths (310.46) feet to an iron pipe set in the ground at the corner of land now or formerly of Everett L. Rand; thence the line runs in a northwesterly direction by an internal angle of one hundred three degrees (103°) twenty-three minutes (23') by line of land of said Rand a distance of five hundred sixty-nine and twenty-five hundredths (569.25) feet to a corner; thence the line turns at a right angle and runs in a northeasterly direction a distance of one thousand sixty and twenty-seven hundredths (1060.27) feet to a point at the center line of a road leading from Danville Corner to Marston's Corner, later known as the Hardscrabble Road, and now discontinued; thence the line runs in a northwesterly direction by the center line of said discontinued road a distance of one thousand fifty-four and ninety-one hundredths (1054.91) feet, more or less, to a point marked by an iron pipe in the ground; thence the line runs in a northwesterly direction by said road and by an internal angle of one hundred eighty degrees (180°) seventeen minutes (17') a distance of two hundred fifty-four and eighty-nine hundredths (254.89) feet to an iron pipe in the ground at the center of said road; thence the line runs South sixty-nine degrees, forty-five minutes a distance of three hundred nine and nine tenths (309.9) feet to the point of beginning.

{2466127:3}                                E-A

## EXHIBIT B

### Permitted Exceptions

1. Taxes and assessments for the year 2010, and subsequent years, which are a lien but are not yet due and payable.

2. Right of Way reserved in a deed from Auburn Business Development Corporation to Richard W. Samson recorded in Book 936, Page 367 with the Androscoggin County Registry of Deeds, Maine.

3. Rights and easements granted to Central Maine Power Company in an instrument dated November 19, 1965 and recorded in Book 955, Page 735 with the Androscoggin County Registry of Deeds, Maine.

4. Rights and easements granted to New England Telephone and Telegraph Company in an instrument dated November 20, 1973 and recorded in Book 1086, Page 706 with the Androscoggin County Registry of Deeds, Maine.

5. Rights and easements granted to Central Maine Power Company and New England Telephone and Telegraph Company in an instrument dated February 20, 1979 and recorded in Book 1393, Page 164 with the Androscoggin County Registry of Deeds, Maine.

6. Rights and easements granted to Auburn Sewage District in an instrument dated June 7, 1983 and recorded in Book 1651, Page 314 with the Androscoggin County Registry of Deeds, Maine.

7. Rights and easements granted to Central Maine Power Company and New England Telephone and Telegraph Company in an instrument dated September 14, 1984 and recorded in Book 1760, Page 300 with the Androscoggin County Registry of Deeds, Maine.

8. Rights and easements granted to Auburn Sewage District and Auburn Water District dated October 26, 2006 and recorded on October 27, 2006 in Book 6950, Page 332 with the Androscoggin County Registry of Deeds, Maine.

Annex 3
Other Prepetition Liens

1. Delaware UCC No. 20186227017 filed September 10, 2018 by De Lage Landen Financial Services, Inc. against Gissing Technologies LLC

Annex 4
Existing Indebtedness

-   Indebtedness owing under the following notes from, among others, the Borrowers in favor of the Lenders: (a) Eighth Amended and Restated Revolving Note, (b) Second Amended and Restated Real Estate Term Loan Note, (c) Second Amended and Restated Equipment Term Loan Note, (d) Second Amended and Restated CapEx Note, and (e) Amended and Restated Second Amendment CapEx Note, in each case, dated as of October 29, 2021.

-   Indebtedness owing under the Third Amended and Restated Subordinated Promissory Note dated June 18, 2019, in the original principal amount of $7,300,000 from Gissing North America LLC ("GNA") in favor of Gissing Automotive Systems, LLC ("GAS"), William H. Vaughn, and Steven B. Phillips.

-   Indebtedness owing under the following notes from GNA in favor of GAS ("GAS Notes"): (a) a First Amended and Restated Promissory Note dated June 18, 2019, in the original principal amount of $1,000,000; (b) a Demand Promissory Note dated October 18, 2019, in the original principal amount of $2,000,000; (c) a Demand Promissory Note dated April 1, 2020, in the original principal amount of $2,000,000; (d) a Demand Promissory Note dated April 5, 2021, in the original principal amount of $1,000,000; and (e) a Subordinated Promissory Note dated May 28, 2021, in the original principal amount of $6,825,000.

-   Indebtedness owing to Tesla, Inc. ("Tesla") under the following: (a) Note Payable executed by GNA dated April 25, 2022, in the original principal amount of $2,850,000; (b) Credit Note and Set Off Agreement by and between GNA and Tesla dated April 22, 2022, in the original principal amount of $9,000,000, and (iii) Tesla Purchase Order No. 4700350669 dated December 3, 2021, in the original principal amount of $3,118,371.18.

-   Indebtedness relating to Permitted Liens.